**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### *Bid Protest*

| | |
|---|---|
| PlanetSpace Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | )   No. 09-476C |
| | )   Judge Block |
| v. | ) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| Space Exploration Technologies | ) |
| Corporation and Orbital Sciences | ) |
| Corporation, | ) |
| | ) |
| Defendant-Intervenors | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF PLANETSPACE INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR PERMANENT INJUNCTIVE RELIEF

Steven J. Rosenbaum
*Counsel of Record*
Derron J. Blakely
Scott A. Freling
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20044
(202) 662-5568
(202) 778-5568 fax
srosenbaum@cov.com

August 28, 2009                    *Counsel for Plaintiff PlanetSpace Inc.*

## TABLE OF CONTENTS

I.    STATEMENT OF FACTS. ............................................................................... 2

    A.    NASA's RFP to Deliver Cargo to and from the International Space Station. .............. 2

    B.    The Offerors........................................................................................ 6

    C.    The SEB Ratings.................................................................................. 9

    D.    The SSA Decision............................................................................... 10

II.    STANDARD OF REVIEW. .......................................................................... 11

III.    THE FACTUAL RECORD. .......................................................................... 12

IV.    NASA COMMITTED VIOLATIONS OF LAW AND REGULATION, AND OTHERWISE ACTED ARBITRARILY AND CAPRICIOUSLY. ................................... 12

    A.    The SSA Decision Was an Unlawful Finding of Non-responsibility (Count I). ........ 12

        1.    Determinations Regarding the Alleged Non-responsibility of a Small Business Can Only Be Made by the SBA. ....................................... 13

        2.    The SSA Eliminated PlanetSpace on Grounds of Purported Non-responsibility. .................................................................. 16

    B.    The SSA Failed to Engage in the Required Trade-Off Analysis (Count II). ............. 19

    C.    The SSA Evaluated PlanetSpace's Proposal with Criteria Not Stated in the RFP and Not Used to Evaluate Orbital's or Space-X's Proposals (Count III). .................. 22

    D.    The SSA Evaluated the Past Performance of PlanetSpace in an Improper Manner (Count IV). ................................................................................... 23

    E.    NASA's Selection of Orbital Violated the U.S. Space Transportation Policy (Count V). ................................................................................................ 27

    F.    Failure to Articulate a Rational Basis for Assessing Risks (Count VI)...................... 31

V.    THERE IS A SUBSTANTIAL CHANCE THAT PLANETSPACE WOULD HAVE RECEIVED A CONTRACT. ........................................................................ 34

VI.    PLANETSPACE HAS SUFFERED IRREPARABLE INJURY. ....................................... 36

VII.    THE BALANCE OF HARDSHIPS FAVORS GRANTING INJUNCTIVE RELIEF. ...... 36

VIII.    THE PUBLIC INTEREST IS SERVED BY GRANTING INJUNCTIVE RELIEF. ......... 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACCESS Sys., Inc.*,
  B-400623.3, Mar. 4, 2009, 2009 CPD ¶ 56 ....................................................20

*Air Brake Sys., Inc. v. Mineta*,
  357 F.3d 632 (6th Cir. 2004) .......................................................................30

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
  83 Fed. Cl. 666 (2008) ..........................................................................12, 38

*AshBritt, Inc. v. United States*,
  87 Fed. Cl. 344 (2009) ......................................................................11, 12, 31

*Axiom Res. Mgmt., Inc. v. United States*,
  564 F.3d 1374 (Fed. Cir. 2009)........................................................................11

*Banknote Corp. of Am. v. United States*,
  56 Fed. Cl. 377 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)................................28

*Bannum, Inc. v. United States*,
  404 F.3d 1346 (Fed. Cir. 2005)................................................................. passim

*Celtech, Inc. v. United States*,
  24 Cl. Ct. 269 (1991), *vacated per stipulation*, 25 Cl. Ct. 368 (1992) .......................14, 15, 16

*DAE Corp. v. Engeleiter*,
  958 F.2d 436 (D.C. Cir. 1992) .......................................................................14

*Data Gen. Corp. v. Johnson*,
  78 F.3d 1556 (Fed. Cir. 1996)........................................................................34

*Diversified Maint. Sys., Inc. v. United States*,
  74 Fed. Cl. 122 (2006) ..............................................................................16

*Dyonyx, L.P. v. United States*,
  83 Fed. Cl. 460 (2008) ..............................................................................15

*e-LYNXX Corp.*,
  B–292761, Dec. 3, 2003, 2003 CPD ¶ 219..............................................................20

*Earll, LLC v. United States*,
  77 Fed. Cl. 710 (2006) ..............................................................................21

*Essex Electro Eng'rs, Inc. v. United States*,
    3 Cl. Ct. 277 (1983) ................................................................................36

*Fabritech, Inc.*,
    B-298247; B-298247.2, July 27, 2006, 2006 CPD ¶ 112 ................................. passim

*Femme Comp Inc. v. United States*,
    83 Fed. Cl. 704 (2008) .........................................................................11, 22

*FMC Corp. v. United States*,
    3 F.3d 424 (Fed. Cir. 1993) .......................................................................11

*Gulf Group, Inc. v. United States*,
    56 Fed. Cl. 391 (2003) ..............................................................................22

*Heritage of Am., LLC v. United States*,
    77 Fed. Cl. 66 (2007) ...............................................................................38

*Holloway & Co. v. United States*,
    87 Fed. Cl. 381 (2009) ..............................................................................12

*Hunt Bldg. Co. v. United States*,
    61 Fed. Cl. 243 (2004) .......................................................................25, 31, 37

*Info. Scis. Corp. v. United States*,
    73 Fed. Cl. 70 (2006) .......................................................................21, 35, 36

*ITT Fed. Servs. Corp. v. United States*,
    45 Fed. Cl. 174 (1999) ..............................................................................31

*L-3 Commc'ns. EOTech Inc. v. United States*,
    83 Fed. Cl. 643 (2008) ..............................................................................21

*LABAT-Anderson, Inc. v. United States*,
    65 Fed. Cl. 570, 581 (2005) ........................................................................38

*Lion Raisins, Inc. v. United States*,
    52 Fed. Cl. 629, 632 (2002) ........................................................................14

*Lockheed, IMS*,
    B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180 ..........................................................20

*Mark Dunning Indus. v. United States*,
    60 Fed. Cl. 687 (2004) ..............................................................................34

*Meridian Mgmt. Corp.*,
    B-285127, July 19, 2000, 2000 CPD ¶ 121 ..........................................................26

*Red River Holdings LLC v. United States*,
No. 09-185C, 2009 WL 2181117 (Fed. Cl. July 17, 2009) ....................................................11

*RJO Enterprises, Inc.*,
B-260126, B-260126.2, July 20, 1995, 95-2 CPD ¶ 93 ......................................................23

*Rhinocorps Ltd. Co. v. United States*,
No. 08-410C, 2009 WL 1362843 (Fed. Cl. May 15, 2009)...............................................36

*Sci-Tec Guaging, Inc.*,
B-252406, B-252406.2, June 25, 1993, 93-1 CPD ¶ 494 ......................................................23

*Serco, Inc. v. United States*,
81 Fed. Cl. 463 (2008) ................................................................................................. passim

*S.J. Thomas Co., Inc.*,
B–283192, Oct. 20, 1999, 99–2 CPD ¶ 73 ........................................................................20

*Stormans, Inc. v. Selecky*,
571 F.3d 960 (9th Cir. 2009) ...............................................................................................38

*Transatlantic Lines LLC v. United States*,
68 Fed. Cl. 48 (2005) ...........................................................................................................39

*Trijicon, Inc.*,
B- 244546, Oct. 25, 1991, 91-2 CPD ¶ 375........................................................................20

*United States v. Emerson*,
846 F.2d 541 (9th Cir. 1988) ...............................................................................................30

*ViroMed Labs., Inc., v. United States*,
87 Fed. Cl. 493 (2009) .........................................................................................................36

*Wackenhut Servs., Inc. v. United States*,
85 Fed. Cl. 273 (2008) ................................................................................................. passim

*West State, Inc.*,
B-255692, B-255693, Mar. 23, 1994, 94-1 CPD ¶ 211 ......................................................18

*XO Commc'ns., Inc.*,
B-290981, Oct. 22, 2002, 2002 CPD ¶ 179 ........................................................................18

## STATUTES

5 U.S.C. § 706.......................................................................................................................11

10 U.S.C. § 2305...................................................................................................................22

15 U.S.C. § 637..............................................................................................................13, 14

28 U.S.C. § 1491 ............................................................................................................11, 36

**OTHER AUTHORITIES**

13 C.F.R. § 125.5 ....................................................................................................................14

48 C.F.R. § 9.103 .............................................................................................................13, 14

48 C.F.R. § 9.104-1 ........................................................................................................ passim

48 C.F.R. § 9.104-3 ................................................................................................................14

48 C.F.R. § 15.001 ................................................................................................................32

48 C.F.R. § 15.101-1 ............................................................................................................19

48 C.F.R. § 15.303 ................................................................................................................22

48 C.F.R. § 15.305 ....................................................................................................22, 23, 26

48 C.F.R. § 15.306 ..................................................................................................................5

48 C.F.R. § 15.308 ................................................................................................................21

48 C.F.R. § 16.504 ..................................................................................................................3

48 C.F.R. § 19.601 ................................................................................................................14

48 C.F.R. § 19.602-1 ..................................................................................................13, 15, 17

48 C.F.R. § 19.602-2 ............................................................................................................15

48 C.F.R. § 19.602-4 ............................................................................................................15

48 C.F.R. § 1815.303 ............................................................................................................10

48 C.F.R. § 1815.307 ..............................................................................................................5

48 C.F.R. § 1815.308 ............................................................................................................31

48 C.F.R. § 1815.370 ........................................................................................................5, 32

Best Practices for Collecting and Using Current and Past Performance Information,
    OFPP, May 2000 .............................................................................................................25

U.S. Space Transportation Policy, Dec. 21, 2004 .................................................................27

Plaintiff PlanetSpace Inc. challenges, and seeks injunctive relief with respect to, NASA's award of two 6-year contracts, each with a minimum value of over $1.5 billion, for commercial resupply services to the International Space Station.  NASA awarded the contracts to two other bidders, notwithstanding that PlanetSpace has teamed with the free world's two largest and most successful purveyors of comprehensive space services, Lockheed Martin and Boeing, and unlike these other bidders, proposes to use proven technology with a long history of successful launches and mission accomplishments; and notwithstanding the fact that NASA's own Source Evaluation Board ("SEB") rated PlanetSpace higher than one of these bidders on *both* evaluation criteria, Mission Suitability and Price, and, indeed, PlanetSpace proposes to provide the requested services for over $600 million *less* than this *lower* ranked bidder.

NASA's failure to award a contract to PlanetSpace was arbitrary and capricious, and a violation of law and regulation, in six independent respects:

1) Notwithstanding the high ratings given the PlanetSpace proposal by NASA's own SEB, a group of experts from disciplines ranging from financial analysis to complex program management, the Source Selection Authority ("SSA") made an actual or *de facto* finding of "non responsibility," *i.e.*, that PlanetSpace lacked the financial, technical, and managerial ability to perform the contract.  Given that PlanetSpace is a small business, NASA had no legal authority to make such a finding, but was required by law and regulation to refer the question of PlanetSpace's responsibility to the Small Business Administration ("SBA"), whose decision on that question is binding on all federal agencies, and which routinely finds "responsible" entities whose responsibility had been questioned by the procuring federal agency.

2) Even assuming that the SSA properly changed the SEB ratings and rated PlanetSpace lower than competitor Orbital Sciences Corporation ("Orbital") with respect to

Mission Suitability, the SSA was required by the Request for Proposals ("RFP") to conduct a "trade-off analysis" to determine whether PlanetSpace's proposal, which was over $600 million less than Orbital's, presented the Best Value. The SSA's failure to do so was unlawful. This Court last year set aside another billion dollar NASA contract award on this same ground.

3)      The SSA unlawfully based his decision on criteria not specified in the RFP.

4)      The SSA evaluated the past performance of PlanetSpace in an improper manner.

5)      NASA violated the U.S. Space Transportation Policy by awarding one of the contracts to an offeror (Orbital) that proposes to use a foreign-made launch vehicle.

6)      The SSA's decision was irrational in its analysis of PlanetSpace's financing and its method for paying its subcontractors.

There is a substantial chance PlanetSpace would have received a contract absent any one of these violations. PlanetSpace has suffered irreparable injury, and the balance of injuries and public interest militate strongly in favor of injunctive relief. A proposed order is provided.

I.      **STATEMENT OF FACTS.**

      A.      **NASA's RFP to Deliver Cargo to and from the International Space Station.**

The International Space Station is a scientific research facility residing in low earth orbit. The Space Station is a joint project among the space agencies of the United States, Russia, Japan, Canada, and the European Space Agency. AR 31045.4.

NASA's fleet of three Space Shuttles currently provides the bulk of NASA's cargo transportation needs to and from the Space Station. *Id.* However, NASA intends to end the Space Shuttle program in 2010, and its planned long-term replacement, the Ares rocket lift system and Orion spacecraft, is unlikely to be ready for launch until perhaps 2015. Kathuria Decl. ¶ 7. NASA has determined to look to the U.S. commercial space industry to address at least part of the need to resupply the Space Station through at least 2015. AR 31045.4.

On April 14, 2008, NASA issued RFP No. NNJ08ZBG001R, seeking proposals for the award of firm, fixed price, "indefinite delivery indefinite quantity" contracts to supply cargo to and return cargo from the Space Station, using U.S.-built launch vehicles. AR, Tab 27. NASA issued six amendments to the RFP, with the final amendment issued on June 17, 2008. AR, Tabs 28-33. An "indefinite delivery indefinite quantity" obligates the contractor to provide the specified goods or services as the need arises. Federal Acquisition Regulation ("FAR") § 16.504. The contract may (as here) provide a general timeframe for services and a minimum amount the contractor will be called upon to deliver. *Id.*

The RFP called for offerors to provide detailed plans and prices for the provision of: (1) transport of cargo to the Space Station ("upmass"); (2) disposal of unneeded cargo from the Space Station ("disposal"); and (3) return of cargo from the Space Station to NASA ("downmass"). AR 1978. The RFP's Statement of Work provided that delivery to the Space Station may require that cargo be transported in pressurized or unpressurized equipment, and may require any combination of delivery, disposal, and/or return of cargo in a single mission. *Id.*

The RFP contained three contract line items ("CLINs"): CLIN 0001 Standard Resupply Services; CLIN 0002 Non-Standard Services; and CLIN 0003 Special Task Assignments and Studies. CLIN 0001 was further divided into four sub-CLINs relating to upmass, downmass, *etc.* AR 1925-29. Offerors were to provide a price per kilogram of mass transported under each sub-CLIN, a fixed price for each of nine services described in CLIN 0002, and composite labor rates for services under CLIN 0003. AR 2049-53, 2076, 2077.

The RFP contemplated the award of one or more contracts, each having a maximum value of $3.1 billion. AR 1925, 2062. Proposals would be evaluated using two overarching factors, Mission Suitability and Price, which would be compared across proposals to determine

which proposal presented the "Best Value" to the Government.  AR 2089.  Mission Suitability was more important than Price.  *Id.*

Mission Suitability comprised three Subfactors:  (1) Subfactor A (Technical Approach); (2) Subfactor B (Management Approach); and (3) Small Business Utilization.  *Id.*

Technical Approach was used to assess System Capabilities and Summary of Performance, Space Station Integration and Demonstration, International Space Station Resupply Mission Performance Plan, and Risks.  Management Approach was used to assess Company Information, Performance Milestones, and Safety and Mission Assurance.  Small Business Utilization was used to assess subcontracting goals for small businesses.  AR 2090-93.

Mission Suitability was scored on a scale of 1000 maximum points, as follows:

|  |  | Points |
|---|---|---|
| Subfactor A – | Technical Approach | 550 |
| Subfactor B – | Management Plan | 400 |
| Subfactor C – | Small Business Utilization | 50 |
|  | Small Business | 25 |
|  | Small Disadvantaged Business | 25 |
| TOTAL |  | 1000 |

AR 2089.

Point totals for each Subfactor were also converted into percentage scores, and assigned corresponding adjectival ratings of either Excellent, Very Good, Good, Fair, or Poor.  AR 2089-90.  The evaluators also assigned "significant strength," "strength," "weakness," or "significant weakness" to each element of each Subfactor.  AR 1158.

An offeror's past performance would be evaluated as part of each Mission Suitability Subfactor, but would not be separately scored.  AR 2090.  Past performance of proposed subcontractors and key personnel would be considered in the past performance evaluation.  AR 2077.  If an offeror did not have a relevant past performance record, the offeror would not be evaluated either favorably or unfavorably on past performance.  AR 2090.

Proposals were evaluated by a SEB, which "provid[es] expert analyses of the offerors' proposals in relation to the evaluation factors and subfactors contained in the solicitation," with members "fully qualified to identify the strengths, weaknesses, and risks associated with proposals submitted in response to the solicitation." NASA FAR Supp. §§ 1815.370(b), (c)(1). The SEB included the Johnson Space Center Division Manager and Management Systems Office Manager; the Contracting Officer; a Lead Pricing Analyst; a Technical Lead; a Launch Services Program Representative; a Program Management Lead; a Space Station Program Representative; and a Senior Safety & Mission Assurance Representative. AR 4472-75.

Offerors addressed identified deficiencies through oral and written discussions with the SEB, and in their final revised proposal. Final proposal ratings and rankings are made after SEB members "thoroughly review each proposal and any committee reports and findings." NASA FAR Supp. §§ 1815.307(b)(iii), 1815.370(g)(4). SEB members then vote on final scores. *Id.* § 1815.370(e)(3).

Three offers were deemed fully responsive, those submitted by PlanetSpace, Orbital, and Space Exploration Technologies Corporation ("Space-X"), formally found to be within the "competitive range for selection," AR 2723-24, 4476, which is "comprised of all of the most highly rated proposals." FAR § 15.306(c). On September 8, 2008, NASA so notified PlanetSpace, and requested that it provide written responses to several questions, including price clarifications, weaknesses and non-compliance findings, and model contract clarifications. AR 2789-832. PlanetSpace did so. AR, Tab 82.

On October 21, 2008, the SEB in oral discussions identified areas of weakness and significant weaknesses in PlanetSpace's proposal. AR, Tab 49. PlanetSpace made several

enhancements in order to address the identified weaknesses, memorialized in its Final Revised Proposal.  AR, Tabs 88-92.

### B.    The Offerors

One of the three offerors, Space-X, was founded in 2002.  AR 8112-13.  Space-X relies primarily on in-house development for its launch and space transport systems.  AR 8050.  Space-X's proposal was premised largely on developing its liquid fueled Falcon 1 rocket booster into a proposed, much larger and more complex launch vehicle, the Falcon 9.  The Falcon 1 has itself failed on three of its five launch attempts, one of which destroyed two NASA satellites and one Department of Defense satellite  Bowker Decl. ¶ 60.

The proposed Falcon 9 would be much more complex than the Falcon 1, intended to carry over twenty times more cargo.  *Id.* ¶ 62.  In order to achieve this capability, Space-X has designed the Falcon 9 to use nine of the Merlin 1C rocket motors used in the unreliable Falcon 1, which itself uses only a single rocket motor, AR 11360, and the same avionics as the Falcon 1, but combined with a fuselage approximately 110 feet longer, seven feet wider, and 600,000 pounds heavier, with over 1,000,000 pounds more thrust, Bowker Decl. ¶ 59.

Space-X has been developing the Falcon 9 launch vehicle and Dragon spacecraft, both of which it proposes to use in the Space Station resupply contract, as part of a separate agreement with NASA -- a $278 million Commercial Orbital Transportation Services ("COTS") agreement.  AR 11298-99, 11667.  Of this $278 million, Space-X has been paid $234 million, and has yet to make a flight of the proposed system.  Bowker Decl. ¶ 68.  The first Falcon 9 demonstration readiness review was scheduled first for February 2008 and then March 2009, but has yet to occur.  Bowker Decl. ¶ 55.  The Falcon 9's first demonstration flight was originally set for September 2008, then reset for June 2009, but now is not scheduled to take place until late 2009

at the earliest.  *Id.* ¶ 68.  Space-X is now more than 17 months behind its original COTS schedule with respect to the readiness review for its demonstration flight.  *Id.* ¶ 55.

Orbital proposed to develop a new launch system based on its Taurus rocket booster, which has flown successfully on 6 of 8 attempts, but has failed on 2 of its last 3 attempts, including a launch on February 24, 2009 that destroyed NASA's $273 million Orbiting Carbon Observatory.  AR 9893; Bowker Decl. ¶ 74.  The new system, the Taurus II, will be substantially different than the existing Taurus, being some 27 feet longer, 5 feet wider, and 250,000 pounds heavier.  Bowker Decl. ¶ 75.  Most significantly, the Taurus II (as proposed) will have a large, liquid fueled rocket stage and use two modified 33-year old Russian-made engines.  AR 9854-55.  The Taurus II will be Orbital's XXXXXXXXXXXXXXXXXXX intended to launch payloads into Earth orbit.  AR 2755-56.  Much of the manufacturing will be accomplished in Ukraine, and much of the development work on the proposed cargo vehicle, the Cygnus, will be done in Italy, AR 29281, Bowker Decl. ¶ 75, with the propellant tanks developed and made in Ukraine, AR 9832, 9852.

The third offeror, PlanetSpace, proposed to retain contract and financial management tasks and subcontract design, development, production, and operation of space services to subcontractors among the most experienced aerospace companies in the world.  AR 10455, 10235-40, 29164, 10594-98.  PlanetSpace's proposal included the following subcontractors:

**Lockheed Martin Space Systems Company.**  Lockheed Martin, in a joint venture with Boeing, currently manages the Space Shuttle program.  Bowker Decl. ¶ 18.  In a second joint venture with Boeing, Lockheed Martin provides Atlas and Delta rocket launch services for the U.S. Government, including satellites for the Department of Defense, NASA, and the National Reconnaissance Office; satellites, exploration vehicles, and probes for NASA; and numerous

commercial missions for the launch of telecommunications satellites. *Id.* Atlas and Delta rocket systems have a better than 95% success rate over 210 launches. *Id.* The Atlas family of rockets alone has launched successfully 85 times, and includes the Atlas V, a launch vehicle PlanetSpace proposes to use for the first Space Station resupply mission. *Id.* ¶¶ 16, 18. Lockheed Martin is responsible for technical and logistical aspects of the program, and with leading the development, production, and operation of the spacecraft that would be used to transport cargo to the Space Station, the Orbital Transfer Vehicle. AR 10522.

**Alliant Techsystems, Inc. ("ATK").** ATK provides rocket engines, launch vehicles, and engineering services to both commercial and government customers. AR 10523-24, 10593. ATK rockets are currently used in the Space Shuttle program; in Delta launch vehicles (used to launch numerous satellites for U.S. Government customers, including the bulk of NASA's recent Mars missions); in Atlas II launch vehicles (formerly used to launch the Defense Satellite Communications System); and in NASA's forthcoming Ares I crew launch vehicle and Ares V cargo Launch vehicle (NASA's replacement for the Space Shuttle). Bowker Decl. ¶ 30. Under the PlanetSpace proposal, ATK is responsible for developing the proposed Athena III launch vehicle and ground operations. AR 10522.

**The Boeing Company.** Boeing is the current prime contractor to NASA for the Space Station, and is responsible for its design, development, construction, and integration. AR 10456. Under the PlanetSpace proposal, Boeing is responsible for cargo carrier development, cargo integration services, and Space Station integration operations support. AR 10522.

PlanetSpace proposes first to use an existing launch vehicle, the Saturn V, and then to provide an entirely U.S.-made launch vehicle, the Athena III, and Orbital Transfer Vehicle. AR 10508-10, 10514. The Athena III is based on the Athena I and II launch vehicles that NASA

used successfully in the 1990's and early 2000's.  AR 10494-95, 10498.  The Athena family of launch vehicles has flown successfully five times, and was subsequently designed by Lockheed Martin to be expanded to the proposed Athena III configuration, by simply replacing the first stage solid rocket motor with a derivative of the Space Shuttle Reusable Solid Rocket Motor used in all Space Shuttle missions.  AR 10479-80, 10498.  Unlike the Taurus II and Falcon 9 launch vehicles proposed by its competitors, PlanetSpace's Athena III utilizes both 100% U.S.-produced rocket motors and a derivative of the highly reliable Space Shuttle Reusable Solid Rocket Motor developed for NASA by ATK.  AR 10493-94.

     **C.**    **The SEB Ratings.**

The SEB rated Space-X's proposal the highest for Mission Suitability with 877 points, with PlanetSpace rated second with 827 points, and Orbital third with 796 points.  AR 4470.  All three proposals received "Very Good" rankings for overall Mission Suitability.  *Id.*  All three proposals received "Very Good" rankings for each Mission Suitability Subfactor, except Orbital received only a "Good" ranking for Small Business Utilization.  *Id.*

Space-X was the lowest price offeror, with PlanetSpace ranked second lowest, and Orbital the highest price (*$613 million more* than PlanetSpace with respect to the services NASA ultimately contracted to acquire from Orbital).  AR 6171-78, 6349, 10966-71; Kathuria Decl. ¶ 30.  Thus, PlanetSpace rated superior to Orbital with respect to *both* Mission Suitability *and* Price.  Moreover, while Space-X's proposal was ranked higher for Mission Suitability than PlanetSpace's proposal, the fact remained that Space-X is a new company with very limited launch success, and nothing on the scale proposed for Space Station resupply (*see* p. 6 *supra*).

The SEB found all of the final proposals had significant strengths, strengths, and weaknesses.  AR 4586, 4677, 4790.  The SEB did not find any final proposal to have significant weaknesses.  *Id.*  PlanetSpace received three significant strengths, four strengths, three

weaknesses, no significant weaknesses, and no deficiencies on the Technical Approach subfactor of the Mission Suitability Evaluation Factor.  AR 4677.  PlanetSpace received its significant strengths in three of four Technical Approach subfactors, including for past performance of PlanetSpace's key personnel and subcontractors.  AR 4679.

PlanetSpace received three significant strengths, four strengths, five weaknesses, no significant weaknesses, and no deficiencies on the Management Approach subfactor of the Mission Suitability Evaluation Factor.  AR 4677.  PlanetSpace received significant strengths in two of three Management Approach subfactors, including Company Information for its past performance and for using "sound teaming arrangements" with highly relevant, expert companies.  AR 4725, 4729.  PlanetSpace received one significant strength on the Small Business Utilization subfactor.  AR 4677.

PlanetSpace thus received a total of seven significant strengths, eight strengths, and eight weaknesses.  *Id.*  Space-X's proposal was found to have a total of five significant strengths, sixteen strengths, and two weaknesses.  AR 4790.  Orbital's proposal was found have a total of four significant strengths, nine strengths, and five weaknesses.  AR 4586.

### D.    The SSA Decision.

Under NASA procedures, the final source selection decision is made by the SSA.  NASA FAR Supp. § 1815.303(b)(i).    After approximately three months of investigation and consideration, the SEB provided the evaluations summarized above to the SSA in a final report issued on December 15, 2008, and during an in-person briefing on that same day.  AR, Tabs 53, 54; AR 31045.106.  The SSA issued his written selection decision eight calendar days later, on December 23, 2008.  AR, Tab 55.  PlanetSpace was not selected.  AR 5211-12.

## II.     STANDARD OF REVIEW.

"A bid protest proceeds in two steps."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the Court determines whether the bid award was violative of 5 U.S.C. § 706(2)(A), *see* 28 U.S.C. § 1491(b)(4), *i.e*., whether the bid decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  This standard is met if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of…applicable statutes or regulations."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotations and citations omitted).

Second, "if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."  *Bannum*, 404 F.3d at 1351.  The prejudice requirement is satisfied if "there was a 'substantial chance' [the bid protestor] would have received [a] contract award but for [the] errors in the bid process."  *Id.* at 1358.

If the bid protestor has thus established succeed on the merits, the Court determines whether injunctive relief is appropriate, analyzing whether the plaintiff has suffered irreparable injury, the balance of hardships, and the public interest.  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  "No one factor, taken individually, is necessarily dispositive."  *Id.*

This Court has set aside bid awards whenever necessary to secure rational decisions, compliant with law and regulation.  *E.g., Wackenhut Servs., Inc. v. United States*, 85 Fed. Cl. 273 (2008) (NASA billion dollar protection services contract); *AshBritt, Inc. v. United States,* 87 Fed. Cl. 344 (2009) (Army Corps of Engineers debris removal contracts); *Red River Holdings LLC v. United States*, No. 09-185C, 2009 WL 2181117 (Fed. Cl. July 17, 2009) (Navy contract for floating vessel to store and deliver military supplies); *Serco, Inc. v. United States*, 81 Fed. Cl. 463 (2008) (government-wide technology products and services); *Femme Comp Inc. v. United*

*States*, 83 Fed. Cl. 704 (2008) ($400 million Army information technology management support services); *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 703 (2008) ($1.2 billion Air Force aircraft maintenance contract).

## III.   THE FACTUAL RECORD.

In resolving the merits of the procurement decision itself, "the trial court is to make findings of fact weighing the evidence in the administrative record."  *AshBritt*, 87 Fed. Cl. at 365, citing *Bannum*, 404 F.3d at 1355.  However,

> In general, it is appropriate to add evidence pertaining to prejudice and the factors governing injunctive relief to the record in a bid protest -- not as a supplement to the AR, but as part of this Court's record.  Evidence directed at prejudice and remedy necessarily would not be before an agency decisionmaker effecting a procurement decision such as a source selection award.  Rather, evidence of the prejudicial effect vel non of a procurement decision or the ramifications of injunctive relief would necessarily post date and flow from such agency decision. Nonetheless, such evidence is crucial to assess whether relief is warranted.

*Id.* at 366-67; *accord, e.g.*, *Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009).

## IV.   NASA COMMITTED VIOLATIONS OF LAW AND REGULATION, AND OTHERWISE ACTED ARBITRARILY AND CAPRICIOUSLY.

In six respects, NASA violated law or regulation, or acted arbitrarily and capriciously.

### A.   The SSA Decision Was an Unlawful Finding of Non-responsibility (Count I).

Despite the SEB's rating of PlanetSpace's proposal as second overall, with a "very good" rating on each Mission Suitability subfactor, the SSA rejected PlanetSpace by concluding that its "likelihood of successful performance" was "remote."  By this and related statements, the SSA made clear that he was rejecting PlanetSpace because it purportedly did not have the ability to perform the contract.  This was not a determination the SSA could lawfully make.

1.      **Determinations Regarding the Alleged Non-responsibility of a Small Business Can Only Be Made by the SBA.**

In order to be eligible for a contract award, a bidder must be "responsible."   FAR § 9.103(a).   The term "responsible" refers to a firm's "ability and capacity to perform" contract requirements.   *Fabritech, Inc.*, B-298247; B-298247.2, July 27, 2006, 2006 CPD ¶ 112 at 3.

FAR § 9.104-1 sets forth seven responsibility criteria, four of which are relevant here. Contractors must (1) "[h]ave adequate financial resources to perform the contract, or the ability to obtain them," (2) "[h]ave a satisfactory performance record," (3) "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," and (4) "[h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them."   FAR § 9.104-1(a), (c), (e), and (f).   The FAR elsewhere defines "responsibility" to "include[e] but not [be] limited to, capability, competency, capacity, credit, integrity, perseverance [and] tenacity…"   FAR § 19.602-1(a).

In the case of *small businesses*, the authority to make a negative (*i.e.*, "non-responsibility") determination does *not* repose in the hands of agency source selection officials; they are *prohibited* from eliminating a small business bidder based on non-responsibility.

Instead, the Small Business Act confers on the SBA exclusive authority to make responsibility determinations for small businesses.   15 U.S.C. §§ 637(b)(7)(A) and (C).[1]   If the

---

[1]      15 U.S.C. § 637(b)(7) provides, in pertinent part, that it shall be the duty of the SBA--

(A) To certify to Government procurement officers…with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract.   A Government procurement officer…may not, for any reason specified in the preceding sentence preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration. *   *   *

(continued…)

- 13 -

SBA finds the entity responsible, it issues a Certificate of Competency, **which is binding on the contracting agency**.  *Id.; see also* FAR § 9.103(b) ("[T]he contracting officer shall make a determination of non-responsibility.  If the prospective contractor is a small business concern, the contracting officer shall comply with Subpart 19.6, Certificates of Competency and Determinations of Responsibility."); FAR § 9.104-3(d)(1).

This requirement is applicable to *all* Government procurements, *see* FAR § 19.601(c) and 13 C.F.R. § 125.5(a)(1), and is a critical element in Congress's efforts to assist small businesses to receive a fair opportunity to compete for and receive Government contracts.  *DAE Corp. v. Engeleiter*, 958 F.2d 436, 439 (D.C. Cir. 1992) ("§ 637(b)(7) is designed to help small businesses overcome the hesitance a procuring agency may have in awarding an ordinary contract to a small business").

As this Court succinctly summarized, "regardless of whether a small-business set-aside is involved, before rejecting a small business's bid on grounds of non-responsibility, an agency must refer the matter to the SBA, which, in its discretion, may issue a COC [(Certificate of Competency)]…. Once the COC is issued, the SBA's determination of responsibility is conclusive."  *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629, 632 (2002) (citations omitted); *accord, e.g.*, *Celtech, Inc. v. United States*, 24 Cl. Ct. 269, 276 (1991), *vacated per stipulation*, 25 Cl. Ct. 368 (1992) ("The procurement officer may not preclude the small business concern from contract award without referring the matter to the SBA for final disposition.  The SBA has

---

(C) In any case in which a small business concern or group of such concerns has been certified by the Administration pursuant to (A)…to be a responsible or eligible Government contractor as to a specific Government contract, the officers of the Government having procurement or property disposal powers are directed to accept such certification as conclusive, and shall let such Government contract to such concern or group of concerns without requiring it to meet any other requirement of responsibility or eligibility...

the final say on responsibility determinations for all small business concerns."); *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 473 (2008) ("Because plaintiff is a qualified as a small business…a non-responsibility determination would require that the contracting officer refer the matter to the SBA to decide whether a Certificate of Competency should issue.").[2]

An agency acts arbitrarily and capriciously, and in violation of governing law and regulation, if it makes an actual or *de facto* determination of non-responsibility, rather than referring the small business's responsibility to the SBA for resolution.  Thus, in *Fabritech*, the contract award was set aside when the agency, without referring the matter to the SBA, declined to award a contract to the protestor small business because it lacked confidence in the business's "ability to obtain [required] parts from approved sources."  2006 CPD ¶ 112 at 3.  This finding "relate[d] directly to the protester's ability or capability to perform, and the agency's concerns clearly align with the description in the relevant FAR provisions of elements bearing on responsibility."  *Id.* at 2, citing FAR §§ 9.104–1(b) (firm must "[b]e able to comply with the required or proposed delivery or performance schedule") and 9.104–3(a) (contracting officer "shall require acceptable evidence of the prospective contractor's ability to obtain required resources…").

---

[2]      The precise process is as follows (as set forth in *Celtech*, 24 Cl. Ct. at 275):

> The COC program requires the procuring agency negotiating with a small business to refer to the SBA any determination that the business is not responsible to perform the particular contract.  Once a procuring agency notifies the SBA that a small business concern lacks certain elements of responsibility, the SBA must inform the business of the agency's determination and give it the opportunity to apply for a COC.  48 C.F.R. § 19.602-2(a); *see* 48 C.F.R. § 9.104-1 (listing elements of responsibility).  If the business applies for and receives a COC from the SBA, the agency's contracting officer must award it the contract.  *See* 48 C.F.R. § 19.602-4(b).  If the SBA denies the prospective contractor's request for the COC, the procuring agency's determination that the prospective contractor is not qualified to perform the contract stands.  *See* 48 C.F.R. § 19.602-4(c); *see also* 48 C.F.R. §§ 19.602-1(a)(1), 19.602-2(c)(1).

Likewise, in *Celtech*, the agency violated the Small Business Act and FAR when it denied a contract award to because a small business's "accounting system [was] unacceptable for recording costs on Government contracts."   24 Cl. Ct. at 277 (citations omitted).   Such a determination "falls squarely within the 'accounting and operational controls' requirement of [FAR] 9.104-1(e)," *id.*, and the agency committed legal error because it had "failed to refer to the SBA its determination that [the small business] was not responsible…."   *Id.* at 274.   *See also Diversified Maint. Sys., Inc. v. United States*, 74 Fed. Cl. 122 (2006) (directing that agency refer issue to the SBA as required by a similar statute).

> **2.     The SSA Eliminated PlanetSpace on Grounds of Purported Non-responsibility.**

PlanetSpace is a small business, AR 5049, 10303, and accordingly benefits from the foregoing Small Business Act and FAR protections.   The SSA's decision to reject PlanetSpace's proposal constituted an improper, actual or *de facto* determination of non-responsibility, because his purported justifications related directly to PlanetSpace's ability or capability to perform the contract.   As in *Fabritech,* the SSA's purported concerns "clearly align with the description in the relevant FAR provisions of elements bearing on responsibility."   2006 CPD ¶ 112 at 3; *accord Celtech*, 24 Cl. Ct. at 277 (finding violation after comparing the stated basis for the agency's decision to the relevant FAR § 9.104-1 responsibility criteria):

- The SSA's improper reliance upon responsibility criteria is plainly manifested by his overall finding:   "I concluded the considerable risk inherent in PlanetSpace's Management approach made the likelihood of successful performance of [PlanetSpace's] proposal remote."   AR 5177, *see also* AR 5181 ("there was a low likelihood PlanetSpace could successfully perform the contract.")   A finding that prospective performance is purportedly "remote" goes to the heart of PlanetSpace's "responsibility," *i.e.*, its "ability and capacity to perform" the contract

requirements, *Fabritech*, 2006 CPD ¶ 112 at 2.  This adverse conclusion directly implicates FAR § 9.104-1 (to be responsible means to "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them") and FAR § 19.602-1(a) ("responsibility" includes "capability, competency [and] capacity").

• The SSA also "questioned whether PlanetSpace could successfully manage much larger subcontractors responsible for the majority of the performance under the contract."  AR 5176.  This constituted a direct finding that PlanetSpace purportedly lacked "the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," FAR § 9.104-1(e).

• While the SEB found PlanetSpace has significant strengths with respect to past performance and technical skills, based particularly on PlanetSpace's plan to team with Lockheed Martin, Boeing, and ATK, and that these strengths would "greatly enhance[] the likelihood of successful performance," AR 4960, the SSA disregarded that SEB rating, finding it "not relevant for purposes of selection" and that PlanetSpace did not have sufficient experience in "development, production, and operation of large, complex space systems."  AR 5175.  This constituted a finding that PlanetSpace purportedly lacked "a satisfactory performance record," FAR § 9.104-1(c), and did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," FAR § 9.104-1(e).

• The SSA disregarded the SEB's high rating of PlanetSpace's technical skill, stating:  "I did not believe these findings should be discriminators for selection when almost all of the technical expertise appeared to reside at the subcontractor level."  AR 5176.  This constituted a finding that PlanetSpace purportedly lacked "the necessary…technical skills, or the ability to

obtain them," FAR § 9.104-1(e), and "the necessary production, construction, and technical equipment and facilities, or the ability to obtain them." FAR § 9.104-1(f).

- The SSA stated that the purported "high financial risk" in PlanetSpace's business case made PlanetSpace likely to fail. AR 5177. This is a quintessential non-responsibility determination. FAR § 9.104-1(a) (bidder must "[h]ave adequate financial resources to perform the contract, or the ability to obtain them"); *XO Commc'ns., Inc*., B-290981, Oct. 22, 2002, 2002 CPD ¶ 179 (non-responsibility determination based upon company's high debt to cash flow ratio and increasing expense to revenue ratios); *West State, Inc.*, B-255692, B-255693, Mar. 23, 1994, 94-1 CPD ¶ 211 (non-responsibility determination based on negative net worth and heavy debt load).

**Indeed, after the SEB presented its findings to the SSA on December 15, 2008, but before the actual SSA decision on December 23, 2008, NASA on December 18, 2008 purported to make an explicit finding of non-responsibility, citing the relevant FAR "responsibility" criteria**:

> PlanetSpace has failed to demonstrate that they have adequate financial resources and/or the ability to obtain the financial resources to perform the ISS CRS requirements in accordance with FAR 9.104-1.

AR 2600-01. **The SEB had fully recognized in a November 19, 2008 memorandum that if NASA were to make a determination of non-responsibility with respect to PlanetSpace, FAR required that the matter be referred to the SBA.** AR 19175 (NASA must "refer the matter to the SBA [if it] were to make a determination of nonresponsibility"). Yet no such referral was ever made. Because NASA failed to make the required referral, the awards must be remanded for re-procurement, with instructions that NASA refer to the SBA the determination whether PlanetSpace should be issued a binding Certificate of Competency.

**B.     The SSA Failed to Engage in the Required Trade-Off Analysis (Count II).**

The SSA's decision to award a contract to Orbital was arbitrary and capricious and a violation of regulations because he did not engage in the required trade-off analysis.  Another billion-dollar NASA contract was recently set aside by this Court on precisely this ground.

The RFP here explicitly provides that "[a] trade-off process, as described at FAR 15.101-1, *will be used* in making source selection."  AR 2089 (emphasis added).  The RFP states that the trade-off would weigh Mission Suitability versus Price, with Mission Suitability more important.  AR 2089.  Such a trade-off analysis is the standard process by which an agency determines "whether one proposal's superiority under the non-price factor is worth a higher price."  *Serco*, 81 Fed. Cl. at 497 n.52; *see also* FAR § 15.101-1(a) (trade-off analysis used when the "Government [is] to consider [an] award to other than the lowest priced offeror or other than the highest technically rated offeror").

After the SSA awarded a contract to Space-X, he concluded that it was "extremely important to the success of the [Space Station] Program" to award a second contract to one of the two remaining offerors.  AR 5181.  Orbital's proposal was $613 million more expensive than PlanetSpace's for the same services.  AR 6171-78, 6349, 10966-71; Kathuria Decl. ¶ 30.  A trade-off analysis was critical.

The SSA nonetheless stated in his Source Selection Statement that he was *not* performing a trade-off analysis:

> Although I recognized that the evaluation criteria provided that Mission Suitability was more important than price, I could not conduct a "typical" trade-off analysis since I believed there was a low likelihood PlanetSpace could successfully perform the contract.

AR 5181.  The SSA failed to perform a trade-off analysis of any kind, and nowhere assessed PlanetSpace's considerable price advantage over Orbital.  This was a direct violation of the RFP.

The RFP's proviso that Mission Suitability was more important than Price did *not* relieve the SSA of his legal obligation to perform a trade-off analysis:

> Even in a competition where price is of less importance than the non-price factors, an agency must meaningfully consider cost or price in making its selection decision. *See S.J. Thomas Co., Inc.*, B–283192, Oct. 20, 1999, 99–2 CPD para. 73 at 3. Although the cost/technical tradeoff process allows an agency to accept other than the lowest-priced submission in such a competition, the perceived benefit of the higher-priced alternative must merit the additional price. *See e-LYNXX Corp., supra*, at 7. In other words, one firm's technical advantage must be determined to outweigh the other firm's price advantage.

*ACCESS Sys., Inc.*, B-400623.3, Mar. 4, 2009, 2009 CPD ¶ 56 at 7 (sustaining bid protest).

Accordingly, "[a]n evaluation and source selection which fails to give significant consideration to cost, or which varies from the RFP's cost evaluation provisions, is inconsistent with [the Competition in Contracting Act] and cannot serve as the basis for a reasonable source selection." *Lockheed, IMS*, B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180 at 4. This Court has admonished that "the agency must dig deep[] and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price." *Serco*, 81 Fed. Cl. at 497. Indeed, last year, another billion-dollar NASA contract award was set aside due to the same defect found here:

> The SSA's dispositive error…was that the SSA determined that "a trade-off analysis was required, since the SEB gave [one bidder] a slightly higher Mission Suitability score and more significant strength than [the other, lower-priced bidder]," yet the SSA's Final Source Selection Decision contains absolutely no discussion about the relevant factors of that trade-off analysis. AR 26643; *see also Serco, Inc. v. United States*, 81 Fed.Cl. 463, 497 (2008) (holding that "generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions.").

*Wackenhut*, 85 Fed. Cl. at 306-07; *see also Trijicon, Inc.*, B- 244546, Oct. 25, 1991, 91-2 CPD ¶ 375 at 3-4 (sustaining bid protest when the evaluation scheme in the solicitation, which called for a comparative assessment of technical and price factors, "was converted to one resulting in the selection of the low-priced, technically acceptable proposal").

A trade-off analysis was particularly warranted given that the SEB had found a total of seven significant strengths and eight strengths in PlanetSpace's proposal; by comparison, the SEB found only four significant strengths and nine strengths in the Orbital proposal.  *Compare* AR 4677, *with* AR 4586.  Although the SSA disagreed with four of the fifteen significant strengths or strengths assigned to the PlanetSpace proposal, he failed to compare any of the remaining strengths and weaknesses in PlanetSpace's and Orbital's proposal, including *eleven* significant strengths or strengths that the SSA did not question in PlanetSpace's far cheaper proposal.  *Serco*, 81 Fed. Cl. at 497 ("[A]s th[e] magnitude [of the price differential] increases, the relative benefits yielded by the higher-priced offer must also increase.").

Furthermore, the SSA was required both to perform the trade-off analysis required by the RFP *and* to document that analysis.  FAR § 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.").  The absence of such documentation is itself grounds to set aside the awards, *see Serco*, 81 Fed. Cl. at 497 ("Finally – and many cases turn on this point – the agency is compelled by the FAR to document its reasons for choosing the higher-priced offer.").

An agency acts arbitrarily and capriciously when it fails to evaluate proposals in accordance with the methodology outlined in the solicitation.  *Earll, LLC v. United States*, 77 Fed. Cl. 710, 711-12 (2006); *see also L-3 Commc'ns. EOTech Inc. v. United States*, 83 Fed. Cl. 643, 653-54 (2008).  "[T]he [agency decision maker] is afforded wide discretion, however, that discretion does not extend to violating the FAR and ignoring an integral factor in the procurement."  *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 115 (2006) (granting injunctive relief).  The SSA's decision not to engage in a trade-off analysis when he awarded the second

contract to Orbital ran counter to the evaluation plan specified in the RFP, and prejudiced

PlanetSpace, the lone unsuccessful bidder, offering a lower-cost proposal.

### C.   The SSA Evaluated PlanetSpace's Proposal with Criteria Not Stated in the RFP and Not Used to Evaluate Orbital's or Space-X's Proposals (Count III).

NASA was required to evaluate proposals "based solely on the factors specified in the

solicitation," 10 U.S.C. § 2305(b)(1), treating all offerors equally.  *See also* FAR § 15.303(b)

("The source selection authority shall…[e]nsure that proposals are evaluated based solely on the

factors and subfactors contained in the solicitation"); FAR § 15.305(a); *Gulf Group, Inc. v.

United States*, 56 Fed. Cl. 391, 397 (2003); *Femme Comp*, 83 Fed. Cl. at 732 ("agencies are

prohibited from relying upon undisclosed evaluation criteria") (citations omitted).

The SSA violated these requirements when he decided that the PlanetSpace proposal (and

not any of the other proposals) should have included a subcontractor back-up plan, even though

the RFP did not contemplate such a requirement.

In the Source Selection Statement, the SSA wrote:

[A]lthough one was not required by the solicitation, I was concerned that [PlanetSpace's proposal] did not contain a backup plan in the event one of the major subcontractors was unable to perform given the sizable amount of responsibilities PlanetSpace proposed to place at the subcontractor level.

AR 5176.  The SSA reiterated this point at the conclusion of the Statement:  "I was also

concerned that the [PlanetSpace] proposal did not contain a backup plan in the event one of the

major subcontractors was unable to perform its sizable responsibilities under this proposal."  AR

5180.

The SSA thus denied a contract to PlanetSpace in part because it had no back-up plan for

the hypothetical failure of three of the largest, and most successful, Government contractors in

aerospace, all of which the SEB had given an extremely positive assessment, and despite the

absence of any RFP requirement for a subcontractor back-up plan.  The SSA did not require a back-up plan any of any other offeror, nor did they submit one.  AR 31139.

Because the other offerors were not required to submit a subcontractor back-up plan and because PlanetSpace was never informed that its failure to submit such a plan would be penalized, the SSA award decision cannot be sustained.  *Sci-Tec Guaging, Inc.*, B-252406, B-252406.2, June 25, 1993, 93-1 CPD ¶ 494 (sustaining protest after finding that agency used unstated evaluation criteria); *RJO Enterprises, Inc.*, B-260126, B-260126.2, July 20, 1995, 95-2 CPD ¶ 93 (sustaining protest when bid rejected due to failure to submit documentation not required by the solicitation).

### D.   The SSA Evaluated the Past Performance of PlanetSpace in an Improper Manner (Count IV).

The SSA's consideration of past performance in reviewing the PlanetSpace proposal was unreasonable and contrary to the stated evaluation requirements.  The RFP provided that the SSA would consider past performance of offerors -- including that of their key personal and subcontractors -- in making his award decision(s).  AR 2090 (stating that the past performance evaluation will consider information obtained through completed Exhibit 2 and Exhibit 4 forms, which are expected to involve major subcontractors and key personnel), AR 2101, 2108; *see also* FAR § 15.305(a)(2)(iii) (requiring SSA's past performance evaluation to "take into account past performance information regarding…key personnel who have relevant experience…[and] subcontractors that will perform major or critical aspects of the requirement when such information is relevant").  Past performance was to be "evaluated as part of each distinct Mission Suitability Subfactor."  AR 2090.

Under Technical Approach, the SEB gave PlanetSpace a significant strength for past performance, finding that its major subcontractors -- Lockheed Martin, ATK, and Boeing -- had a lengthy and exemplary record of performance on "highly relevant" Government contracts:

> Finding 200 (Significant Strength):  "The excellent technical past performance of the PlanetSpace subcontractors on numerous highly relevant NASA and Department of Defense contracts greatly enhances the likelihood of successful performance on the Commercial Resupply Services (CRS) contract due to their direct and successful experience in launch and orbital control development, International Space Station (ISS) missions and cargo integration, and flight procedure development."

AR 4960; *see also* AR 4681-82.   Under Management Approach, the SEB similarly gave PlanetSpace a significant strength for its key management personnel, and another significant strength for its use of "sound teaming arrangements" with highly relevant subcontractors:

> Finding 260 (Significant Strength):  "The PlanetSpace management team's key personnel and subcontractors, ATK and Lockheed Martin, were rated excellent in past performance and possess highly relevant experience in areas related to the SOW which leads to [a] high potential for success."

> Finding 282 (Significant Strength):  PlanetSpace's proposed "[t]eaming with highly relevant aerospace companies with complementary expertise is a highly sound and realistic management approach."  AR 4974; *see also* AR 4726-29.

Yet the SSA disregarded these three findings because "of the absence of a corresponding strength regarding the prime contractor's abilities to perform the contract."  AR 5176 (Findings 260, 282); *see also* AR 5175 (Finding 200).  The SSA thus dismissed the relevance of *all* of PlanetSpace's major subcontractors' and key personnel's excellent and successful past performance on highly relevant similar contracts, casting aside three significant strengths in the PlanetSpace proposal without otherwise questioning the factual basis underlying each.  AR 5172 ("I agreed with all findings the SEB made regarding any of the offerors as part of my examination of the SEB presentation."); *accord* AR 31128.

- 24 -

The SSA's assessment of past performance was improper for several reasons.  First, neither the RFP, the regulations, nor the statute sets forth any requirement of a "corresponding strength" in order that subcontractor past performance be counted favorably in the SSA's overall evaluation.  The SSA had no authority to import such a requirement without the agency first amending the evaluation criteria in the RFP.  *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 274 (2004); *see also* Part IV.C *supra*.

Second, even assuming *arguendo* that it was proper for the SSA to discount PlanetSpace's subcontractor team in his evaluation of past performance, in evaluating PlanetSpace's own past performance, he erred by failing even to assess the past performance of PlanetSpace's key employees.  The Office of Federal Procurement Policy ("OFPP"), the Federal agency responsible for development and maintenance of the FAR, has directed that an agency must consider relevant past performance of a contractor's key personnel *before* it concludes that the contractor has no past performance.  According to the OFPP, "[i]f the contractor is truly a new entity *and* none of the company principals ever performed relevant work for others, the company is considered to have no past performance."  Best Practices for Collecting and Using Current and Past Performance Information, OFPP, May 2000, *available at* http://www.whitehouse.gov/omb/rewrite/procurement/contract_perf/best_practice_re_past_perf.html (last visited Aug. 27, 2009) (emphasis added).  But, the OFPP expects that "this will happen very rarely," because even a new entity expecting to compete in a particular line of business will likely have resources with relevant key personnel.  *Id.*

PlanetSpace's proposal identified key personnel with decades of experience in the aerospace industry and direct experience managing large and successful NASA contracts.  AR 10604, 11065-11102.  For example, PlanetSpace's Chief Operating Officer, Michael Bowker,

has over 25 years of technical operating and management experience supporting NASA projects, including extensive experience managing large fixed-price prime contracts with cost-based subcontracts. *See, e.g.,* AR 10605, 11068-69. The SSA gave absolutely no consideration to the directly relevant and extensive past performance of PlanetSpace's key personnel. The SSA's failure to consider this experience is arbitrary and capricious because it is contrary to the RFP and the FAR, *see* pp. 23, 25 *supra*.

Third, even if (contrary to fact) there was no relevant past performance of PlanetSpace, its employees, or its subcontractors, the SSA's self-created "corresponding strength" requirement is inconsistent with the explicit mandate in the FAR and the RFP that an offeror's lack of past performance would not be evaluated negatively. FAR § 15.305(a)(2)(iv) (offerors "without a record of relevant past performance or for whom information on past performance is not available…may not be evaluated favorably or unfavorably on past performance"); *accord* AR 2090. While the SSA paid lip service to this proviso, AR 5175, his decision simply to disregard the outstanding past performance of PlanetSpace's major subcontractors and key personnel because of a purported lack of "corresponding strength" meant that PlanetSpace's lack of past performance was in fact being evaluated unfavorably. *Meridian Mgmt. Corp.*, B-285127, July 19, 2000, 2000 CPD ¶ 121 at 5 & n.2 ("[T]he inclusion of a score of 0 for past performance for an area in which the offeror in fact has no experience serves to lower the offeror's overall past performance score, in violation of the requirement that firms lacking relevant past performance history receive a neutral evaluation for past performance").

The SSA's treatment of the PlanetSpace's past performance was critical to his conclusion that Orbital's proposal was technically superior, notwithstanding the SEB's thorough review and rankings. In fact, without the SSA's wholly improper treatment of PlanetSpace's past

performance history, the SSA would have had no basis to select Orbital's higher priced, lower rated bid.

> **E.      NASA's Selection of Orbital Violated the U.S. Space Transportation Policy (Count V).**

The U.S. Space Transportation Policy, issued on December 21, 2004 (the "Space Policy") provides that "United States Government payloads ***shall be launched on space launch vehicles manufactured in the United States, unless exempted*** by the Director of the Office of Science and Technology Policy [("OSTP")], in consultation with the Assistant to the President for National Security Affairs."   *See*  http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf, at p.7 (emphasis added); *accord* AR 30861.   Offerors were notified that compliance with the Space Policy was a minimum requirement of the RFP.  AR 1959, 1972; *see also* AR 30861 (reiterating this requirement in NASA's formal, written responses to prospective bidders' written questions regarding the RFP, *i.e.*, Q-76, Q-77).  Although it stated that the Space Policy had historically applied to launch vehicles and not "payloads," NASA acknowledged that the Space Policy required it to consult with OSTP about the foreign content of any bid.  AR 30862.

Thus, in order to meet RFP requirements, either the bidder had to use a U.S.-made launch vehicle, or NASA had to obtain an exemption prior to awarding a contract to a bidder using a foreign-made launch vehicle.  Whether the "payload" (here, the cargo transfer vehicle) had to be included in the analysis was to be resolved in discussions with OSTP.

NASA nonetheless failed to follow the Space Policy in awarding a contract to Orbital.  Orbital's proposal includes the Taurus II launch vehicle, almost none of which appears to be U.S.-made.  The first stage of the Taurus II includes either the NK-33 or the RD-180, both Russian-made engines, Bowker Decl. ¶ 76, and a Ukrainian-made fuel tank, and "may" contain

Ukrainian valves and telemetry control hardware.  AR 29281.  The first stage is manufactured in

the Ukraine, as recently acknowledged by Orbital's own launch manager.  Bowker Decl. ¶ 75.

The pressurized cargo transfer vehicle is also primarily foreign -- the pressurized cargo module

will be built by Thales Alenia Space in Italy, and numerous electronic systems will be built in

Japan and Europe.  AR 29281.

The administrative record reveals that NASA was concerned, prior to award, that the

Orbital launch vehicle and pressurized cargo vehicle may not have complied with the Space

Policy.  AR 29279-85 (July 22, 2008 memo to NASA Headquarters, requesting assistance from

OSTP).  Despite a keen awareness that interpretation of the Policy requirement is "the

responsibility of" OSTP, AR 6316, 29279, the administrative record does not contains an single

document from OSTP addressing this issue.  In fact, there is no documentation showing that the

specific issues raised by Orbital's bid were ever resolved.[3]

While there is some indication that an "interagency review" concluded in 2007 that the

version of the Taurus II proposed for use in Orbital's COTS contract was "U.S.-made", AR

6316, there is no official documentation of either the OSTP's conclusion or the scope of its

applicability beyond Orbital's COTS contract.  Moreover, there is substantial reason to question

the applicability of a determination in the COTS context as being applicable in Space Station

resupply context.  First, COTS is a demonstration project only -- it is not intended to launch

"U.S. Government payloads" as provided in the Space Policy.  *See* "Commercial Crew &

---

[3]     The RFP required bidders to certify that they were in fact providing "space vehicles
manufactured in the United States" in accordance with the Space Policy.  AR 1972.  Orbital's
certification that "to the best of its knowledge and belief" it was proposing to provide a U.S.-
made launch vehicle, *see* AR 6424, does not satisfy the Space Policy.  *Banknote Corp. of Am. v.
United States*, 56 Fed. Cl. 377, 382 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) (bidders must
demonstrate how they will conform to material requirements, not simply state that they will).

Cargo," NASA, *at* http://www.nasa.gov/offices/c3po/about/c3po.html (last visited Aug. 27, 2009). As such, and unlike the Space Station resupply contract, the Space Policy could be fully complied with in the COTS context through the use of a foreign-made launch vehicle and cargo module because no "United States Government payload[]" launches were specifically contemplated by the COTS program.

Second, it appears that the configuration of the Taurus II to be used in the Space Station resupply contract has changed substantially since COTS was awarded. As noted above, the Taurus may use at least a different rocket engine, made in Russia, and Orbital has publicly acknowledged that the first stage is manufactured in the Ukraine. Bowker Decl. ¶¶ 75-76.

The only documentation in the administrative record regarding NASA's presentation of any Space Policy issue to the OSTP in connection with the Space Station resupply contract is a December 12, 2008 (11 days prior to award) memo to the "file" in which Lynn Cline, a NASA Headquarters official, described a conversation that she had almost two months earlier with Damon Wells, a Senior Policy Advisor at the OSTP, regarding "the applicability of [the Space] [P]olicy to the proposal that NASA has received from Orbital." AR 6316. In recounting the conversation months later, Ms. Cline identified the following issue: "whether the definition as envisaged by the policy referred solely to the boost phase of the vehicle (i.e., the Taurus II launch vehicle) or if it also included the cargo transfer vehicle." *Id.* There is no mention of the foreign nature of the cargo transfer vehicle in the memorandum. According to Ms. Cline, Mr. Wells "agreed that it was a reasonable interpretation that the policy refers to the launch vehicle and not the payload, in this case the cargo vehicle," *but* left the question "open" in order "to have an opportunity to see any proposals that might have raised broader questions, such as a fully foreign cargo transfer vehicle." *Id.* The memo to the file concludes: Mr. Wells "stated that

NASA could proceed with its procurement activity and no interagency review would be required in this case." *Id.*

This informal discussion between members of NASA and OSTP staffs, completely lacking in documentation from OSTP, fails to satisfy the requirements of the Space Policy, in four respects:

*First*, the Space Policy assigns responsibility for administering the U.S.-made launch vehicle requirement to the Director of OSTP, who must consult the "Assistant to the President for National Security Affairs," *i.e.*, the National Security Advisor.  Although the Director of OSTP may have the power to delegate his authority with regard to a particular matter to a subordinate, there is no indication in the administrative record that Mr. Wells (a "Senior Policy Advisor") was delegated authority to make required decisions with respect to the Space Policy. Where a specific Government official has been given authority over a certain matter, his subordinate may not make that decision absent a valid delegation of authority.  *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 640 (6th Cir. 2004) (finding NHTSA's Chief Counsel without authority to make "final fact-bound determinations" because Administrator had not delegated authority to him to do so); *United States v. Emerson*, 846 F.2d 541 (9th Cir. 1988) (DEA Administrator's scheduling of a drug as a controlled substance was an improper exercise of authority because the Attorney General, who was specifically given authority to take such action, did not issue a redelegation of authority that would have allowed the Administrator to act).

*Second*, leaving aside the issue of the proper treatment of the cargo transfer vehicle, there is no indication of any decision being made with respect to the version of the Taurus II proposed for use by Orbital.  As noted *supra*, although there exists a reference to the Orbital vehicle under the COTS contract being "U.S.-made", AR 6316, there is no official documentation of the

OSTP's conclusion or the scope of its applicability beyond Orbital's COTS contract.  As noted above, COTS is a demonstration project only -- it is not intended to launch "U.S. Government payloads" as provided in the Space Policy.  Moreover, the Taurus II appears to have changed, using a different Russian-made engines, and with the first stage is manufactured in the Ukraine.

*Third*, there is no indication of any consultation with the National Security Advisor.

*Fourth*, even assuming *arguendo* that Mr. Wells had sufficient authority to decide whether NASA could proceed with the award to Orbital, it is clear from Ms. Cline's recount of her conversation with Mr. Wells that he did not in fact make a decision whether the cargo vehicle should be treated as part of the Orbital launch vehicle for the purposes of the Space Policy requirement.  Instead, he left the question "open" in order "to have an opportunity to see any proposals that might have raised broader questions, such as a fully foreign cargo transfer vehicle." AR 6316.

NASA thus violated both the Space Policy and the RFP into which that Policy was incorporated.  "It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation." *AshBritt*, 87 Fed. Cl. at 374.  NASA's failure to follow the requirements set forth in its own Solicitation, including application of the Space Policy to all bids, constitutes a prejudicial violation of the procurement, *see Hunt Bldg.*, 61 Fed. Cl. at 273, and the contract award to Orbital must be set aside.  *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 194 (1999) ("[A] contract award may not be upheld when the [agency] improperly departs from [the] stated evaluation criteria in a solicitation.")  (citations omitted).

## F.      Failure to Articulate a Rational Basis for Assessing Risks (Count VI).

An SSA selection decision must consider "all evaluation factors," NASA FAR Supp. § 1815.308(1), and provide a "clear and logical audit trail" for the rationale for ratings and scores, "including a detailed account of the decisions leading to the selection." *Id.* § 1815.308(2).

All three offeror proposals had multiple weaknesses, according to the SEB; none had "significant weaknesses."   AR 4586, 4677, 4790.   A "weakness" is a perceived flaw in a proposal that increases the risk of unsuccessful contract performance.   FAR § 15.001. Weaknesses are not considered discriminators for or against selection, and are not typically presented to the SSA.  NASA FAR Supp. § 1815.370(i)(6)(i).

A "significant weakness" in a proposal is a flaw that *appreciably* increases the risk of unsuccessful contract performance.  FAR § 15.001.  None of the weaknesses in Space-X's or Orbital's bids were changed to "significant" weaknesses by the SSA; only PlanetSpace's scoring changed.   The SSA irrationally and without adequate documentation ignored or disregarded every strength or significant strength found by the SEB to be present in PlanetSpace's proposal, while designating as significant weaknesses and/or discriminators against selection factors relating to PlanetSpace's financing and supervision of its subcontractors.

Specifically, PlanetSpace's contract arrangement with its subcontractors was originally found to be a "weakness" by the SEB.   The SSA elevated this to a "significant weakness" because PlanetSpace purportedly planned to use "cost reimbursement" subcontracts for "much of the work" to be done under its fixed price prime contract, thus purportedly jeopardizing the financial viability of the project.  AR 5179-80.  This determination is without a factual basis and is therefore irrational.

First, the main element in the SSA's risk assessment, that "much of the work would be performed on large subcontracts on a cost reimbursement basis," is simply untrue.  PlanetSpace's final revised proposal, and the information the Company provided during discussions, make clear that ***XX%*** of the subcontracted work was on a fixed-price basis.  AR 31781 (Table 7).

The remaining XX% covered development work to be performed on *existing heritage components* for which most of the development work has already been completed. *Id*. As such, the potential for cost overruns for the work integrating these components into PlanetSpace's proposed launch vehicle and spacecraft was by its nature limited. Moreover, much of this work was itself to be subcontracted by PlanetSpace's subcontractors on a firm, fixed-price basis, further reducing the risks of any cost overruns. AR 10605-06. PlanetSpace provided these facts to NASA, AR 31781,  10605-06; however, the SSA did not cite, consider, or address any of them in his decision.

Even if such development work did result in cost overruns, PlanetSpace had secured funding commitments of $XXXXXX in excess of its projected requirements (a XX% margin) -- adequate to cover any cost overrun occurring during the project. AR 10591. These secure financing commitments were substantially more than either of the other bidders proposed, a fact never addressed by the SSA.

Similarly, the SSA's conclusion that the PlanetSpace proposal was not financially viable because it would not be "cash flow positive" until "nearly" the end of the contract is factually wrong. AR 5177. PlanetSpace's business plan projected that it would be "cash flow" positive within XXXXX of flying its first mission. AR 10590.

Finally, PlanetSpace's purported lack of oversight capability, found by the SSA but not the SEB, AR 5176, ignores that the Company's in-house management brought to the project considerable expertise in project management, including several employees with *decades* of experience in managing cost reimbursement subcontracts under fixed price prime contracts. For example, PlanetSpace's Chief Operating Officer has an extraordinary depth of experience in managing space programs at several aerospace companies, and specific relevant and successful

experience managing fixed-price prime contracts using cost based subcontracts.  AR 10605, 11068-69.   PlanetSpace's Chief Business Officer and its Chairman also have extensive experience in fixed-price contracting.  AR 11070-71, 11077-78.

The SSA thus clearly misperceived or overlooked critical facts.  The Source Selection Statement lacks any "clear and logical trail" or "detailed account" leading to the conclusions he reached, and should be set aide.

## V.   THERE IS A SUBSTANTIAL CHANCE THAT PLANETSPACE WOULD HAVE RECEIVED A CONTRACT.

PlanetSpace can easily show "a 'substantial chance' it would have received [a] contract award but for [NASA]'s errors in the bid process."  *Bannum,* 404 F.3d at 1358 (citations omitted).  The "test is more lenient than showing actual causation, that is, showing that but for the errors [the plaintiff] would have won the contract."  *Id.* (citations omitted); *accord Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996) (protestor need not show that "but for the alleged error the protester would have been awarded the contract;" "[s]uch a rule would make it virtually impossible for a protester ever to prevail").

Here, (a) NASA had decided to award contracts to at least two of the three bidders, (b) the SEB had ranked PlanetSpace's Mission Suitability Factor materially higher than Orbital, and (c) PlanetSpace's bid was indisputably hundreds of million of dollars less than Orbital's.  Thus, if the Court agrees with PlanetSpace that *any* of its substantive claims regarding errors in the SSA's evaluation of PlanetSpace's Mission Suitability was more than *de minimis*, it necessarily follows that there was a "substantial chance" that PlanetSpace would have been awarded a contract.  *Wackenhut*, 85 Fed. Cl. at 310 ("[B]ecause [the protestor] was the only other bidder determined to be in the competitive range, but for the award to [the awardee], [the protestor] likely would have been awarded the contract."); *Mark Dunning Indus. v. United States*, 60 Fed.

- 34 -

Cl. 687, 690 (2004) ("Because plaintiff was next in line for the contract, it is clear that but for the alleged error, plaintiff had a substantial chance of receiving the contract.")

Moreover, the violations established by the specific counts of PlanetSpace's complaint confirms that PlanetSpace suffered prejudice. Count I establishes that the SSA violated law and regulations when it decided not to award small business PlanetSpace a contract based upon a *de facto* finding of non-responsibility. There is far more than a "substantial chance" that the SBA would find PlanetSpace responsible and, hence, entitled to a Certificate of Competency. The SEB experts themselves found PlanetSpace responsible, awarding its proposal a "Very Good" ranking for overall Mission Suitability *and* for each Mission Suitability Subfactor. If a competent body such as the SEB deemed PlanetSpace competent, there is indisputably a "substantial chance" the SBA would as well. Moreover, the SBA routinely disagrees with adverse agency responsibility determinations; in 2008, the SBA granted eighty-nine Certificates of Competency, and forty-nine more in the first half of 2009. Kathuria Decl. ¶ 36-37.

Count II challenges NASA's failure to conduct the legally required trade-off analysis between Mission Suitability and Price, which necessarily caused prejudice by making it impossible for the SSA to determine which proposal presented the Best Value. *Info. Scis.*, 73 Fed. Cl. at 94 (finding prejudice when it is impossible to determine which offeror would have presented the Best Value had the analysis been properly conducted). Indeed, given that PlanetSpace's price was a whopping $613 million lower than Orbital's, prejudice necessarily adheres. *Cf. Serco*, 81 Fed. Cl. at 497 ("as th[e] magnitude [of the price differential] increases, the relative benefits yielded by the higher-priced offer must also increase").

Counts III, IV, and VI demonstrate that the SSA erred in his evaluation of the PlanetSpace proposal in three critical respects: (a) in his imposition of a "backup plan"

requirement; (b) in his treatment of past performance records; and (c) in his analysis of PlanetSpace's financial capabilities.   Each error went to the heart of the SSA's award determination, and reversal would necessarily give PlanetSpace a substantial chance of being awarded a contract (particularly given its substantially lower price).

Count V addresses Orbital's ineligibility for award, given that its launch vehicle is foreign-made.  This violation was obviously prejudicial to PlanetSpace:  (a) Orbital never should have been awarded a contract, (b) NASA had decided that two contracts would be awarded, and (c) the only two other offerors in the competitive range were PlanetSpace and Space-X.

## VI.    PLANETSPACE HAS SUFFERED IRREPARABLE INJURY.

"When assessing irreparable injury, the relevant inquiry is whether the protesters have an adequate remedy, in the absence of an injunction."  *Info. Scis.*, 73 Fed. Cl. at 127.    A bid protestor almost never has an adequate remedy at law:

> Standing alone, the loss of an opportunity to fairly compete on…government contracts constitutes irreparable harm.  *Rhinocorps Ltd. Co. v. United States,* No. 08-410C, 2009 WL 1362843, at *6 (Fed. Cl. May 15, 2009).  This is because "[a]n action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits.'"  *Bannum, Inc. v. United States,* 60 Fed.Cl. 718, 730 (2004) (quoting *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl. Ct. 277, 287 (1983)), *aff'd,* 404 F.3d 1346 (Fed.Cir. 2005); *see* 28 U.S.C. § 1491(b)(2) (limiting this court's ability to award monetary relief in bid protests "to bid preparation and proposal costs").

*ViroMed Labs., Inc., v. United States*, 87 Fed. Cl. 493, 503 (2009).  *See also* Kathuria Decl. ¶¶ 15-25 (detailing irreparable injuries to PlanetSpace).

## VII.    THE BALANCE OF HARDSHIPS FAVORS GRANTING INJUNCTIVE RELIEF.

The balance of hardships must be assessed with reference to the specific relief PlanetSpace seeks:  (a) a declaration that NASA made the prejudicial errors set forth in Counts I through VI, and (b) a permanent injunction requiring that NASA reprocure the Space Station

resupply contracts in accordance with law and a reasonable exercise of discretion, within 60 days of the date of the Court's decision absent good cause.

PlanetSpace does not seek an injunction against further contract action pending NASA's reprocurement, recognizing that NASA's corrective action will likely result in the displacement of only a single contractor.  Alternatively, reopening the procurement might result in a third award, to PlanetSpace.

To the extent NASA in the reprocurement determines that PlanetSpace's proposal is superior and should be awarded one of the two contracts, or that Orbital is ineligible, the losing offeror has no grounds for complaint.  *Hunt Bldg.*, 61 Fed. Cl. at 280 ("[The awardee] will still be able to compete, this time on equal footing with [the protestor], whereas absent injunctive relief, [the protestor] will have been unfairly denied a meaningful opportunity to compete.  On balance, injunctive relief is warranted to remedy the unfair process here.")

Similarly, although the requirement that NASA re-evaluate the proposals will impose some additional expense on the agency, such considerations pale when measured against the need to ensure that the bid determination is performed in accordance with statute and regulation, *see* the discussion of the public interest, *infra*.  Likewise, if, as PlanetSpace anticipates, the result of the re-evaluation will be a contract award to it, then the Government will necessarily have benefited from its selection.  *Cf. Wackenhut*, 85 Fed. Cl. at 312 ("The minimal additional time and expense involved in requiring NASA to have members of the SEB re-evaluate key elements of the 'Mission Suitability' Factor and 'Price' Factor and for the new SSA to re-evaluate the SEB's reconsidered Final Findings to select the proposal that is the 'best value' to the Government is outweighed by the importance of allowing [the protestor] the opportunity to compete fairly for this contract.")

Finally, less than four percent of contract funds have been spent to date. Kathuria Decl. ¶ 35. That amount (approximately $70 million per contract) is far less than the savings the Government will garner by selecting the $613 million cheaper PlanetSpace proposal.

## VIII.   THE PUBLIC INTEREST IS SERVED BY GRANTING INJUNCTIVE RELIEF.

"It has long been recognized that the public interest is served by an injunction that is designed to ensure that the procurement process is conducted pursuant to law." *Wackenhut*, 85 Fed Cl. at 312; *accord, e.g.*, *Ala. Aircraft*, 83 Fed. Cl. at 703; *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 581 (2005).

Any purported negative impacts must be shown to be causally linked to the *specific* injunctive relief PlanetSpace seeks: "[T]he court should weigh the public interest in light of the *likely* consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Stormans, Inc. v. Selecky*, 571 F.3d 960, 989 (9th Cir. 2009); *see also Serco*, 81 Fed. Cl. at 502 (any "ill effects…may be ameliorated by a properly-framed injunction…narrowly tailored to the problems encountered").

PlanetSpace's requested relief simply requires NASA to conduct a re-procurement in conformity with applicable law and regulation. The existing contracts can continue in the interim; and as noted, one possible result will be the award of a third contract, to PlanetSpace. *Cf. Wackenhut*, 85 Fed. Cl. at 312 ("a limited injunction directing NASA to reexamine the Proposals submitted in response to the Solicitation and comply with the terms of the Solicitation, the APA and relevant provisions of the FAR is in the public interest"); *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 80 (2007) ("[I]t is in the public interest to take action to redo the flawed procurement and, in doing so, correct the errors that occurred in the initial procurement process. To be sure, there is a countervailing public interest in minimizing disruption of the ACES program, and thereby minimizing harm to Army personnel enrolled in the ACES

program.  That interest is served, however, by the reduced level of disruption that would be occasioned by the tailored relief and prompt resolicitation discussed…*supra,* as compared to immediately enjoining performance under the existing contracts.").

Any delay will be minimal; and "only in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." *Serco*, 81 Fed. Cl. at 502 (quotations omitted); *accord, e.g., Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005).  "[T]he delay and administrative burdens associated with setting aside the current awards and requiring the agency to take curative actions are, of course, problems of defendant's own making.  Those ill effects, moreover, may be ameliorated by a properly-framed injunction that, as defendant has repeatedly urged, is narrowly tailored to the problems encountered." *Serco*, 81 Fed. Cl. at 502.

Given the limited relief PlanetSpace seeks, the Court need not delve deeply into the implications of a NASA decision, upon re-evaluation, to award a contract to PlanetSpace that displaces either Orbital or Space-X.  However, in an abundance of caution, PlanetSpace has submitted herewith declarations addressing the public interest, which show that, based on the performance of Orbital and Space-X to date, PlanetSpace would almost surely be able to provide the necessary resupply services to the Space Station sooner than those companies.  These include the declaration of former Space Shuttle astronaut and aerospace executive John Michael Lounge, who demonstrates that:

- PlanetSpace's bid proposal provides NASA with the only launch vehicle, the Atlas V, that has been flight proven -- over 85 times.  As such, PlanetSpace's bid is the only bid that provided NASA with "assured access," as defined in the Space Policy, to the Space Station;

- Because of PlanetSpace's "assured access" to the Space Station, awarding a contract to PlanetSpace would ensure that ISS operations could be maintained and program goals reached after the Space Shuttle retirement, even if Orbital or Space-X are unable to meet their mission schedules, and, even if PlanetSpace's own Athena III launch vehicle is delayed.

In addition, PlanetSpace has submitted the declaration of Michael Bowker, an aerospace executive with over 25 years of experience in management and technical operations supporting NASA missions, and a former NASA project manager, who demonstrates that, based in part on an analysis of developments since the award:

- Space-X and Orbital have encountered numerous and substantial delays in the development and demonstration of critical hardware to be used in ISS resupply missions.

- The delays suffered by Space-X and Orbital are also predictive of future delays, given their nature and number.  As such, despite their nearly one-year headstart, Orbital and Space-X are unlikely to be able to provide Space Station resupply services prior to PlanetSpace.

## CONCLUSION

The Court should grant the declaratory and injunctive relief sought by PlanetSpace.  A proposed order is attached.

      Respectfully submitted,

      s/ Steven J. Rosenbaum
      Steven J. Rosenbaum
      *Counsel of Record*
      Derron J. Blakely
      Scott A. Freling
      Covington & Burling LLP
      1201 Pennsylvania Avenue, N.W.
      Washington, D.C.  20044
      (202) 662-5568
      (202) 778-5568 fax
      srosenbaum@cov.com

August 28, 2009      *Counsel for Plaintiff PlanetSpace Inc.*