**PROPOSED REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | |
|---|---|
| PlanetSpace, Inc., )<br><br>    Plaintiff, )<br><br>        v. )<br><br>The United States, )<br><br>    Defendant. )<br><br>Space Exploration Technologies )<br>Corporation, and )<br><br>Orbital Sciences Corporation, )<br><br>    Defendant-Intervenors )<br> ) | **PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**<br><br>Case No. 09-476C<br>Judge Block |

### INTERVENOR ORBITAL SCIENCES CORPORATION'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Of Counsel:

Kevin C. Dwyer
Daniel E. Chudd
Caroline A. Keller
Anna M. Baldwin

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington D.C. 20001-4412

David A. Churchill
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

(202) 639-6056 Telephone
(202) 637-6360 Protected Facsimile

Counsel for Intervenor
ORBITAL SCIENCES CORPORATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ................................................................................ 1

ARGUMENT .................................................................................................... 5

I.     NASA'S COMPARATIVE EVALUATION REVEALED SERIOUS
       WEAKNESSES IN PLANETSPACE'S PROPOSAL. ................................. 5

       A.     PlanetSpace's Proposal Revealed Serious Technical Challenges
              That PlanetSpace Was Ill-Equipped to Meet. ................................. 6

              1.     PlanetSpace Increased Risk and Technical Challenge by
                     Proposing Use of Two Different Launch Vehicles. ........................ 6

              2.     PlanetSpace Faced Increased Risk and Technical
                     Challenge Because of Its Need to Re-qualify Heritage
                     Components. ................................................................................ 7

              3.     PlanetSpace's Proposal Involved Increased Risk Because
                     of the Need to Make Further Changes to Its Fairing
                     Design. ........................................................................................ 8

       B.     PlanetSpace's Management Plan Exposed NASA to Performance
              Delays and Serious Financial Risks. ................................................ 8

              1.     PlanetSpace's Use of Cost-Plus Subcontracts Significantly
                     Increased Risk of Cost and Schedule Problems. .......................... 9

              2.     PlanetSpace's Plan for the Receipt of Milestone Payments
                     Was Unrealistic and Increased Financial Risk to the
                     Government. .............................................................................. 10

              3.     PlanetSpace's Plan for the Receipt of FAA Licenses
                     Revealed a Fundamental Lack of Understanding of Basic
                     CRS Requirements. ..................................................................... 11

       C.     The Flaws in PlanetSpace's Management Plan Magnified the
              Technical and Business Case Risks Facing PlanetSpace. ............... 11

II.    THE SSA DID NOT MAKE A RESPONSIBILITY DETERMINATION
       WITH RESPECT TO PLANETSPACE, AND NO REFERRAL TO THE
       SSA WAS REQUIRED (COUNT I). ........................................................ 13

i

III.   THE AGENCY CONDUCTED A PROPER TRADE-OFF ANALYSIS
       AMONG THE PROPOSALS (COUNT II)...........................................................15

       A.   The Source Selection Statement Contains an Explicit Trade-off
            Analysis. ..............................................................................................16

       B.   The SSA's Testimony Confirms That a Proper Trade-Off Was
            Made. ....................................................................................................18

IV.    THE SSA WAS PROPERLY CONCERNED WITH RISK AND
       PLANETSPACE'S LACK OF A BACK-UP PLAN (COUNT III)........................20

V.     THE SSA'S EVALUATION OF PLANETSPACE'S PAST
       PERFORMANCE WAS REASONABLE AND COMPLIED WITH
       ALL APPLICABLE REQUIREMENTS (COUNT IV)..........................................21

VI.    NASA'S SELECTION OF ORBITAL COMPLIED WITH THE U.S.
       SPACE TRANSPORTATION POLICY (COUNT V). ..........................................23

       A.   OSTP Is Vested with Authority to Interpret the U.S. Space
            Transportation Policy...........................................................................23

       B.   NASA Properly Consulted with OSTP About Application of the
            Space Transportation Policy with Respect to CRS Proposals, and
            Obtained OSTP's Approval To Proceed with Orbital's Proposal. ...............25

       C.   OSTP Also Determined that Orbital's Foreign Cargo Vehicle
            Satisfies the Space Transportation Policy..............................................27

       D.   Orbital Submitted a Valid Certification of Its Compliance with
            the Space Transportation Policy. ..........................................................28

       E.   NASA Did Not Rely Solely on OSTP's Prior Determination that
            Orbital's Taurus II Satisfied the Space Transportation Policy. .................28

       F.   The Space Transportation Policy Does Not Require a
            Determination by OSTP Prior to Launch. ..............................................30

VII.   THE SSA RATIONALLY ASSESSED THE RISKS OF
       PLANETSPACE'S SUBCONTRACTING AND FUNDING
       APPROACHES (COUNT VI)...............................................................................31

       A.   PlanetSpace's Use of Cost-Type Subcontracts for the
            Development Phase of the Contract Posed Significant
            Performance Risks. ...............................................................................32

            1.   The Cost-Plus Development Subcontracts Are Inherently
                 Risky. ...........................................................................................32

2.     The SSA Understood the Scope of the Cost-Plus Subcontracts. .................................................................. 33

3.     The SSA Fully Considered PlanetSpace's Management Team. ...................................................................................... 36

B.     PlanetSpace's Tentative Financing and Delayed Funding Schedule Exacerbate the Risks of Its Proposed Approach. ........................... 38

1.     PlanetSpace's Financing Was Neither Secure nor Committed. .................................................................. 38

2.     PlanetSpace's Delayed Payments Endanger Contract Performance. .............................................................. 39

VIII.    PLANETSPACE IS NOT ENTITLED TO INJUNCTIVE RELIEF. ...................... 42

A.     The Balance of Harms Weighs in Favor of the Government. ...................... 43

B.     The Balance of Harms Does Not Support Injunctive Relief. ........................ 44

1.     "Delay Would Adversely Affect the Interests of the United States." .............................................................. 45

2.     Injunctive Relief Would Harm the United States and the Public Interests in Other Ways Besides Delay. ................................ 48

CONCLUSION ............................................................................................................... 49

REQUEST FOR RELIEF ............................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

CASES AND GAO DECISIONS

*Aeroplate Corp. v. United States*, 67 Fed. Cl. 4 (2005).................................................14

*Chapman Law Firm v. United States*, 63 Fed. Cl. 519 (2005) ....................................30

*DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501 (2008)...........................................14

*E.L. Hamm & Assocs.*, B-280766.5, Dec. 29, 1999, 200 CPD ¶ 13 ...........................15

*EP Products Inc. v. United States*, 63 Fed. Cl. 220 (2005) .........................................42

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) ...........................................44, 45

*KSEND v. United States*, 69 Fed. Cl. 103 (2005) ...................................................41-42

*Marine Hydraulics International, Inc. v. United States*, 43 Fed. Cl. 664 (1999)..................15, 20

*PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004).................................41, 42

*PGBA LLC v. United States*, 60 Fed. Cl. 567 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004) .....................................................................................................................47

*PlanetSpace v. United States*, 86 Fed. Cl. 566 (2009)..................................4, 44, 45, 48

*PlanetSpace, Inc.*, B-401016, B-401016.2, Apr. 22, 2009, 2009 CPD ¶ 103............4, 6

*Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738 (2006)...............................30

*Pressure Technology, Inc.*, B-265792, Dec. 29, 1995, 95-2 CPD ¶ 288 ......................15

*R.L. Campbell Roofing Co., Inc.*, B-289868, May 10, 2002, 2003 CPD ¶ 37 ..............14

*Wackenhut Services v. United States*, 85 Fed. Cl. 273 (2008).......................................19

*Wackenhut Services, Inc.*, B-400240, B-400240.2, Sept. 10, 2008, 2008 CPD ¶ 184..................23

*YRT Services Corp. v. United States*, 28 Fed. Cl. 366 (1993) .......................................13

*Zolon Technology, Inc.*, B-299904.2, Sept. 18, 2007, 2007 CPD ¶ 183........................14

STATUTES AND REGULATIONS

28 U.S.C. § 1491(b)(3) ...................................................................................................42

42 U.S.C § 16614(a) ..................................................................................................24, 26

FAR 15.305(a)(2)(iv)........................................................................................................21

FAR 31.205-18 ..............................................................................................................50

NASA FAR Supp. 1815.300-70(a)(i) .............................................................................3

NASA FAR Supp. 1815.303(b) .......................................................................................3

NASA FAR Supp. 1815.305(a)(3)(A) .............................................................................3

NASA FAR Supp. 1815.308(1) ...................................................................................3, 21

NASA FAR Supp. 1815.370(b) .......................................................................................3

**OTHER AUTHORITIES**

http://www.orbital.com/NewsInfo/Publications/TaurusII_fact.pdf...............................30

http://www.orbital.com/NewsInfo/Publications/Taurus_fact.pdf.................................30

http://www.ostp.gov/cs/about_ostp/leadership_staff....................................................26

U.S. Transportation Policy Fact Sheet at 7, issued Jan. 6, 2005, *available at*
     http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf .........24, 27, 28, 30

## INTRODUCTION

This is Orbital Science Corporation's ("Orbital's") Response to Plaintiff PlanetSpace, Inc.'s ("PlanetSpace's") Motions for Judgment on the Administrative Record and for Permanent Injunction ("PlanetSpace Memo"), and Cross-Motion for Judgment on the Administrative Record.

Each of PlanetSpace's allegations fails as a matter of fact and law. Accordingly, this Court should grant Orbital's Cross-Motion for Judgment on the Administrative Record and deny PlanetSpace's Motion for Judgment on the Administrative Record as well as its Motion for Permanent Injunction.

## STATEMENT OF FACTS

The International Space Station is an international scientific research facility manned in low Earth orbit. AR Tab 186 (Contracting Officer's Statement of Facts ("COSF")) at 31045.4. On April 14, 2008, NASA issued RFP No. NNJ08ZBG001R, seeking proposals for a firm fixed-price, indefinite delivery indefinite quantity "Commercial Resupply Services" contract for space transportation services to supply cargo to the International Space Station for a period of seven years, beginning on January 1, 2009 and ending on December 31, 2015 (the "Commercial Resupply Service contracts" or "CRS contracts"). *Id.* at 31045.5. Because the United States intends to retire use of its Space Shuttle in 2010, the purpose of these contracts is to ensure that the United States can meet its international obligations to provide critical cargo resupply services to the International Space Station, including supplies of air, water, food, medicine, spare parts, and scientific experiments. *See id.* 31045.4.

In a related program, NASA has awarded Commercial Orbital Transportation Services ("COTS") Space Act Agreements to commercial providers for commercial cargo demonstrations. *See* AR Tab 186 (Agency Legal Memorandum ("LM")) at 031021; AR Tab 186 (COSF) at 31045.6; AR Tab 70 (Orbital Initial Proposal, Vol. II) at 6457; AR Tab 78 (SpaceX

Exploration Technologies Corporation ("SpaceX") Initial Proposal, Vol. II) at 7984.  Orbital and

SpaceX are the current providers under the COTS program, *see* AR Tab 186 (LM) at 3092, with

the NASA/Orbital demonstration project already having an approximately $██ million

investment, AR Tab 70 at 6460.  Although the COTS Space Act Agreements are separate from

the CRS contracts, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

     The CRS Solicitation stated that NASA could award contracts to more than one offeror,

each with a maximum value of $3.1 billion.  AR Tab 30 (RFP, Amendment 3) at 1925, 2062.

The Solicitation further provided for a minimum contract value equal to the negotiated value of

20 megatons ("MT") of cargo, AR Tab 27 (RFP) at 1314, and estimated the requirements for

cargo delivery to be approximately 48 MT, *id.* at 1481.

     Under the CRS Solicitation, award was to be made based on the evaluation of proposals

under two evaluation criteria, Mission Suitability and Price, with Mission Suitability more

important than Price.  AR Tab 30 (RFP, Amendment 3) at 2089.  In addition, NASA was to

consider each offeror's relevant past performance in its evaluation of each Mission Suitability

Subfactor, but past performance was not separately scored.  *Id.* at 2090.  Mission Suitability was

scored on a 1000 point scale, under three Subfactors: Technical Approach (550 points), with

subfactors for system capabilities/ summary of performance, ISS integration/demonstration, ISS

resupply mission performance plan, and risks; (2) Management Plan (400 points), with

subfactors for company information, performance milestones, and safety/mission assurance; and

(3) Small Business Utilization (50 points).  *Id.* at 2089.

As in all NASA procurements of over $50 million or more, the Source Selection Authority ("SSA") and the Source Evaluation Board ("SEB") performed complementary roles in the evaluation of the CRS proposals. *See* NASA FAR Supp. 1815.300-70(a)(i).  The SEB conducted the initial evaluation of proposals, AR Tab 186 (COSF) at 31045.10, under its duty to provide "expert analyses of the offerors' proposals in relation to the evaluation factors and subfactors contained in the solicitation," NASA FAR Supp. 1815.370(b).  In accordance with the Solicitation Plan, the SEB assigned "significant strength," "strength," "weakness," or "significant weakness" to each element of each Mission Suitability Subfactor for each offeror, while the Mission Suitability Subfactors and the total Mission Suitability Factor were evaluated using the adjectival ratings of "Excellent," "Very Good," "Good," "Fair," and "Poor."  AR Tab 23 (Evaluation Plan) at 1157-58; *see* NASA FAR Supp. 1815.305(a)(3)(A).

Although the SEB rated PlanetSpace's initial proposal as "███," it elected to retain all three offerors in the competitive range.  AR Tab 186 (COSF) at 31045.48.  Following oral discussions with each offeror, the SEB conducted an extensive evaluation of each offeror's FPR. *See id.* at 31045.49, 31045.53-54.

The SSA, William Gerstenmaier, NASA's Associate Administrator for Space Operations, was charged to conduct a comparative assessment of proposals, in order to determine which proposals offered the best value and services to the Government, before making the final source selection decision. *See* NASA FAR Supp. 1815.303(b); 1815.308(1).  The SEB presented its evaluations to the SSA in a final report and conducted a lengthy in-person briefing on December 15, 2008.  AR Tab 186 (COSF) at 31045.79-80; *see* AR Tabs 53 (SEB Final Report) and 54 (Source Selection Presentation).  On December 23, 2008, the SSA determined, in a rigorously detailed selection decision, that award should be made to both Orbital and SpaceX, but not to PlanetSpace.  AR Tab 55 (Source Selection Statement) at 5172-82.

On January 13, 2009, PlanetSpace filed a protest of this award decision with the Government Accountability Office ("GAO") and contract performance was automatically stayed pursuant to the Competition in Contracting Act ("CICA").   On February 10, 2009, NASA issued an override of the CICA stay based on "urgent and compelling circumstances" because *inter alia* immediate contract performance was required to ensure that the awardees could launch on time and the United States' international obligations would be met.  Dkt. 17, Ex. A at 8, *PlanetSpace v. United States*, 09-cv-00099RHH.

PlanetSpace filed a Complaint in this Court shortly thereafter protesting NASA's override determination.  In an oral decision on February 20, 2009, this Court denied PlanetSpace's motions for preliminary injunctive and declaratory relief.  *See PlanetSpace v. United States*, 86 Fed. Cl. 566, 567 (2009).  In its written opinion, this Court concluded:

> NASA considered all important aspects of the contracts and
> showed that delay would adversely affect the interests of the
> United States. Plaintiff's arguments to the contrary do not diminish
> the fact that NASA's determination was not arbitrary or capricious
> but considered fully and thoroughly. The Agency's conclusions are
> reasonable.

*Id.* at 568.

On April 22, 2009, the GAO denied PlanetSpace's protest, including many of the same protest grounds contained in this proceeding, in its entirety.  AR Tab 190 (GAO Decision) (unredacted); *PlanetSpace, Inc.*, B-401016, B-401016.2, Apr. 22, 2009, 2009 CPD ¶ 103.

On July 23, 2009, *seven months* after contract award and *three months* after the GAO had denied its protest, PlanetSpace filed its Protest in this Court.  Despite months of on-going contract performance and the prior Court of Federal Claims decision upholding NASA's override decision, PlanetSpace did not seek preliminary injunctive relief, nor did PlanetSpace request an expedited briefing schedule.

**ARGUMENT**

I.     **NASA'S COMPARATIVE EVALUATION REVEALED SERIOUS WEAKNESSES IN PLANETSPACE'S PROPOSAL.**

NASA's CRS contract seeks to acquire a complex, high-risk service: the delivery of cargo and equipment to the International Space Station.  After a long and thorough source selection process, on December 23, 2008, the SSA ultimately determined that NASA should award two contracts – one to Orbital and one to SpaceX.  In a GAO protest of this award decision, which included extensive briefing and a three-day evidentiary hearing in March 2009, PlanetSpace challenged without success nearly every aspect of the Agency's evaluation and decision to award contracts to its competitors.  In the GAO protest, as in this very belated one – filed over ***seven months*** after NASA's award decision – both the written Source Selection Statement and the entirety of the administrative record show that the SSA's award decisions were reasonable, well-documented, and entirely consistent with the requisite evaluation criteria.

The SSA's decision to award contracts to SpaceX and Orbital, but not to PlanetSpace, was based on a searching, comparative analysis that revealed the awardees' proposals to be the best values and PlanetSpace's proposal to be fraught with risk and unrealistic projections.  In its papers setting forth its current protest grounds, PlanetSpace does its best to minimize or ignore outright the serious risks identified in its proposal by the SSA.  Accordingly, before turning to the specific grounds on which PlanetSpace complains about the Agency's decision, it is necessary to place PlanetSpace's protest in context by highlighting the significant risks, challenges, and discriminators that the SSA reasonably identified in PlanetSpace's proposal, especially when viewed in comparison with the proposals of Orbital and SpaceX.  The SSA, viewing PlanetSpace's proposal as a whole, rightly understood these multiple, individual risks were interrelated such that they would magnify one another in the course of performance, compounding the overall level of risk present in PlanetSpace's proposal.

A.     **PlanetSpace's Proposal Revealed Serious Technical Challenges That PlanetSpace Was Ill-Equipped to Meet.**

The SSA focused on three negative technical issues in PlanetSpace's proposal, but not the awardees' proposals, that were significant for source selection purposes: 1) PlanetSpace's decision to propose using two different launch vehicles; 2) PlanetSpace's need to re-qualify heritage components because of its use of different launch vehicles; and 3) PlanetSpace's decision to propose an inadequate payload fairing margin for the transportation of external cargo.

1.     **PlanetSpace Increased Risk and Technical Challenge by Proposing Use of Two Different Launch Vehicles.**

While both SpaceX and Orbital proposed to use the same launch vehicle for the entirety of the contract period, PlanetSpace does not have an existing launch vehicle that is suitable for use over the whole of the CRS program.  Instead, PlanetSpace proposed to use two different launch vehicles, an existing (overly large, and overly expensive) Atlas V vehicle to be followed by a "still immature" Atlas III vehicle.  AR Tab 55 (Source Selection Statement) at 5175; AR Tab 190 (GAO Decision) at 31764-65.  The SSA reasonably viewed use two different launch vehicles as a significant, negative discriminator because doing so would require "verification and integration of [PlanetSpace's] orbital vehicle with two launch vehicles . . . which potentially increases the technical and schedule risk to NASA."  AR Tab 55 at 5175.  The SSA was particularly concerned about this aspect of PlanetSpace's proposal because its schedule was already quite late as proposed: while NASA asked that resupply services begin in 2010, PlanetSpace received an evaluated weakness for proposing its first launch 23 months into the contract delivery period, in December 2011.  *Id.*  Moreover, the SSA was troubled by the fact that PlanetSpace would not provide the full-range of requested cargo services until 2013.  *Id.*

In contrast, SpaceX proposed to achieve a full range of services in 2010, AR Tab 55 (Source Selection Statement) at 5178, while Orbital proposed to begin some services in 2010,

and all services by 2012. *Id.* at 5173.  As such, not only was the SSA reasonably concerned that any problems with integration of two different launch vehicles would further delay PlanetSpace's already late schedule, he was also right to evaluate PlanetSpace's proposed use of two vehicles as inferior to the approaches presented by SpaceX and Orbital.  *Id.* at 5175, 5177.

> **2.     PlanetSpace Faced Increased Risk and Technical Challenge Because of Its Need to Re-qualify Heritage Components.**

Relatedly, the SSA was concerned with the evaluated weakness that PlanetSpace received for its need to re-qualify heritage components when transitioning to its Athena III launch vehicle from the Atlas V.  AR Tab 55 (Source Selection Statement) at 5175.  The SSA explained that "re-qualification posed a significant technical challenge" for PlanetSpace.  *Id.*  This is so because the Atlas V uses a liquid fuel engine while the Athena III would use a solid rocket motor.  As Mr. Gerstenmaier explained before the GAO, a solid rocket motor tends to have a broader and harsher acoustic environment than does a liquid engine, which means that PlanetSpace would have to design for two different vibro-acoustic environments.  AR Tab 188 (GAO Hearing Transcript ("Transcript") at 31146 (pp. 103-05).  Not only is such analysis difficult and time-consuming,  PlanetSpace's proposed approach could end up requiring the unbudgeted use of replacement hardware should its heritage components lack a sufficient design margin to survive qualification testing for the ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████  Neither Orbital nor SpaceX has a need to qualify heritage components for two different vehicles.  Accordingly, the SSA reasonably found that the "significant technical challenge" involved in re-qualification, with its stress on the cost and

management aspects of PlanetSpace's proposal, weighed against the selection of PlanetSpace. AR Tab 55 (SEB Final Report) at 5175-76; AR Tab 188 (Transcript) at 31147 (pp. 107-08).

### 3. PlanetSpace's Proposal Involved Increased Risk Because of the Need to Make Further Changes to Its Fairing Design.

The third technical discriminator that weighed against PlanetSpace's selection was PlanetSpace's evaluated weakness for proposing an inadequate payload fairing margin.  AR Tab 55 (Source Selection Statement) at 5176.  Payload fairing, as the SSA explained to the GAO, refers to the outside shroud of the launch vehicle.  AR Tab 188 (Transcript) at 31149 (p. 114). Both Mr. Gerstenmaier and the Source Evaluation Board were concerned that PlanetSpace's rocket design provided for too little margin between the fairing and the location of the external payload.  As the SEB found, PlanetSpace's failure to adjust the outside fairing in response to concerns that NASA expressed during discussions shows a "lack of realism and indicate[s] a lack of understanding of the content and complexity of resources required to perform external cargo service which can result in substantial added risk to the availability of unpressurized cargo delivery to ISS."  AR Tab 53 (SEB Final Report) at 4697.  Only PlanetSpace had the need to make further changes to its fairing design.  The SSA, moreover, reasonably determined that PlanetSpace had less ability than either Orbital or SpaceX to rise to this kind of challenge because PlanetSpace also had weaknesses in its management plan.  AR Tab 55 at 5180.

### B. PlanetSpace's Management Plan Exposed NASA to Performance Delays and Serious Financial Risks.

The risks and likely impact of these technical challenges were made more severe by the comparative inadequacies in PlanetSpace's management plan.  The SSA was troubled by three weaknesses that he deemed significant for source selection purposes in PlanetSpace's proposal: 1) PlanetSpace's use of cost-plus subcontracts, 2) the high financial risk that PlanetSpace's proposal posed to the Government given its unrealistically early schedule for receipt of milestone

payments, and 3) PlanetSpace's "lack of understanding" as to which Federal Aviation Administration permits were needed given the commercial nature of the CRS contract.

      **1.**     **PlanetSpace's Use of Cost-Plus Subcontracts Significantly Increased Risk of Cost and Schedule Problems.**

Unlike either SpaceX or Orbital, PlanetSpace proposed to use cost-type subcontracts for the development work to be performed by its much larger, more experienced subcontractors, Boeing, Lockheed Martin, and ATK – who were responsible for almost all the substantive work under the CRS contract – while PlanetSpace operated on a fixed-price basis with NASA. The SSA was concerned with two critical risks presented by this structure: *first*, that PlanetSpace would be unable to manage its large cost-plus subcontractors given a lack of appropriate management and cost controls in PlanetSpace's proposal, and *second*, that as a result of the lack of controls, PlanetSpace would experience cost overruns which would eventually be borne by NASA (in the form of poor or late performance).

As to the first risk, the SSA gave detailed testimony to the GAO explaining that PlanetSpace did not have in place sufficiently detailed cost control plans nor concrete processes to control and hold accountable the major industry players with which it had teamed. AR Tab 188 (Transcript) at 31144-45, 31188 (pp. 97-99, 270). With respect to the second risk, in its FPR, PlanetSpace openly acknowledged that its decision to use cost-plus subcontractors was a risky one. *See* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10581 ("Given that PlanetSpace is a small company with a [firm fixed price] NASA contract and with [cost plus] development subcontracts awarded to Lockheed Martin and ATK it follows that lack of effective subcontract controls could result in significant delays and cost over runs."). Although PlanetSpace claimed that its decision to use cost-plus subcontracts for development was done, "in order to reduce initial contracted value," *id.* at 10606, this meant that PlanetSpace would be responsible for cost overruns despite the fact, discussed *infra* at VII.B.1, that PlanetSpace's business plan makes

clear that it would have very little ability to absorb additional costs. *See id.* at 10590, Fig. M-1.

In contrast, both SpaceX and Orbital proposed to perform the bulk of the work under the CRS

contract themselves, and were not overly-reliant on outside subcontractors.

> **2.      PlanetSpace's Plan for the Receipt of Milestone Payments Was
>            Unrealistic and Increased Financial Risk to the Government.**

The SSA was also concerned with the "high financial risk to the Government" that

resulted from PlanetSpace's aggressive and unrealistic projections for when it could achieve

technical milestones that are tied to receipt of planned payments from the Government.  AR Tab

55 (Source Selection Statement) at 5177.  The SSA was particularly concerned with

PlanetSpace's unrealistic plan for when it would achieve the milestone known as ISS integration.

As NASA officials explained before the GAO, ISS integration is a "major readiness milestone"

that occurs prior to the first launch, and can be satisfied either analytically or through actually

launching and physically demonstrating a successful berth to the Space Station.  AR Tab 188

(Transcript) at 31420 (p. 792).  PlanetSpace's cash flow proposal was based on the assumption

that it would demonstrate ISS integration – and receive payment for this milestone – ███████

months prior to its first launch.  This SEB labeled this aspect of PlanetSpace's proposal as

"unrealistic" and "high financial risk," AR Tab 53 (SEB Final Report) at 4761, given that no

orbital vehicle, whether from NASA or one of its international partners, had ever demonstrated

ISS integration so far in advance of a launch.  As the SSA explained at the GAO hearing, if

PlanetSpace missed this unrealistic target and accordingly did not receive the early milestone

payment as planned, PlanetSpace's already high-risk business case would have been subject to

further stress.  AR Tab 188 at 31142 (p. 86).

**3.      PlanetSpace's Plan for the Receipt of FAA Licenses Revealed a Fundamental Lack of Understanding of Basic CRS Requirements.**

Finally, the SSA was also concerned with the evaluated weakness that PlanetSpace received because of the erroneous assumptions it made in addressing FAA licensing requirements.  AR Tab 55 (Source Selection Statement) at 5177.  Although the SSA recognized that the errors that PlanetSpace had made were correctible, he reasonably regarded this weakness as a discriminator because PlanetSpace's errors "demonstrated a lack of understanding about the basic requirements of the commercial nature of CRS."  *Id.*

**C.      The Flaws in PlanetSpace's Management Plan Magnified the Technical and Business Case Risks Facing PlanetSpace.**

As the SSA explained, each of the above risks and discriminators was more serious when viewed in light of all other risks identified.  For example, the SSA recognized that risks of delayed performance or cost-overruns faced by PlanetSpace were made all the more serious because of the high-risk nature of PlanetSpace's business case.  Having neither internal cash reserves, such as Orbital, nor an existing revenue stream, such as SpaceX, PlanetSpace's proposal is built on the assumption that it will borrow ████████████ of dollars to pay, on a cost-reimbursement basis, the subcontractors who will perform the vast majority of the work on the CRS contract.  *See* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10591; AR Tab 190 (GAO Decision) at 31763.

PlanetSpace's dependence on debt financing – much of which it has not even secured, *see infra* at Section VII.B.1 – makes the risks inherent in its unrealistic ISS integration schedule even greater.  PlanetSpace would be under incredible strain if it missed a targeted milestone payment given the tenuous nature of its debt financing.  Indeed, even assuming that PlanetSpace could meet its unrealistic targets for milestone payments, PlanetSpace's proposal does not project that it will achieve debt payback until ████████████████████████ AR

Tab 89 (PlanetSpace FPR, Vol. II) at 10590.  Likewise, PlanetSpace would face serious difficulties if it failed to properly control the costs incurred by its cost-plus subcontractors given that PlanetSpace's cash flow projection does not include the management cash reserve that PlanetSpace elsewhere claims to have at its disposal as a management tool.  AR Tab 188 (Transcript) at 31431 (pp. 838-39); AR Tab 190 (GAO Decision) at 31765 ("[I]t is clear from PlanetSpace's proposal that the estimated maximum cumulative debt of $█████ million did not include what PlanetSpace terms a '█ percent management reserve.'").  And though they are not present in PlanetSpace's proposal, PlanetSpace would be in need of serious management controls to deal with the cost and schedule pressures that are likely to arise in the context of qualifying two different orbital vehicles and redesigning the payload fairing.  *See* AR Tab 190 at 31765-66 (holding that the SSA was reasonably concerned by the lack of cost and management concerns in PlanetSpace's proposal).

        In short, serious interrelated risks pervaded PlanetSpace's proposal. In light of all of these concerns, the SSA rationally and reasonably considered PlanetSpace's proposal to be much higher-risk than those of its competitors:

> It's the magnitude of the debt that's incurred in combination with the contract structure where I have a cost-plus contract operating underneath a fixed-price contract. I'm told in the proposal that they will use reserves to manage that. Those reserves are not shown in the [related] chart, which would actually make it worse.  I'm told in this proposal that the [milestone] payments need to occur at a certain frequency. They don't appear to be able to occur in that frequency, so it will get worse. The schedule is already late in ████ with the delivery of my cargo. They don't have the ability to slip things later. They're doing integration of two different rockets, an [ ] Atlas V and an Athena III which puts additional cost burden, additional integration burden, additional cost risk on the program. So it's not any one of these items in general that causes a problem. But it's the accumulation of all of them in here that makes this a high risk proposal in my opinion.

AR Tab 188 (Transcript) at 31442 (pp. 89-90).

In sum, the SSA's decision to select SpaceX and Orbital for award, but not PlanetSpace, is well-reasoned and thoroughly documented. None of PlanetSpace's individual protest grounds, as discussed below, change the fact that PlanetSpace's proposal was fairly determined to be considerably higher-risk than the proposals of either SpaceX or Orbital. The SSA's judgment that selection of Orbital and SpaceX, and not PlanetSpace, provided the best chance of "maximiz[ing] the probability of success of the ISS Program" is beyond reproach. AR Tab 55 (Source Selection Statement) at 5181.

## II.   THE SSA DID NOT MAKE A RESPONSIBILITY DETERMINATION WITH RESPECT TO PLANETSPACE, AND NO REFERRAL TO THE SSA WAS REQUIRED (COUNT I).

PlanetSpace incorrectly characterizes several statements in the SSA's Source Selection Statement as constituting an "improper, actual or de facto determination of responsibility," which only could properly be made by the SBA. *See* PlanetSpace Memo at 12, 16. Orbital concurs with the detailed response to these allegations set forth in SpaceX's Response to Plaintiff's Motion for Judgment on the Administrative Record, and thus will not address this issue at length. The SSA's decision did not constitute a responsibility determination of PlanetSpace's ability or capacity to perform the CRS contract. Rather, the SSA properly conducted a meticulous comparative evaluation of the offerors' proposals in accordance with the RFP's stated evaluation criteria. *See* NASA FAR Supp. 1815.308(1). In that comparative evaluation, PlanetSpace's proposal was found wanting, and was rightfully rejected.

This Court has held that an agency may evaluate proposals using traditional responsibility factors without reaching a responsibility determination. *See YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 394 (1993). Similarly, GAO has long recognized that an agency may evaluate proposals using traditional responsibility-type factors – such as experience, past performance, and personnel qualifications, as technical evaluation factors – where a comparative evaluation of

those factors is to be made.  *See, e.g., R.L. Campbell Roofing Co., Inc.*, B-289868, May 10, 2002, 2003 CPD ¶ 37 at 10.  No SBA referral is required where a small business offeror's proposal is rejected for failing to comply with the RFP or as a result of a comparative analysis with other offerors.  *See Aeroplate Corp. v. United States*, 67 Fed. Cl. 4, 8-9 (2005); *Zolon Tech., Inc.*, B-299904.2, Sept. 18, 2007, 2007 CPD ¶ 183 at 7-8.

The case law in this Court also establishes that SBA referral is required only when the offeror is in line for award except for a responsibility determination.  *See DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 516 n.29 (2008) (finding referral to SBA required only where the small business offeror is an "apparent successful business offeror" under the comparative evaluation of proposals) (emphasis omitted) (quoting FAR 19.601(c)).

NASA's award decision was not a responsibility determination, but the product of a detailed comparative evaluation of proposals under the criteria set forth in the RFP.  In his evaluation of the Technical and Management Subfactors under Mission Suitability, the SSA reasonably found a number of significant technical and management risks that rendered the possibility of PlanetSpace's successful performance of the CRS contract "remote."  *See* AR Tab 55 (Source Selection Statement) at 5177.  The SSA was rightfully concerned with PlanetSpace's subcontracting structure and the significant financial risks presented in PlanetSpace's proposal. *Id.* at 5176-77.  As a result of PlanetSpace's weaknesses and risks, the SSA reached an unfavorable comparative evaluation of its proposal in comparison to the other proposals.

PlanetSpace fails to point to any actual or *de facto* finding of responsibility in the Source Selection Statement.  Because of the SSA's comparative evaluation of proposals which led to his choice of SpaceX and Orbital over the PlanetSpace offer, PlanetSpace was never in line for award such that a responsibility determination was required.  In the GAO protest, NASA made a binding representation that it did not make a nonresponsibility determination with respect to

PlanetSpace, AR Tab 188 (Transcript) at 31342 (pp. 480-81), and the SSA testified he "didn't look specifically at the details of [PlanetSpace's] financial resources." *Id.* at 31137 (p. 69). GAO concluded that the Agency's focus on financial risk was not a matter of responsibility, because the solicitation expressly provided for evaluation of the substantial risk of cost overruns on the part of PlanetSpace's subcontractors. AR Tab 190 (GAO Decision) at 31766 (citing *Independence Constr., Inc.*, B-292052, May 19, 2003, 2003 CPD ¶ 105 at 4). Accordingly, and contrary to PlanetSpace's contentions, the SSA had no basis for referring PlanetSpace to the SBA for a determination of responsibility.

## III. THE AGENCY CONDUCTED A PROPER TRADE-OFF ANALYSIS AMONG THE PROPOSALS (COUNT II).

"A trade-off decision is proper when it is made on the basis of a comparative assessment of proposals against all source selection criteria in the solicitation." *Marine Hydraulics Int'l, Inc. v. United States*, 43 Fed. Cl. 664, 675 (1999) (citation omitted). In reviewing a protestor's claim that a trade-off analysis was not conducted, the record is examined to determine whether the SSA performed a qualitative comparison between proposals. *E.L. Hamm & Assocs.*, B-280766.5, Dec. 29, 1999, 200 CPD ¶ 13 at 9 (holding that a trade-off analysis was sufficient where the SSA "discuss[ed] the merits of . . . [the] proposals with respect to non-cost factors" and made a trade-off decision on that basis). Even where the SSA did not fully articulate the trade-off, the protest should be denied where the decision is "clearly supported by the record." *Pressure Tech., In*c., B-265793, Dec. 29, 1995, 95-2 CPD ¶ 288 at 4.

PlanetSpace asserts that no trade-off analysis was conducted because the SSA noted in the Source Selection Statement that he could not perform a "typical" trade-off analysis. PlanetSpace Memo at 19. This protest ground should be denied because the Source Selection Statement itself, as well as the whole of the record, reveal that a searching trade-off analysis ***was*** conducted, but it was not "typical" because the decision of whether to award a contract to

PlanetSpace was not a difficult one to make in light of the combination of factors that made it much less likely, despite the individual strengths of its proposal and its lower price, that PlanetSpace could perform the contract successfully as compared with Orbital.

### A.    The Source Selection Statement Contains an Explicit Trade-off Analysis.

In the Source Selection Statement, the SSA began by addressing in detail each of the evaluation factors for all three offerors and the weight accorded to each factor by the SEB.  AR Tab 55 (Source Selection Statement) at 5167-72.  He then explained his own analysis for the offerors' non-price factors.  *Id.* at 5172.  After discussing the individual proposals in detail, the SSA performed a qualitative comparison of the non-price factors for all three proposals.  *Id.* at 5179.  At the outset, the SSA stated that he agreed with the SEB that SpaceX had submitted the highest-rated proposal.  *Id.*  The SSA then turned to comparing PlanetSpace's and Orbital's proposals and used his discretion in "weighing the relative importance of specific findings," including the aspects of the proposals that he viewed as discriminators based on his considerable experience.  *Id.*  First, he noted that, while Orbital offered to provide a full range of services on this time-sensitive contract by 2012, PlanetSpace would not be able to do so until 2013.  *Id.* Second, the SSA was concerned that PlanetSpace's proposal placed the lion's share of work in the hands of subcontractors working on a cost-reimbursement basis.  *Id.* at 5179-80.  This structure was especially troublesome to the SSA because PlanetSpace would have a firm, fixed-price contract with NASA, yet it projected it would not "recoup its sizeable investment in the CRS program until close to the end of the contract."  *Id.* at 5180.  In contrast, the SSA concluded that Orbital had a "sound and effective subcontractor management process[]," which was based in part on Orbital's "existing processes and tools to manage fixed-price spacecraft development." *Id.*

The SSA further compared Orbital and PlanetSpace's subcontracting plans. He noted that while PlanetSpace lacked the subcontractor management experience that is critical to manage a contract of this magnitude effectively, Orbital was able to take advantage of existing processes and tools for doing so.  AR Tab 55 (Source Selection Statement) at 5180.  Similarly, whereas PlanetSpace would be in a much more vulnerable position if one or more of its subcontractors were unable to perform, Orbital's plan called for only limited use of subcontractors and only to augment its sizable in-house expertise.  *Id.*  The SSA concluded that Orbital's plan decreased the risk associated with non-performing subcontractors, which was critical in light of the importance of the CRS contract.  *See id.*

The SSA's comparison of these, and other significant discriminators, led him to the inevitable conclusion that he had "much higher confidence in Orbital's ability to provide resupply services on a fixed price basis," and, therefore, that "Orbital had the second best proposal [after SpaceX] based on Technical and Management subfactors under Mission Suitability."  AR Tab 55 (Source Selection Statement) at 5180.  In short, as a result of the comparative evaluation, the SSA had significantly greater confidence in Orbital's proposal than in PlanetSpace's.

The SSA then analyzed the prices offered by all three offerors and conducted an explicit trade-off analysis.  Based on the RFP's evaluation scheme, he concluded that SpaceX proposed the lowest overall price, PlanetSpace offered the next lowest overall price, and Orbital proposed the highest overall price.  AR Tab 55 (Source Selection Statement) at 5181.  In selecting SpaceX for award, the SSA "was not required to conduct a trade-off analysis" because SpaceX had "the best technical proposal and offered the lowest overall price to the Government."  *Id.*  As between PlanetSpace and Orbital, the SSA noted that Orbital's proposal was "superior due to the serious Management risks inherent in the PlanetSpace proposal," yet recognized that PlanetSpace's

overall price was significantly lower than Orbital's. *Id.* He noted that "the evaluation criteria provided that Mission Suitability was more important than price," and concluded that he could not conduct a "typical" trade-off analysis in this instance. *Id.* Based on his comparative, detailed examination of the proposals – which spanned ten pages of the Source Selection Statement – he concluded that the relative price differential was not decisive given the fact that PlanetSpace's management and subcontracting plans were so significantly inferior to Orbital's. Despite the significant price differential between PlanetSpace's and Orbital's proposals, after making an evaluation "utilizing a combination of mission suitability and price," the SSA concluded that Orbital's proposal represented the best value to the Government, such that its selection, along with the selection of SpaceX,  would "maximize the probability" of success of the CRS program. *Id*

**B.      The SSA's Testimony Confirms That a Proper Trade-Off Was Made.**

Mr. Gerstenmaier's testimony before the GAO confirms that he conducted a comprehensive trade-off analysis and that PlanetSpace's assertions to the contrary lack merit. Noting that the "overall idea" of a trade-off analysis is to "determine which contract provides the best value to the Government,"  AR Tab 188 (Transcript) at 31229 (p. 435), Mr. Gerstenmaier explained (what is obvious from the record) that he and the SEB evaluated the price, technical, and schedule components of the proposals to determine "[w]hich contractor had the highest probability of delivering the cargo we needed to space station in the time frame that we needed it for a price that was reasonable." *Id.* at 31229 (p. 436).  Mr. Gerstenmaier used his entire evaluation of the competing proposals, including the SEB charts that were used to present the proposals to him, as the basis for conducting his trade-off analysis. *Id.* at 31229 (pp. 434-35).

Mr. Gerstenmaier and the SEB came to the consensus that PlanetSpace's lower price did not constitute the best value.  AR Tab 188 (Transcript) at 31229 (p. 437).  He considered whether

Orbital's higher price was "worth it," and concluded that it was. *Id.* at 31229 (p. 436).

Mr. Gerstenmaier explained that "[p]rice was a consideration," but because the "overall

requirements of the RFP [direct that] mission suitability is more important than price," he

"looked at mission suitability first, but didn't totally ignore price" in deciding to award the

contract to Orbital. *Id.* at 31230 (p. 438). Indeed, Mr. Gerstenmaier testified that in his

discussions with the SEB, he and the SEB "probably went into [price considerations] in more

detail than [they] typically would because [he] ha[s] to go justify these number to Congress and

to [the Office of Management and Budget]." *Id.* at 31158 (p. 150). Thus, despite the fact that

PlanetSpace purported to offer NASA a "real price advantage," *id.* at 31230 (pp. 438; 439-40),

Mr. Gerstenmaier and the SEB discussed which proposals offered "the highest probability of

being able to achieve our overall needs." *Id.* at 31230 (p. 441). Mr. Gerstenmaier was

concerned that the price advantage proposed by PlanetSpace could turn out to be illusory, as he

did not "see evidence in [PlanetSpace's] proposal that they had the right [cost and management]

controls in place to be able to perform at the level they bid on the proposal." *Id.* at 31191 (p.

282). Accordingly, at the meeting at which the selection decisions were made, Mr. Gerstenmaier

summarized for the SEB and all of the NASA senior advisors who were present all of the

discriminators he found in making his selection decision, and the "SEB and all of [his] advisors"

concurred with the decision. *Id.* at 31231 (p. 442).

　　The Source Selection Statement, either standing alone or viewed in the context of Mr.

Gerstenmaier's testimony and the record as a whole, establish that a trade-off analysis was

completed in a comprehensive and thorough fashion. PlanetSpace's comparison of this case to

the Court's recent decision in *Wackenhut Services v. United States*, 85 Fed. Cl. 273 (2008), is

wholly inapposite. PlanetSpace Memo at 20. In *Wackenhut*, this Court sustained a protest where

the written source selection decision "contain[ed] absolutely no discussion about the relevant

factors" for the trade-off decision.  85 Fed. Cl. at 307.  This case could hardly be more different, as the SSA's written decision expends ten pages discussing factors relevant to the trade-off decision, and includes three pages of explicitly comparative discussion, and contains a section integrating the previous discussion, captioned "Trade-off Analysis."  *See* AR Tab 55 (Source Selection Statement) at 5172-82.  As is required, the SSA "in this case exercised his 'independent judgment' and specifically identified the 'benefits associated with additional costs.'"  *Marine Hydraulics Int'l, Inc.*, 43 Fed. Cl. at 676 (citing FAR 15.308).  Accordingly, this protest ground should be denied.

## IV.    THE SSA WAS PROPERLY CONCERNED WITH RISK AND PLANETSPACE'S LACK OF A BACK-UP PLAN (COUNT III).

PlanetSpace also argues that the SSA unreasonably questioned PlanetSpace's proposal based on its lack of a back-up plan for subcontract performance, but failed to raise the same concern over the lack of a back-up plan for Orbital's subcontractors.  PlanetSpace Memo at 22.  PlanetSpace argues that this is evidence of an unstated evaluation criterion.  *Id.*  That is not so.  The context and substance of the SSA's discussion makes clear that a back-up plan itself was not a requirement; PlanetSpace's lack of such a plan was simply evidence of its failure to address and mitigate the considerable risks inherent in its approach.

Given Orbital's vast experience with fixed-price contracts and its use of cost controls, for which it was awarded two significant strengths, AR Tab 55 (Source Selection Statement) at 5174, the SSA rationally determined that he had no reason to consider whether Orbital had a back-up plan for its subcontractors.  PlanetSpace, in contrast, presented a risk-laden management approach and has little experience managing large and more experienced subcontractors.  *See id.* at 5175-76.  Furthermore, PlanetSpace's subcontractors are set to perform the bulk of the development work under the CRS contract, under risky cost-plus subcontracts.  *Id.* at 5176.

Taking into account the risks presented in PlanetSpace's management structure and its financing plan, the SSA reasonably voiced his concern that PlanetSpace lacked a subcontractor backup plan for mitigating its risks. There is no evidence that a back-up plan was a stand-alone evaluation criterion.

## V.     THE SSA'S EVALUATION OF PLANETSPACE'S PAST PERFORMANCE WAS REASONABLE AND COMPLIED WITH ALL APPLICABLE REQUIREMENTS (COUNT IV).

PlanetSpace argues that the SSA's treatment of PlanetSpace was improper because 1) there is no requirement in the RFP or applicable regulations that PlanetSpace have a "corresponding strength" to its subcontractors, 2) that the SSA failed to credit the past performance of PlanetSpace's "key employees," and 3) that the SSA treated PlanetSpace's lack of relevant past performance negatively, in violation of FAR 15.305(a)(2)(iv). PlanetSpace Memo at 25-26. None of these arguments has merit.

First, the SSA's decision not to treat the past performance of PlanetSpace's subcontractors as a discriminator in its favor in no way shows that there was an unstated "corresponding strength" requirement. Instead, the SSA's evaluation was entirely consistent with the Solicitation criteria. Indeed, during Oral Discussions on October 21, 2008, NASA specifically notified PlanetSpace that "[f]irms that are submitting a proposal as a prime-subcontractor relationship will be evaluated on the ***combined past performance*** of each company involved in the proposal." AR Tab 49 (Oral Discussions w/ PlanetSpace) at 3700 (emphasis added). And that is exactly what the SSA did. The SSA reasonably determined, because PlanetSpace had no relevant experience in development, production, and operation of large, complex space system, that the experience of PlanetSpace's subcontractors was offset by its own lack of experience as a prime contractor. The SSA reasonably believed this presented a significant risk in PlanetSpace's proposal, particularly given the complexity of the CRS contract.

AR Tab 55 (Source Selection Statement) at 5180.  Thus, the SSA properly concluded the SEB's

finding did not weigh in favor of PlanetSpace's selection and could not be a discriminator, since

the FAR requires a neutral rating for contractors with little or no past experience.  *See id.* at

5174-75.

Second, the record makes clear that the SSA did consider and credit PlanetSpace's key

personnel.  During the Source Selection Presentation, the SSA took particular note of the

significant management structure and personnel changes that PlanetSpace had made in its final

proposal.  The SSA and his advisors asked additional questions about the experience and

expertise of PlanetSpace's key personnel.  AR Tab 186 (COSF) at 31045.87.  In this same

discussion, risk was discussed in the context of the ability of a small prime contractor to manage

a fixed-price contract with its key personnel required to manage and control very large cost-plus

development subcontractors.  *Id.*  Mr. Gerstenmaier expanded on this issue in his testimony

before the GAO.   Although he testified that PlanetSpace's key personnel are "excellent" and

"really good folks" with "a proven track record . . . in terms of being able to deliver on contracts

and work," AR Tab 188 (Transcript) at 31131 (p. 43), those personnel did not assuage his

overriding concerns about PlanetSpace's proposal.

The issue for Mr. Gerstenmaier was the contract structure and management plan

proposed by Planet Space: although PlanetSpace employed "very capable people," PlanetSpace's

proposal to have cost-plus subcontractors perform the majority of the work underneath a fixed-

price prime contract meant that its key personnel would be in a "very tough situation with the

way the basic contract structure is put together to be able to effectively control the cost[,] deliver

the cargo and the activity in the time needed."  AR Tab 188 (Transcript) at 31131 (p. 44).  As

Mr. Gerstenmaier affirmatively testified that he credited PlanetSpace with employing capable

key personnel, *see id.* (p. 43), it is plainly not true, as PlanetSpace asserts, that the SSA "gave

absolutely no consideration" to the experiences of its management team.  PlanetSpace Memo at 26.  The SSA was not required to disregard the serious risks in PlanetSpace's proposal because of the work history of a few of its high-level personnel.  PlanetSpace's argument to the contrary amounts to nothing more than baseless disagreement with NASA's evaluation of its proposal.  *See Wackenhut Servs., Inc.,* B-400240, B-400240.2, Sept. 10, 2008, 2008 CPD ¶ 184 at 6.

Third, there is no evidence that the SSA treated PlanetSpace's lack of past performance negatively.  Indeed, in denying all of PlanetSpace's previous protest grounds, the GAO explicitly rejected this argument, stating that "the SSA determined only that the protester's record of past performance should not be considered as a discriminator; he did not downgrade the proposal overall under the past performance factor."  AR Tab 190 (GAO Decision) at 31763.  Because the SSA merely offset to neutral two SEB findings which were based solely on the strength of PlanetSpace's subcontractors, and accordingly treated PlanetSpace's own lack past performance as neither a positive or a negative, this protest ground should again be rejected.

## VI.    NASA'S SELECTION OF ORBITAL COMPLIED WITH THE U.S. SPACE TRANSPORTATION POLICY (COUNT V).

PlanetSpace contends that NASA violated the U.S. Space Transportation Policy by failing to ascertain whether the launch vehicle offered by Orbital is manufactured in the United States, or exempted by the White House Office of Science & Technology Policy ("OSTP").  *See* PlanetSpace Memo at 27-31.  PlanetSpace also claims that Orbital's Taurus II configuration has evolved over time, so that prior U.S. manufacture determinations by OSTP for Orbital's rocket are of no relevance to the CRS contract.  For the reasons discussed below, these contentions are without merit and this protest ground should be denied.

### A.    OSTP Is Vested with Authority to Interpret the U.S. Space Transportation Policy.

OSTP has responsibility to implement the U.S. Space Transportation Policy:

> United States Government payloads shall be launched on space
> launch vehicles manufactured in the United States, unless
> exempted by the Director of the Office of Science and Technology
> Policy, in consultation with the Assistant to the President for
> National Security Affairs.

*See* U.S. Transportation Policy Fact Sheet at 7, issued Jan. 6, 2005, *available at*

http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf; *see also* 42 U.S.C §

16614(a) ("NASA shall not launch a payload on a foreign vehicle except in accordance with the

Space Transportation Policy announced by the President on December 21, 2004.").

In accordance with this Space Transportation Policy, before the CRS RFP was issued, in

response to industry questions, NASA informed potential offerors:

> The U.S. Space Transportation Policy requires that "United States
> Government payloads shall be launched on space vehicles
> manufactured in the United States."  Interpretation of this
> provision is the responsibility of the White House Office of
> Science and Technology Policy (OSTP).  Historically, the
> domestic manufacturing requirement has been interpreted to apply
> to launch vehicles and not payloads.  NASA has not consulted with
> OSTP to evaluate a transfer vehicle under the policy.  NASA
> would seek to consult with OSTP about the application of the
> policy requirement to any specific proposal.

AR Tab 182 (Exchanges w/ Offerors) at 30861.

NASA reiterated the applicability of the Space Transportation Policy in the CRS

Solicitation.  The RFP required each offeror to certify whether or not it was "using space

vehicles manufactured in the United States in accordance with U.S. Space Transportation Policy

dated 21 December 2004."  AR Tab 30 (RFP, Amendment 3) at 1972.  Amendment 1 of the RFP

again stated NASA's intention to consult with OSTP about the application of the policy to the

CRS proposals.  AR Tab 28 (RFP, Amendment 1) at 1503; *see also* Tab 182 (Exchanges w/

Offerors) at 30861.

-24-

B.     **NASA Properly Consulted with OSTP About Application of the Space Transportation Policy with Respect to CRS Proposals, and Obtained OSTP's Approval To Proceed with Orbital's Proposal.**

In its initial proposal, Orbital confirmed its understanding of the requirements of the Space Transportation Policy, and explained its intent to comply as follows:

> Pursuant to these sections of the National Space Policy, from 2005 through 2007 Orbital provided materials and briefings to the White House Office of Science and Technology Policy (OSTP)-led interagency group tasked with reviewing Taurus II compliance. The interagency group completed its policy compliance review in July 2007, and notified Orbital that Taurus II would be treated as a launch vehicle manufactured in the United States and be eligible to launch US Government payloads.

AR Tab 69 (Orbital Initial Proposal, Vol. I) at 6425.

Orbital's initial proposal also set forth that the principal foreign components in the Taurus II are the two Taurus II first stage engines, which Orbital intends to purchase from Aerojet at the engines' current location in Sacramento, California, but were originally designed and produced in Russia for use on the Russian N-1 launch vehicle.  AR Tab 69 (Orbital Initial Proposal, Vol. I) at 6426; AR Tab 70 (Orbital Initial Proposal, Vol. II) at 6589; AR Tab 85 (Orbital FPR, Vol. II) at 9852, 9854.  In addition, the Taurus II first stage body will be built by ███████ of Ukraine, as will the propellant level sensing system in the first stage.  *See* AR Tab 70 at 6589; AR Tab 85 at 9852.  Finally, several electronic components will be provided by ███████████████████████████████████████████  *See* AR Tab 70 at 6589, 6598-99; AR Tab 85 at 10013.[1]

---

[1]  In contrast to Orbital's forthright proposal discussion of its foreign content, PlanetSpace ignored its intent to use foreign launch vehicle components and stated flatly that all of its space vehicle manufacturing activities would take place in the United States.  *See* AR Tab 73 (PlanetSpace Initial Proposal, Vol. I) at 7352.  Specifically, PlanetSpace omits any discussion of the fact that its Atlas V launch vehicle ████████████████████  *See* AR Tab 188 (Transcript) at 31148 (p. 111); AR Tab 186 (LM) at 31029 ████████████████ ████████████████

On July 22, 2008, NASA sought review from OSTP to ensure compliance of all three offerors' initial proposals[2] with the Space Transportation Policy.  AR Tab 173 (OSTP cont'd) at 29279.  NASA provided to OSTP a detailed explanation of the foreign content of Orbital's proposed CRS system, based on the details of the domestic and foreign components of the Taurus II as set forth in Orbital's initial proposal.  *Id.* at 29281.

On October 24, 2008, Lynn Cline, NASA Deputy Associate Administrator, and thus a Deputy to NASA's SSA, William Gerstenmaier, then met with Damon Wells at OSTP for review and approval of the CRS offerors' proposals under the Space Transportation Policy.  *See* AR Tab 67 (OSTP) at 6316.  During this meeting, Mr. Wells confirmed OSTP's July 2007 determination that Orbital's Taurus II qualifies as U.S.-manufactured and is thus eligible to launch U.S. Government payloads, and communicated OSTP's further determination that NASA could proceed with its CRS procurement with no further interagency review.  *Id.*  OSTP's determination was documented prior to award of the CRS contract in the form of a memorandum to the record, prepared by Ms. Cline, dated December 12, 2008.  *Id.*

It is thus manifest that OSTP and NASA fully complied with the mandate of the Space Transportation Policy, and OSTP's conclusions were confirmed by NASA before award.  NASA expressly obtained OSTP's approval of Orbital's Taurus II rocket as complying with the U.S. Space Transportation Policy.

PlanetSpace wildly claims that Mr. Wells might have lacked delegated authority to make required OSTP determinations with respect to the Space Transportation Policy.  PlanetSpace Memo at 30.  Mr. Wells is a Senior Analyst who reports to the Assistant Director of Space and Aeronautics of OSTP.  *See* http://www.ostp.gov/cs/about_ostp/leadership_staff.  In the absence

_____

[2] PlanetSpace wrongly insinuates that NASA was "concerned" with whether Orbital alone complied with the Space Transportation Policy and requested guidance from OSTP only with

of any evidence that OSTP did not approve or has otherwise disavowed Mr. Wells'
communication of OSTP's determinations to NASA, PlanetSpace's speculative allegations about
his lack of authority are nothing short of frivolous.

**C.      OSTP Also Determined that Orbital's Foreign Cargo Vehicle Satisfies the Space Transportation Policy.**

PlanetSpace asserts that OSTP also failed to decide whether Orbital's "cargo vehicle,"
which is part of the payload of the rocket and not part of the launch vehicle, should be
disqualified under the Space Transportation Policy.  PlanetSpace Memo at 31.

NASA explained to industry even before the RFP was issued that "[h]istorically, the
[Space Transportation Policy] domestic manufacturing requirement has been interpreted to apply
to launch vehicles and not payloads."  AR Tab 182 (Exchanges w/ Offerors) at 30861.  This is
consistent with the very terms of the Space Transportation Policy, which applies to "launch
vehicles" and does not refer to payloads.  *See* U.S. Transportation Policy Fact Sheet at 7, issued
Jan. 6, 2005, *available at*

http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf

Orbital described in its initial proposal that its "Pressurized Cargo Module" would be
built by Alenia in Turin, Italy, AR Tab 70 (Orbital Initial Proposal, Vol. II) at 6552, 6599, 6677,
and this fact was explicitly included by NASA in its request to OSTP for guidance on all three
proposals in July 2008.  AR Tab 173 (OSTP cont'd) at 29279, 29281.  As NASA's December
12, 2008, memorandum made clear, OSTP confirmed that a "reasonable interpretation of the
policy refers to the launch vehicle ***and not the payload***," *i.e.* the cargo vehicle, but that OSTP
had not previously determined this question generically because of concerns about the possibility
of that one of the offerors would propose a "fully foreign cargo transfer vehicle."  AR Tab 67

---

respect to Orbital's proposal.  *See* PlanetSpace Memo at 28.

(OSTP) at 6316 (emphasis added).  OSPT thus left open the possibility that its approval would

be required for a fully foreign cargo transfer vehicle, with no domestic content.[3]  In OSTP's

meeting with NASA in October 2008, OSTP determined that Orbital's cargo vehicle did not

contravene the Space Transportation Policy, and authorized NASA to proceed.  *Id.*

**D.      Orbital Submitted a Valid Certification of Its Compliance with the Space
Transportation Policy.**

PlanetSpace also asserts that Orbital's certification, stating that "to the best of its

knowledge and belief" it was proposing to use "space vehicles manufactured in the United States

in accordance with the Space Transportation Policy," AR Tab 69 (Orbital Initial Proposal, Vol. I)

at 6424, did not satisfy the Space Transportation Policy.  PlanetSpace Memo at 28, n.3.  The

short answer is that Orbital's certification is in the ***precise words*** required by the RFP, AR Tab

30 (RFP, Amendment 3) at 1972 and, indeed, in the same words used by PlanetSpace for its

corresponding certification, AR Tab 73 (PlanetSpace Initial Proposal, Vol. I) at 7351.  Based on

OSTP's 2007 determination that Orbital's Taurus II rocket satisfies the Space Transportation

Policy, Orbital's CRS certification of U.S.-manufacture is beyond reproach.

**E.      NASA Did Not Rely Solely on OSTP's Prior Determination that Orbital's
Taurus II Satisfied the Space Transportation Policy.**

PlanetSpace acknowledges, as it must, that there is "some indication" in the record that

OSTP determined in July 2007 that Orbital's Taurus II rocket was manufactured in the U.S. for

purposes of the Space Transportation Policy.  PlanetSpace Memo at 28.  PlanetSpace goes on to

---

[3]  NASA in fact inquired further of Orbital during discussions concerning the foreign content of
the "visiting vehicle" proposed by Orbital.  AR Tab 142 (E-mails, Jeffrey R. Theall) at 25179.
Orbital responded fully to NASA's inquiry, *see id.*, stating that the manufactured cost of non-
U.S. subsystems in its visiting vehicle comprise ███████████  Dkt. 43, Ex. 1, *PlanetSpace v. United States*, Case No. 09-476C, and thus
demonstrating compliance with the Space Policy even if it were applied to the cargo vehicle.

allege, relying on hearsay allegations not part of the Administrative Record,[4] that if Orbital's

prior Taurus II "U.S.-manufacture" determination was made in connection with its COTS

contract with NASA, certain supposed "changes" in the Taurus II between Orbital's COTS and

CRS proposals would render OSTP's approval out-of-date and inapplicable.  *Id.* at 28-29.

PlanetSpace again misses the mark for two reasons.

      First, while Orbital correctly informed NASA of its July 2007 inter-agency "U.S.

manufacture" determination, AR Tab 69 (Orbital Initial Proposal, Vol. I) at 6425, neither Orbital

nor NASA relied solely upon that prior determination for Space Policy compliance under the

CRS contract.  Instead, in July 2008 NASA presented the details of Orbital's specific CRS

Taurus II configuration to OSTP for approval, AR Tab 173 (OSTP cont'd) at 29279, and

obtained OSTP's specific determination on that configuration.  AR Tab 67 (OSTP) at 6316.

OSTP's determination reaffirmed its July 2007 determination that Orbital's Taurus II qualifies as

U.S.-manufactured.

      Second, the configuration of Orbital's standard Taurus II Rocket ███████████

███████████████████ including the first stage Russian engines and the first stage

manufactured in Ukraine.  Orbital's "enhanced" Taurus II offered to NASA as part of Orbital's

CRS proposal differs only in ███████████████████████████ AR

Tab 85 (Orbital FPR, Vol. II) at 9852-53, 9862-64 (discussing replacement of the Taurus II's

---

[4]  By Motion to Strike dated September 8, 2009, the United States moved to strike all three of
PlanetSpace's obviously improper declarations, including the declaration of Michael Bowker
("Bowker Decl."), on which PlanetSpace relies for all of its factual allegations about supposed
differences between Orbital's CRS and COTS Rocket designs.

[5]  Orbital's proposal explains that the CRS system is ████████████████████
████████████████████████████████  AR Tab 70 (Orbital Initial
Proposal, Vol. II) at 6457; Tab 85 (Orbital FPR, Vol. II) at 9829.

████████████████████████████████████████████

███████████████████████████████

PlanetSpace wrongly relies on the Bowker Declaration, at ¶¶ 75-76, as support for the incorrect notion that Orbital's COTS Taurus II rocket differs in foreign content from the CRS Taurus II rocket.  PlanetSpace Memo at 27-39.  That reliance is entirely misplaced.  Mr. Bowker's ¶ 75 draws only an irrelevant comparison between Orbital's original Taurus rocket (used *neither* in COTS nor CRS), *see* http://www.orbital.com/NewsInfo/Publications/Taurus_fact.pdf, and Taurus II – which is used *both* in COTS *and* CRS, *see* http://www.orbital.com/NewsInfo/Publications/TaurusII_fact.pdf. The first stage of Taurus II is of course manufactured in the Ukraine, Bowker Decl. ¶ 75, as Orbital's proposal and NASA's July 2008 memorandum to OSTP make clear, AR Tab 70 (Orbital Initial Proposal, Vol. II) at 6480, 6589; AR Tab 85 (Orbital FPR, Vol. II) at 10013; AR Tab 173 (OSTP cont'd) at 29281.  Nor does Orbital's consideration after CRS award of changing one Russian engine for another Russian engine, *see* Bowker Decl. ¶ 76, make any difference in NASA's compliance with the Space Transportation Policy.  Any such consideration by Orbital is obviously a matter of contract administration only, not subject to review in this protest.  *See Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 755 (2006).

    **F.**    **The Space Transportation Policy Does Not Require a Determination by OSTP Prior to Launch.**

Even if OSTP had not rendered an affirmative determination as to the U.S.-manufacture of Orbital's Taurus II before award, PlanetSpace's protest on this ground would be unavailing. By its terms, the Space Transportation Policy prohibits the Government only from *launching* foreign manufactured space launch vehicles.  *See* U.S. Transportation Policy Fact Sheet at 7, issued Jan. 6, 2005, *available at* http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf.  Compliance with this

requirement is thus a matter of contract administration to be determined *after* contract award, but

before the first launch. *See Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738 (2006);

*Chapman Law Firm v. United States,* 63 Fed. Cl. 519, 529-30 (2005). Thus, as long as OSTP's

determination is made prior to launch of the Taurus II, the requirements of the Space

Transportation Policy will be met. As a matter of contract administration and not a solicitation

requirement, compliance with the Space Transportation Policy need not be determined prior to

contract award.

Accordingly, NASA fully complied with the U.S. Space Transportation Policy in

confirming the U.S. manufacture of Orbital's Taurus II Rocket, and NASA's award to Orbital on

that basis is entirely proper.

## VII.   THE SSA RATIONALLY ASSESSED THE RISKS OF PLANETSPACE'S SUBCONTRACTING AND FUNDING APPROACHES (COUNT VI).

PlanetSpace contends NASA improperly assessed the risks both of PlanetSpace's undue

reliance on cost-plus development subcontractors and of its delayed recoupment of contract

costs. PlanetSpace Memo at 31-34. The SSA determined that PlanetSpace's "subcontracting

structure . . . represented a significant risk to the successful performance of the program. [He]

believed it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when

most of the effort in the early stages of the contract would be performed under cost type

subcontracts." AR Tab 55 (Source Selection Statement) at 5176. Similarly, he was concerned

that "PlanetSpace did not project it would recoup its sizable investment in the CRS program until

close to the end of the contract." *Id.* at 5180. Collectively, "[t]hese risks made [the SSA] believe

it was highly unlikely PlanetSpace would have the ability needed to address technical challenges

in its proposal . . . ." *Id.* PlanetSpace's criticisms of these findings are without merit.

A.   **PlanetSpace's Use of Cost-Type Subcontracts for the Development Phase of the Contract Posed Significant Performance Risks.**

PlanetSpace proposed to award more than $███ million in cost-plus subcontracts to Lockheed Martin/Boeing and ATK for the "development of Athena III launch vehicle and modular orbital transfer vehicles." AR Tab 191 (Supplement to the Administrative Record) at 31780-81. PlanetSpace's use of cost-type development subcontracts under a fixed-price prime contract posed significant risks to contract performance. The SSA's decision to classify that subcontract structure as a negative discriminator, AR Tab 55 (Source Selection Statement) at 5176-77, 5179-80, is thus beyond reproach.

1.   **The Cost-Plus Development Subcontracts Are Inherently Risky.**

PlanetSpace's cost-plus development subcontractors would not bear any cost risk and thus would have little, if any, incentive to control costs. *See* AR Tab 188 (Transcript) at 31427 (p. 820). Although it now seeks to downplay the risk, PlanetSpace earlier acknowledged its use of cost-plus development subcontracts could result in significant schedule delays and cost overruns. *See, e.g.,* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10581 ("Given that PlanetSpace is a small company with a [Firm Fixed Price] NASA contract and with [Cost Plus Fixed Fee/Incentive Fee] development subcontracts awarded to Lockheed Martin and ATK it follows that lack of effective subcontract controls could result in significant schedule delays and cost over runs."); AR Tab 89 at 10607.

Lockheed Martin/Boeing and ATK likely understood that there was significant risk inherent in PlanetSpace's technical approach, given their decisions to perform the development work only on a cost-reimbursement basis. These industry veterans have experience with the technical, schedule, and cost risks inherent in fixed-price development subcontracts, and were in a position to assess the immaturity of PlanetSpace's proposed approach. As the SSA observed, it is thus telling that each chose to perform the required development work for PlanetSpace only on

a cost-reimbursement basis.  AR Tab 188 (Transcript) at 31191 (p. 283) ("I also questioned why Boeing and Lockheed didn't bid this as fixed price work if they thought it was understood and financially controllable.").

According to PlanetSpace itself, the cost-plus subcontract structure "buffers financial risk exposure" for its larger, more experienced subcontractors, thereby allowing them to participate in the CRS project.  *See* AR Tab 74 (PlanetSpace Initial Proposal, Vol. II) at 7498 (Fig. M1.A-1). Later, PlanetSpace was even more explicit:  "Cost plus is used for development in order to reduce *initial* contracted value.  If a fixed price [sub]contract were used for development, the [sub]contract value would be priced to include risk assessment costs.  The costs for risks that never arise during the program are therefore billed to PlanetSpace and are not recoverable."  AR Tab 89 (PlanetSpace FPR, Vol. II) at 10606 (emphasis added).  Put another way, PlanetSpace's fixed prices were based on rosy projections of development costs, to which the subcontractors themselves would not contractually commit; to the contrary, their subcontract prices would have been higher under fixed-price contracts.  *Id.*

### 2.    The SSA Understood the Scope of the Cost-Plus Subcontracts.

PlanetSpace argues that the "main element in the SSA's risk assessment, that 'much of the work would be performed on large subcontracts on a cost reimbursement basis,' is simply untrue."  PlanetSpace Memo at 32 (no citation provided).  PlanetSpace contends instead that "■% of the subcontracted work was on a fixed-price basis."  *Id.*  The implicit assertion – that the SSA mistakenly believed that the majority of the *total* subcontract effort would be performed on a cost-reimbursement basis – is itself simply untrue.  Instead, the SSA "believed it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when most of the effort *in the early [development] stages of the contract* would be performed under cost type subcontracts."  AR Tab 55 (Source Selection Statement) at 5176 (emphasis added).

PlanetSpace also seeks to denigrate the significance of the cost-plus subcontracts by claiming that "[t]he remaining ██% covered development work to be performed on *existing heritage components* for which most of the development work has already been completed." PlanetSpace Memo at 33 (citing AR Tab 191 (Supplement to the Administrative Record) at 31781).  Notably, the cited reference provides no support for the assertion that "most of the development work had been completed."  Instead, the record reflects that PlanetSpace consistently underestimated the risk of cost growth and schedule delays by relying on optimistic assessments of the maturity of individual components.

PlanetSpace's assertions about the maturity of its approach are based on the technology readiness levels ("TRLs") that PlanetSpace had assigned to particular CRS components.  *See, e.g.,* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10482-83.  TRLs are based on a scale from 1 to 9, with TRL 1 being an idea or concept that has yet to be proven, TRL 8 being a fully qualified system or element that has flown or is about fly in space, and TRL 9 being an operational system.  AR Tab 188 (Transcript) at 31421 (p. 797).  NASA believed that the component-level TRLs assigned by PlanetSpace overstated the maturity of its proposed system because the individual components had not yet been integrated into a functional system:

> There's still configuration changes that have to be made, there's still software that has to be coded, there's still integration and testing and certification that has to happen at the system level. And then at the next level up, there's a parallel development as well where we take many systems, propulsion, life support, power, thermal, and so forth, and we have to integrate those together into an operational spacecraft, and then there's multiple different spacecraft configurations for unpressurized, for pressurized, for return [cargo].  So . . . the big picture view . . . was that even though the TRLs for components may be high, at the integrated system or integrated element level, there's still some serious work to be done, which of course leads to . . . serious cost ahead of us as [to] development of these systems.

*Id.* at 31425 (p. 812-13); AR Tab 190 (GAO Decision) at 11 ("NASA noted that PlanetSpace had assumed technology readiness levels of ▮ (on a scale of 1 to 9 with 9 representing an operational system), for more than half of listed subsystem components, which the agency viewed as unrealistically high."). The SSA agreed, noting that, while the individual components for CRS are known and at least partially developed, "the challenge of CRS is integrating them all into a service to provide cargo to station." AR Tab 188 at 31150 (p. 119).

Finally, PlanetSpace attempts to minimize the risk of its cost-plus development subcontracts by claiming that much of the work under those subcontracts "was itself to be [further] subcontracted by PlanetSpace's subcontractors on a firm, fixed-price basis." PlanetSpace Memo at 33. But the SSA specifically considered that argument, and properly concluded that the fixed-price third tier vendor work did not mitigate the risk still present in the cost-plus contracts held by Boeing, Lockheed Martin, and ATK. As the SSA explained: "[I]t's not the fixed price vendor work that causes . . . problems. It's the integration activity, it's the analysis activity, it's the computer runs, the other integration and overhead, even sometimes their management systems, earned value, et cetera, [that] are the basis for the cost increases I see under [Boeing and Lockheed Martin's] cost-plus contracts." AR Tab 188 (Transcript) at 31208 (p. 353).[6] As noted above, Boeing, Lockheed, and ATK likely concurred that technical and cost risk remained inherent in PlanetSpace's technical approach, given their decisions to perform development only on a cost-reimbursement basis.

------------------------------------------------------------

[6] *See also* AR Tab 190 (GAO Decision) at 13 ("NASA's concerns extended beyond the proportion of the contract effort that was expected to be cost-based. In this regard, NASA evaluated the technology readiness levels assumed by PlanetSpace as unrealistically high, and found the assumed development costs to be inadequate in light of the significant effort that would be required to integrate multiple components for three different orbital vehicle configurations and a launch vehicle. Furthermore, it was NASA's experience that required integration efforts had been the basis for cost increases under prior NASA cost-plus contracts with [Lockheed Martin] and Boeing.").

### 3.   The SSA Fully Considered PlanetSpace's Management Team.

PlanetSpace also attacks NASA's assessment of the risks of PlanetSpace's cost-plus subcontracts by asserting the SSA "ignore[d]" PlanetSpace's purported "expertise in project management, including several employees with *decades* of experience in managing cost reimbursement subcontracts under fixed price prime contracts," primarily the experience of PlanetSpace's Chief Operating Officer.  PlanetSpace Memo at 33.  That charge is baseless.  The SSA specifically noted the "significant strength" assigned to PlanetSpace for "its management team's key personnel and subcontractors."  AR Tab 55 (Source Selection Statement) at 5176; *see* AR Tab 53 (SEB Final Report) at 4726-27.

The SSA properly concluded, however, that the significant strengths assigned by the SEB for PlanetSpace's management team's key personnel and subcontractors (Finding 260) and for providing additional information on and augmenting its teaming arrangement (Finding 282) "were offset as being discriminators for selection because of the absence of a corresponding strength regarding the prime contractor's abilities to perform the contract."  AR Tab 55 (Source Selection Statement) at 5176.  The SSA explained:  "It can be a significant strength to have strong subcontractors; however, I did not believe these findings should be discriminators for selection when almost all of the technical expertise appeared to reside at the subcontractor level." *Id.*  Indeed, although PlanetSpace lacked technical expertise and intended to rely heavily on its subcontractors to perform nearly all of the development work under the CRS contract, *see* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10606 (Fig. M1.B-1), PlanetSpace nonetheless intended to serve as "the single point of responsibility, authority, and accountability to NASA for ISS CRS services and program performance."  *Id.* at 10595.

The SSA did not disagree with the SEB's recognition of the individual management strengths for PlanetSpace's key management personnel and teaming arrangements. *See* AR Tab

188 (Transcript) at 31129, 31192 (pp. 35, 287-88); *cf.* AR Tab 55 (Source Selection Statement) at 5176.  However, he concluded that these strengths must properly be viewed through the lens of the overall teaming arrangement through which they would operate, *i.e.,* whether the proposed prime contractor has the processes and controls in place able to achieve the outcome described by the technical teaming arrangement.  AR Tab 188 at 31129, 31192 (pp. 35, 287-88).

Here, the SSA believed that no matter how strong PlanetSpace was technically in the individual areas of management personnel and teaming arrangements, it would have a very difficult time trying to manage the subcontractors below, given the cost-plus nature of the development subcontracts and the lack of technical expertise at the prime contractor level.  AR Tab 55 (Source Selection Statement) at 5176-77; AR Tab 188 (Transcript) at 31129 (p. 36).  The SSA reasonably determined that these individual strengths were neutralized because PlanetSpace's proposed management construct made it very difficult, if not impossible, for those strengths to be demonstrated through successful performance.  He questioned whether PlanetSpace's proposal offered the programmatic elements necessary to control cost and schedule and to incentivize contractors to deliver on the cost profile it promised to NASA, *see* AR Tab 188 at 31192-93 (pp. 288-90), and properly concluded that it did not:

> You can take the best project manager in the world and put him in a contract that just cannot deliver no matter what he does.  And the question[,] was there enough in the proposal that showed that the contract structure would allow these people [to] excel and to use their skills the way they have in past contracts.  And that's what I couldn't find in the proposal.

*Id.* at 31195 (p. 298).  Thus, NASA's experienced SSA reasonably determined that the experience of PlanetSpace's proposed Chief Operating Officer and other key personnel was not

sufficient to mitigate the risks posed by PlanetSpace's proposed subcontracting approach.[7]  *Id.* at

31129 (pp. 36-37).

      **B.**      **PlanetSpace's Tentative Financing and Delayed Funding Schedule Exacerbate the Risks of Its Proposed Approach.**

              **1.**      **PlanetSpace's Financing Was Neither Secure nor Committed.**

      PlanetSpace also contends that the risk of development cost overruns can be disregarded

because, "[e]ven if . . . development work did result in cost overruns, PlanetSpace had secured

funding commitments of $██ million in excess of its projected requirements (a ██% margin) --

adequate to cover any cost overrun during the project." PlanetSpace Memo at 33 (citing AR Tab

89 (PlanetSpace FPR, Vol. II) at 10591).  PlanetSpace relies in large part on supposed financing

"commitments" from ████████████████████████████████████

███████████████████ AR Tab 89 at 10591.  But those "secure financial commitments,"

PlanetSpace Memo at 33, were neither secure nor committed, and thus do not mitigate the

considerable risk of cost overruns inherent in PlanetSpace's approach.

      In its final financing letter, ██████████ states that it has been "engaged to work with

PlanetSpace as financial advisor," and commits only to "initiate the process for a proposed

capital raise of $██ million." AR Tab 40 (Pre-Award Survey) at 2578.  According to that letter,

"[t]he capital raise will be conducted on a best-efforts basis, and its success will depend on

market conditions, among other factors." *Id.* ████████████ thus provided no security or

commitment to raise the funds.

---

[7]  In any event, PlanetSpace apparently misrepresented the experience of Michael Bowker, proposed as PlanetSpace's Chief Operating Officer.  Under the heading, "Previous Positions (last five years)," PlanetSpace represented that Mr. Bowker had previously served as "Senior Vice President & Chief Operating Officer, Chief Operating Officer, Planet Space." AR Tab 91 (PlanetSpace FPR, Vol. IV) at 11068.  Mr. Bowker's sworn Declaration, submitted in this action, makes no such claim, stating only that, "[i]f PlanetSpace is awarded a contract, I ***will be*** the Chief Operating Officer of PlanetSpace." Bowker Decl. ¶ 4 (emphasis added).

PlanetSpace also misrepresented the agreement with ████████. ████████ only signed a "Letter of Intent" to "pursue financing" of $██ million. AR Tab 40 (Pre-Award Survey) at 2580. That funding was neither secure or assured, as ████████ itself discussed the financing in conditional terms: "***If*** ████████ is successful in obtaining such financing . . . ." *Id.* (emphasis added).

Finally, PlanetSpace's funding from ████████ was not firmly committed. Its letter states only that "████████ is willing to establish a debt facility in the amount for $████████ plus fees," but makes clear that actual financing would be dependent on the future negotiation of "mutually agreeable terms and conditions": "████████ will execute an agreement to this effect ***subject to mutually agreeable terms and conditions*** contained in all documentation which includes the government contract purchase agreement, etc." AR Tab 82 (PlanetSpace Responses) at 8826 (emphasis added). PlanetSpace acknowledges that a term as basic as the interest rate had yet to be agreed upon. *See* AR Tab 89 (PlanetSpace FPR Vol. II) at 10592 (listing the ████████ interest rate as "One Month LIBOR + TBD credit spread"). Thus, that financing also was neither assured nor committed.

## 2.  PlanetSpace's Delayed Payments Endanger Contract Performance.

The RFP states that "NASA will evaluate the offeror's proposed milestones for compliance with the limitation in Clause II.A.6, and the overall risk that the payment schedule provides to NASA." AR Tab 30 (RFP, Amendment 3) at 2091. In accordance with that provision, the SSA stated that "the financial risk that PlanetSpace proposed to assume was a discriminator for selection." AR Tab 55 (Source Selection Statement) at 5177. Noting that PlanetSpace "did not project it would reflect positive cumulative cash from operations until nearly the end of the contract," the SSA was reasonably concerned with the financial risk that accompanied PlanetSpace's delayed receipt of contract payments. *Id.*; *see also id.* at 5180 (SSA

was concerned that "PlanetSpace did not project it would recoup its sizable investment in the CRS program until close to the end of the contract.").

PlanetSpace's challenge to this finding rests wholly on a mischaracterization of the SSA's concern. According to PlanetSpace, "the SSA's conclusion that the PlanetSpace proposal was not financially viable because it would not be 'cash flow positive' until 'nearly' the end of the contract is factually wrong. AR Tab 55 (Source Selection Statement) at 5177. PlanetSpace's business plan projected that it would be 'cash flow' positive within ███ *years* of flying its first mission. AR 10590." PlanetSpace Memo at 33. Despite Planet Space's misleading use of quotation marks around the phrase, "cash flow positive," and its accompanying citation to the Source Selection Statement (AR Tab 55 at 5177), that term was not used by the SSA. Instead, the SSA's expressed concern related to the fact that PlanetSpace would not experience "positive cumulative cash from operations" – *i.e.,* total cash receipts in excess of total cash outlays – until ███████████████████████ *Id.* at 5177, 5180; *see also* AR Tab 190 (GAO Decision) at 7 ("The SSA noted as a particular concern . . . the fact that PlanetSpace did not project it would recoup its sizable investment in the [CRS] program until near the end of the contract . . . .").

The so-called "canyon chart," included in PlanetSpace's FPR, *see* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10590, and presented to the SSA, AR Tab 166 (Source Selection Presentation Backup Charts) at 28764, establishes graphically and numerically the accuracy of the SSA's assertion that PlanetSpace "did not project it would reflect positive cumulative cash from operations until nearly the end of the contract," AR Tab 55 (Source Selection Statement) at 5177:



AR Tab 89 at 10590, Fig. M-1.

The canyon chart demonstrates there would be no positive net cumulative cash from CRS operations until "essentially the end of the contract period," shown where the line beneath the green "canyon" reaches the $█████████, and as confirmed by the numerical "Cum Cash from Ops" entries near the bottom of the figure.  AR Tab 89 (PlanetSpace FPR, Vol. II) at 10590, Fig. M-1; *see also* AR Tab 188 (Transcript) at 31141 (p. 85).

PlanetSpace's argument does not relate to the point where "cumulative cash from operations" becomes positive or greater than $███ –which was the basis for the SSA's concern – but instead relates to the ██████████ where "cash flow" turns positive.  That point, shown by the bottom of the green "canyon," is when PlanetSpace first begins to eat away at its accumulated contract deficit of $███ million (*i.e.,* where its negative "cumulative cash from operations" first begins to decrease).  *See* AR Tab 89 (PlanetSpace FPR, Vol. II) at 10590, Fig. M-1.  But achieving positive cash flow is a hollow achievement.  When its cash flow first turns positive; (a) PlanetSpace will have spent $███ million more in cash than it will have received;

and (b) it will have incurred $▮ million in contract-related debt.  Accordingly, the SSA was

right to be concerned about PlanetSpace's proposed payment milestones.

## VIII.   PLANETSPACE IS NOT ENTITLED TO INJUNCTIVE RELIEF.

In determining whether to issue a permanent injunction, a court must consider four

factors:

> (1) whether, as it must, the plaintiff has succeeded on the merits of
> the case; (2) whether the plaintiff will suffer irreparable harm if the
> Court withholds injunctive relief; (3) whether the balance of
> hardships to the respective parties favor the grant of injunctive
> relief; and (4) whether it is in the public interest to grant injunctive
> relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  A plaintiff must

demonstrate its right to injunctive relief by clear and convincing evidence.  *KSEND v. United

States*, 69 Fed. Cl. 103, 112 (2005); *see also EP Prods. Inc. v. United States*, 63 Fed. Cl. 220,

224 (2005) ("[I]njunctive relief is so drastic in nature, a plaintiff must demonstrate that its right

to such relief is clear.").  The Tucker Act also directs the Court to "give due regard to the

interests of the national defense and national security and the need for expeditious resolution of

the action" when deciding bid protests.  28 U.S.C. § 1491(b)(3).

PlanetSpace has failed to show that NASA acted unlawfully or unreasonably in its award

decision.  Injunctive relief should be denied because PlanetSpace has not established success on

the merits "as it must," *PGBA*, 389 F.3d at 1228.

Even if NASA acted unreasonably, however, injunctive relief is not warranted in this

case.  First, PlanetSpace grossly exaggerated its purported harms if an injunction is not issued.

Second, the harm to the Government and the public interest far outweigh PlanetSpace's

purported harm.

### A.    The Balance of Harms Weighs in Favor of the Government.

According to PlanetSpace, it would suffer from four injuries if injunctive relief is not granted: 1) lost opportunity to compete; 2) potential loss of employees; and 3) potential loss of its teaming arrangements; and 4) speculative financial burdens.  These injuries, however, are greatly overstated and, as discussed *infra*, pale in comparison to the harm a permanent injunction would cause the Government and the public interest.

First, PlanetSpace's allegation, through the Declaration of Dr. Kathuria, that it could lose employees is entirely speculative and, by this point, not credible.  NASA issued its award decision in late December 2008, and decided to override the stay of contract performance in February 2009.  Yet there is no suggestion that in the **eight months** since PlanetSpace was informed that it had not been awarded a contract (including four months between the GAO's denial of PlanetSpace's protest and Dr. Kathuria's declaration) that PlanetSpace **had in fact lost any employees** as a result.  Accordingly, it is highly speculative for PlanetSpace to now contend that they would be irreparably harmed by such an injury when, in eight months, it has not been injured.

Similarly, PlanetSpace's allegation that it could be harmed by losing its teaming arrangements with its subcontractors is speculative.  Again, there is no suggestion that PlanetSpace's team members have ceased their relationships with PlanetSpace despite PlanetSpace having learned eight months before that it had not been awarded the contract.  Moreover, the injury alleged by PlanetSpace in this regard is entirely speculative.  According to Dr. Kathuria, PlanetSpace would be harmed "from losing one or more of its key teaming partners *for future procurements*."  Kathuria Decl. ¶ 21 (emphasis added).  In this case, the only partnership that matters is its agreement with partners for the CRS procurement.  It is entirely speculative to suggest that PlanetSpace's partners would team with it again on other

procurements (as opposed to teaming with others or competing as primes) regardless of the outcome of this litigation.

Finally, PlanetSpace's purported financial harms are likewise not credible and speculative on their face. First, PlanetSpace alleges that it has spent ███████ of dollars on independent research and development ("IR&D") that it would not be able to recover without a CRS contract. IR&D is normally recoverable as an indirect expense, FAR 31.205-18; thus, any other recovery of these expenses directly through a CRS contract would be improper. PlanetSpace could not be harmed by the denial of injunctive relief on this basis. Moreover, PlanetSpace's allegation that it would be forced to borrow or spend a significant amount of money to be competitive in future procurements is entirely speculative. Again, the requirements of the unnamed future procurements are impossible to know, therefore it is wholly speculative for PlanetSpace to contend that it would be forced to spend any amount "beyond what it originally budgeted and secured from investors" based on the outcome of this litigation.

**B.      The Balance of Harms Does Not Support Injunctive Relief.**

In considering the balance of the hardships, the Court "must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted." *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003) (citing *ES-KO v. United States*, 44 Fed. Cl. 429, 435 (1999)). Additionally, in determining the public interest in the context of a permanent injunction, the Court must not only consider the public's interest in a fair and open procurement process, but also the "potential damage to the public interest from other causes." *Id.* Here, the harm a permanent injunction would pose to the Government and the public interest far outweigh PlanetSpace's alleged harms.

1.      **"Delay Would Adversely Affect the Interests of the United States."**

The Government has already demonstrated the need to begin and continue contract performance by overriding the automatic CICA stay.  As this Court found in February 2009, upholding the Government's override determination: "NASA considered all important aspects of the contracts and ***showed that delay would adversely affect the interests of the United States***." *PlanetSpace v. United States*, 86 Fed. Cl. 566, 568 (2009) (emphasis added).  Among the "urgent and compelling circumstances" that required immediate contract performance, NASA noted that without contract performance it would be required to "reduce the ISS crew size to a skeleton crew" and would "mean [that] the U.S. will not be able to fulfill its international agreements." *See* Dkt. 17, Ex. A at 5, *PlanetSpace v. United States*, 09-cv-00099RHH.  These concerns affect not only the United States as Defendant, but the public interest at large because the public has an interest in its government fulfilling its international agreements.

PlanetSpace's suggestion that any delay would be "minimal" is unavailing.  First, NASA's decision to override the CICA stay demonstrated many months ago that ***any delay***, even a purported "minimal" delay, would adversely affect the United States interests.  This alone is sufficient to demonstrate that the balance of harms favors the United States.  *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654-55 (2003).  In *Gentex*, the Court concluded the balance of harms weighed against injunctive relief where the agency's override decision had "established the urgency and critical importance of the . . . program on its own." *Id.* at 655.  Indeed, as here, despite the fact that the program was a long-term program with "initial operational capability . . . almost three years away," the Court determined it had no basis to conclude that the agency's determination that delay would adversely affect the program was arbitrary, capricious, or irrational. *Id.*  Here, not only did NASA override the CICA stay for urgent and compelling

circumstances, as in *Gentex*, but this Court has already concluded the determination was reasonable. *PlanetSpace v. United States*, 86 Fed. Cl. at 568.

Second, while PlanetSpace speculates that reprocurement would only take 60 days, any such reprocurement would likely take a great deal longer. As PlanetSpace noted, the initial award decision was made after approximately three months of investigation and consideration by the SEB. PlanetSpace Memo at 10. The award decision was made eight months after the RFP was issued. *See* AR Tabs 27 (RFP) at 1297 & 55 at 5182 (Source Selection Statement) (RFP issued April 14, 2008, Award Decision made December 23, 2008). Here, especially given the length of time since the award decision was made, not only would NASA have to reevaluate proposals, but it also would likely be required to solicit new proposal information. The need for further proposal information is highlighted by the Declaration of Michael Bowker submitted by PlanetSpace, in which he contends that PlanetSpace could perform on a revised schedule including a three-month delay from its initial schedule. Bowker Decl. ¶¶ 12, 14.[8] Of course, such a schedule has never been submitted to NASA for review or evaluation.

Third, PlanetSpace's reliance on Mr. Bowker's declaration to suggest that if PlanetSpace were awarded a contract, it would not result in delay is unhelpful. Mr. Bowker bases his conclusion that PlanetSpace could launch with a three-month delay on an award "within the next 30 days." Of course, because PlanetSpace did not seek an expedited conclusion to this protest, 30 days from the date of Mr. Bowker's declaration (August 27) will have run long before the

---

[8] Orbital agrees with the Government that the Bowker declaration is improper and should be stricken from the record as an improper attempt to supplement the administrative record. Orbital likewise agrees that the Declaration of Michael Lounge ("Lounge Decl.") should be stricken as well. Like Mr. Bowker's declaration, Mr. Lounge's declaration is unavailing. Mr. Lounge contends that PlanetSpace is the only offeror to provide "assured access" to the Space Station. Lounge Decl. ¶ 25. The concept of "assured access," however, does not appear in the RFP and in any event provides no analysis of the effect of injunctive relief on the parties or the public interest. Therefore, PlanetSpace's reliance on the Lounge Declaration is misplaced.

Court decides this case. However, even if Mr. Bowker's declaration were read to mean within 30 days of the Court's decision, PlanetSpace's own suggested timeline of 60 days for a reprocurement, *see* PlanetSpace Proposed Order, Dkt. 33-6, Ex. 1, *PlanetSpace v. United States*, Case No. 09-476C, exceeds dramatically the timeline for Mr. Bowker's estimate. And, of course, Mr. Bowker's declaration is wholly unreliable for another reason: Mr. Bowker himself is plainly interested in the outcome of this litigation because he "participated significantly in the preparation of PlanetSpace's bid proposal in this matter" and he "will be the Chief Operating Officer of PlanetSpace" if PlanetSpace is awarded a contract. Bowker Decl. ¶ 4. It is of no surprise, and of no value to the Court, that Mr. Bowker believes PlanetSpace would perform better than the awardees.

It is simply incredible to suggest that almost nine months after contract award, any award to PlanetSpace after a reprocurement would not cause a prejudicial delay. PlanetSpace has done nothing to mitigate this inevitable delay. PlanetSpace did not bring its Complaint until ***seven months*** after contract award and ***three months*** after its first protest was denied by the GAO. Moreover, even after belatedly filing in this Court, PlanetSpace did not seek a Temporary Restraining Order or a Preliminary Injunction, nor did PlanetSpace seek expedited briefing of this matter. Instead, based on PlanetSpace's own proposed schedule, this Court will not issue its decision until October 2009, ten months after contract award and six months after the GAO previously denied PlanetSpace's protest. Under these circumstances, PlanetSpace's strategic decisions also weigh decisively against injunctive relief. *Cf. PGBA LLC v. United States*, 60 Fed. Cl. 567, 569-70 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004) (injunction was not justified

"particularly when [the facts are] viewed in light of [Plaintiff's] early strategic decision not to seek preliminary injunction.").[9]

### 2. Injunctive Relief Would Harm the United States and the Public Interests in Other Ways Besides Delay.

Even if delay in contract performance was not an issue, the harm to the United States and the public interest would weigh against injunctive relief. PlanetSpace unreasonably delayed bringing its action in this Court, and then did not seek any expedited resolution of its Complaint. Thus, the United States has paid and continues to pay millions of dollars to the awardees for ongoing contract performance that NASA has determined is needed urgently. Moreover, if contract performance continues while NASA performs any recompetition or reevaluation, NASA would continue to pay the contractors for their performance during this time period as well. As a result, if PlanetSpace were to be awarded a contract after a reprocurement, the Government would receive no return on all the money paid to the displaced contractor(s) for performance over approximately a year or more of contract performance. This would obviously have an adverse affect not only on the Agency's budget but on the public fisc as a whole. Consequently, not only would this harm the United States, but it would cause damage to the public interest as well.

PlanetSpace's alternative argument – that a third contract could be awarded, PlanetSpace Memo at 38, – is equally unavailing. The RFP specified the guaranteed minimum value of the contract as the "negotiated value of 20,000 kg (20 MT) of upmass to the International Space Station . . . ." AR Tab 27 (RFP) at 1314. NASA's override decision, however, noted that the cargo amounts procured with the contracts to Orbital and SpaceX (for the guaranteed minimum

---

[9] Orbital also agrees entirely with the Government's contention that PlanetSpace's delay should bar its entire protest under the equitable doctrine of laches. Moreover, as the Government contends, PlanetSpace's request for injunctive relief is barred by res judicata given this Court's

of 20 MT to Orbital and 28.3 MT to SpaceX) "is the remaining requirement left after the ISS
[International Partners] have provided their bartered vehicles." Dkt. 17, Ex. A at 5-6,
*PlanetSpace v. United States*, 09-cv-00099RHH; *see also* AR Tab 27 at 1481 (showing estimated
requirements for cargo delivery to the ISS of 39.6 MT of internal upmass and 8.3 MT of external
upmass). Thus, there is not enough required cargo to allow or justify a third contract award.

## CONCLUSION

For the reasons stated above, the Court should grant Intervenor's Cross-Motion for
Judgment on the Administrative Record and deny Plaintiff's Motions for Judgment on the
Administrative Record and for Permanent Injunction.

## REQUEST FOR RELIEF

Orbital Sciences Corporation requests the Court:

(1)  Grant Intervenor's Cross-Motion for Judgment on the Administrative Record;

(2)  Deny Plaintiff's Motion for Judgment on the Administrative Record;

(3)  Deny Plaintiff's Motion for Permanent Injunction; and

(4)  Any such other relief as this Court deems appropriate under the
circumstances.

---

prior decision upholding the override determination.

Respectfully submitted,

s/ David A. Churchill
David A. Churchill
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
Telephone:  (202) 639-6056
Fax: (202) 637-6360 (protected)

*Of counsel:*
Kevin C. Dwyer
Daniel E. Chudd
Caroline A. Keller
Anna M. Baldwin

*Counsel of Record for Intervenor,*
*Orbital Sciences Corporation*

JENNER & BLOCK LLP

Dated:  September 18, 2009