REDACTED VERSION

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### *Bid Protest*

_____

| | |
|---|---|
| PlanetSpace Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| Space Exploration Technologies | ) |
| Corporation and Orbital Sciences | ) |
| Corporation, | ) |
| | ) |
| Defendant-Intervenors | ) |
| | ) |

No. 09-476C
Judge Block

_____

## COMBINED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF PLANETSPACE INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR PERMANENT INJUNCTIVE RELIEF, AND IN OPPOSITION TO THE GOVERNMENT'S AND INTERVENORS' CROSS-MOTIONS

Steven J. Rosenbaum
*Counsel of Record*
Derron J. Blakely
Scott A. Freling
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20044
(202) 662-5568
(202) 778-5568 fax
srosenbaum@cov.com

October 2, 2009

*Counsel for Plaintiff PlanetSpace Inc.*

# TABLE OF CONTENTS

I.  PLANETSPACE HAS ESTABLISHED ITS CLAIMS ON THE MERITS...................... 1

    A.  The SSA's Decision Was an Unlawful Finding of Non-responsibility (Count I). . 1

        1.  Responsibility Determinations Must be Referred to the SBA. .................. 1

        2.  The SSA's Decision Was Based Upon Planet Space's Purported Non-responsibility............................................................................................ 2

        3.  A Referral Was Required Regardless of Whether NASA Included the Responsibility Criteria in the RFP or Purported to Engage in a Comparative Evaluation............................................................................ 6

        4.  PlanetSpace Was the "Apparent Successful Business Offeror." ............... 9

    B.  The SSA Failed to Engage in the Required Trade-Off Analysis (Count II)......... 11

    C.  SSA Evaluated PlanetSpace's Proposal with Criteria Not Stated in the RFP and Not Used to Evaluate Orbital's or Space-X's Proposals (Count III). ................... 13

    D.  The SSA Evaluated the Past Performance of PlanetSpace in an Improper Manner (Count IV)........................................................................................... 15

    E.  NASA's Selection of Orbital Violated the U.S. Space Transportation Policy (Count V). ....................................................................................................... 17

    F.  The SSA's Failure to Articulate a Rational Basis for Assessing Risks  (Count VI). ....................................................................................................... 20

II.  THERE IS A SUBSTANTIAL CHANCE THAT PLANETSPACE WOULD HAVE RECEIVED A CONTRACT. ........................................................................... 22

III.  PLANETSPACE HAS ESTABLISHED IRREPARABLE INJURY. ............................. 23

IV.  THE BALANCE OF HARDSHIPS FAVORS GRANTING INJUNCTIVE RELIEF.... 25

V.  THE PUBLIC INTEREST FAVORS GRANTING INJUNCTIVE RELIEF. ................. 27

VI.  THE GOVERNMENT'S HALF-HEARTED LACHES ARGUMENT IS WITHOUT MERIT. ........................................................................................................... 28

    A.  There Was No Unreasonable Delay.................................................................... 28

    B.  There Has Been No Prejudice............................................................................ 30

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) (en banc)...............................................................30

*ACCESS Sys., Inc.*,
  B-400623.3, Mar. 4, 2009, 2009 CPD ¶ 56 ...........................................................11

*Aeroplate Corp. v. United States*,
  67 Fed. Cl. 4 (2005) ...............................................................................................10

*Akal Security, Inc. v. United States*,
  87 Fed. Cl. 311 (2009) .....................................................................................23, 24

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
  83 Fed. Cl. 666 (2008) ...........................................................................................23

*AshBritt, Inc. v. United States*,
  87 Fed. Cl. 344 (2009) ...........................................................................................23

*Bannum, Inc. v. United States*,
  404 F.3d 1346 (Fed. Cir. 2005)..............................................................................26

*Bean Dredging Corp. v. United States*,
  22 Cl. Ct. 519 (1991) .............................................................................................23

*Capitol CREAG LLC*,
  B-294958.4, Jan. 31, 2005, 2005 CPD ¶ 31.........................................................7, 8

*Cardinal Maint. Serv., Inc. v. United States*,
  63 Fed. Cl. 98 (2004) .............................................................................................23

*Celtech, Inc. v. United States*
  24 Cl. Ct. 269, 277 (1991), *vacated per stipulation*, 25 Cl. Ct. 368 (1992) ...................2, 6, 10

*Champion Spark Plug Co. v. Reich*,
  121 F.2d 769 (8th Cir. 1941) ..................................................................................27

*City of College Station v. City of Bryant*,
  932 F. Supp. 877 (S.D. Tex. 1996) .........................................................................27

*Cornetta v. United States*,
  851 F.2d 1372 (Fed. Cir. 1988) (en banc)..............................................................30

*CW Gov't Travel, Inc. v. United States*,
  61 Fed. Cl. 559 (2004) ...........................................................................................29

*D&G Contract Servs.*,
    B-231453, B-231453.2, 68 Comp. Gen. 277 (1989) ...............................................9

*DCMS-ISA, Inc. v. United States*,
    84 Fed. Cl. 501 (2009) ...............................................................................10

*Dismas Charities, Inc. v. Unites States.*,
    75 Fed. Cl. 59 (2007) ................................................................................20

*Dyonyx, L.P. v. United States*,
    83 Fed. Cl. 460 (2008) .........................................................................8, 9, 23

*E.L. Hamm & Assocs., Inc.*,
    B-280766.5, Dec. 29, 1999, 2000 CPD ¶ 13 ...........................................13

*Fabritech, Inc.*,
    B-298247; B-298247.2, July 27, 2006, 2006 CPD ¶ 112 ...................6, 9, 10

*Fort Carson Support Servs. v. United States*,
    71 Fed. Cl. 571 (2006) ..........................................................................12, 14

*Global Computer Enters., Inc. v. United States*,
    No. 08-133C, -- Fed. Cl. --, 2009 WL 2355774 (July 24, 2009).............1, 28

*Info. Scis. Corp. v. United States*,
    73 Fed. Cl. 70 (2006) ................................................................................22

*Int'l Mgmt. Servs., Inc. v. United States*,
    80 Fed. Cl. 1 (2007) .................................................................................11

*IPlus, Inc.*,
    B-298020.2, June 5, 2006, 2006 CPD ¶ 90...............................................16

*Klinge Corp. v. United States*,
    82 Fed. Cl. 127 (2008) ......................................................................1, 20, 23

*L-3 Commuc'ns EOTech, Inc. v. United States*,
    83 Fed. Cl. 643 (2008) .................................................................................1

*Labat-Anderson Inc., v. United States*,
    50 Fed. Cl. 99 (2001) ................................................................................23

*Labatt Food Serv., Inc. v. United States*,
    84 Fed. Cl. 50 (2008) ..................................................................................1

*Lion Raisins, Inc. v. United States*,
    52 Fed. Cl. 629 (2002) .................................................................................2

*Lockheed, IMS,*
B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180 .......................................................................12

*Marine Hydraulics Int'l, Inc. v. United States,*
43 Fed. Cl. 664 (1995) ......................................................................................................12

*Mark Dunning Indus. v. United States,*
60 Fed. Cl. 687 (2004) ......................................................................................................22

*Meridian Mgmt. Corp.,*
B-285127, July 19, 2000, 2000 CPD ¶ 121 ......................................................................16

*Metcalf Constr. Co., Inc. v. United States,*
53 Fed. Cl. 617 (2002) ......................................................................................................23

*Minor Metals, Inc. v. United States,*
38 Fed. Cl. 379 (1997) ................................................................................................23, 24

*Overstreet Elec. Co., Inc. v. United States,*
47 Fed. Cl. 728 (2000) ................................................................................................23, 24

*Pacific Sky Supply, Inc.,*
B-215189, Jan. 18, 1985, 85-1 CPD ¶ 53 ...........................................................................4

*PlanetSpace Inc. v. United States,*
86 Fed. Cl. 566 (2009) ................................................................................................25, 26

*Poett v. MSPB,*
360 F.3d 1377 (Fed. Cir. 2004).........................................................................................30

*Pressure Technology, Inc.,*
B-265793, Dec. 29, 1995, 95-2 CPD ¶ 288 ......................................................................13

*RJO Enters., Inc.,*
B-260126, B-260126.2, July 20, 1995, 95-2 CPD ¶ 93 ....................................................14

*SAI Indus. v. United States,*
60 Fed. Cl. 731 (2004) ......................................................................................................23

*Sanford & Sons Co.,*
B-231607, 67 Comp. Gen. 612 (1988) ................................................................................8

*Sci-Tec Guaging, Inc.,*
B-252406, B-252406.2, June 25, 1993, 93-1 CPD ¶ 494 ..................................................14

*Serco, Inc. v. United States,*
81 Fed. Cl. 463 (2008) ............................................................................................. passim

*Shermco Indus., Inc. v. United States*,
    584 F. Supp. 76 (N.D. Tex. 1984) .......................................................................4

*SP Sys., Inc. v. United States*,
    86 Fed. Cl. 1 (2009) .......................................................................................16

*Strategic Hous. Fin. Corp. of Travis County v. United States*,
    87 Fed. Cl. 183 (2009) ....................................................................................28

*Tessa Structures, LLC*,
    B-298835, Dec. 14, 2006, 2006 CPD ¶ 199 ............................................ passim

*Titan Tire Corp v. Care New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)........................................................................25

*United Enter. & Assocs. v. United States*,
    70 Fed. Cl. 1 (2006) .......................................................................................28

*United Int'l Investigative Servs., Inc. v. United States*,
    41 Fed. Cl. 312 (1998) ....................................................................................23

*ViroMed Labs., Inc., v. United States*,
    87 Fed. Cl. 493 (2009) ....................................................................................23

*Wackenhut Servs., Inc. v. United States*,
    85 Fed. Cl. 273 (2008) .................................................................... passim

*Waldorf v. United States*,
    8 Cl. Ct. 321 (1985) .......................................................................................30

*Wanlass v. Gen. Elec. Co.*
    148 F.3d 1334 (Fed. Cir. 1998).......................................................................30

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008) ......................................................................................25

*Zenith Radio Corp v. United States*,
    710 F.2d 806 (Fed. Cir. 1983).........................................................................24

## STATUTES & REGULATIONS

10 U.S.C. § 2305 ........................................................................................................14

15 U.S.C. § 637 ....................................................................................................2, 3, 7

13 C.F.R. § 121.1002 ..................................................................................................11

48 C.F.R. § 9.104-1 ...............................................................................................3, 4, 9

48 C.F.R. § 9.104-3......................................................................................9

48 C.F.R. § 15.001.....................................................................................21

48 C.F.R. § 15.305.....................................................................................15

48 C.F.R. § 15.308.....................................................................................13

48 C.F.R. § 19.602-1.................................................................................2, 3

NASA FAR Supp. § 1815.370....................................................................21

Pub. L. No. 95-89, 91 Stat. 561 (Aug. 4, 1977)..........................................3

Pub. L. No. 85-536, 72 Stat. 389 (July 18, 1958)........................................3

## OTHER AUTHORITIES

42 AM. JUR. 2D INJUNCTIONS § 3 (2009)....................................................27

13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
Procedure § 3533.10 (2d ed. 1984 & Supp. 1995)....................................6

13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
Procedure § 3533.10.3 (3d ed. 2009)........................................................6

18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and
Procedure § 4420 (3d ed. 2009)..............................................................26

43A C.J.S. INJUNCTIONS § 91 (2009)..........................................................27

H.R. Conf. Rep. No. 95-535 .......................................................................3

H.R. Rep. No. 95-1 .....................................................................................3

RESTATEMENT (SECOND) OF JUDGMENTS § 27 ...........................................26

RESTATEMENT (SECOND) OF JUDGMENTS § 28 ...........................................26

The Government's employment of colorful rhetoric (describing PlanetSpace's claims as "counterfactual, logically flawed and wholly implausible") and its mischaracterization of the relief PlanetSpace seeks (which most certainly is not "an interruption of Contract performance" by Space-X and Orbital) cannot overcome PlanetSpace's showing that the SSA decision was unlawful and that appropriate injunctive relief should be granted.

## I.    PLANETSPACE HAS ESTABLISHED ITS CLAIMS ON THE MERITS.

### A.    The SSA's Decision Was an Unlawful Finding of Non-responsibility (Count I).

The SSA decision was unlawful because it rejected PlanetSpace on grounds of purported non-responsibility, but questions of responsibility for a small business such as PlanetSpace must be referred to the SBA for its binding resolution.  *See* PlanetSpace Mem. 12-18. The Government's and Intervenors' contentions that (a) non-responsibility determinations need not be referred to the SBA, (b) PlanetSpace was not rejected on grounds of non-responsibility, (c) even if it was, SBA referral was not required because responsibility factors were identified in the RFP and addressed on a "comparative" basis, and (d) a referral was not required because PlanetSpace was not the "apparent successful business offferor," are all unavailing.[1]

### 1.    Responsibility Determinations Must be Referred to the SBA.

The Government sweepingly contends (Gov. Mem. 14) that "[t]here is simply *no support*,

---

[1]    Although the Intervenors rely heavily on the GAO decision, *see, e.g.* Orbital Mem. 5-13, this Court is not bound by the GAO's prior determinations, *see Global Computer Enters., Inc. v. United States*, No. 08-133C, -- Fed. Cl. --, 2009 WL 2355774, at *60 (July 24, 2009), and has routinely disagreed with the GAO's interpretation of applicable law and assessment of agency action.  *See, e.g., Wackenhut Servs., Inc. v. United States*, 85 Fed. Cl. 273 (2008) (rejecting GAO's analysis and finding that agency had failed to adequately defend its technical evaluation and document its analysis); *L-3 Commuc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650-57 (2008) (finding that GAO had improperly ignored a series of "evaluation irregularities"); *Klinge Corp. v. United States*, 82 Fed. Cl. 127, 137-38 (2008) (finding that GAO had misapplied the statutory requirements applicable to the bid); *Labatt Food Serv., Inc. v. United States*, 84 Fed. Cl. 50 (2008) (disagreeing with GAO as to the effect of the prejudice caused by the procuring agency's legal error); *Global Computer Enters.* (granting protest and disagreeing with GAO regarding whether agency had violated applicable legal requirements).

in the FAR or any other law or regulation, for PlanetSpace's argument that an agency is 'prohibited from eliminating a small business bidder based on non-responsibility,'" quoting PlanetSpace Mem. 13 (emphasis in original).  To the contrary, that is precisely what this Court has explicitly held: "[R]egardless of whether a small-business set-aside is involved, before rejecting a small business's bid on grounds of non-responsibility, an agency must refer the matter to the SBA, which, in its discretion, may issue a COC [(Certificate of Competency)]…. Once the COC is issued, the SBA's determination of responsibility is conclusive."  *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629, 632 (2002); *see also* PlanetSpace Mem. 14-15 (citing additional CFC decisions).  These decisions simply apply the plain language of § 637(b)(7)(A) and (C), *see* PlanetSpace Mem. 13-14 & n.1.[2]

> **2.     The SSA's Decision Was Based Upon Planet Space's Purported Non-responsibility.**

By statute and regulation, the concept of "responsibility" is quite broad, explicitly encompassing whether a bidder seeking to perform a given contract has "adequate financial resources;" will "be able to comply with the required or proposed delivery or performance schedule;" has a "satisfactory performance record;" has the "necessary organization, experience, accounting and operational controls and technical skills, or the ability to obtain them;" has the "necessary production, construction, and technical equipment and facilities, or the ability to obtain them"; and any other element of responsibility, "including but not limited to" whether the small business has the necessary "capability, competency, capacity, credit, integrity,

---

[2]     The *only* regulatory exceptions to the mandatory referral obligation is when the small business is not qualified and eligible to receive the award, or has been suspended or debarred, *see* FAR § 19.602-1(a)(2)(i), *Celtech, Inc. v. United States*, 24 Cl. Ct. 269, 277 (1991), *vacated per stipulation*, 25 Cl. Ct. 368 (1992), exceptions of no relevance here.

perseverance and tenacity…to receive[d] and perform a specific Government contract."   15 U.S.C. § 637(b)(7)(A); FAR § 9.104-1(a), (b), (c), (e), & (f); FAR § 19.602-1(a).

In short, "[b]idder responsibility…concerns whether a bidder can perform as promised in its bid."  *Tessa Structures, LLC*, B-298835, Dec. 14, 2006, 2006 CPD ¶ 199.

Congress has worked hard to ensure that small businesses actually benefit from § 637(b)(7)'s protections.  When first added to the Act in 1958, § 637(b)(7) required a referral to the SBA only when a small business's bid was rejected on grounds of "capacity or credit."  *See* Pub. L. No. 85-536, § 2[8], 72 Stat. 389, 390 (July 18, 1958).

But Congress found that this limitation had "resulted in severe problems for the small business community," because procuring agencies were avoiding the SBA referral requirement simply by relying upon responsibility "elements aside from a small business's capacity or credit."  H.R. Rep. No. 95-1, *reprinted in* 1977 U.S.C.C.A.N. 821 & 833.  Congress therefore amended § 637(b)(7)(A) to provide (as it currently does) for mandatory SBA referrals "with respect to *all elements of responsibility*, including but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity…"  *See* Pub. L. No. 95-89, Title V, § 501, 91 Stat. 561 (Aug. 4, 1977) (emphasis added).  As Congress succinctly explained:

> **The House bill authorizes the SBA to make all determinations regarding the responsibility of a small business concern to perform a specific Government contract.   The term "responsibility" would include all criteria presently used by procurement officers.  The bill also provides that a contract may not be withheld for any such reason without referring the matter to SBA for a determination.**

H.R. Conf. Rep. No. 95-535, *reprinted in* 1977 U.S.C.C.A.N. 821 & 851 (emphasis added).

To be sure, as the Government suggests (Gov. Mem. 14-15), a small business's bid can

be rejected for reasons having nothing to do with responsibility: its bid might be non-responsive,[3] or its price might be non-competitive, or the small bidder may have been suspended or debarred from government contracts.   An SBA referral is not required under such circumstances, *see Shermco Indus., Inc. v. United States*, 584 F. Supp. 76 (N.D. Tex. 1984).

But here, the SSA rejected PlanetSpace on grounds that no objective reader could conclude constituted anything other than his finding that PlanetSpace lacked "responsibility," *e.g.,* lacked the ability to "perform as promised in its bid" (*Tessa Structures*, 2006 CPD ¶199 at 3), *see, e.g.*, AR 5180 ("it was highly unlikely PlanetSpace would have the ability needed to address technical challenges in its proposal…"); AR 5181 ("I could not conduct typical trade-off analysis since I believed there was a low likelihood PlanetSpace could successfully perform the contract."); AR 5177 ("I concluded the considerable inherent risk in PlanetSpace's Management approach made the likelihood of successful performance of this proposal remote."); *see generally* PlanetSpace Mem. 16-18.

Given these statements, the Government's contention (Gov. Mem. 14-15) that PlanetSpace was rejected for reasons other than responsibility is not credible.   Indeed, the six specific SSA findings the Government cites only reinforce PlanetSpace's position.

The *very first* SSA finding cited by the Government as one not going to PlanetSpace's responsibility addressed whether PlanetSpace could "complete the mission in a timely fashion." (Gov. Mem. 14).   *But this is a classic question of a bidder's responsibility*, explicitly set forth as such in FAR 9.104-1: "To be determined responsible, a prospective contractor must— (b) Be

---

[3]     "Responsiveness refers to the bidder's or offeror's unconditional agreement to supply precisely what is called for in a solicitation.   Responsibility, on the other hand, refers to the bidder's or offeror's ability to do so; it includes financial status, experience, and the like." *Pacific Sky Supply, Inc.,* B-215189, Jan. 18, 1985, 85-1 CPD ¶ 53 at 7.

able to comply with the required or proposed delivery or performance schedule…." *See also Tessa Structures*, 2006 CPD ¶199 at 5 ("the agency's finding that Tessa could not perform within the number of days specified in its bid constituted a determination of nonresponsibility").

Four other SSA findings cited by the Government also clearly go to PlanetSpace's responsibility.  Whether PlanetSpace's use of heritage components, and its payload fairings, presented a "significant technical challenge" that raised questions whether the Company could complete its mission (Gov. Mem. 14-15) go directly to several responsibility criteria, including at least PlanetSpace's "technical skill" and "capability," as well as the more general responsibility question whether PlanetSpace "can perform as promised in its bid," *Tessa Structures.*  Whether PlanetSpace's use of cost plus subcontracting "presented a significant risk to the successful performance of the program" (Gov. Mem. 15) goes to the adequacy of PlanetSpace's financial resources and operational controls, as well as to the more general question whether PlanetSpace "can perform as promised in its bid,"  *Tessa Structures.*  Whether PlanetSpace's proposal presented a high financial risk to the Government (Gov. Mem. 15) is a red herring, because the SSA openly admitted in his Source Selection Statement any concern over financial exposure to the Government had been resolved, *see* AR 5177.  While the SSA thought this issue also presented a risk to PlanetSpace's "business case," *id.*, that goes directly to its responsibility, *e.g.*, whether PlanetSpace had adequate financial resources, could comply with the required or proposed delivery or performance schedule, and has the necessary capability capacity and credit.

Finally, the SSA's suggestion that PlanetSpace's proposal reflected that it "did not understand basic FAA licensing requirements" (Gov. Mem. 15) arguably goes to its "competency," and in any event, the SSA readily acknowledged that "[t]his lack of understanding, in and of itself, could have been corrected during performance," *see* AR 5177,

- 5 -

and there is no indication that the SSA would have rejected the PlanetSpace proposal on this ground, *see* pp. 9-11 *infra* regarding the "apparent successful bidder" requirement.

As in virtually every bid protest in which the GAO or this Court has ordered a referral to the SBA for a responsibility determination, the Government's contention that it acted for reasons other than responsiveness is not credible and should be rejected. *See, e.g., Fabritech, Inc.*, B-298247; B-298247.2, July 27, 2006, 2006 CPD ¶ 112 at 3 (requiring referral to the SBA and rejecting "agency assert[ion] that the decision to reject Fabritech's proposal was based not on a finding of nonresponsibility, but on a finding that the proposal was unacceptable for failure to meet a qualification requirement, and thus there was no requirement for referral to the SBA."); *Tessa Structures*, 2006 CPD ¶ 199 (rejecting procuring agency's assertion that it had eliminated the small business due to non-responsiveness and a "materially unbalanced bid" rather than on grounds of non-responsibility); *see also Celtech*, 24 Cl. Ct. at 277 (reasons for rejection constituted non-responsibility determination and not lack of qualification as agency asserted).[4]

> ### 3.    A Referral Was Required Regardless of Whether NASA Included the Responsibility Criteria in the RFP or Purported to Engage in a Comparative Evaluation.

There are two independent answers to the Government's and Intervenors' contention that an SBA referral was not required because NASA had indicated in the RFP that responsibility

---

[4]    The Government contends that *Celtech* is of "dubious value," citing the out of date second edition of Wright and Miller for the proposition that "Most courts state that no precedential effects flow from a judgment that has been vacated as moot." Gov. Mem. 16 n.3, quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3533.10 at 442 (2d ed. 1984 & Supp. 1995). But the Government fails to mention that Wright & Miller were in the second edition extremely critical of this position, *see id.*, and that in their current, third edition, happily note that "some courts have come to recognize that an opinion rendered before a case is mooted has as much precedential value as any other opinion in a living case, even though it may not be protected as 'stare decisis' in the sense that it is binding in later cases." 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3533.10.3 (3d ed. 2009).

criteria would be part of the bid evaluation, and the SSA purportedly was using responsibility criteria to make a "comparative" evaluation among the PlanetSpace, Orbital and Space-X proposals, *see* Gov. Mem. 17-22; Space-X Mem. 12-14.

*First*, the Small Business Act flatly forbids a procuring agency's rejection of a small business on responsibility grounds, requiring referral to the SBA for a binding determination. The Act neither limits the referral requirement to any particular evaluative methodology the procuring agency may have employed, nor eliminates the referral requirement if responsibility criteria are listed in the RFP.  Congress amended the Act specifically to ensure that "the SBA [will] make *all determinations* regarding the responsibility of a small business concern to perform a specific Government contract," *see* p. 3 *supra* (emphasis added).

Many procurements do not involve small businesses offerors, and § 637(b)(7) has no relevance under those circumstances.  But when a small business *is* involved in a bid, § 637(b)(7) requirements adhere, and if the small business is rejected on grounds of responsibility, an SBA referral is required under the plain terms of that statutory provision, regardless of the methodology by which responsibility was determined by the procuring agency.

*Second*, even those authorities indicating that *certain* kinds of comparative analyses need not be referred to the SBA have held that a referral *must* be made when such a comparative analysis leads to the results reached here.  The GAO addressed this question in a 2005 decision overturning earlier precedents purporting to loosen the SBA referral requirement:

> Earlier decisions of our Office, such as Advanced Res. Int'l, Inc.-Recon., B249679.2, Apr. 29, 1993, 93–1 CPD 348 at 2–3, include language suggesting that no SBA referral is required, even where a small business proposal is rejected solely due to an "unacceptable" rating under a responsibility-type evaluation criterion, so long as the rating was "comparative."  It appears from the final SSEB report to the SSA…that GSA relied on the language in these earlier decisions in deciding that no SBA referral was required here.  We continue to hold that no SBA referral is needed where the small

business offeror is not selected for award merely because, while its proposal is evaluated as acceptable, another offeror's proposal is evaluated as superior under a comparative analysis or because of a cost/technical tradeoff analysis. **Where, however, a finding that a small business offeror's proposal is unacceptable under a responsibility-type criterion precludes such a comparative or tradeoff analysis, it is tantamount to a nonresponsibility determination.** To the extent our Office's earlier decisions can be read to be inconsistent with the rule as stated here, they will no longer be followed.

*Capitol CREAG LLC*, B-294958.4, Jan. 31, 2005, 2005 CPD ¶ 31 at n.6 (emphasis added).

*Accord, e.g., Sanford & Sons Co.*, B-231607, 67 Comp. Gen. 612, 613 (1988) ("an agency may not find that a small business is nonresponsible under the guise of a relative assessment of responsibility factors and thus avoid referring the matter to the [SBA]").

    *Capitol CREAG* thus instructs that "where…a finding that a small business offeror's proposal is unacceptable under a responsibility-type criterion *precludes…a* comparative or *tradeoff analysis*, it is tantamount to a nonresponsibility determination" and must be referred to the SBA. 2005 CPD ¶ 31 at n.6. That is precisely what happened here, where the SSA explicitly stated: "I could not conduct [a] 'typical' trade-off analysis since I believed there was a low likelihood PlanetSpace could successfully perform the contract." AR 5181.

    It would be difficult to imagine a statement that more clearly triggers the SBA referral requirement under the *Capitol CREAG* formulation. The SSA explicitly stated both his conclusion of "a low likelihood PlanetSpace could successfully perform the contract" -- a classic determination of non-responsibility, *see* p. 4 *supra* -- and that this conclusion made it impossible for him to conduct a typical (indeed, any, *see* pp. 11-13 *infra*) trade-off analysis. That is precisely the situation that, under *Capitol CREAG*, mandates a referral of the matter to the SBA.

    The precedents cited by the Government do not support its contrary position. The Government contends that *Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460 (2008), holds that a

referral to the SBA is not required when an element of responsibility is included in the RFP as an assessment criteria.  (Gov. Mem. 21).  To the contrary, *Dyonyx* held that no SBA referral was necessary because the plaintiff had failed an RFP "pricing criterion" with which "plaintiff's final proposal was noncompliant," and *not* a criterion as to "personnel" that constituted an element of responsibility under FAR 9.104-1(f) and 9.104-3(a), as the plaintiff had contended.  83 Fed. Cl. at 473-74.  *D&G Contract Servs.*, B-231453, B-231453.2, 68 Comp. Gen. 277 (1989), similarly concluded that the small business had been rejected for reasons having nothing to do with its responsibility, *id.* at 279 ("There is nothing in the record which indicates that D&G was rejected on the basis of nonresponsibility.  … [I]ts offer was rejected because it was unbalanced.")

Finally, *Fabritech* (Gov. Mem. 21) directly supports PlanetSpace, holding that the agency's rationale for rejecting the small business "relate[d] directly to the protester's ability or capability to perform" and therefore constituted a non-responsibility determination requiring an SBA referral, rejecting the Government's contention that the bidder had failed a "qualification requirement," *i.e.*, "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract."  2006 CPD ¶ 112 at 2-3.

### 4.    PlanetSpace Was the "Apparent Successful Business Offeror."

PlanetSpace clearly *was* "the apparent successful business offeror," *i.e.*, would apparently have been selected absent the SSA's non-responsibility determinations.  This is so because: (a) there were only three bidders in the competitive range, AR 2723-24, 4476; (b) NASA had decided that two of the three would be awarded contracts, AR 5181; (c) the SEB rated PlanetSpace 31 points higher than Orbital with respect to Mission Suitability, AR 5167; and (d) PlanetSpace's bid was a whopping $613 million cheaper than Orbital's, thus far surpassing Orbital on the second evaluation factor, Price, *see* PlanetSpace Mem. 19.

The reasons why the SSA did not select PlanetSpace as the winning bidder all went to PlanetSpace's purported lack of responsibility, *see* pp. 4-6 *supra.*  Thus, absent the very factors that require SBA determination, PlanetSpace was the apparent successful business offeror and referral to the SBA was required.

That is precisely the analytical approach taken by this Court in *Aeroplate Corp. v. United States*, 67 Fed. Cl. 4 (2005), cited at Gov. Mem. 16.  Having found that the procuring agency had erred in rejecting the small business on grounds of non-responsiveness, the Court concluded that the only remaining ground for rejection went to the small business's alleged non-responsibility, and ordered that the producing agency refer that question to the SBA for binding resolution, *see* 67 Fed. Cl. at 14.

The case principally relied upon by the Government, *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501 (2009) (Gov. Mem. 15), is of no assistance to it, given that the agency there had canceled the entire bid solicitation, with the result that there were no successful offerors, apparent or otherwise, *see* 84 Fed. Cl. at 501-02 & 516 n.29.

To the extent the Government is contending that a referral to the SBA is required only if the procuring agency has formally determined or acknowledged that the protestor would have awarded the contract absence a finding of non-responsibility (Gov. Mem 15), that position is inconsistent with numerous GAO and court decisions requiring that a matter be referred to the SBA without any such determination or acknowledgment, *see, e.g., Aeroplate*; *Fabritech*; *Tessa Structures*; *Celtech.*

Ironically, Space-X seeks to excuse the SSA's failure to seek a responsibility determination from the SBA by inviting this Court to usurp the SBA's authority and issue a finding that PlanetSpace is not a small business for purposes of this procurement.  (Space-X Mem. 24-28).  This Court has *no* jurisdiction to make a size determination, which may explain

- 10 -

why the Government did not join Space-X in making this argument.  *See Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 6-7 (2007) ("Plaintiff's argument that Torres is not a small business [under the ostensible subcontractor rule] lacks merit because neither the contracting officer nor the SBA has determined that Torres is not a small business, and this court lacks any authority to entertain a size protest") (citing 13 C.F.R. § 121.1002, which provides that SBA "makes all formal size determinations").[5]

### B. The SSA Failed to Engage in the Required Trade-Off Analysis (Count II).

Neither the Government nor Intervenors dispute that a proper trade-off analysis was mandated both by applicable regulations and the terms of the RFP, given that PlanetSpace's proposal was vastly less expensive than Orbital's,  *see* Planet Space Mem. 19.  A proper trade-off analysis addresses and "determine[s] whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price," *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008); *see also ACCESS Sys., Inc.*, B-400623.3, Mar. 4, 2009, 2009 CPD ¶ 56 at 7 ("an agency must meaningfully consider cost or price").

Here, the SSA's purported trade-off analysis is barely half a page long, containing but three paragraphs, *see* AR 5181.  The first and third paragraphs are wholly irrelevant to the trade-off as between the PlanetSpace and Orbital proposals,[6] and the second paragraph consists of a mere three sentences, the last of which states the SSA's ultimate conclusion that he could not conduct a "typical trade-off analysis" (*see* pp. 4 & 8 *supra*).  Indeed, the SSA did not conduct any trade-off at all, and never even mentions, in this part of the Source Selection Statement or

---

[5]     In any event, all of the SBA decisions cited by Space-X dealt with the specific subject of restricted small business set-aside procurements.

[6]     The first paragraph simply states that a trade-off was not necessary with respect to the Space-X proposal because it was both the highest ranked and the lowest priced.  The third paragraph addresses whether to make one or two awards.  AR 5181.

elsewhere, the amount ($613 million) by which the PlanetSpace bid beat the Orbital bid, *cf. Lockheed, IMS*, B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180 at 4 ("While agencies have considerable discretion in determining the particular method to be used in evaluating cost or price, that method should, to the extent possible, accurately measure the cost to be incurred under competing proposals.").

The Government attempts to defend the SSA's actions by pointing to the earlier sections of his decision that dealt with his discussion of the *technical* elements of the proposals, *see* Gov. Mem. 24-25, but that does not substitute for the required trade-off between *Mission Suitability* and *Price*: as "the decisional law demonstrates, [the regulation] obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals-rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price." *Serco*, 81 Fed. Cl. at 497. This case is thus just like *Wackenhut*, with "absolutely no discussion about the relevant factors of that trade-off analysis." 85 Fed. Cl. at 306-07.[7]

Orbital relies (Orbital Mem. 15) on a CFC decision in which the bid price difference on a $2.3 million contract was $5,000 -- *less than two tenths of one percent* -- and the Court understandably endorsed the SSA's conclusion that "the higher past performance evaluation is worth the small difference in price." *Marine Hydraulics Int'l, Inc. v. United States*, 43 Fed. Cl.

---

[7]   Orbital attempts to rely on the SSA's testimony during the GAO hearing to fill the missing gap (Orbital Mem. 18-19), but "any new explanations of the evaluation process made post-award are the sort of '*post hoc* rationalizations' that courts reject in bid protest cases." *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 591-92 (2006). "The place to look for the required rationale is the Source Selection Decision Document." *Id*. at 592.

664, 673-74 & n.15 (1995).[8]  Here, the $613 million difference represents a full 33% of Orbital's bid, and a robust trade-off analysis was required, *cf. Serco*, 81 Fed. Cl. at 497 ("as th[e] magnitude [of the price differential] increases, the relative benefits yielded by the higher-priced offer must also increase").

PlanetSpace also demonstrated that the SSA violated applicable regulation because he not only failed to perform, but to document, the required trade-off analysis.  PlanetSpace Mem. 21, *citing, e.g.,* FAR § 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.").  The Government notes that FAR § 15.308 also provides that "the documentation need not quantify the tradeoffs that led to the decision," *see* Gov. Mem. 26, but this simply means that "the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors," *Serco*, 81 Fed. Cl. at 497; "the agency is [still] compelled by the FAR to document its reasons for choosing the higher-priced offer.  Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise."  *Id.*

C. **SSA Evaluated PlanetSpace's Proposal with Criteria Not Stated in the RFP and Not Used to Evaluate Orbital's or Space-X's Proposals (Count III).**

---

[8]      Orbital also cites (Orbital Mem. 15) *E.L. Hamm & Assocs., Inc.*, B-280766.5, Dec. 29, 1999, 2000 CPD ¶ 13, but there the SSA explicitly addressed the amount of the cost difference and concluded that the "benefits found in [the protestor's] proposal did not warrant paying the price premium."  *Id.* at 6.  To the extent *Pressure Technology, Inc.*, B-265793, Dec. 29, 1995, 95-2 CPD ¶ 288 (*see* Orbital Mem. 15), suggests that a trade-off analysis need not be set forth by the SSA in his Source Selection Statement, it is inconsistent with this Court's direct holdings to the contrary in *Wackenhut* and *Serco*.

PlanetSpace has established that NASA imposed an unstated evaluation factor -- a "back-up plan" requirement -- on PlanetSpace and PlanetSpace alone, *see generally* PlanetSpace Mem. 22-23.  This violated the rule that an award decision be "based solely on the factors specified in the solicitation."  10 U.S.C. § 2305(b)(1).  Because a "back-up plan" was not required by the solicitation, the lack of one could not legally form any part of the SSA's decision to reject PlanetSpace's bid.  *Sci-Tec Guaging, Inc.*, B-252406, B-252406.2, June 25, 1993, 93-1 CPD ¶ 494 (sustaining protest after finding that agency used unstated evaluation criteria); *RJO Enters., Inc.*, B-260126, B-260126.2, July 20, 1995, 95-2 CPD ¶ 93 (sustaining protest when bid rejected due to failure to submit documentation not required by the solicitation).

The Government and Intervenors concede that this back-up plan evaluation criterion was not explicit in the solicitation, instead arguing that it was "intrinsic" to the Agency's evaluation of PlanetSpace's management approach.  (Gov. Mem. 27; Orbital Mem. 20-21; Space-X Mem. 30-32).  This argument is entirely unavailing because the SSA himself unequivocally stated that the solicitation *did not include a back up plan requirement.*  AR 5176 ("Furthermore*, although one was not required by the solicitation*, I was concerned that [PlanetSpace's] proposal did not contain a backup plan…").  The Government and Intervenors may not now be heard to provide an explanation contrary to the agency's contemporaneous interpretation.  *See Fort Carson*, 71 Fed. Cl. at 591-92 ("any new explanations of the evaluation process made post-award are the sort of '*post hoc* rationalizations' that courts reject  in bid protest cases.").

Moreover, even if a "back-up plan" requirement were somehow "intrinsic" to the management approach subfactor, it was patently irrational for NASA to require such a plan from PlanetSpace, a company that had teamed with three of the most successful aerospace companies in the world, but not from Space-X, a start-up company attempting to build the required launch and transfer vehicles on its own and having numerous demonstrated failures with much smaller

launch vehicles, or from Orbital, a company with no experience in large scale, liquid fuel rockets and its own extensive history of launch failures, *see* PlanetSpace Mem. 6-9.  Indeed, PlanetSpace was the only offeror that actually did have a back-up plan, by offering the existing and proven Atlas V as an alternative launch vehicle, *see* AR 5175.

### D. The SSA Evaluated the Past Performance of PlanetSpace in an Improper Manner (Count IV).

The RFP provided that NASA would consider the past performance of offerors, including their key personnel, and major subcontractors.  *See* AR 2090, 2101, 2108.  Such consideration was also required by FAR § 15.305(a)(2)(iii) (requiring past performance evaluation to "take into account past performance information regarding…key personnel who have relevant experience…[and] subcontractors that will perform major or critical aspects of the requirement when such information is relevant").  The SEB applied these requirements and found PlanetSpace's bid to have three "significant strengths" in management approach based on the combined past performance of the PlanetSpace team.  AR 5174-75.

The SSA disregarded these strengths entirely, instead finding that PlanetSpace could not be given credit for its subcontractors' admittedly exceptional past performance because PlanetSpace did not have a "corresponding strength" in performing the very work it intended to subcontract.  AR 5176.  This represented an impermissible reliance upon an unstated evaluation factor, and an impermissible refusal to rely upon the past performance of PlanetSpace's own key employees, *see* PlanetSpace Mem. 23-27.[9]

These conclusions cannot be escaped by terming the SSA's action a determination of the

---

[9]    There is but a single mention of PlanetSpace's key employees in the Source Selection Statement, and that was merely a reference to the SEB's positive evaluation of PlanetSpace's past performance.  AR 5172.

"weight" to be given the past performance of subcontractors, *see* Gov. Mem. 31-32 (citing *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 23-24 (2009)).   The SSA failed to perform any weighting at all, concluding that the past performance records of each member of the subcontractor team in PlanetSpace's bid were simply "not relevant for purposes of selection" notwithstanding their "numerous" excellent ratings on "highly relevant" NASA and DOD contracts, *see* AR 5175.[10]

The SSA's decision to focus solely on PlanetSpace's own past performance served as his principal justification for finding management approach risks in PlanetSpace's bid, and the subsequent finding that Orbital's bid was "superior."  AR 5181.  The failure to give any credit to PlanetSpace for the past performance of its subcontractors or key employees lowered PlanetSpace's management and technical approach scores.  Thus, the Government's contentions notwithstanding (Gov. Mem. 34-35), this case is like *Meridian Mgmt. Corp.*, B-285127, July 19, 2000, 2000 CPD ¶ 121 at 5 & n.2, in which the improper treatment of past performance materially lowered the bidder's ranking.[11]

---

[10]   The Government and Intervenors attempts to prop up the agency's decision by pointing out the SSA's reliance on management risks purportedly present in PlanetSpace's bid, and his GAO testimony, miss the mark.   There is no contemporaneous evidence of the SSA's consideration of the Past Performance of key employees, only his legally irrelevant *post hoc* rationalizations given during the GAO protest, *see* p. 12 n.7 *supra*.  Moreover, the management risks identified could only be justified by improperly failing to take into account the specific past experience each member of the PlanetSpace team brought to bear on each of the identified risks.  *See, e.g*., AR 10605, 11068-69.

[11]   Space-X purports to rely on *IPlus, Inc.*, B-298020.2, June 5, 2006, 2006 CPD ¶ 90 (Space-X Mem. 32-33), but in that case, unlike here, the agency specifically credited the protestor with the past performance of its subcontractors.  *Id.* at 7.  In a footnote, the GAO noted that it would be inappropriate to give credit for past performance of a kind the team member would not be providing under the contract in question, *see id.* at n.8; but here, the SEB gave PlanetSpace's subcontractors credit (which the SSA improperly disregarded) for precisely the kind of performance they would be undertaking under the ISS Resupply contract, *see* AR 4960, 4974, 5175-76.

E.      **NASA's Selection of Orbital Violated the U.S. Space Transportation Policy (Count V).**

Compliance with the U.S. Space Transportation Policy was a stated requirement of the RFP, with the result that bidders had to use "***space launch vehicles manufactured in the United States, unless exempted*** by the Director of the Office of Science and Technology Policy [("OSTP")], in consultation with the Assistant to the President for National Security Affairs." PlanetSpace Mem. 27-31.   NASA affirmatively committed to seek a determination from the OSTP whether launch vehicles qualified as U.S.-made, especially insofar as they contained foreign content, or that a proper exemption had been obtained.  *Id.*  Among the specific questions to be resolved by the OSTP was whether the orbital transfer vehicle would be included in determining whether the vehicle was "manufactured in the United States," *see id.* at 27.

The administrative record establishes that NASA did not follow these requirements with respect to Orbital's foreign-laden launch vehicle, in two critical respects.

*First*, even leaving aside the orbital transfer vehicle issue, NASA did not follow the Space Policy with respect to Orbital's Taurus II rocket itself.  NASA instead relied entirely upon the OSTP having addressed the Space Policy in relation to the Taurus II rocket in connection with the earlier Commercial Orbital Transportation Services ("COTS") procurement.  Gov. Mem. 37 (citing AR 6316).

But the written conclusions of the COTS review, which the Government has sought to add to the administrative record, explicitly stated that OSTP's approval was based upon the then "current configuration" of the Taurus II, and that "[a]ny significant increase in non-U.S. components from this proposed level could necessitate further review relative to the applicable provisions of the [P]olicy."  AR 31791.  Internal OSTP documents reveal that the approval had

been based in part based on the "extensive modification[s]" to be made by a U.S. company (Aerojet) to the Russian-made NK-33 engines to be used in the Taurus II.  AR 31800.

Neither NASA nor Orbital have challenged PlanetSpace's assertion (PlanetSpace Mem. 27, 29, 31) that subsequent to the COTS approval, Orbital appears to have materially changed the Taurus II to remove the NK-33 engines "extensively modify[ed]" by Aerojet and replaced them with the **entirely Russian made RD-180 engine**, *see* Orbital Mem. 25, 30, & n.1.   This is precisely the kind of "significant increase in non-U.S. components" that the COTS approval explicitly stated "could necessitate further review relative to the applicable provisions of" the Policy.  AR 31791.  Yet the administrative record is bereft of any indication that such further review has taken place.

Indeed, the OSTP did not generate a single document in connection with the International Space Station ("ISS") Resupply contract.[12]  Moreover, the "memo to the file" written by Lynn Cline of NASA (AR 6316) simply mentions the OSTP's prior consideration of the Taurus II rocket, which examined the rocket's configuration as it existed during the COTS procurement, *see* AR 31791.  *See also* Gov. Mem. 37.[13]

*Second*, PlanetSpace established in its opening memorandum (at 29-31) that the only document that exists with respect to the applicability of the Space Policy to the Orbital transfer

---

[12]    On August 31, 2009, PlanetSpace's counsel filed a Freedom of Information Act request upon OSTP, seeking "any records memorializing or pertaining to the Office of Science and Technology Policy's consideration of the application of the United States Space Transportation Policy to launch vehicles proposed to be used in connection with NASA procurement RFP NNJ08ZBG001R (International Space Station Commercial Resupply Services)."   OSTP's response did not contain a single document dating from or relating to that procurement, as opposed to the COTS procurement.  AR 31793-938

[13]    Orbital notes that the Atlas V rocket proposed for use by PlanetSpace includes XXXXXX XXXXXX, but ignores that this is the only major part of the rocket that is foreign-made, unlike the Taurus II, with its Russian made engine, Ukrainian-made fuel tank, Ukrainian made valves and telemetry control hardware, and Ukrainian made first stage, *see*  PlanetSpace Mem. 27-28.

vehicle is a memo to the file by a NASA employee regarding a telephone conversation she had held almost two months earlier with OSTP "Senior Policy Advisor" Damon Wells.  Mr. Wells is **one of fifteen** OSTP Senior Policy Advisors, *see* http://www.ostp.gov/cs/about_ostp/leadership_ staff; he had not been delegated authority to make required decisions with respect to the Space Policy; and he did not consult with the National Security Advisor.  *See* PlanetSpace Mem. 30.

Neither the Government nor Intervenors respond by showing any delegation of authority to Mr. Wells.  They instead misconstrue PlanetSpace's claims regarding NASA's failure to implement the Space Policy.

Orbital appears to suggest that PlanetSpace's argument is that the OSTP does not have the power to interpret the Space Policy (Orbital Mem. 23-24), thus ignoring PlanetSpace's actual argument that the Senior Policy Advisor lacked the Director's power to do so.  The Government reads into PlanetSpace's argument two "assumptions," neither of which PlanetSpace actually suggested explicitly or implicitly:  that NASA had to consult with the "National Security Advisor" instead of the OSTP Director, and that "OSTP failed to make a decision on Orbital's use of Taurus II and cargo vehicle."  (Gov. Mem. 35). The Government then vigorously attacks these straw men, never addressing PlanetSpace's true claims:  that NASA did not follow the requirements of the RFP, or the explicit requirement of the Space Policy itself, by presenting OSTP with the specific contents of Orbital's vehicle as it actually exists for purposes of the ISS Resupply contract, for a determination whether it could be considered U.S.-made, and by securing the Director's decision whether Orbital's cargo vehicle should be included in making that assessment.

Finally, the Government and Orbital attempt to recast compliance with the Space Policy as a question solely of contract administration -- *i.e.*, that the required OSTP consultation (and exemption, if necessary) only need be obtained prior to launch (Gov. Mem. 36, 38-39; Orbital

Mem. 30-31).  This ignores the explicit requirements of the RFP, applicable case law, and the absurd results this interpretation would bring.

Compliance with the Space Policy was a "minimum requirement" of the RFP, as NASA explicitly and contemporaneously recognized, *see* PlanetSpace Mem. 27, *citing, e.g.*, AR 1959, 1972.  A failure to meet a solicitation's minimum requirements renders a bid non-responsive, and it "cannot be considered for contract award."  *Dismas Charities, Inc. v. Unites States.*, 75 Fed. Cl. 59, 60 (2007).  *Actual* compliance is required.  *See Klinge Corp.*, 82 Fed. Cl. at 135 (granting injunction terminating contract when winning bidder would not be providing U.S.-made goods as required by the RFP, notwithstanding bidder's certification to the contrary).

Furthermore, the Government's and Orbital's assertion that the required consultation (and exemption, if necessary) only need be obtained prior to launch would mean NASA would commit to pay a contractor hundreds of millions of dollars of the public fisc, only to find out after the launch vehicle is constructed and ready for launch that that contractor is ineligible to perform.

While we agree that compliance with the Space Policy is ongoing, compliance with the Space Policy must be achieved in advance of award as a matter of RFP requirements, the case law, and any reasonable interpretation of the Policy itself.

F.     **The SSA's Failure to Articulate a Rational Basis for Assessing Risks (Count VI).**

The SSA's conclusion that the PlanetSpace proposal posed undue financial risk was principally based on his belief that "much of the work would be performed on large subcontracts on a cost reimbursement basis," when in fact, XX% of the sub-contracted effort was to be

performed on a fixed-price basis. *See* PlanetSpace Mem. 32, citing AR 31787 (Table 7).[14]

Moreover, the remaining XX% relates to residual development work on existing heritage

components, and integration effort of this sort by definition does not involve the level of

unpredictability and potential cost variance associated with a "from scratch" development effort,

*id.* The SSA's evaluation of financial risk was thus based on incorrect factual premises

rendering his conclusions irrational.[15]

Like the SSA, the Government and Intervenors fail to address these facts, or the pertinent

performance incentives and cost controls reflected in PlanetSpace's proposal, *see* PlanetSpace

Mem. 32. They instead point to other alleged financial risks present in PlanetSpace's bid

proposal in an attempt to prop up the SSA's unsupported conclusion, including PlanetSpace's

purported break-even point and debt financing plan. *See* Gov. Mem. 40, Space-X Mem. 34,

Orbital Mem. 38-39.[16] But these risks were merely assessed as a "weakness" by the SEB, AR

4760-61, and weaknesses are not normally discriminators against selection. *See* FAR § 15.001;

NASA FAR Supp. § 1815.370(i)(6)(i). Each of the three proposals contained evaluated

weaknesses; Orbital's contained five, *see* AR 4586.

---

[14]    The XXXXX figure referenced by the Government (Gov. Mem. 42-43) relates only to the percentage of XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, not the *overall* amount of subcontracted effort, *see* AR 31781 (Table 7).

[15]    The Government notes that the SEB initially evaluated PlanetSpace's use of cost-plus contracts as a "significant weakness" (Gov. Mem. 41), but that finding was changed to a mere "weakness" after PlanetSpace provided clarifications about its planned work and details about cost-controls it had put in place. The Government discussion elides that the SSA switched the evaluation back to a "significant weakness" based on false factual premises.

[16]    So that the record is clear, Orbital's contention that PlanetSpace would not be cash-flow positive until "near the end" of contract performance (Orbital Mem. 41) is based on a single, worst case scenario presented in PlanetSpace's alternative business case. *See* AR 10590. PlanetSpace's proposal materials incorporated data and charts illustrating PlanetSpace's ability to achieve positive cash flow under the contract by XXXX, with several years still remaining on contract performance. AR 29167, 29053-54, 2572-75. Contingency planning that acknowledges worst-case scenarios is a mechanism that *mitigates risk.*

PlanetSpace's legal challenge does not require this Court to conclude that there were no weaknesses in PlanetSpace's (or anyone else's) proposal.  Rather, PlanetSpace challenges the SSA's decision to rescore PlanetSpace's financial plan from a mere "weakness" to a "significant weakness" based on a demonstrably false premise as to the percentage of the subcontracting that was cost-plus, which resulted in his erroneous conclusion regarding the level of risk presented by PlanetSpace's bid.

## II.    THERE IS A SUBSTANTIAL CHANCE THAT PLANETSPACE WOULD HAVE RECEIVED A CONTRACT.

While conceding that PlanetSpace will establish prejudice --*i.e*., a substantial chance it would have been awarded a contract absent the alleged legal violations -- if PlanetSpace establishes Count I (non-responsibility), *see* Gov. Mem. 45, the Government contends that PlanetSpace could not show prejudice as to any remaining Count because NASA's conclusion that PlanetSpace's proposal contained "serious management risks" would remain intact.  *Id*. This is simply not so:

- Count II -- A bid such as PlanetSpace's, having a 31-point higher overall rating and a $613 million price advantage, clearly has a "substantial chance" of award in a best value procurement, if the SSA had actually engaged in the required cost versus technical trade-off.  *See Wackenhut*, 85 Fed. Cl. at 310 ("[B]ecause [the protestor] was the only other bidder determined to be in the competitive range, but for the award to [the awardee], [the protestor] likely would have been awarded the contract."); *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 94 (2008) (finding prejudice when it was impossible to determine which offeror would have presented the Best Value had the analysis been properly conducted).

- Counts III, IV, and VI -- As shown in Parts I(C), (D), & (F) *supra*, the "serious management risks" purportedly identified by the SSA resulted from his failure properly to follow the prescribed evaluation criteria as to past performance, the existence of a back-up plan, and the assessment of financial risk.  It was those failures that allowed him on grounds of "management risks" to justify his disregard for PlanetSpace's higher scores and substantial price advantage.  If the SSA had properly applied the evaluation criteria, there would have been no rational basis to disagree with the SEB having ranked PlanetSpace higher than Orbital on both Mission Suitability and Price.  As such, PlanetSpace would have had a "substantial chance" award.  *See Mark Dunning Indus. v. United States*, 60 Fed. Cl. 687, 690 (2004) ("Because plaintiff was next in line for the

contract, it is clear that but for the alleged error, plaintiff had a substantial chance of receiving the contract.")

- Count V -- The Space Policy unequivocally provides that United States Government payloads will only be launched on domestic launch vehicles, absent an exemption from the Director of the Office of Science and Technology Policy, *see* Part I(E) *supra.* Compliance with the Policy was a minimum requirement for all bids. *See id.* Orbital's noncompliance with that policy rendered it ineligible for award. Because there were only three bidders, and NASA had decided it would make two awards, Orbital's disqualification would necessarily lead to an award to PlanetSpace.

## III.   PLANETSPACE HAS ESTABLISHED IRREPARABLE INJURY.

Absent injunctive relief, PlanetSpace will be permanently denied the revenues and profits it would have earned under the ISS Resupply contract.  That constitutes irreparable injury; Planet Space cited this Court's decision in *ViroMed Labs., Inc., v. United States*, 87 Fed. Cl. 493, 503 (2009), for the proposition that "[s]tanding alone, the loss of an opportunity to fairly compete on…government contracts constitutes irreparable harm [because] an action at law only allows recovery of bid preparation costs in a suit for damages, but not loss of anticipated profits." (quotations omitted), *see* PlanetSpace Mem. 36.

PlanetSpace could have cited more than a dozen other CFC decisions reaching precisely the same conclusion.[17]  To the extent the single CFC decision cited by the Government, *Minor*

---

[17]     *E.g.*, *Akal Security, Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009) ("The mere loss of money is not irreparable harm so long as the litigant can be made whole through money damages.  However, if a litigant has no action against the United States for lost profits, as is the case here, the harm to the litigant can be considered irreparable.  A lost opportunity to compete in a fair competitive bidding process for a contract has been found sufficient to prove irreparable harm.") (quotations omitted); *Klinge Corp.*, 82 Fed. Cl. at 138 (same); *Serco,* 81 Fed. Cl. at 501-02 (same); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) (same); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (same); *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 701-02 (2008) (same); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000) (same); *Labat-Anderson Inc., v. United States*, 50 Fed. Cl. 99, 110 (2001) (same); *Dyonyx*, 83 Fed. Cl. at 475 (same); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 378-79 (2009) (same); *Cardinal Maint. Serv., Inc. v. United States,* 63 Fed. Cl. 98, 110 (2004) (same); *SAI Indus. v. United States,* 60 Fed. Cl. 731, 747 (2004) (same); *Metcalf Constr. Co., Inc. v. United States*, 53 Fed. Cl. 617, 645 (2002) (same).

*Metals, Inc. v. United States,* 38 Fed. Cl. 379, 381-82 (1997) (Gov. Mem. 46), might be read to provide otherwise,[18] it is out of step with the overwhelming weight of CFC authority and, indeed, has been rejected as a "but see" citation in several decisions, *e.g., Akal,* 87 Fed. Cl. at 319-20; *Overstreet*, 47 Fed. Cl. at 744 n.25.

PlanetSpace also submitted a declaration listing additional injuries, including the loss of key personnel; the endangerment of its relationship with Lockheed, ATK and Boeing; and the imperilment of the Company's long term viability, *see* Kathuria Decl. ¶¶ 15-25. Given the size of the contract at issue, the "loss of this anticipated revenue would be a significant blow to PlanetSpace's long-term viability, particularly its ability to fund new research projects and attract new investors." *Id.* ¶ 23. There is thus no basis for the Government's assertion (Gov. Mem. 46) that this case presents the mere "possibility" of harm.

Lastly, the Government challenges PlanetSpace's showing of irreparable injury by contending that "as an economic matter, there is no real, net injury, because the Contract will provide jobs to one company or the other." (Gov. Mem. 46). That line of argument suggests that a thief could steal the Chief of Police's car, and then defend his action on the ground that there is "no real, net injury" because the car will still provide transportation for "one [person] or the other."[19]

---

[18] *Minor Metal* in fact has no bearing on whether a bidder whose bid was permanently rejected due to legal defects in the bid award itself has suffered irreparable injury. Rather, in denying the plaintiff's request for an injunction pending appeal in order to block the submittal of responses to an RFP, the *Minor Metal* court simply concluded that the plaintiff had not suffered irreparable injury because it was not precluded from taking part in the bidding process on the same footing as anyone else. 38 Fed. Cl. at 381-82. In addition, *Minor Metal* cited *Zenith Radio Corp v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983), but that non-bid protest case does not address whether lost profits that cannot be recovered in an action at law constitute irreparable injury.

[19] While the Government claims PlanetSpace neglected to cite two cases that the Government asserts are "controlling law" (Gov. Mem. 12 n.1), PlanetSpace did in fact cite the (continued…)

## IV.    THE BALANCE OF HARDSHIPS FAVORS GRANTING INJUNCTIVE RELIEF.

The Government's and Intervenors' arguments with respect to the "balance of harms" flow from the false premise that PlanetSpace seeks to enjoin contract performance, resulting in a work stoppage on ISS Resupply projects.  *See* Gov. Mem. 47 (cataloging harms stemming from "an interruption of Contract performance"); Orbital Mem. 45; Space-X Mem. 38.    The Government and Intervenors are chasing straw men.  PlanetSpace has not requested injunctive relief resulting in any work stoppage.  As clearly stated in PlanetSpace's opening memorandum (at 37), and echoed in its Proposed Order, PlanetSpace "does not seek an injunction against further contract action pending NASA's reprocurement, recognizing that NASA's corrective action will likely result in the displacement of only a single contractor.  Alternatively, reopening the procurement might result in a third award, to PlanetSpace."

In light of the relief actually being sought, the "material harms" alleged by the Government and Intervenors fade away, and one is left with a balance of harms clearly weighing in favor of PlanetSpace, *see* PlanetSpace Mem. 36-38.

The questions presented here are quite distinct from those at issue when Judge Hodges addressed whether to leave in place NASA's override of the automatic stay resulting from PlanetSpace's filing of its GAO appeal, and the Government's and Intervenors' suggestion that those proceedings are *res judicata* (Gov. Mem. 48, Orbital Mem. 45-46) are not well taken.  First, there is no overlap whatsoever on the merits; Judge Hodges made clear he was

---

Federal Circuit's controlling precedents on the standard of review in a bid protest case and the availability of permanent injunctive relief where a protester succeeds on the merits.  *See* PlanetSpace Mem. 11, 36.  The two cases that the Government characterizes as "controlling law" -- *Titan Tire Corp v. Care New Holland, Inc*., 566 F.3d 1372, 1375-76 (Fed. Cir. 2009) (a patent infringement case) and *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008) (a wildlife protection case) -- are not bid protest cases and do not involve permanent injunctive relief.  Space-X and Orbital also did not cite either case.

"review[ing] the merits of [the] override independent of any consideration of the merits of the underlying contract award." *PlanetSpace Inc. v. United States*, 86 Fed. Cl. 566, 567 (2009).

Similarly, with respect to the factors going to a party's entitlement to injunctive relief, Judge Hodges made clear that, in deciding whether NASA's override of the stay should be enjoined, he was deciding whether NASA, Orbital and Space-X should be immediately blocked from taking any and all actions under the contracts, *id.*  The relief sought here would not have any such effect, either in the short or long term:  PlanetSpace does not seek to block any funding while NASA performs the reprocurement, and anticipates that it will, at most, displace one of the two winning bidders.

Furthermore, Judge Hodges was not called on to, and did not actually decide, where the public interest lay.  The Court instead merely decided whether NASA's action to override the stay was irrational, *see* 86 Fed. Cl. at 568, applying the inherent presumption in favor of NASA's determination contained in the "arbitrary and capricious" review standard.  Here, the applicable injunction standard requires the Court itself to determine whether the public interest would be served by an injunction.  *See, e.g.*, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  *Res judicata* does not apply in such circumstances.  *See* 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4420 (3d ed. 2009) (discussing requirement that issue must actually be decided); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (same); RESTATEMENT (SECOND) OF JUDGMENTS § 28 (no issue preclusion where burden in first proceeding is different or has shifted in the second proceeding, or legal context has changed).

Finally, in assessing PlanetSpace's request for injunctive relief, the Court must assess the facts as they currently exist: "it goes without saying that, in determining whether the requirements for an injunction have been met, this Court must look to the facts in existence at the

time that the injunction issues…" *City of College Station v. City of Bryant*, 932 F. Supp. 877, 885 (S.D. Tex. 1996). Therefore, a court "will give relief appropriate to events occurring pending the suit." *Champion Spark Plug Co. v. Reich*, 121 F.2d 769, 772 (8th Cir. 1941); *see also* 43A C.J.S. INJUNCTIONS § 91 (2009) ("Since equity acts in the present tense, relief is dependent on present and future conditions…."); 42 AM. JUR. 2D INJUNCTIONS § 3 (2009) ("Generally, the conditions at the time of the hearing of the suit, rather than as they existed at the suit's commencement, will be the basis for any injunctive relief.")

## V.    THE PUBLIC INTEREST FAVORS GRANTING INJUNCTIVE RELIEF.

Neither the Government nor Intervenors challenge the overarching principle that the public interest is served by an injunction designed to ensure that the procurement process is conducted pursuant to law, *see* PlanetSpace Mem. 38 (citing cases). They instead advance arguments based on the false premise that PlanetSpace seeks to enjoin contract performance and thereby cause a complete work stoppage, an argument disposed of *supra*.[20]

PlanetSpace also demonstrated at some length in its opening brief that, although the Court need not delve deeply into the implications of a NASA decision, upon re-evaluation, to award a contract to PlanetSpace that displaces either Orbital or Space-X, based on the performance of Orbital and Space-X to date, PlanetSpace would almost surely be able to provide the necessary resupply services to the ISS sooner than those companies. In support of that proposition, PlanetSpace submitted declarations demonstrating, *inter alia*, that Orbital and Space-X are both far behind schedule, and will likely slip much further behind. *See* PlanetSpace Mem. 6-7 & 40 (citing Bowker Decl. ¶¶ 54-79).

---

[20]     The Government's claim to the contrary notwithstanding (Gov. Mem. 49), PlanetSpace has not requested an injunction "directing" a third award, only an order requiring NASA to consider such an award during the reprocurement. *See* PlanetSpace's Proposed Order.

Neither intervenors submitted any declarations attempting to rebut these showings, and it is too late for them to do so now.[21]  The Government's declaration *openly admits* that it will be "challenging" for Orbital and Space-X to meet their schedules, *see* Suffredini Decl. ¶ 8, and that "[t]he CRS contract awardees, Orbital and Space-X, are providing new space vehicles in an industry that has a high failure rate on new launch and orbital vehicles."  *Id.* at ¶ 16.

## VI.   THE GOVERNMENT'S HALF-HEARTED LACHES ARGUMENT IS WITHOUT MERIT.

The Government's lack of faith in its laches argument is apparent from its brevity (roughly one page) and position (page 49 of a 50 page brief).  And, indeed, the Government does not remotely satisfy the heavy burden required to establish laches.

The "mere passage of time" cannot give rise to laches.  *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 21 (2006).  These must instead be an *unreasonable* delay in filing, resulting in prejudice to the defense of the action or a party's economic interests.  *Global Computer Enters.*, 2009 WL 2355774, at *71.  The laches defense to a bid protest is reserved for "extraordinary circumstances."  *United Enter.*, 70 Fed. Cl. at 21-22.

### A.   There Was No Unreasonable Delay.

PlanetSpace diligently pursued its claims during the period following the December 23, 2008 award:

- PlanetSpace requested a debriefing on December 24, 2008, which was held on January 9, 2009.

- PlanetSpace filed a bid protest with the GAO on January 14, 2009, resulting in an automatic stay of performance of the contracts.

---

[21]   *Cf. Strategic Hous. Fin. Corp. of Travis County v. United States*, 87 Fed. Cl. 183, 189-90 (2009) (party may not raise arguments for first time in reply or upon readily available evidence that it did not present previously).

- The Government overrode the stay twenty-six days later, on February 10, 2009. PlanetSpace sought review of that override decision in the CFC on February 18, 2009. The Intervenors supported the override decision, which the CFC upheld on February 20, 2009.

- PlanetSpace continued to pursue its bid protest at the GAO, with an adverse decision issued on April 22, 2009.

- From May through June, PlanetSpace engaged in good-faith negotiations with NASA, in an ultimately unsuccessful effort to seek a compromise solution that would have obviated further litigation.  *See* Second Decl. of Chirinjeev Kathuria ¶¶ 4-6 (submitted herewith).

- PlanetSpace prepared and filed its CFC complaint on July 23, 2009.

Based on the foregoing facts, there has been no unreasonable delay, *see CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 569 (2004) (laches not applicable to bid protest filed after a 14-month delay), PlanetSpace having been at all times actively engaged in seeking a resolution of its claims either by negotiation, *see id.* at 569 (no unreasonable delay given negotiations between the parties), or by litigation, *id.*

Orbital's contention that PlanetSpace did not seek an "expedited" CFC schedule and press its case with the requisite urgency (Orbital Mem. 46-47) misrepresents the procedural history.  PlanetSpace proposed a schedule reducing by up to half the time each party would normally have to submit briefs in a bid protest;[22] no party suggested it would be injured if things did not move faster; and the Government itself extended the schedule by requesting additional time to file the administrative record (although it had already been compiled for purposes of the GAO protest).

---

[22]  *Compare* RCFC R. 52.1 and 7.2 (providing 28 days for a response and cross-motion to a motion for judgment on the administrative record; 28 days for a response to any cross-motion; and 14 days for a reply to any response to either a motion or cross-motion for judgment on the administrative record) *with* PlanetSpace's Proposed Scheduling Order, Docket Entry 5 (providing 21 days for a response and cross-motion to a motion for judgment on the administrative record; 14 days for a response to any cross-motion; and 14 days for any reply to a response to either a motion or cross-motion for summary judgment).

**B.      There Has Been No Prejudice.**

"To establish prejudice [giving rise to laches], the defending party must show that allowing the plaintiff's claim after an unreasonable delay will cause the defending party either economic prejudice or prejudice in mounting a defense."  *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988) (en banc).  No party asserts any prejudice to mounting its defense, and economic prejudice requires that "a defendant and possibly others ... suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Wanlass v. Gen. Elec. Co.* 148 F.3d 1334, 1337 (Fed. Cir. 1998) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) (en banc)).  A defendant must show that it was prejudiced "as a result of th[e] delay," *Waldorf v. United States*, 8 Cl. Ct. 321, 326 (1985), not that it will be prejudiced if the plaintiff is granted the relief it seeks.  *Id.*; *accord Poett v. MSPB*, 360 F.3d 1377, 1384 (Fed. Cir. 2004).

The Government and Orbital broadly argue that "if contract performance were interrupted at this juncture, the impact would be devastating."  Gov. Mem. 50.  But it is the Government and Intervenors that are responsible for performance having gone forward, having overridden (over PlanetSpace's objection) the automatic stay during the GAO bid protest.  And, even if there were an adverse impact on the other bidders from PlanetSpace's success on its claims, that would be a result of the merits of PlanetSpace's case, not PlanetSpace's allegedly unreasonable delay in filing this lawsuit.  Furthermore, the Intervenors do not and cannot complain that they will suffer economic harm for expenditures made to develop their launch systems because they are obligated to develop those systems under their respective COTS agreements, for which they are being paid more than $150 million each.

**CONCLUSION**

The Court should grant the declaratory and injunctive relief sought by PlanetSpace.

Respectfully submitted,

s/ Steven J. Rosenbaum
Steven J. Rosenbaum
*Counsel of Record*
Derron J. Blakely
Scott A. Freling
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20044
(202) 662-5568
(202) 778-5568 fax
srosenbaum@cov.com

October 2, 2009                    *Counsel for Plaintiff PlanetSpace Inc.*