**[REDACTED VERSION]**
**No. 09-476C**
**(Judge Block)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**PLANETSPACE, INC.,**
**Plaintiff**,

**v.**

**THE UNITED STATES OF AMERICA,**
**Defendant,**

**SPACE EXPLORATION  TECHNOLOGIES CORPORATION,**
**Intervenor,**

**and**
**ORBITAL SCIENCE CORPORATION,**
**Intervenor.**

---

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

---

**TONY WEST**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**ALAN J. LO RE**
**Assistant Director**

**OF COUNSEL:**                                **WILLIAM G. KANELLIS**
**STACEY K. GRIGSBY**                   **Trial Attorney**
**Trial Attorney**                              **Commercial Litigation Branch**
                                                        **Civil Division**
**VINCENT A. SALGADO**              **Department of Justice**
**Senior Attorney**                            **8th Floor**
**Office of General Counsel**             **1100 L Street, N.W.**
**NASA Headquarters**                     **Washington, D.C. 20530**

**Dated:  October 16, 2009**              **Attorneys for Defendant**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

PLANETSPACE, INC.,                    )
                                      )
      **Plaintiff,**                  )
                                      )
      v.                              )        **No. 09-476 C**
                                      )    **(Judge Lawrence J. Block)**
THE UNITED STATES OF AMERICA,  )        **BID PROTEST**
                                      )
      **Defendant,**                  )      **[REDACTED VERSION]**
                                      )
SPACE EXPLORATION                     )
TECHNOLOGIES CORPORATION,     )
                                      )
      **Intervenor, and**             )
                                      )
ORBITAL SCIENCE CORPORATION,  )
                                      )
      **Intervenor.**                 )

**DEFENDANT'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

      Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims

("RCFC"), defendant, the United States, respectfully submits its reply in support of its cross-

motion for judgment upon the administrative record.[1]

**I.     Plaintiff's "Responsibility" Argument Continues To Ignore The Express Language
      Of Applicable Regulations, The Solicitation, Controlling Law, And Common Sense**

      Our opening brief explained that plaintiff's contention that NASA conducted a "*de facto*

finding of nonresponsibility" was without merit:  Plaintiff failed to acknowledge the text of the

very FAR provision it cited – FAR part 9.104-3(d)(1) – which directs SBA referrals only when "a

small business concern's offer . . . would otherwise be accepted."  As NASA rejected

---

[1]     Throughout this brief we use the following abbreviations:  plaintiff's Rule 52.1 brief ("Pl.Br."); its reply brief ("Pl.Rep."); our Rule 52.1 brief ("Gov.Br."); National Aeronautics and Space Administration ("NASA"); PlanetSpace, Inc. ("PlanetSpace" or "plaintiff"); Orbital Sciences Corporation ("Orbital"); Space Exploration Technologies, Inc. ("SpaceX"); Small Business Administration ("SBA"); Federal Acquisition Regulation ("FAR"); NASA Request for Proposal No. NNJ08ZBG001R ("RFP" or "Solicitation"); Source Selection Authority ("SSA").

PlanetSpace's proposal for multiple, independent reasons, its offer was not "otherwise accepted." Gov.Br.13-15.  And since PlanetSpace was not the "apparent successful small business offeror," 48 C.F.R. § 19.601(c), no referral to the SBA was warranted.  Gov.Br.14-17.

Plaintiff's reply assumes its conclusion.  It reasons:  (1) PlanetSpace was the "apparent successful offeror," <u>because</u> (2) "[t]he reasons why [NASA] did not select PlanetSpace as the winning bidder all went to PlanetSpace's purported lack of responsibility," which is prohibited, <u>because</u> (3) responsibility determinations of PlanetSpace can only be made by the SBA, <u>because</u> (4) PlanetSpace was the "apparent successful offeror."  Pl.Rep.9-10.  Atop this self-fulfilling proof, plaintiff cites case law for a proposition that no one disputes:  where a small business's proposal is identified as superior to other bidders' proposals, the agency must refer the proposal to the SBA for a Certificate of Competency determination.[2]  Pl.Rep.7-11.

Apart from its circularity, there are three fundamental errors in plaintiff's response.

The first is that plaintiff neglects to discuss that NASA in this case was bound by FAR part 15.101.  AR1473.  This section expressly vested NASA with the authority to consider PlanetSpace's "technical" proposal, "past performance," and "the risk of unsuccessful contract performance."  48 C.F.R. § 15.101.  Thus, these factors – that plaintiff claims NASA was "flatly forbid[den]" from considering, Pl.Rep.7 – were expressly contemplated by law.  Yet plaintiff's

---

[2]      The cases cited by plaintiff do not match its rhetoric.  For example, plaintiff declares that "in virtually every bid protest" in this Court, the Government's claims that it had not conducted a responsibility determination were rejected.  Pl.Rep.6.  Yet plaintiff cites to only <u>one</u> case of this Court – a vacated opinion.  <u>Id.</u>  Further, after its opening exegesis disparaging the reliability of GAO opinions, Pl.Rep.1 n.1, plaintiff hangs its hat on *dictum* in a <u>footnote</u> of <u>Capitol CREAG LLC</u>, B-294958.4, a matter which neither involved an inappropriate responsibility determination, nor supports plaintiff's claim in this case.  There, the GAO merely noted the distinction between an agency's proper evaluation that a company's <u>proposal</u> was inadequate, as opposed to an assessment that the company <u>itself</u> was inadequate.  Id. at ¶ 31, 7-8.

reply contains no reference, whatsoever, to this statutory obligation.  See Pl.Rep.ii-vi.  Indeed,

rather than account for FAR part 15.101, or explain how it might co-exist with regulations

discussing SBA COC referrals, plaintiff reads the text of SBA regulations so broadly as to vitiate

all others.  This approach betrays elementary canons of statutory construction:  The FAR

provisions cited by plaintiff should be read to complement FAR part 15.101's directives, not

extinguish them.  See Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 533

(1995) ("when two statutes are capable of co-existence, . . . it is the duty of the courts, absent a

clearly expressed congressional intention to the contrary, to regard each as effective.")

(quotations omitted).  A common-sense reading of these regulations plainly vests NASA

contracting officials with the authority to examine the "technical" aspects of PlanetSpace's

proposal, its "past performance," and "the risk of unsuccessful contract performance."  48 C.F.R.

§ 15.101.  Only after NASA has examined these functions and determined that PlanetSpace

offered the "best value" and was an "apparent small business offeror," 48 C.F.R. § 19.601(c), but

deemed PlanetSpace incapable of performing the contract for reasons relating to its status as a

small business, would an SBA referral be required.  See 48 C.F.R. § 9.104-3(d)(1).

     Plaintiff's boundless interpretation of the word "responsibility" expands the SBA's

jurisdiction to encompass virtually all contracting functions and would yield absurd results.  E.g.,

Pl.Rep.4 (timely mission completion "is a classic question of a bidder's responsibility")

(emphasis in original).  For example, plaintiff characterizes NASA's conclusion that "it was

highly unlikely PlanetSpace would have the ability needed to address technical challenges in its

proposal" as a "finding that PlanetSpace lacked responsibility."  Pl.Rep.4.  Plaintiff would have

this Court divest the career engineers, technicians, and rocket scientists at NASA of the ability to

assess the technical aspects of sending a rocket into space, and would have the Court mandate that these technical evaluations be made by lawyers working at the SBA.

The complexity and seriousness of this procurement deserve a more sober assessment than that offered by plaintiff.  The record includes NASA's well-documented conclusions that there existed "serious Management risks inherent in PlanetSpace's proposal," and that it had "reservations with regard to PlanetSpace's ability to successfully address the technical challenges associated with its proposal[.]"  AR5181.  NASA noted material problems that would result from PlanetSpace's choice of two launch vehicles, which "potentially increases the technical and schedule risk to NASA."  AR5175.  It concluded that re-qualification of heritage components for the new launch vehicle "posed a significant technical challenge due to loads induced by the first stage rocket motor."  AR5175.  NASA observed that PlanetSpace had failed to take into account the need to increase the envelope of payload fairing, the resolution of which "would be a significant technical challenge to PlanetSpace."  AR5176.  These judgments were the culmination of several months of analyses by a multitude of NASA career professionals. AR31045.105-106.  They reside at the core of NASA's contracting function.  48 C.F.R. § 15.101.

The second error in plaintiff's response is that the Solicitation expressly required NASA to examine the criteria that plaintiff claims are SBA "responsibility" determinations.  See Gov.Br.17-21; AR2089-95.  Plaintiff does not dispute that these assessments were required by the RFP – once again, it avoids discussion of the RFP altogether.  Pl.Rep.7-9.  Instead, it insists that, regardless of whether these evaluations were required by the RFP, the "Small Business Act flatly forbids a procuring agency's rejection of a small business on responsibility grounds." Pl.Rep.6-7 (emphasis supplied).  In short, plaintiff asserts that NASA was prohibited from

applying to PlanetSpace the terms of the Solicitation.  The Court should reject this argument.

Plaintiff's challenge to NASA's implementation of the terms of the Solicitation is problematic.  PlanetSpace was well aware of the Solicitation's terms when it submitted its bid:  it understood that NASA would evaluate its "teaming arrangements," its "management approach," AR2091, and "the overall risk that [PlanetSpace's] payment schedule provides to NASA," AR2091, among other criteria.  Yet, notwithstanding that it knew the Solicitation <u>required</u> NASA to examine these criteria, PlanetSpace lodged no objection to the Solicitation prior to contract award.  If PlanetSpace believed what it now claims – that NASA's implementation of the Solicitation's terms would violate applicable laws or regulations – it bore an obligation to raise this issue prior to contract award:

> a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

<u>Blue and Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("<u>Blue and Gold</u>"); <u>accord</u> <u>Frazier v. United States</u>, 79 Fed. Cl. 148, 177 (2007); <u>Benchmade Knife Co. v. United States</u>, 79 Fed. Cl. 731, 737 (2007) (protestor waived objections to the terms of the solicitation by not filing protest during the time for submitting bids); <u>Scott v. United States</u>, 78 Fed. Cl. 151, 154 n.2 (2007).  This rule emerges as much from equity as from law:

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation.  Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

5

Blue and Gold, 492 F.3d at 1314 (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n. 14 (2005) (correction in original).  Prior to contract award in this case, PlanetSpace was aware of the criteria in the Solicitation that it now disputes.  Its election to "roll the dice" precludes it from challenging the Solicitation at this juncture.

These legal bars aside, plaintiff's claim that NASA was "prohibited" from applying the RFP's terms to PlanetSpace is implausible.  Indeed, this reading would impose upon NASA the dilemma of Morton's Fork:  According to plaintiff, it was improper for NASA to apply terms of the RFP against it.  But if NASA had not evaluated PlanetSpace against these RFP criteria, Orbital and Space-X would have reason to protest the procurement for NASA's failure to comply with the terms of the RFP and for unequal treatment.  See, e.g., 10 U.S.C. § 2305(b)(1) (contracting agency must "evaluate . . . proposals and make an award based solely on the factors specified in the solicitation.").  Under PlanetSpace's reading of the FAR, NASA's conduct of the procurement would be contrary to law in every circumstance.

II.    **Plaintiff Elects To Ignore NASA's Trade-Off Analyses**

Our opening brief demonstrated that plaintiff's claims that the SSA stated "that he was *not* performing a trade-off analysis[,]" Pl.Br.19, and that the SSA "failed to perform a trade-off analysis of any kind," id., were without basis in fact.  Gov.Br.23-25.  Plaintiff's reply refuses to acknowledge our multiple citations to the record, and further avoids discussing the controlling standard for what constitutes a "trade-off" analysis.

48 C.F.R. § 15.101-1 (c) instructs that the contracting agency should account for whether "[t]he perceived benefits of the higher priced proposal shall merit the additional cost."  See also 48 C.F.R. § 15.101-1 ("documentation need not quantify the tradeoffs that led to the decision.").

As we explained, the "perceived benefits" of Orbital's "higher priced" proposal, and their

consideration against PlanetSpace's proposal, were discussed throughout NASA's Source

Selection Decision.  Gov.Br.24-26; AR31230 (tr.438:22-440:17).  Although plaintiff ignores

NASA's documentation of these trade-offs, the record is self-evident.

      First, the SSA summarized his analysis in a section entitled, "Trade-off Analysis:"

> I concluded the proposal from Orbital was superior due to the
> serious Management risks inherent in the PlanetSpace proposal;
> however I recognized PlanetSpace had a lower overall price than
> the Orbital proposal.  I had reservations with regard to
> PlanetSpace's ability to successfully address the technical
> challenges associated with its proposal given the risks I identified
> in its Management approach.

AR5181 (emphasis supplied).  This passage both references and incorporates the SSA's earlier

analyses:

    (1)    assessing the price of the three offerors for each of the CLINs, AR5170-72 (e.g.,
            CLIN 002 pricing "exhaustively investigated;" PlanetSpace's CLIN 003 price
            "was significantly higher than the prices proposed by SpaceX and Orbital);
    (2)    assessing the strengths and weaknesses of Orbital's proposal, AR5172-5174;
    (3)    assessing PlanetSpace's strengths and weaknesses, AR5174-78;
    (4)    comparing the "Non-price Factors" of the offerors' proposals, AR5179-80; and
    (5)    comparing the prices of the offerors' proposals.  AR5180-81.

Throughout its decision, NASA repeatedly assessed that Orbital's proposal offered benefits that

outweighed any price advantage that PlanetSpace might offer:  "Based on my assessment of the

complexity and interplay of PlanetSpace's technical and management risks, I had much higher

confidence in Orbital's ability to provide resupply services on a fixed-price basis."  AR5180.

At the GAO hearing in this case, the SSA further elaborated upon these trade-off analyses.  See

AR31229 (tr. 435-36); AR31229; AR311231.

      The record is replete with NASA's explanations of how "[t]he perceived benefits of the

higher priced proposal shall merit the additional cost." 48 C.F.R. § 15.101-1 (c).  Plaintiff does

not allude to these analyses, but simply repeats its claim that an alleged price differential (which

is based upon speculation and is outside the record[3]) mandates that NASA do something more

than it did – without explaining what more NASA could have done.  Pl.Rep.11-12.  In so doing,

plaintiff wishes upon this procurement a standard as opaque as it is contrary to law.  This Circuit

has long recognized that a trade-off analysis does not implicate a rigid, mechanical calculus of

fixed criteria, but rather, involves what is "inherently a judgmental process."  Galen Med.

Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  For this reason, contracting

agencies enjoy "substantial discretion to determine which proposal represents the best value for

the government."  E.W. Bliss v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  Plaintiff's

insistence upon some nebulous, higher standard neglects this precedent, as well as NASA's

considered judgment that PlanetSpace's price advantage was significantly outweighed by its

proposal's material deficiencies and risks.  AR5179-81.

In sum, plaintiff's assertion that the SSA's analyses contained "absolutely no discussion

about the relevant factors of that trade-off analysis," Pl.Rep.12, is disproved by multiple

discussions in the record and misunderstands this Court's review of  "best-value" procurements.

See NEQ, LLC v. United States, 88 Fed. Cl. 38, 51 (2009) (rejecting inadequate trade-off claim:

"this court's role is to ensure that the contracting officer examined the relevant data and

articulated a rational connection between the facts found and the choice made.").

---

[3]	Plaintiff's statements regarding a "$613 million difference" between the prices of
the offerors, e.g., Pl.Rep.13, rely upon extra-record evidence and are misleading.  In fact, this
number appears nowhere in the record, and is based upon the ex-post conjecture of PlanetSpace's
employee.  Thus, that the SSA "never even mentions" this figure, Pl.Rep.11, is to be expected, as
this figure was contrived for the purpose of this litigation long after the contract was awarded.

**III.    The SSA Evaluated PlanetSpace's Proposal In Accordance With The RFP And
            Applied The Same Criteria To All The Proposals**

Our initial brief demonstrated that the SSA did not rely solely upon PlanetSpace's lack of

a back-up plan in his decision not to award the ISS CRS Contract.  In response, PlanetSpace

merely repeats its original arguments that the SSA relied upon criteria not stated within the RFP

and that the Solicitation did not require a back-up plan.  These bare assertions do not prove that

the SSA employed unstated evaluation criteria.  Plaintiff's argument does not account for the

substantial discretion afforded to agencies in a "best value" procurement.

The RFP alerted PlanetSpace that NASA would evaluate the risk associated with its

management approach.  AR2091.  Pursuant to the RFP, NASA identified material problems in

PlanetSpace's management approach:  (1) its use of cost-plus subcontracts for the large

subcontractors, (2) the high financial risk of PlanetSpace's ISS integration and payment schedule,

and (3) PlanetSpace's failure to understand basic Federal licensing requirements.  AR5176-77.

PlanetSpace assumes that an agency must precisely list every possible element it might

consider in the RFP, even if such an element is intrinsic to another stated evaluation factor.  This

is not the law in this Circuit.  Gulf Group, Inc. v. United States, 56 Fed. Cl. 391, 398 (2003) ("a

solicitation need not identify each element to be considered by the agency during the course of

the evaluation where such element is intrinsic to the stated factors.").  The SSA's discussion of a

contingency plan did not import new criteria, but only suggested a solution that might have

mitigated the significant weaknesses in Planetspace's management approach.[4]

_____

[4]    PlanetSpace announces, for the first time in its reply, that the Atlas V was its
back-up plan.  Pl.Rep.15.  It is hard to imagine how PlanetSpace could rely upon the Atlas V as a
"back-up" when, according to PlanetSpace's proposal, the Atlas V would not provide all the
services called for in the Solicitation.  AR10457; AR10459; AR10479; AR10787-10790.

**IV.    Plaintiff's Claim Regarding NASA's Analyses Of PlanetSpace's Past Performance Has No Basis In Law And Ignores The Solicitation's Terms**

Our opening brief established that the SSA properly determined that PlanetSpace was entitled to a neutral past performance rating due to its lack of experience as a prime contractor. This conclusion comports with both the terms of the RFP and the applicable law.

In response, PlanetSpace reasserts that the SSA should have given it additional credit for the past performance of its key personnel and subcontractors.  Pl.Rep.15-16.  These arguments again urge this Court to conduct a *de novo* review of a discretionary determination.  Cf. RCFC 52.1.  Yet, they do not refute the underlying fact that SSA's evaluation of past performance was reasonable, consistent with the stated evaluation criteria, and complied with relevant statutory and regulatory requirements.  See JWK, Int'l Corp. v. United States, 52 Fed. Cl. 650, 659 (2002).

Plaintiff's reply to this argument is misleading in some respects.  Pl.Rep.16.  Contrary to PlanetSpace's claim, the SSA acknowledged the experience of PlanetSpace's key personnel multiple times.  See AR5168 ("The first significant strength was past performance of the PlanetSpace team's key personnel"); AR5169 ("The first significant strength was for past performance of the PlanetSpace subcontractors' and managements teams and key personnel"); AR5176.  The SSA concluded this experience was entitled to little weight, as PlanetSpace's past performance did not demonstrate its ability to manage larger subcontractors.[5]  AR5175.

After weighing this information, the SSA concluded that the attendant risks presented by PlanetSpace's lack of experience managing as a prime contractor limited the predictive value of

---

[5]    The RFP expressly referenced that "[p]ast performance indicates how an offeror performed on earlier work and can be a significant indicator of how well it can be expected to perform the work at hand."  AR2090 (emphasis supplied).  Thus, PlanetSpace understood that NASA would consider its own past performance first and foremost.

the past performance of the subcontractors and key personnel.  For these reasons, the SSA gave

PlanetSpace a neutral rating.  AR5175.  That a neutral rating may have lowered PlanetSpace's

scores does not indicate NASA's treatment of past performance was improper.  See Banknote

Corporation v. United States, 56 Fed. Cl. 377, 387 (2003) (no error where agency downgraded

the rating of an offeror's technical proposal due to its lack of experience as a prime contractor).

Although PlanetSpace may disagree with this assessment, the record depicts that the

SSA's approach was reasonable and in accordance with the law and the Solicitation.

**V.      PlanetSpace's "Space Policy" Claim Is Counterfactual And Meritless**

PlanetSpace's reply repeats its allegations that NASA did not follow the United States

Space Transportation Policy ("USSP") with respect to the Taurus II rocket.  This argument is

predicated upon an erroneous assumption and again implores this Court to conduct an improper,

*de novo* factual inquiry.

First, there is no support in the administrative record for plaintiff's claim that OSTP's

prior approval of the Taurus II did not extend to the configuration Orbital proposed in this

procurement.  The Office of Science and Technology Policy's ("OSTP") stated that OSTP

considered the Taurus II a domestically-manufactured space vehicle pursuant to the USSP, and

that only a "significant increase in non-U.S. components . . . could necessitate further review

relative to the application of the policy provisions."  AR31791 & n.1.  Orbital's bid did not

change the amount of foreign content in the Taurus II, and Orbital's proposal makes clear that its

"CRS system is based on the launch and in-space vehicles . . . that will be demonstrated by the

joint NASA/Orbital COTS demonstration project."  AR6457; AR6550-51.  The record reflects

Orbital did not materially change the Taurus II's configuration.  AR6316; AR25169; AR31788.

PlanetSpace's only "proof" that Orbital changed the foreign content in the Taurus II since the 2007 OSTP review is two misplaced citations to Orbital's cross-motion for judgment in this litigation and a self-serving declaration of PlanetSpace's purported "expert" who admittedly has no personal knowledge of the current configuration of the vehicle.  See Pl.Br.27-28; Pl.Reply18, Bowker Decl. ¶ 76.[6]

Second, it was reasonable for NASA officials to consult with a senior policy advisor at OSTP regarding the application of the USSP and rational for NASA to rely upon his interpretation of the policy.[7]  This Court generally affords the Government's decision-making process the presumption of regularity.  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001).  An agency need not make an affirmative showing that it acted lawfully "unless the presumption has been rebutted by record evidence."  Id.  A litigant, not the agency, bears the "heavy burden" of  challenging the presumption.  Id.

Plaintiff has not met the heavy burden of overcoming the presumption by alleging that Mr. Wells lacked authority to interpret the USSP.  OSTP's enabling statute expressly permits the Director of OSTP to delegate any responsibility and provides that "[i]n carrying out his functions under this chapter, the Director is authorized to . . . appoint such officers and employees as he

---

[6]     Reliance upon Mr. Bowker's declaration, as well as other declarations submitted by PlanetSpace, is contrary to the law of this Circuit for the reasons expressed in our motion to strike (filed September 8, 2009).

[7]     Even if this Court were to require that the Government make an affirmative showing that a senior policy analyst was delegated the authority to interpret policies as part of his duties, the remedy would be to remand the matter to the agency to resolve this issue.  See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); accord Walls v. United States, No. 2008-5179, 2009 WL 3082293, at *7 (Fed. Cir. Sept. 29, 2009).  NASA would then request Mr. Wells's appointment letter.

may deem necessary to perform the functions now or hereafter vested in him and to prescribe

their duties." 42 U.S.C.A. § 6616.  Based upon this statute and Mr. Well's title of "Senior Policy

Advisor" in the Technology Section, NASA officials reasonably inferred that Mr. Wells could

interpret OSTP policies as part of his official duties.  PlanetSpace has not identified a single

document in the record that would cause NASA to question whether Mr. Wells was delegated the

authority to opine upon the proper application of the USSP.

Third, even assuming the truth of PlanetSpace's allegations, NASA conducted an

adequate investigation into Orbital's ability to comply with the USSP during the performance

period.  See AR1959, AR1972.  PlanetSpace misconstrues the United States' argument in this

respect and suggests that treating this matter as one involving contract administration effectively

relieves Orbital of its duty to comply with the USSP.  Rather, the import of this argument is that

Orbital's alleged non-compliance with the certification requirement cannot serve as grounds to

invalidate the award unless the proposal "on its face" should have led NASA to the conclusion

that Orbital "could not and would not comply with" the solicitation's terms.  Precision Standard,

Inc. v. United States, 69 Fed. Cl. 738, 755 (2006).[8]

---

[8]      PlanetSpace's reliance upon Dismas Charities, Inc. v. United States, 75 Fed. Cl.
59 (2007), and Klinge Corporation v. United States, 82 Fed. Cl. 127 (2008), is misplaced.
Dismas held that an unsuccessful offeror whose bid was non-responsive had no standing to bring
a bid protest challenging the procurement.  75 Fed. Cl. at 60-61.  Klinge acknowledged that an
agency may accept an offeror's certification of compliance, but warned that if  "prior to the
award, the agency has reason to believe that a firm will not provide compliant products, the
agency should go beyond a firm's representation of compliance."  Klinge, 82 Fed. Cl. at 135.

**VI.    NASA's Assessment That PlanetSpace's Proposal Contained Material Weaknesses And Presented Unacceptable Risks Was Reasonable And Was Based Upon Multiple, Significant Shortcomings And Mistakes In PlanetSpace's Proposal**

Our initial brief described how, after considering all the relevant facts, the SSA reasonably perceived that PlanetSpace's proposed subcontracting structure posed an appreciable risk to PlanetSpace's performance of the Contract.  Taking one phrase out of context, plaintiff again alleges that the "SSA's evaluation of financial risk was . . . based on incorrect factual premises."  Pl.Rep.21.  Plaintiff's argument rests upon the SSA's statement that "much of the work would be performed on large subcontracts on a cost-reimbursement basis."  Contrary to plaintiff's assertion, this statement does not misstate any aspect of PlanetSpace's proposal.

This statement refers to the fact that PlanetSpace's proposal contemplated subcontracting almost a third of the development work "in the early stages of the contract" on a cost reimbursement basis.  AR5176.  The word "much" does not indicate a definite quantity, and there is no evidence that the SSA intended the word much to represent more than the 30 percent of development work that PlanetSpace admitted it would subcontract out using cost contracts. AR5680; AR3093.  In light of this evidence and PlanetSpace's own admissions, the SSA's characterization of PlanetSpace's use of cost subcontracts was accurate and reasonable.

Thus, the SSA acted well within his authority when he chose to classify this area of PlanetSpace's proposed management approach as a "significant weakness."  Cf. 48 C.F.R. § 15.308.  PlanetSpace now complains that the SSA should have considered this area a mere weakness because of its proposed performance incentives and cost controls.  The fact remains that the SSA clarified that he considered PlanetSpace's plan to "manage this risk through cost controls and incentives," AR5176, but decided that "the subcontracting structure still represented

14

a significant risk to the successful performance of the program." Id.  That plaintiff disagrees with

this assessment does not amount to flaw in the SSA's reasoning and misunderstands the agency's

considerable discretion.  See E.W. Bliss, 77 F.3d at 449; Axiom Resource Management, Inc. v.

United States, 564 F.3d 1374, 1383 (2009) (mere disagreement with a contracting agency's

judgment does not make the determination unreasonable).

**VII.   The Equities Strongly Disfavor Granting The "Extraordinary Remedy" Of
Injunctive Relief**

Our opening brief explained that, even if plaintiff could establish success on the merits of

all six of its claims, interrupting contract performance as plaintiff proposes would result in

significant, material consequences to the United States.  We explained that the balance of harms

and public interest militate strongly against an injunction, as it would impede mission

completion, prevent the Government from maintaining its presence on the ISS, and would upset

the United States' treaty obligations; by contrast, PlanetSpace speculates about a potential loss of

business that would befall any bidder.  We further explained that because NASA rejected

PlanetSpace's proposal for multiple, independent reasons, it cannot demonstrate prejudice unless

it succeeds on Count I, and/or all six counts.  Gov.Br.44-49.

Plaintiff nominally addresses each of the criteria for injunctive relief in its response.

Pl.Rep.22-28.  But in so doing, it misrepresents the nature of relief that it seeks, and appears to

misunderstand some of the requisites needed for an injunction to issue.

First, in an effort to mollify our demonstration of the significant and tangible harms that

would attend any interruption in contract performance, plaintiff states that "PlanetSpace has not

requested injunctive relief resulting in any work stoppage."  Pl.Rep. 25; Pl.Rep.1 (PlanetSpace is

"most certainly not" seeking "an interruption of Contract Performance by Space-X and Orbital").

These statements are patently untrue.  In its Complaint, under the section entitled "Request for Relief," plaintiff expressly requested that the Court permanently enjoin both of the Contract awards and re-procure the entire contract:

> The Court should enter a permanent injunction remanding the subject procurement to NASA, and requiring NASA, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, to reprocure the services awarded in the International Space Station resupply contracts, in accordance with statutes, regulations and a reasonable exercise of discretion, with such re-procurement to be completed within 60 days of the date of the Court's decision, absent good cause.

Complaint ¶ 116 (emphasis supplied); see also id. ¶ 117 (discussing NASA's "re-review" and "reopening the procurement").  Plaintiff has not amended its Complaint or otherwise altered its request for a permanent injunction.

Thus, plaintiff's statements to the Court that it "has not requested injunctive relief resulting in any work stoppage" are false.  Pl.Rep.25; see id. at 1.  In fact, plaintiff has asked the Court to permanently enjoin both contract awards, remand the procurement back to NASA, and have NASA "reprocure the services awarded in the [ISS] resupply contracts" within 60 days.  Compl. ¶ 116.  Further, there is no plausible circumstance wherein the Court could grant the relief requested by plaintiff – i.e., "a permanent injunction remanding the subject procurement to NASA," Compl. ¶ 116 – that would not result in an interruption of contract performance and the jeopardy that we described in our opening brief.  Finally, as we explained in our opening brief, to the extent plaintiff believes that the Court may direct NASA to award the contracts in a particular manner, or under certain conditions, plaintiff is mistaken.  United Int'l Investig. Servs., Inc. v. United States, 41 Fed. Cl. 312, 323-24 (1998).

In February of this year, NASA and PlanetSpace appeared before this Court in this matter.  Plaintiff maintains that "the questions presented here are quite distinct from those at issue" in that proceeding.  Pl.Rep.25.  In fact, the issues were coterminous.  At the February hearing, as it does here, "[p]laintiff offered arguments regarding four factors courts normally consider in deciding whether to grant an injunction."  PlanetSpace v. United States, 86 Fed. Cl. 566, 568 (2009).  The Court determined, after "consider[ing] all important aspects of the contracts," "that delay would adversely affect the interests of the United States."  Id.  Plaintiff had full opportunity to litigate the issues relating to an injunction based upon the same factual theory, was denied relief, and elected not to appeal.  It may not now re-litigate this issue.  See Sharp Kabushiki Kaisha v. Thinksharp, Inc., 448 F.3d 1368, 1370 (Fed. Cir. 2006).

The perils of delay that compelled the Court not to interrupt contract performance in March 2009 are much more evident, and greater, seven months later.  Cargo is scheduled for delivery in Spring of 2011.  Gov.Br. Ex. A ¶ 7.  The production cycle for resupply spacecrafts is between 24 to 27 months.  Id., Ex. A ¶¶ 6, 15, Ex. B ¶ 8.  Given this time-frame, it is "extremely doubtful" that any new provider, starting today, could meet contract performance dates.   Ex. A ¶ 7.  The failure to timely deliver critical supplies would impair the United States' ability to meet its international agreements and "adversely impact the future of further International Space Exploration initiatives."  Ex. A ¶ 20.

Apart from mischaracterizing the relief that it seeks, PlanetSpace also appears to misunderstand the factors that a court will consider when deciding whether to grant injunctive relief.  In our original brief, we alluded to the Supreme Court's recent explanation that injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129 S.

Ct. 365, 376-77 (Nov. 12, 2008).

Plaintiff relegates Winter to a footnote, questions its characterization as "controlling

law," and asserts that it "[did] not involve permanent injunctive relief."  Pl.Rep.25.  These sought

distinctions are immaterial, Amoco Production Co. v. Gambell, 480 U.S. 531, 546 n.12 (1987)

("[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction

with the exception that the plaintiff must show a likelihood of success on the merits rather than

actual success"), and wrong.  Gear Wizzard, Inc. v. United States, 87 Fed. Cl. 218, 220 (2009)

(bid protest relying upon Winter for the standard for injunctive relief.).

Next, plaintiff insists that it has indeed "established irreparable injury."  Pl.Rep.23.  It

describes revenues and profits that it would have earned under the extant contract, and asserts

that the loss of this contract is "irreparable."  Pl.Rep.23.  By this statement, plaintiff fails to

appreciate that the economic "harm" it identifies is completely ordinary.

> Only economic loss that threatens the survival of a movant's
> business constitutes irreparable harm.  . . .  The plaintiffs do not
> claim that they will be destroyed if they do not obtain an
> injunction. Rather, they merely claim that they risk losing a
> valuable contract and some of their employees. This is insufficient.

Foundation Health Fed'l Servs. v. United States, 1993 WL 738426 (D.D.C. 1993) (internal

citations and quotations omitted); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379,

381-82 (1997); Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

Plaintiff does not allege the loss of this contract will threaten its survival.  Its distant speculation

about the possible consequences that may attend the loss of one contract – which attends every

unsuccessful bidder in every Federal procurement – does not satisfy this standard.

Indeed, plaintiff's analogy to the stolen police car illustrates its mistake.  Pl.Rep.24.  The harm it identifies there is not irreparable at all because the Chief of Police may either (1) recover the car, or (2) be reimbursed for its fair value.  The injury plaintiff describes is entirely reparable.

**VIII.**  **Plaintiff Fails To Explain Why It Waited Seven Months To Seek Injunctive Relief**

Our opening brief explained that, given the time constraints in this case, the exigency of prompt contract performance, the hazards that will attend any interruption of contract performance, and plaintiff's election to wait until seven months after contract award to file suit in this case, its claim is barred by laches.  Gov.Br.49-50; see, e.g., New Era Publications Int'l v. Henry Holt and Co., 873 F.2d 576, 584 (2d Cir. 1989).

Plaintiff does not dispute that it waited seven months after contract award to seek an injunction in this Court.  Nor does plaintiff dispute that it waited three months after the GAO issued its decision denying its protest to file its lawsuit.  Rather, it insists that this three-month delay in filing its complaint is not unreasonable because it was engaged "in good faith negotiations with NASA."  Pl.Rep.28-29.  Then, it appends to its pleading 80 pages of e-mail traffic (and related material) between Dr. Kathuria and the SSA, and characterizes these e-mail as "good faith negotiations" in an "effort to seek a compromise solution."  Pl.Rep.29.

Accepting, *arguendo*, plaintiff's characterization as true, its response is remarkably untethered to any acceptable practice in this Court or any other Federal court.  Federal Rule of Evidence 408 expressly states that "Evidence of conduct or statements made in compromise is . . . inadmissible."  As this Court has correctly observed, "[t]he policy to protect the sanctity of any settlement negotiations is an important one to promote efficient, less costly resolution in appropriate cases."  PCL Const. Serv's v. United States, 84 Fed. Cl. 408, 431 (2008).  Given

plaintiff's characterization of these documents as settlement negotiations,[9] plaintiff's offer of these e-mail as evidence that it was justified in not filing a lawsuit intimates that the Government might settle because it found merit in PlanetSpace's claim.  The introduction of these communications is improper and flouts the Federal Rules of Evidence.

However improper plaintiff's reliance upon these e-mail, its claim that it was for some reason precluded from filing a lawsuit in this Court while it engaged in "negotiations" is not credible.  There was nothing, whatsoever, prohibiting PlanetSpace from filing a complaint in this Court and prosecuting this claim, while simultaneously proceeding with whatever "negotiations" it believed it could realize.  These simultaneous tracks are routine in Federal litigation.

More importantly, in February 2009, PlanetSpace was made fully aware of the exigencies surrounding these contracts and the importance of immediate and timely execution of their terms.  PlanetSpace, 86 Fed. Cl. at 566-67 (hearing regarding "urgent and compelling circumstances that significantly affect interests of the United States").  Notwithstanding that PlanetSpace knew of these imperatives, it elected to wait until late July 2009 – three months after the GAO issued its decision – to file a Complaint.  There is no reasonable excuse for this delay, and its reply offers none.  PlanetSpace's claim is barred by laches because it was dilatory in filing its claim, and that claim could operate to the prejudice the United States and its international partners.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests the Court to grant our cross-motion for judgment upon the administrative record.

---

[9]     Plaintiff's attempt to characterize as "negotiations" after-the-fact e-mail sent by a disappointed bidder to the SSA strains credulity.  NASA was several months into contract performance when these e-mail were exchanged, and there was nothing to "negotiate" with respect to this procurement.  Nor was there anything for NASA to "compromise."  Pl.Rep.29.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Alan J. Lo Re
ALAN J. LO RE
Assistant Director

OF COUNSEL

STACEY K. GRIGSBY
Trial Attorney

VINCENT A. SALGADO
Senior Attorney
Office of General Counsel
NASA Headquarters


Dated: October 16, 2009

s/ William G. Kanellis
WILLIAM G. KANELLIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone:    (202) 353-0526
Facsimile:    (202) 514-8640

Attorneys for Defendant

## <u>CERTIFICATE OF FILING</u>

I hereby certify that on November 5, 2009, a REDACTED VERSION of

"DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT UPON

THE ADMINISTRATIVE RECORD" was filed electronically.  I understand that notice of this

filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.


   s/William G. Kanellis