Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | |
|---|---|
| PlanetSpace, Inc., | ) **PROTECTED MATERIAL TO BE** |
| | ) **DISCLOSED ONLY IN** |
| **Plaintiff,** | ) **ACCORDANCE WITH UNITED** |
| | ) **STATES COURT OF FEDERAL** |
| **v.** | ) **CLAIMS PROTECTIVE ORDER** |
| | ) |
| The United States, | ) |
| | ) |
| **Defendant.** | ) Case No. 09-476C |
| | ) Judge Block |
| **Space Exploration Technologies** | ) |
| **Corporation, and** | ) |
| | ) |
| **Orbital Sciences Corporation,** | ) |
| | ) |
| **Defendant-Intervenors** | ) |
| | ) |

## INTERVENOR ORBITAL SCIENCES CORPORATION'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Of Counsel:

Kevin C. Dwyer
Daniel E. Chudd
Caroline A. Keller
Anna M. Baldwin

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington D.C. 20001-4412

David A. Churchill
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

(202) 639-6056 Telephone
(202) 637-6370 Protected Facsimile

Counsel for Intervenor
ORBITAL SCIENCES CORPORATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 2

I.      PLANETSPACE'S PROPOSAL WAS NOT REJECTED BECAUSE OF
AN IMPROPER RESPONSIBILTY DETERMINATION (COUNT I). ................... 2

      A.     The SSA's Decision Was Not Based On A Responsibility
Finding. ............................................................................................. 3

      B.     No SBA Referral Was Required In This Case. ................................. 4

      C.     PlanetSpace Was Not An Apparent Successful Offeror. ................. 6

      D.     PlanetSpace Has Failed To Show That It Was Even Theoretically
Entitled To SBA Referral And Thus Cannot Demonstrate
Prejudice. ......................................................................................... 7

II.     THE SSA CONDUCTED A PROPER TRADEOFF ANALYSIS
(COUNT II). ................................................................................................... 8

III.    THE SSA WAS REASONABLY CONCERNED WITH RISK AND
PLANETSPACE'S LACK OF A BACK-UP PLAN (COUNT III). ......................... 10

IV.    THE SSA'S EVALUATION OF PLANETSPACE'S PAST
PERFORMANCE WAS PROPER AND ENTIRELY REASONABLE
(COUNT IV). ................................................................................................. 11

V.     NASA'S EVALUATION OF ORBITAL COMPLIED WITH THE U.S.
SPACE TRANSPORTATION POLICY (COUNT V). ............................................. 13

      A.     NASA Properly Consulted With OSTP About Application Of The
Space Transportation Policy With Respect To CRS Proposals,
And Obtained OSTP's Approval To Proceed With Orbital's
Proposal. ........................................................................................... 13

           1.     Both NASA and Orbital Met the Requirements of the
Space Transportation Policy. ............................................. 13

           2.     ███████████████████████████████ ..................... 15

      B.     OSTP Properly Communicated Its Space Transportation Policy
Decision to NASA. ........................................................................... 15

VI.     THE SSA RATIONALLY ASSESSED THE RISKS OF
        PLANETSPACE'S SUBCONTRACTING AND FUNDING
        APPROACHES (COUNT VI)...................................................................................17

VII.    PLANETSPACE IS NOT ENTITLED TO INJUNCTIVE RELIEF. .......................18

        A.      PlanetSpace's Speculative Claims Of Injury Do Not Justify
                Granting Injunctive Relief. ...........................................................................18

        B.      The Balance Of Harms And The Public Interest Require The
                Denial Of Injunctive Relief............................................................................19

CONCLUSION...........................................................................................................................20

## TABLE OF AUTHORITIES

CASES AND GAO DECISIONS

*Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed. Cl. 488 (2009)...................11

*Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) .....................................4

*Capitol CREAG LLC*, B-294958.4, Jan. 31, 2005, 2005 CPD ¶ 31............................................ 4-6

*Champion-Alliance, Inc.*, B-249504, Dec. 1, 1992, 92-2 CPD ¶ 386...........................................14

*DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501 (2008)...............................................................6

*DEI Consulting*, B-401258, July 13, 2009, 2009 CPD ¶ 151 .......................................................16

*DeTekion Security Systems, Inc.*, B-290835, B-298235.2, July 31, 2006, 2006 CPD ¶ 130.........12

*Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568 (Fed. Cir. 1996) .................................19

*EP Productions, Inc. v. United States*, 63 Fed. Cl. 220 (2005) .....................................................18

*Fort Carson Support Services v. United States*, 71 Fed. Cl. 571 (2006) .......................................10

*PGBA, LLC v. United States*, 60 Fed. Cl. 196 (2004) ...................................................................10

*PlanetSpace v. United States*, 86 Fed. Cl. 566 (2009)...................................................................20

*U.S. Defense Systems, Inc.*, B-245563, Jan. 17, 1992, 92-1 CPD ¶ 89.........................................14

*United States Telecom Ass'n v. Federal Communications Commission*, 359 F.3d 554
(D.C. Cir. 2004) .......................................................................................................................16

*United International Investigative Services, Inc. v. United States*, 42 Fed. Cl. 73 (1998)............19

*Wackenhut Services v. United States*, 85 Fed. Cl. 273 (2008)........................................................10

*YRT Services Corp. v. United States*, 28 Fed. Cl. 366 (1993) .....................................................2, 3

OTHER AUTHORITIES

48 C.F.R. § 9.104-3(d)(1) ...............................................................................................................2

FAR 15.308....................................................................................................................................12

NASA FAR Supplement 1815.308(1) ......................................................................................... 1-2

U.S. Transportation Policy Fact Sheet, issued Jan. 6, 2005, *available at*
http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf ...........................16

**INTRODUCTION**

After exhaustive briefing, PlanetSpace has failed to demonstrate that there was anything improper with the decision of NASA's Source Selection Authority ("SSA"), William Gerstenmaier, to award Commercial Resupply Services ("CRS") contracts to SpaceX and Orbital, but not to PlanetSpace. As is made clear by the Source Selection Statement and the whole of the administrative record, PlanetSpace's claims are as meritless as they are wide-ranging. The SSA did not 1) make an improper responsibility determination, 2) fail to perform a tradeoff analysis, 3) employ unstated evaluation criteria in evaluating PlanetSpace's proposal, 4) improperly evaluate PlanetSpace's past performance, 5) violate the U.S. Space Transportation Policy, or 6) fail to articulate a rational basis for assessing risk.

Instead, the SSA's decision was an entirely reasonable response to the fact that PlanetSpace's proposal was fraught with risk and unrealistic projections. As a company inexperienced in the space industry with no current revenue-producing business, to compete for the CRS contract, PlanetSpace proposed to place cost-type subcontracts for high-risk development work to industry giants under its own fixed-price prime contract with NASA. But PlanetSpace adopted this subcontract structure without also proposing sufficient controls to manage and incentivize its subcontractors, creating a risk of cost-overruns and performance delays – risks that were all the more serious given that PlanetSpace's proposed timeline for cargo delivery was already much later than either SpaceX's or Orbital's and because PlanetSpace, unlike its competitors, proposed to take on the additional technical burden involved in qualifying and using two separate launch vehicles. The SSA could not, consistent with NASA's critical mission for CRS, ignore that these factors made PlanetSpace's proposal much higher risk than the proposals of SpaceX or Orbital. As such, the SSA's decision not to select PlanetSpace for award was reasonable, and well within the discretion afforded to him. *See* NASA FAR Supp.

1

1815.308(1) (SSA's discretion is limited only by the test of "rationality and consistency with the [RFP's] evaluation criteria").

## ARGUMENT

## I. PLANETSPACE'S PROPOSAL WAS NOT REJECTED BECAUSE OF AN IMPROPER RESPONSIBILTY DETERMINATION (COUNT I).

PlanetSpace has failed to show that NASA should have referred it to the Small Business Association ("SBA") before rejecting PlanetSpace's proposal. PlanetSpace's claim fails both requirements for SBA referral — SBA referral is only required where "a small business concern's offer [1] that would otherwise be accepted is to be rejected [2] because of a determination of non-responsibility." 48 C.F.R. § 9.104-3(d)(1). The expansive rule advocated by PlanetSpace would effectively mean that the procuring agencies – notwithstanding their expertise as to their own needs and requirements – could not evaluate critical schedule, technical, and cost parameters of competing proposals. Rather, PlanetSpace suggests that when a small business is in the competition, any and all "responsibility"-type criteria must be evaluated exclusively by the SBA. *See* PlanetSpace's Reply in Support of its Motion for Judgment on the Administrative Record and in Opposition to the Government's and Intervenors' Cross-Motions ("PlanetSpace Reply") at 2-6. The SBA rules have never been so broadly interpreted, and PlanetSpace's all-encompassing proposed rule is absurd on its face.

PlanetSpace's Reply completely ignores the line of case law that both the Government and Orbital have cited, which holds that an Agency may evaluate proposals using traditional responsibility factors without making a responsibility determination. *See, e.g., YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 395 (1993). Here, the SSA did not make a responsibility determination but instead conducted a thorough comparative evaluation of the offerors' proposals in accordance with the factors listed in the RFP and rejected PlanetSpace's proposal as a result of that comparative evaluation. *See* Orbital's Response to Plaintiff's Motion for

-2-

Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record ("Orbital Mem.") at 13-15. PlanetSpace responds 1) that responsibility determinations must be referred to the SBA, 2) that PlanetSpace was the apparent successful business offeror, and 3) that as the apparent successful offeror, PlanetSpace was nonetheless rejected on responsibility grounds. *See* PlanetSpace Reply at 1.

As to the first point, all parties agree that true responsibility determinations are required to be referred to the SBA. Here, however, PlanetSpace's claim fails both because it was never the apparent successful offeror and because the SSA never made a responsibility determination. Moreover, even if PlanetSpace did satisfy these criteria, its claim would still fail because PlanetSpace has never shown that it actually is a small business entitled to referral, meaning that it is unable to show prejudice.

### A.     The SSA's Decision Was Not Based On A Responsibility Finding.

In making its expansive argument that "the concept of 'responsibility' is quite broad," PlanetSpace Reply at 2, PlanetSpace fails to address that this Court has squarely held that an agency may use responsibility-related factors in the evaluation process without being deemed to have made a responsibility determination. *See YRT Servs. Corp.*, 28 Fed. Cl. at 395. It is simply not the case that each time an agency evaluator comparatively addresses a responsibility-related factor under the RFP, the evaluator is making a formal responsibility determination. Nor is an offeror rejected based on responsibility simply because that offeror comes up short in the comparative evaluation of factors which overlap with responsibility-related criteria. But notwithstanding the lack of case law support for such positions, that is the implication of PlanetSpace's argument.

Specifically, PlanetSpace argues that the SSA's findings as to PlanetSpace's use of heritage components and its space vehicle payload fairing "go directly to several responsibility

criteria, including at least PlanetSpace's 'technical skill' and 'capability[.]'" PlanetSpace Reply at 5. Indeed, PlanetSpace goes so far as to argue that even the SSA's observation that PlanetSpace's proposal failed to observe FAA licensing requirements is "arguably" a non-responsibility finding as this goes to PlanetSpace's "competency." *Id.*

PlanetSpace's argument would render the process of a normal comparative evaluation by the expert buying agency indistinguishable from a formal responsibility determination. The implication of PlanetSpace's argument is that only the SBA – and not NASA – could have determined in the first instance whether PlanetSpace's proposal to qualify heritage components for two different launch vehicles was a comparative weakness, or whether PlanetSpace's need to make further adjustments to its proposed payload fairing margin ought to have been regarded as a discriminator among all three proposals. But plainly, the Small Business requirements at issue did not remove NASA's ability to conduct a searching comparative evaluation of a highly technical rocket designed for missions to outer space.[1]

**B.     No SBA Referral Was Required In This Case.**

PlanetSpace has failed to show that an SBA referral was required in this case 1) because the comparative evaluation that NASA conducted was entirely proper and was not tantamount to a non-responsibility determination, and 2) because PlanetSpace was not, in any event, the apparent successful offeror.

PlanetSpace argues that the GAO decision in *Capitol CREAG LLC*, B-294958.4, Jan. 31, 2005, 2005 CPD ¶ 31 at 7 n.6, shows that an SBA referral was required here. *See* PlanetSpace

---

[1]     To the extent that PlanetSpace is arguing that NASA could not, in fact, comparatively evaluate its proposal under the terms specified in the RFP because such an evaluation could only be conducted by the SBA, PlanetSpace is in effect arguing that the evaluation scheme set out in the RFP is invalid. Such an argument is not only absurd on the merits, it is also untimely as challenges to the terms of the Solicitation must be raised prior to award. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007).

Reply at 7-8.  *Capitol CREAG* states that where an evaluator makes "a finding that a small business offeror's proposal is unacceptable under a responsibility-type criterion," and such a finding "precludes . . . a comparative or tradeoff analysis, it is tantamount to a nonresponsibility determination" that must be referred to the SBA.  2005 CPD ¶ 31 at 7 n.6.  PlanetSpace contends that referral was mandated by the SSA's statement that he "could not conduct [a] 'typical' tradeoff analysis since [he] believe[d] there was a low likelihood PlanetSpace could successfully perform the contract," AR Tab 55 (Source Selection Statement) at 5181.  PlanetSpace Reply at 4.  PlanetSpace misreads and ignores the relevant context of both the SSA's statement and *Capitol CREAG*.  Taking the selection decision first, it is clear that the SSA *did* conduct an extensive tradeoff analysis.  *See* AR Tab 55 at 5172-82.  Neither a comparative nor a tradeoff analysis was in any way "precluded" from the outset.  Read in the context of the entire source selection decision, the SSA's statement merely recognized that the tradeoff was not a close call, even in light of PlanetSpace's lower price, because of the crippling, risk-laden nature of PlanetSpace's proposal.

Second, nothing in *Capitol CREAG* prohibited the SSA here from deciding that PlanetSpace's proposal was comparatively lacking because of the risks it presented.  In *Capitol CREAG*, the GAO ultimately found that the Agency had not made a prohibited responsibility determination.  GAO differentiated between finding that an ***offeror itself*** was lacking on the basis of a responsibility factor versus finding that the ***offeror's proposal*** was lacking.  2005 CPD ¶ 31 at 7-8.  According to GAO, the former could raise a responsibility concern whereas the latter would not.  *Id.*  In denying the protest in *Capitol CREAG*, the GAO explained that the agency had not found that an offeror itself "lacked adequate management and staffing," but had acceptably found that an offeror's "proposed management and staffing plan – CREAG's approach to performing the contract work – created a high risk of unacceptable performance."

*Id.* GAO explained that "[b]ecause [the Agency's] negative assessment was based on the way that CREAG proposed to perform, rather than on CREAG's capabilities, we conclude that what occurred was not tantamount to a nonresponsibility determination." *Id.* at 8.

Here too, the SSA's decision was based on a concern that PlanetSpace's proposed *approach* "created a high risk of unacceptable performance" because of the interrelated risks that pervaded PlanetSpace's proposal – including its use of a cost-plus subcontracting structure without proposing adequate cost and management controls, as well as the fact that PlanetSpace, unlike the other offerors, proposed to take on the additional risk involved in qualifying two different launch vehicles in order to attempt to meet NASA's schedule needs.  Orbital Mem. at 11-12; AR Tab 188 (Transcript) at 31142-43 (pp. 89-90).  The SSA's concerns with the risks in PlanetSpace's proposal are entirely appropriate under the holding in *Capitol CREAG*.

### C.    PlanetSpace Was Not An Apparent Successful Offeror.

In addition to the fact that the SSA did not make a responsibility determination, PlanetSpace's claim fails because it was not the apparent successful offeror.  Arguing to the contrary, PlanetSpace maintains that it would have received the award because 1) there were only three bidders, 2) the Source Evaluation Board ("SEB") rated PlanetSpace higher than Orbital with respect to Mission Suitability, and 3) PlanetSpace's bid was significantly less expensive than Orbital's.  *See* PlanetSpace Reply at 9-10.  That the SEB rated PlanetSpace more highly than Orbital did not make PlanetSpace an apparent successful offeror.  This Court has squarely held that the ratings and conclusions of lower-level evaluators do not determine which offeror is apparently successful. *See DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 517 n.29 (2008).  Only after a proposal is fully considered by both the SEB and the SSA can there be an apparent successful offeror.  In this case, it was only the SSA who had the ability to look across both the Technical and Management Factors and evaluate the proposals as a whole.  *See* AR Tab

55 (Source Selection Statement) at 5177.  As a result of doing so, the SSA stated that he "had

much higher confidence" in Orbital's approach, as compared to PlanetSpace.  *Id.* at 5180.  Thus,

PlanetSpace was never an apparent successful offeror.  PlanetSpace's argument to the contrary is

entirely unsupported by the record.

> **D.    PlanetSpace Has Failed To Show That It Was Even Theoretically Entitled To SBA Referral And Thus Cannot Demonstrate Prejudice.**

Finally, even if (contrary to fact) the SSA had made a responsibility determination and

even if (contrary to fact) PlanetSpace was an apparent successful offeror, PlanetSpace is still not

entitled to any relief under Count 1 because it has failed to show that it actually is a small

business and was thus prejudiced by the lack of an SBA referral.  As SpaceX argued at length in

its Cross-Motion for Judgment on the Administrative Record, no referral to the SBA was

required here because PlanetSpace, as a result of its teaming arrangement with large

subcontractors, cannot be considered small in size under the SBA's ostensible subcontractor rule.

*See* SpaceX's Response to PlanetSpace's Motion for Judgment on the Administrative Record and

Cross-Motion on the Administrative Record ("SpaceX Mem.") at 25-28 (citing 13 C.F.R.

§ 121.103(h)(4)).

Tellingly, PlanetSpace offers no substantive reply to this argument but asserts only that it

would be improper for this Court to "usurp the SBA's authority and issue a finding that

PlanetSpace is not a small business for purposes of this procurement."  PlanetSpace Reply at 10.

But this Court is not being asked to make an affirmative size determination.  Instead, the issue is

that, unless PlanetSpace can show that it was actually entitled to an SBA referral, PlanetSpace

cannot show that it was prejudiced by any non-responsibility finding.  Because PlanetSpace has

completely failed to show its entitlement to such a referral, its claim for relief under Count I must

be denied.

## II.   THE SSA CONDUCTED A PROPER TRADEOFF ANALYSIS (COUNT II).

As both the Government and Orbital have previously established, the SSA conducted a searching tradeoff analysis. *See* Defendant's Response to PlanetSpace's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record ("United States Mem.") at 23-26; Orbital Mem. at 15-20. Notwithstanding the obvious record of the tradeoff analysis contained in the Source Selection Statement, PlanetSpace persists in arguing that "the SSA did not conduct any trade-off at all." *See* PlanetSpace Reply at 11. PlanetSpace goes on to raise a new argument as to why – notwithstanding pages of comparative analysis in the source selection statement, including a section explicitly captioned "Trade-off Analysis" – no tradeoff was made: because the SSA "never even mentions . . . the amount ($613 million) by which the PlanetSpace bid beat the Orbital bid." *Id.* at 11-12. This argument is as unavailing as it is misleading.

The contention that the SSA did not consider the significance of the cost differences between Orbital and PlanetSpace is meritless. Indeed, the GAO rightly rejected PlanetSpace's argument that "NASA did not adequately consider price" simply because the selection decision does not include a total evaluated price. See AR Tab 190 (GAO Decision) at 31769-71. Not only did the SSA discuss and compare each offeror's pricing in detail, *see* AR Tab 55 (Source Selection Statement) at 5170-72, 5180-81, in the section of the Source Selection Statement labeled "Trade-off Analysis," the SSA explicitly stated that "I concluded the proposal from Orbital was superior due to the serious Management risks inherent in the PlanetSpace proposal; however, I recognized PlanetSpace had a lower overall price than the Orbital proposal." *Id.* at 5181. Given the SSA's misgivings about the high-risk nature of PlanetSpace's proposal, he reasonably concluded that its lower price was not enough to warrant its selection on a best value basis.

The SSA was not required to state a specific dollar-amount difference between the proposals in order to make a proper tradeoff decision. Indeed, the $613 million number that PlanetSpace repeatedly cites is misleading for at least two reasons.

First, NASA never required each offeror to give a "total price" for its proposal because NASA had the freedom, under this IDIQ contract, to mix and match services purchased from various offerors. *See* AR Tab 188 (Transcript) at 31225 (pp. 420-21). As such, the Solicitation required each offeror to provide pricing on a per-mission basis, and made clear that comparisons of offerors' pricing would also be made on a per-kilogram basis. *See* AR Tab 27 (Basic RFP § VII.C.P2) at 1478; AR Tab 33 (RFP Amend. 6) at 2130. The record here makes clear that the SSA was extensively briefed on the offerors' per-mission and per-kilogram pricing. AR Tab 54 (Source Selection Presentation) at 5152-64.

Second, and more importantly, NASA did not require each offeror to propose the same services – and in fact, the offerors did not propose to perform the same work. For example, PlanetSpace – unlike Orbital – did not propose to meet any of NASA's needs for 2.7 MT of pressurized upmass cargo during 2010. AR Tab 27 (RFP) at 1302, 1464 (stating requirement); AR Tab 54 (Source Selection Presentation) at 5152 (comparing Orbital and PlanetSpace). Likewise, PlanetSpace did not propose to meet NASA's 1.5MT requirement for return downmass in 2012, while Orbital did. AR Tab 27 at 1302, 1464; AR Tab 54 at 5042. And finally, whereas PlanetSpace did not propose to provide any unpressurized upmass services in 2011, Orbital did. AR Tab 54 at 5152. PlanetSpace's belated argument that the tradeoff decision was improper because of the SSA's failure to cite a particular "total price" difference number is thus utterly meaningless.

Instead, both the source selection decision itself and the whole of the record show that the SSA was well-aware of the fact that PlanetSpace's pricing was, for most CLINs and subCLINs,

considerably lower than Orbital's. *See* AR Tab 188 (Transcript) at 31160 (pp. 158-59) ("The relative[] difference was Orbital was significantly more costly than PlanetSpace.... [I]n the simplest of terms, roughly SpaceX is around $███ per kilogram, Orbital is around $███ per kilogram, and PlanetSpace sits around $██ to $███ per kilogram").[2]  However, as a result of the comparative evaluation the SSA conducted, the SSA simply had much greater confidence in Orbital's proposal than in PlanetSpace's.  AR Tab 55 (Source Selection Statement) at 5180-81.  Accordingly, despite the significant price advantage of PlanetSpace's proposal, the SSA reasonably concluded that selecting SpaceX and Orbital for award would best "maximize the probability" of success of the CRS program.  *Id.* at 5181.  As the SSA's tradeoff analysis is both reasonable and well-documented, PlanetSpace's claim under Count II must be denied.

## III.    THE SSA WAS REASONABLY CONCERNED WITH RISK AND PLANETSPACE'S LACK OF A BACK-UP PLAN (COUNT III).

In its Reply, PlanetSpace fails to show that there was anything unreasonable about the SSA's concern about PlanetSpace's lack of a back-up plan, given the high overall level of risk in PlanetSpace's proposal.  PlanetSpace argues that "[b]ecause a 'back-up plan' was not required by the solicitation, the lack of one could not legally form *any part* of the SSA's decision to reject PlanetSpace's bid."  PlanetSpace Reply at 14.  This argument is wholly unsupported by any

---

[2]    PlanetSpace's contention, *see* PlanetSpace Reply at 12 n.7, that this Court is prohibited from looking to the SSA's testimony before the GAO in order to confirm that the SSA made a proper tradeoff analysis is baseless.  The case that PlanetSpace cites for this proposition – *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 591-92 (2006) – discusses the limited utility of relying on a post-award debriefing, in contrast to the written selection statement, for an explanation of the selection decision.  There is no discussion in *Fort Carson* of reliance on previous GAO testimony of selection officials.  However, other Court of Federal Claims decisions make clear that it is entirely appropriate for this Court to look to and rely on the GAO testimony of selection officials in adjudicating this bid protest.  *See Wackenhut Servs. v. United States*, 85 Fed. Cl. 273 (2008); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 214 (2004).  Accordingly, although the tradeoff decision is well-documented based on the Source Selection Statement alone, Mr. Gerstenmaier's testimony usefully serves to fully explain and amplify the reasoning already set forth in the written selection statement.

case law or by commonsense. The SSA's concern about the lack of a back-up plan was a reasonable expression of his concern about PlanetSpace's failure to address and mitigate the considerable risks inherent in its approach. Given that the SSA himself contemporaneously stated that a back-up plan was not a requirement under the Solicitation, AR Tab 55 (Source Selection Statement) at 5176, there is simply no basis on which to argue that he nonetheless used the lack of such a plan as a stand-alone, unspecified evaluation factor.

PlanetSpace's argument in the alternative – that even if there was no stand-alone back-up plan requirement, it was irrational for the SSA to express such a concern about PlanetSpace, given that it "had teamed with three of the most successful aerospace companies in the world," PlanetSpace Reply at 14 – simply misses the point. The SSA was not concerned with the substantive capabilities of PlanetSpace's team members (which he expressly acknowledged, *see* AR Tab 55 (Source Selection Statement) at 5176), but with the fact that PlanetSpace's proposal was based on a risk-laden management approach and an overly optimistic financing plan. PlanetSpace's mere disagreement with the SSA's concern fails to establish that the SSA's judgment was irrational. *See Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009).

## IV.   THE SSA'S EVALUATION OF PLANETSPACE'S PAST PERFORMANCE WAS PROPER AND ENTIRELY REASONABLE (COUNT IV).

In its Reply, PlanetSpace continues to assert that the SSA's evaluation of PlanetSpace's past performance was flawed because 1) the SSA impermissibly treated PlanetSpace's lack of a "corresponding strength" to its subcontractors as an unstated evaluation criterion, and 2) the SSA impermissibly refused to reply on the past performance of PlanetSpace's key employees. PlanetSpace Reply at 15. PlanetSpace has apparently abandoned its previous argument that the SSA treated its lack of relevant past performance negatively, in violation of FAR 15.305(a)(2)(iv).

As to PlanetSpace's first argument, there was nothing improper about the SSA's decision not to rely on the significant strength that PlanetSpace received from the SEB for the past performance of its subcontractors.  The SSA was required to exercise his judgment independently of the SEB, *see* FAR 15.308, and he properly did so, finding that because PlanetSpace had no relevant experience itself in the development, production, or operation of large space systems, the experience of its subcontractors was offset by its own lack of experience as a prime.  *See* AR Tab 55 (Source Selection Statement) at 5175; AR Tab 190 (GAO Decision) at 31763 ("[T]he SSA determined only that the protester's record of past performance should not be considered as a discriminator; he did not downgrade the proposal overall under the past performance factor").  That the SSA disagreed with the SEB does not mean that there was any unstated evaluation criterion or that his decision was in any way improper.  *DeTekion Security Sys., Inc.*, B-290835, B-298235.2, July 31, 2006, 2006 CPD ¶ 130 at 10 ("The judgments of selection officials are governed not by the views of those who advise them, but by the tests of rationality and consistency with the stated evaluation criteria.").

Likewise, there is no substance to PlanetSpace's argument that the SSA unreasonably failed to credit PlanetSpace for the past performance of its key employees.  The contemporaneous evaluation record – as well as the SSA's GAO testimony – makes entirely clear that the SSA acknowledged that PlanetSpace had employed capable key personnel.  *See* AR Tab 186 (COSF) at 31045.87; AR Tab 188 (Transcript) at 31131 (p. 43).   The SSA reasonably determined that the presence of those key employees was not a decisive discriminator given the overall level of risk in PlanetSpace's proposal.  Because PlanetSpace's past performance claim is based on nothing more than mere disagreement with the SSA's judgment, Count IV should be rejected.

## V.    NASA'S EVALUATION OF ORBITAL COMPLIED WITH THE U.S. SPACE TRANSPORTATION POLICY (COUNT V).

Abandoning several of its previous arguments, PlanetSpace's Reply narrows its

allegations that NASA failed to meet the U.S. Space Transportation Policy's requirements in the

CRS procurement to: (1) NASA "relied entirely" on OSTP's 2007 interagency determination

approving Orbital's Taurus II launch vehicle as U.S.-manufactured and therefore in compliance

with the Space Transportation Policy, and (2) Mr. Damon Wells, of OSTP, lacked authority to

communicate OSTP's approval of Orbital's launch vehicle to NASA.  *See* PlanetSpace Reply at

16-19.  To the contrary, NASA obtained OSTP's approval of Orbital's specific CRS Taurus II

configuration (█████████████████████████████████████████████), and there is

no evidence that Mr. Wells of OSTP lacked authority to render OSTP's determination and to

communicate that determination to NASA.

### A.    NASA Properly Consulted With OSTP About Application Of The Space Transportation Policy With Respect To CRS Proposals, And Obtained OSTP's Approval To Proceed With Orbital's Proposal.

#### 1.    Both NASA and Orbital Met the Requirements of the Space Transportation Policy.

PlanetSpace curiously alleges that NASA "did not follow the requirements of the RFP, or

the explicit requirement of the Space Policy itself, by presenting OSTP with the specific contents

of Orbital's vehicle as it actually exists for purposes of the ISS Resupply contract, for a

determination whether it could be considered U.S.-made, and by securing the Director's decision

whether Orbital's cargo vehicle should be included in making that assessment."  PlanetSpace

Reply at 19.  To the contrary, on July 22, 2008, NASA sought review from OSTP of the foreign

content of all three CRS offerors' initial proposals to ensure compliance with the Space

Transportation Policy.  *See* AR Tab 173 (OSTP cont'd) at 29279.  NASA's July 2008

memorandum to OSTP explicitly restated the specific content of Orbital's CRS Taurus II <u>directly</u>

from Orbital's <u>CRS</u> proposal.  *See id.* at 29281; AR Tab 69 (Orbital Initial Proposal, Vol. I) at

6425.  Based on that information, OSTP subsequently pronounced Orbital's CRS Taurus II to be compliant with the Space Transportation Policy, and authorized NASA to proceed with the CRS procurement.  *See* AR Tab 67 (OSTP) at 6316.

While Orbital's compliance with the Space Transportation Policy was thus considered specifically by NASA and OSTP for the CRS procurement, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.

PlanetSpace insinuates that NASA's December 2008 memorialization of OSTP's determination on the Taurus II is insufficient, and that NASA is required to produce some formal pronouncement of OSTP's determination.  *See* PlanetSpace Reply at 18.  But nowhere in the Space Transportation Policy, the FAR, or the CRS RFP, is there any requirement for OSTP to issue formal documentation of its Space Transportation Policy determinations.  While an agency must document its evaluation judgments in sufficient detail to show that they are reasonable, the necessary amount and level of detail will vary from procurement to procurement.  *See U.S. Defense Sys., Inc.*, B-245563, Jan. 17, 1992, 92-1 CPD ¶ 89 at 3; *Champion-Alliance, Inc.*, B-249504, Dec. 1, 1992, 92-2 CPD ¶ 386 at 6-7.  Since OSTP was not required to generate formal documentation of its determination, NASA's pre-award memorandum confirming OSTP's determination that Orbital's CRS Taurus II met the requirements of the Space Transportation Policy is unimpeachable.  PlanetSpace's protest on this ground is meritless.

-14-

2.   ██████████████████████████.

In its Reply, PlanetSpace abandons its principal basis for arguing that Orbital's Taurus II configuration somehow "changed" between OSTP's 2007 determination and the CRS procurement. Both Orbital and the Government have demonstrated that PlanetSpace's "evidence" of this alleged change, relying on the Declaration of Michael Bowker ("Bowker Decl."), at ¶ 75, is entirely misplaced. *See* Orbital Mem. at 30; Defendant's Reply in Support of its Motion for Leave to Correct the Administrative Record at 4-5. Mr. Bowker's Declaration discusses only the evolution from Taurus I to Taurus II, ██████████████████████ ████████████████.

PlanetSpace now attempts a further spin on its Taurus II "change" argument, by suggesting that Orbital might use a Russian RD-180 engine instead of its modified NK-33 engine in the CRS Taurus II. PlanetSpace Reply at 18. ***There is no such change in Orbital's Taurus II configuration.*** To the contrary, the first stage engines proposed by Orbital for CRS, and approved by OSTP, are the same NK-33s. *See* AR Tab 85 (Orbital FPR, Vol. II) at 9852-53. Only ***PlanetSpace*** plans to use ██████████████, for its Atlas V launch vehicle. AR Tab 188 (Transcript) at 31148 (p. 111); AR Tab 186 (Agency Legal Memorandum) at 31029 (identifying use of Russian engines by PlanetSpace).[3]

**B.     OSTP Properly Communicated Its Space Transportation Policy Decision to NASA.**

PlanetSpace argues, without any support in fact or law, that OSTP's determination approving Taurus II as a domestic launch vehicle is invalid because Mr. Wells "had not been delegated authority to make required decisions with respect to the Space Policy," PlanetSpace

---

[3]     Mr. Bowker's speculation about Orbital's post-award consideration of a further engine change, *see* Bowker Decl. at ¶ 76, finds no support in the record.

Reply at 19.  PlanetSpace fails to provide any evidence that OSTP's determination could not be delegated to Mr. Wells to make or to communicate to NASA, or that OSTP failed to ratify his decision.  NASA is not required to provide affirmative evidence of the delegation of authority within OSTP, any more than it is required to prove the delegation of authority to NASA's SSA. *See U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent."); *cf. DEI Consulting*, B-401258, July 13, 2009, 2009 CPD ¶ 151 at 2 n.1 ("Government officials are presumed to act in good faith . . . .").  OSTP's 2007 determination of Orbital's compliance with the Space Transportation Policy was prepared and communicated to NASA by Mr. Wells, *see* AR Tab 193 (OSTP Inter-agency Memorandum) at 31791-92.  PlanetSpace has no reason to question Mr. Wells' authority to do the same in the CRS procurement.  *See* AR Tab 67 at 6316.

PlanetSpace also states that OSTP's determination is invalid because Mr. Wells "did not consult with the National Security Advisor."  PlanetSpace Reply at 19.  However, the Space Transportation Policy only requires the Director of OSTP to consult with the Assistant to the President for National Security Affairs when it is seeking an *exemption* under the Space Transportation Policy, for foreign-manufactured vehicles.  *See* U.S. Transportation Policy Fact Sheet at 7, issued Jan. 6, 2005, *available at* http://www.ostp.gov/galleries/Issues/Space_Transportation_Policy05.pdf.  OSTP was not required to consult with the Assistant to the President for National Security Affairs because OSTP had already determined that Orbital's launch vehicle was U.S.-manufactured; thus no exemption was necessary.

VI.    **THE SSA RATIONALLY ASSESSED THE RISKS OF PLANETSPACE'S SUBCONTRACTING AND FUNDING APPROACHES (COUNT VI).**

In its Reply Memorandum, PlanetSpace abandons many, but not all, of the reckless charges it laid against the SSA's risk assessment.  In light of Orbital's rebuttal, PlanetSpace no longer claims:  (a) that "PlanetSpace had secured financing commitments of $237 million in excess of its projected requirements," PlanetSpace Motion for Judgment on the Administrative Record ("PlanetSpace Mem.") at 33; *cf.* Orbital Mem. at 38-39; or (b) that the SSA improperly failed to credit PlanetSpace for its purported management expertise, PlanetSpace Mem. at 33-34; *cf.* Orbital Mem. at 36-38 & n.7.  PlanetSpace does, however, persist in two claims that are flatly contradicted by the record.

*First*, PlanetSpace asserts that the SSA's risk assessment was "based on a demonstrably false premise as to the percentage of subcontracting that was cost-plus," PlanetSpace Reply at 22, and rests that assertion on the SSA's supposed "belief," unsupported by any citation to the record, "that 'much of the work would be performed on large subcontracts on a cost reimbursement basis,'" *id.* at 20 (no citation provided).  The implicit assertion – that the SSA mistakenly believed that the majority of the *total* subcontract effort would be performed on a cost-reimbursement basis – is itself "demonstrably false."  *Id.* at 22.  Instead, the SSA "believed it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when most of the effort *in the early [development] stages of the contract* would be performed under cost type subcontracts."  AR Tab 55 (Source Selection Statement) at 5176 (emphasis added).

*Second*, PlanetSpace claims, in a supposed effort to clarify the record, that additional documents support its claim that PlanetSpace would be able to achieve positive cash flow by ▮▮▮▮.  PlanetSpace Reply at 21 n.16.  Of course, that fact has not been in contention.  As Orbital previously established, the SSA's risk assessment both was fully supported in the record and related to a different problem:  the fact that PlanetSpace would not experience "positive

-17-

cumulative cash from operations" – *i.e.,* total cash receipts in excess of total cash outlays – until

████████████████████.  AR Tab 55 (Source Selection Statement) at 5177, 5180;

Orbital Mem. at 39-41.  The new documents cited by PlanetSpace simply confirm the basis for

the SSA's concern, *see, e.g.,* AR Tab 169 (Pre-Award Survey Cont'd) at 29054, or relate to a

technical approach – ███████████████████████████████████

████ – that was abandoned in PlanetSpace's Final Proposal Revision, *see* AR Tab 40 (Pre-

Award Survey) at 2572-73.[4]

## VII.   PLANETSPACE IS NOT ENTITLED TO INJUNCTIVE RELIEF.

Injunctive relief should be denied first and foremost because none of PlanetSpace's

claims succeed on the merits.  *See EP Prods. Inc. v. United States*, 63 Fed. Cl. 220, 224 (2005)

("[I]njunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief

is clear.").  But even if NASA had acted unreasonably, injunctive relief would still be

unwarranted because 1) PlanetSpace's claims to irreparable injury are speculative and

exaggerated, and 2) the harms to the Government and to the public interest far outweigh any

purported injury to PlanetSpace.

### A.   PlanetSpace's Speculative Claims Of Injury Do Not Justify Granting Injunctive Relief.

In support of its Cross-Motion for Judgment on the Administrative Record, Orbital

explained why each of the injuries that PlanetSpace lists fails to justify injunctive relief.  *See*

Orbital Mem. at 43-44.  Those injuries include PlanetSpace's potential loss of employees, the

potential loss of its teaming arrangements, and lost profits.  As Orbital previously pointed out,

---

[4]      PlanetSpace disingenuously derides Orbital (and, by implication, the SSA) for relying on "a single worst case scenario presented in PlanetSpace's alternative business case."  PlanetSpace Reply at 21 n.16.  PlanetSpace ignores that the "canyon chart" document cited by Orbital, AR Tab 89 at 10590 (cited in Orbital Mem. at 40-41) is the very same (and the only) document cited by PlanetSpace for its original assertion about being "cash flow positive," *see* PlanetSpace Mem.

PlanetSpace has made no suggestion – and still makes no such claim in its Reply – that it has actually lost any employees or teaming partners in the nearly *ten months* since NASA issued its award decision in December 2008. That PlanetSpace has no response on this point conclusively demonstrates that both of these harms are entirely speculative.

This leaves PlanetSpace with only the loss of revenue from the CRS contract. That injury falls far short of the showing needed to justify the drastic remedy of injunctive relief. *United Int'l Investigative Servs., Inc. v. United States*, 42 Fed. Cl. 73, 75 (1998), *aff'd*, 194 F.3d 1335 (Fed. Cir. 1999) ("Plaintiff's allegation of harm (that it would suffer an 'unjust loss of a valuable business opportunity with the Government') does not rise to the level of the irreparable harm that must be shown to receive injunctive relief."); *cf. Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) (observing that allowing a mere claim of lost profits to serve as the basis for a showing of irreparable harm "would convert the 'extraordinary' relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits").

**B.     The Balance Of Harms And The Public Interest Require The Denial Of Injunctive Relief.**

In its Reply, PlanetSpace disingenuously claims that the balance of harms weigh in its favor because "PlanetSpace has not requested injunctive relief resulting in any work stoppage." PlanetSpace Reply at 25. But PlanetSpace has repeatedly stated that it seeks, as a result of the reprocurement sought here, "displacement" by NASA of one of the already performing offerors. *See* PlanetSpace Mem. at 37; PlanetSpace Reply at 27. Such a "displacement" is plainly a work stoppage to replace one of the current contractors with PlanetSpace and would have the near-certain effect of causing a performance delay, as Mr. Gerstenmaier explained in his affidavit in

---

at 33 (citing only "AR 10590" for relevant proposition).

support of the Government's Cross-Motion. *See* United States Mem., Ex. A at ¶ 7.

PlanetSpace's conclusory response – that it would "almost surely be able to provide the

necessary resupply services to the ISS sooner" than SpaceX or Orbital – is entirely unsupported

and incredible. PlanetSpace Reply at 27. PlanetSpace's evaluated proposal was much later than

either Orbital or SpaceX in providing a full-range of services to the ISS, but at this point,

PlanetSpace could not begin performance until at least December 2009 – nearly a year behind

Orbital and SpaceX (both of whom began performance in February 2009). Displacing either

SpaceX or Orbital plainly risks very serious delays. As such, both the balance of harms and the

public interest factors weigh squarely in the Government's favor, especially given that this Court

has already upheld NASA's determination that any such "delay would adversely affect the

interests of the United States." *PlanetSpace v. United States*, 86 Fed. Cl. 566, 568 (2009).

## CONCLUSION

For the reasons stated above, the Court should grant Intervenor's Cross-Motion for

Judgment on the Administrative Record and deny Plaintiff's Motions for Judgment on the

Administrative Record and for Permanent Injunction.

Respectfully submitted,

s/ David A. Churchill
David A. Churchill
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
Telephone: (202) 639-6056
Fax: (202) 637-6370 (protected)

*Of counsel:*
Kevin C. Dwyer
Daniel E. Chudd
Caroline A. Keller
Anna M. Baldwin

*Counsel of Record for Intervenor,*
*Orbital Sciences Corporation*

JENNER & BLOCK LLP

Dated: October 16, 2009