**[REDACTED VERSION]**
**No. 09-476C**
**(Judge Block)**

_____

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

**PLANETSPACE, INC.,**
**Plaintiff,**

v.

**THE UNITED STATES OF AMERICA,**
**Defendant,**

**SPACE EXPLORATION  TECHNOLOGIES CORPORATION,**
**Intervenor,**

**and**
**ORBITAL SCIENCE CORPORATION,**
**Intervenor.**

_____

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR**
**JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND**
**CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

_____

**TONY WEST**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**ALAN J. LO RE**
**Assistant Director**

**OF COUNSEL:**                    **WILLIAM G. KANELLIS**
**STACEY K. GRIGSBY**              **Trial Attorney**
**Trial Attorney**                **Commercial Litigation Branch**
                                  **Civil Division**
**VINCENT A. SALGADO**            **Department of Justice**
**Senior Attorney**               **8th Floor**
**Office of General Counsel**     **1100 L Street, N.W.**
**NASA Headquarters**             **Washington, D.C. 20530**

**Dated: September 18, 2009**      **Attorneys for Defendant**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PLANETSPACE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-476 C |
| | ) | (Judge Lawrence J. Block) |
| THE UNITED STATES OF AMERICA, | ) | BID PROTEST |
| | ) | |
| Defendant, | ) | |
| | ) | |
| SPACE EXPLORATION | ) | [REDACTED VERSION] |
| TECHNOLOGIES CORPORATION, | ) | |
| | ) | |
| Intervenor, and | ) | |
| | ) | |
| ORBITAL SCIENCE CORPORATION, | ) | |
| | ) | |
| Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims,

defendant, the United States, respectfully submits its response to plaintiff's motion for judgment

upon the administrative record, and its cross-motion for judgment upon the administrative record.

## STATEMENT OF THE ISSUES

1.  Whether Government contract awards based upon applicable regulations and the express terms of a solicitation were arbitrary, capricious, or contrary to law.

2.  Whether equities favor an injunction that would result in the failure of the United States to meet mission requirements and satisfy international obligations.

3.  Whether the claims of a plaintiff are barred by laches, where that plaintiff waited seven months after the initiation of contract performance to prosecute its claim, notwithstanding its awareness that delays would severely jeopardize mission completion.

## STATEMENT OF THE CASE

### I.      Nature of the Case

PlanetSpace, Inc. ("PlanetSpace"), protests the award by the National Aeronautics and

Space Administration ("NASA") of contracts awarded on December 23, 2008 ("Contract" or

"Contracts"), pursuant to Request for Proposal No. NNJ08ZBG001R.  These Contracts govern

supply services in support of the International Space Station ("ISS").  PlanetSpace seeks to

enjoin Contract performance by the winning bidders, Orbital Sciences Corporation ("Orbital")

and Space Exploration Technologies, Inc. ("SpaceX"), and re-procure the Contract.  Pl.Br.38.

### II.     Counterstatement of Facts

#### A.      The International Space Station

The ISS is a multi-billion dollar scientific research facility operating in low earth orbit.

The ISS is a joint project under a partnership agreement among the space agencies of the United

States, Russia, Japan, Canada, and the European Space Agency.  The ISS is scheduled to remain

in operation through the end of 2015.  AR31045.4.

#### B.      Resupply Services to the ISS

Pursuant to international agreements with its partners, NASA is responsible for

resupplying the ISS.  Among other things, NASA must supply laboratory supplies, internal and

external ISS system spare parts, and food, water and medicine for ISS crewmembers.  NASA

must provide this service through the end of 2015.  AR31045.4.  NASA currently fulfills these

obligations by use of the Space Shuttle.  The Space Shuttle will be retired in December 2010,

whereupon NASA will have no other reasonable means to resupply the ISS.  AR31045.42.

C.      **NASA Request for Proposal No. NNJ08ZBG001R ("RFP" or "Solicitation")**

NASA issued the Solicitation on April 14, 2008, seeking proposals for commercial

resupply services ("CRS") to the ISS.  The RFP contemplates the award of firm, fixed price,

indefinite delivery, indefinite quantity Contracts.  AR1297, AR1364.  The RFP permits NASA to

make multiple awards.  The guaranteed minimum value of each Contract is the negotiated value

of 20,000 kg (20 metric tons) of "upmass."  The total maximum value of each Contract awarded

is $3.1 billion. AR 1314.  NASA issued six amendments to the RFP.  AR Tab 28-33, AR1498-

2162.  The Statement of Work ("SOW") calls for the submission of proposals to provide

(1) transport of cargo to the ISS ("upmass"); (2) disposal of cargo from the ISS ("disposal"); and

(3) return of cargo from the ISS to Earth ("downmass").  AR 1978.  The RFP also provides that

transport to the ISS may be required in pressurized or unpressurized spacecrafts and may require

any combination of delivery, disposal, and/or return of cargo in one mission.  AR 1978.  These

requirements are set forth in the RFP in three contract line items ("CLIN") as follows:

> CLIN 0001    Standard Resupply Services.
> CLIN 0002    Nonstandard Services.
> CLIN 0003    Special Task Assignments and Studies.

AR1314-17, AR2049-53.

Section VII of the RFP sets forth two evaluation factors for award:  Mission Suitability

and Price/Cost.  The evaluation was conducted in accordance with Federal Acquisition

Regulation ("FAR") Part 12, "Acquisition of Commercial Items."  Source selection was based

upon a trade-off process between the evaluation factors for award as described in FAR part

15.101-1.  The RFP established that the Mission Suitability factor is more important than

Cost/Price.  AR1473.  Under the Cost/Price evaluation, offerors were required to state prices for

3

each CLIN on schedules provided in the RFP.  AR1314-17.  The Cost/Price analysis assessed the reasonableness of proposed prices and costs.  AR1478.

Mission Suitability was numerically weighted and scored on a 1,000 point scale.  Mission Suitability was broken down into three sub-factors, with an assigned weighting of points:

|            |                             |       | Points |
|------------|-----------------------------|-------|--------|
| Subfactor A | Technical Approach         |       | 550    |
| Subfactor B | Management Plan            |       | 400    |
| Subfactor C | Small Business Utilization |       | 50     |
|            | Small Business              | 25    |        |
|            | Small Disadvangaged Business | 25   |        |
|            |                             | Total | 1,000  |

AR1473.

The Mission Suitability factor and subfactors were also adjectivally rated (Excellent, Very Good, Good, Fair and Poor) in accordance with NASA FAR Supplement ("NFS") 1815.305(a)(3)(A).  All other things being equal, the RFP stated that the Agency would consider proposals offering a full range of vehicle services more favorably.  AR1474.  An offeror's relevant record of past performance was evaluated as part of each distinct Mission Suitability subfactor. The past performance evaluation was based upon, among other things, any information obtained independently by NASA for each of the respective Mission Suitability subfactors.  Past performance was not separately scored and in the event of an offeror without a record of relevant past performance or for whom information on past performance was not available, the offeror would not be evaluated favorably or unfavorably on past performance.  AR1474.

Under Subfactor A, "Technical Approach," proposals were evaluated for their ability to meet NASA's needs and development maturity, production and annual delivery capability, processing lead times, approach to meeting the task-order demand, and understanding of the

4

scope, content and complexity of the resources required to perform, among other things. AR1475.

Under Subfactor B, "Management Plan," each offeror's proposed management team was evaluated for key positions, teaming arrangements, and completeness in meeting the key aspects of the SOW.  NASA also assessed each offeror's proposed performance milestones in relation to proposed payment schedules, to assess the risk to the government.  AR1475, AR2091.

### D.    The Source Evaluation Board and Evaluation Plan

Offerors' proposals were evaluated by a Source Evaluation Board ("SEB"), which was comprised of seven voting members and several non-voting members.  The Source Selection Authority ("SSA") was William Gerstenmaier, a thirty-two year veteran of NASA, who also serves as NASA's Associate Administrator for Space Operations.  AR1155; Ex. A ¶ 1.

Pursuant to the Evaluation Plan developed for this procurement, the SEB was responsible for providing its expert analysis of proposals in accordance with the stated evaluation factors set forth in the RFP and summarizing its results in written findings.  AR1154-56.  the SEB operated on a consensus basis requiring general agreement by the quorum on each adjectival finding or numerical score.  AR4466-5037.

### E.    Competitive Range, Oral Discussions, and Final Proposal Revisions

On September 8, 2009, pursuant to FAR part 15.306(c), the Contracting Officer ("CO") established a competitive range of the most highly-rated proposals.  PlanetSpace, Orbital, SpaceX were found to be within the competitive range.  AR2723-24.

On the same day, the CO requested written responses to questions regarding price issues, significant weaknesses, and other proposal clarifications.  AR2789-2832.  All offerors responded

to these requests.  AR Tabs 81-83.  NASA held oral discussions with each of the offerors

beginning October 22, 2009.  AR3573.  Following oral discussions, NASA issued requests for

final proposal revisions from each offeror.  AR4145-4210; AR4211-78; AR4279-337.  Final

proposal revisions were submitted by each offeror on November 10, 2008.  AR9604-10229 (Tabs

84-87); AR10230 - 11120 (Tabs 88 - 92); AR11120-12660 (Tabs 93-98).

**F.     Evaluation Results**

Final evaluation results were presented to the SSA on December 15, 2008.  AR4466.  The

overall final evaluation results for Mission Suitability were:



AR 5035.

Proposed prices under CLIN 0001 (which represent the bulk of RFP services), were:

**CLIN 0001 Weighted Average Template Prices CY2010 – 2016 in $K/kg**



AR5035.

**G.     Source Selection Decision**

On December 23, 2008, the SSA awarded CRS contracts to Orbital and SpaceX.

AR5165-82.  Because SpaceX submitted the best technical proposal and also offered the lowest

overall price, selection of SpaceX was obvious and required no trade-off analysis.   Selection of a

6

second contractor, however, required a trade-off analysis.  Pursuant to FAR part 15.101, after

considering the price and technical proposals of Orbital and PlanetSpace, the SSA assessed that,

notwithstanding its lower point score, Orbital submitted a superior technical proposal due to

serious management risks inherent in PlanetSpace's proposal.  AR5172-81.  Although the SSA

acknowledged PlanetSpace's lower overall price, he expressed reservations with regard to

PlanetSpace's ability to successfully address the technical challenges associated with its proposal

given the risks identified in its management approach.  AR5181.

## SUMMARY OF THE ARGUMENT

In support of its motion for judgment on the administrative record, plaintiff advances six

arguments, none of which possess merit.

First, plaintiff's contention, that NASA conducted a "*de facto* finding of

nonresponsibility," is contrary to law.  Plaintiff ignores and misinterprets controlling provisions

of the FAR, which expressly state that a referral to the Small Business Administration ("SBA")

for  a "responsibility" determination applies only to "a small business concern's offer that would

otherwise be accepted . . . ."  FAR part 9.104-3(d)(1) (emphasis supplied).  PlanetSpace's offer

was not "otherwise accepted"   NASA rejected its offer for multiple reasons.  Nothing in the

FAR supports plaintiff's argument that a contracting agency must refer a small business to the

SBA before that bidder's offer has been deemed acceptable.  Further, apart from misreading the

FAR, plaintiff neglects that the RFP required NASA to conduct the evaluations that plaintiff

characterize as a "de facto" responsibility findings.  Plaintiff's contention that a contracting

agency may not assess RFP criteria where they overlap with a SBA responsibility determination

is illogical, implausible, and betrays a fundamental misunderstanding of Government contracting.

Second, plaintiff's contention that NASA "did not engage in the required trade-off analysis[,]" is counterfactual, as evinced by eight single-spaced pages of analyses that did just that.  AR5172-78 (analyses of proposals of Orbital and PlanetSpace); AR5179-80 (comparing non-price factors of proposals); AR5174-79 (offering detailed analyses of Orbital's proposal); AR5180-81 (e.g., comparing PlanetSpace and Orbital proposals; comparing "PlanetSpace['s] lower overall price" with the "risks [the SSA] identified in its Management approach").

Third, plaintiff's assertion that the SSA based his decision upon criteria not stated in the RFP misconstrues the SSA's analysis of PlanetSpace's management approach.  The RFP required NASA to evaluate each offeror's management plan for "feasibility, realism, suitability, risk[,] and soundness," as well as its "teaming arrangements and completeness in meeting the key aspects of the SOW."  AR2091.  PlanetSpace's plan raised significant concerns for NASA concerns that were exacerbated by the absence of a contingency plan.  NASA's discussion of this issue was both lawful and reasonable.

Fourth, PlanetSpace's allegation that the SSA evaluated PlanetSpace's past performance improperly is premised upon the erroneous assumption that an agency must give the same weight to a subcontractor's past performance as that of a prime contractor.  Neither the RFP nor the FAR obligated the SSA to treat the past performance of PlanetSpace's subcontractors in this manner. The SSA offered a reasonable explanation for his decision to give PlanetSpace a neutral rating.

Fifth, PlanetSpace's contention that NASA violated the United States Space Policy ("USSP") by awarding one of the Contracts to Orbital is factually and legally meritless.  The record depicts that the Office of Space and Technology Policy ("OSTP") determined that Orbital's space vehicle was eligible to launch United States Government payload for the

purposes of the policy, and that the policy did not prohibit Orbital's use of foreign <u>components</u> in its cargo vehicle.  AR6316.  Further, the USSP only requires an agency to initiate the interagency coordination process as early as possible, which NASA did when it consulted with OSTP.

<u>Sixth</u>, PlanetSpace's contention that the SSA's decision was irrational in its analysis of PlanetSpace's financing and subcontracting structure stands at odds with the law of this Circuit. The Court of Appeals for the Federal Circuit has counseled that, in the bid protest context, this Court should not seek to examine "the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials."  <u>E.W. Bliss Co. v. United States</u>, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal citations omitted).  Although the SSA disagreed with the SEB as to the magnitude of the risk associated with PlanetSpace's proposal, his statement detailed the reasoning underlying his decision.  That PlanetSpace disagrees with the SSA's technical rating is neither unexpected nor sufficient to invalidate the procurement.

Apart from the absence of merit in PlanetSpace's arguments, the equities in this case strongly counsel against any interruption of Contract performance, now ten months after Contract award.  PlanetSpace's claim is barred by laches, because it slept on its rights in this case and delayed filing its protest until <u>seven months</u> after Contract performance began.  Enjoining Contract award at this late juncture would imperil NASA's timely provision of supplies to the ISS and would jeopardize the ability of the United States and its partner nations to effect ISS missions.  The material harms that would befall the United States and its partners if Contract performance were delayed far eclipse the speculative losses that might affect PlanetSpace.  There exists a compelling public interest in continuing Contract performance uninterrupted.

## ARGUMENT

### I.     Standard Of Review

#### A.     Scope Of Review

The standard of review for a motion for judgment upon the administrative record, pursuant to RCFC 52.1, is similar, but not identical to, a motion for summary judgment under RCFC 56.  Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005).  A motion for summary judgment considers whether the moving party has proved its case as a matter of fact and law, or alternatively, whether a genuine issue of material fact precludes judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  By contrast, the Court's inquiry under Rule 52.1 is narrower:  i.e., given all of the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that an agency's decision was arbitrary or capricious, or was otherwise not in accordance with law.  Bannum, 404 F.3d at 1357 (instructing the Court to make "factual findings under RCFC 52.1 from the [limited] record evidence as if it were conducting a trial on the record.").

#### B.     Legal Standard For Overturning An Agency Procurement Decision

Injunctive relief, such as that sought here, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129 S. Ct. 365, 376 (Nov. 12, 2008).  "Because of the force behind an injunction, and because injunctive relief is an exception to the rule that 'courts have no general supervising power over the proceedings and action of the various administrative departments of the government,' . . . permanent injunctions 'do not issue as of course.'"  Canadien Lumber Trade Alliance v. United States, 30 CIT 892, 896 (2006) (quotations omitted).

In a bid protest, the Court will set aside an agency procurement decision where, after reviewing the Administrative Record, it assesses that the agency's contract award was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (cited in 28 U.S.C. § 1491(b)(4)).  Application of the arbitrary and capricious standard involves neither judicial fact finding nor review of the agency's factual statements for "substantial evidence."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)).  The court of appeals has explained that an award may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  Impresa Construzioni Geom. Domenico Garufi  v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).

In evaluating whether an agency official's action was rational, the "disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Id. at 1333.  The Court will sustain an agency decision "evincing rational reasoning and consideration of relevant factors."  Id. at 1058 (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)).  The Court assesses whether there has been "a clear error of judgment," without substituting its own judgment for the agency's.  E.g., Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004).  Thus, this Court should uphold the agency's decision unless it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Further, plaintiff in this case must demonstrate that NASA committed a clear violation of law or abused its discretion, and that the error materially prejudiced it by depriving it of a "substantial chance" of winning the award.  CACI, Inc. Fed. v. United States, 719 F.2d 1567, 1573 (Fed. Cir. 1983); see also 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581-82 (Fed. Cir. 1996). Even if it could establish prejudice, PlanetSpace must demonstrate that it is likely to suffer irreparable harm if the injunction is not granted.  Titan Tire Corp. v. Case New Holland Inc., 566 F.3d 1372, 1375-76 (Fed. Cir. 2009) (citing Winter, 129 S. Ct. at 65); see also Gear Wizzard, Inc. v. United States, 87 Fed. Cl. 218, 220 (2009) (applying test set forth in Winter in a bid protest).[1] Plaintiff must prove that this harm outweighs the burdens imposed upon the United States if the injunction were to be granted; and that this relief would not disserve the public interest.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

**C.     Protests Emerging From GAO Decisions**

Where, as in this case, a protest emerges from an earlier protest before the Government Accountability Office ("GAO"), the preceding GAO decision provides useful guidance, as the Comptroller General possesses "substantial expertise in procurement matters."  Biospherics, Inc. v. United States, 48 Fed. Cl. 1, 8 (2000).  This Circuit has recognized that GAO bid protest decisions, while not binding, are "accorded a high degree of deference by the courts."  E.W. Bliss & Co. v. United States, 33 Fed. Cl. 123, 134 (1995), aff'd., 77 F.3d 445 (Fed. Cir. 1996).

---

[1]     PlanetSpace's brief cites to neither Titan Tire Corp. nor Winter, which is controlling law.  Its section addressing "irreparable injury" does not describe how PlanetSpace would be irreparably injured, but instead discusses how a bid protestor "almost never has an adequate remedy at law."  Pl.Br.36.

**II.     PlanetSpace Is Not Likely To Prevail On The Merits**

      **A.     PlanetSpace's Argument That NASA's Assessment Of PlanetSpace's Contracting Plan And Management Was A "De Facto Responsibility Determination" Misinterprets The FAR, Neglects The Express Language Of The RFP, Is Counterfactual, Illogical, And Implausible**

PlanetSpace alleges that NASA's assessment of PlanetSpace's "financial, technical, and managerial ability" was a "*de facto* finding of 'non responsibility.'"  Pl.Br.1; <u>see</u> <u>also</u> <u>id.</u> 13-18. PlanetSpace alleges that NASA's rejection of "PlanetSpace's proposal constituted an improper, actual or de facto determination of non-responsibility, because his purported justification related directly to PlanetSpace's ability or capability to perform the contract."  <u>Id.</u> at 16.

PlanetSpace's argument ignores and misinterprets relevant FAR provisions and is contrary to law, neglects discussion of NASA's obligations under the RFP, is counterfactual, logically flawed, and wholly implausible.

      **1.     PlanetSpace Misinterprets The FAR**

PlanetSpace contends that "an agency acts arbitrarily and capriciously, and in violation of governing law and regulation, if it makes an actual or *de-facto* finding of non-responsibility, rather than referring the small business's responsibility to the SBA for resolution."  Pl.Br.15. This argument misinterprets the FAR regulations governing responsibility determinations.

Contrary to its assertion, the FAR provision cited by plaintiff does <u>not</u> require NASA "to refer the question of PlanetSpace's responsibility to the [SBA]."  Pl.Br.1.  Although PlanetSpace cites to the regulation governing responsibility determinations, FAR part 9.104, Pl.Br.13-16, it neglects the regulation's operative (and dispositive) subsection, FAR part 9.104-(3)(d)(1). Subsection (d)(1) outlines a contracting agency's obligations relating to small business responsibility determinations:

> Small business concerns.  If a small business concern's offer <u>that</u>
> <u>would otherwise be accepted</u> is to be rejected because of a
> determination of nonresponsibility, the contracting officer shall
> refer the matter to the [SBA], which will decide whether or not to
> issue a Certificate of Competency (see subpart 19.6).

48 C.F.R. § 9.104-3(d)(1) (emphasis supplied).  That a SBA referral is required only for

successful offerors is buttressed by FAR part 19.601, which describes the SBA's COC program:

> A contracting officer shall, upon determining an <u>apparent</u>
> <u>successful small business offeror</u> to be nonresponsible, refer that
> small business to the SBA for a possible COC, even if the next
> acceptable offer is also from a small business."

48 C.F.R. § 19.601(c) (emphasis supplied).[2]  Thus, contrary to PlanetSpace's contention, the

FAR expressly states that the obligation to refer a responsibility determination to the SBA is only

triggered where the contracting agency has determined that the small business's offer would

"<u>otherwise be accepted</u>."  48 C.F.R. § 9.104-3(d)(1).  There is simply <u>no support</u>, in the FAR or

in any other law or regulation, for PlanetSpace's argument that an agency is "prohibited from

eliminating a small business bidder based on non-responsibility."  Pl.Br.13.

        In this case, no SBA referral was necessary because PlanetSpace's offer would <u>not</u>

"otherwise be accepted[,]" 48 C.F.R. § 9.104-3(d)(1), and PlanetSpace was <u>not</u> the "apparent

successful small business offeror[.]"  48 C.F.R. § 19.601(c).  To the contrary, NASA articulated

<u>six independent reasons</u> for rejecting PlanetSpace's proposal, including (1) that its proposed use

of an alternate launch vehicle to provide initial cargo delivery capability in 2011 presented risks

of delays, and called into question whether it could complete the mission in timely manner,

AR5175; (2) that its use of heritage components presented a "significant technical challenge" that

---

        [2]        PlanetSpace cites, but does not discuss, the text of this provision.  Pl.Br.14 (citing
FAR part 19.601(c) as "applicable to all Government procurements").

raised questions as to whether it could complete the mission, AR5175-76; (3) that its payload fairing's static envelope was increased without a change to the outside diameter, presenting problems and a significant technical challenge that called into question whether it could complete the mission, AR5176; (4) that its use of a cost-plus subcontracting structure presented a "significant risk to the successful performance of the program[,]" AR5176; (5) that its plan presented a high financial risk to the government because it did not project positive cash flow until late in the program, AR5177; and (6) that its proposal reflected that PlanetSpaces did not understand basic FAA licensing requirements.  AR5177.

    The record makes clear that PlanetSpace was not the apparent successful business offeror, and that no "responsibility determination" was performed.  NASA itself recognized that because PlanetSpace was not the "apparent successful business offeror," no responsibility determination was made, and no referral was necessary.  See AR 31045.79 (NASA did not make a responsibility determination because "PlanetSpace was not the apparent successful offeror").

    This plain reading of the FAR comports with this Court's past consideration of the issue. For example, in DCMS-ISA, Inc. v. United States, 84 Fed. Cl. 501 (2009), the protestor argued (as PlanetSpace does here) that the Government's evaluation of its "past performance . . . was a responsibility determination of a type requiring referral to the SBA for a COC[.]"  Id. at 517 n.29; cf. Pl.Br.17.  The Court rejected this argument, explaining that the SBA responsibility referral applies only for an "apparent successful business offeror"   which DCMS-ISA was not.

>    FAR Subpart 9.1 governs the determination of "whether
>    prospective contractors and subcontractors are responsible."  FAR
>    9.100[.]  FAR 9.104-3(d)(1) . . . provides that "[i]f a small business
>    concern's offer *that would otherwise be accepted* is to be rejected
>    because of a determination of nonresponsibility, the contracting
>    officer shall refer the matter to the [SBA], which will decide

15

> whether or not to issue a [COC] (see [FAR] Subpart 19.6)."
> (emphasis added).  FAR 19.601(c)[,] in turn, states that "[a]
> contracting officer shall, upon determining an *apparent successful*
> *business offeror* to be nonresponsible, refer that small business to
> the SBA for a possible COC[]" (emphasis added).  In this case,
> however, no small business concern's offer was selected as an
> "apparent successful business offeror[.]"

84 Fed. Cl. at 517 n.29 (emphasis in original); see also Delta Data Sys. Corp. v. Webster, 744

F.2d 197, 202 (D.C. Cir. 1984) (a SBA referral is required "only when responsibility factors

'preclude' a small business from being awarded a contract[.]"); Aeroplate Corp. v. United States,

67 Fed. Cl. 4, 7 (2005) ("Although [the contracting agency] made a determination that plaintiff

was nonresponsible, [it] was under no obligation to notify the SBA because it concurrently

rejected plaintiff's bid on other grounds.").

    It is for this reason that the cases cited by PlanetSpace in its brief are inapt.  Pl.Br.14-16.

They discuss circumstances where the protestor was the "apparent successful small business

offeror," 48 C.F.R. § 19.601(c), and where its offer would "otherwise be accepted."  48 C.F.R.

§ 9.104-3(d)(1).  See Lion's Raisins, Inc. v. United States, 51 Fed. Cl. 238, 240  (2001) (SBA

involved because USDA "believed plaintiff would be the successful bidder for the contracts");

Fabritech, Inc., B-298247, B-298247.2, 2006 CPD ¶ 112, 2006 WL 2098680 (Comp. Gen.

July 27, 2006) (SBA referral required for "a small business concern's offer that would otherwise

be accepted"); Celtech, Inc. v. United States,[3] 24 Cl. Ct. 269 (1991) (in a non-competitive

procurement, protestor was the sole bidder), vacated, 25 Cl. Ct. 368 (1992).  Otherwise, the cases

---

[3]        Apart from being inapt, PlanetSpace's citation of a vacated opinion is of dubious
value.  See 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL
PRACTICE AND PROCEDURE § 3533.10 at 442 (2nd ed. 1984 & Supp.1995) ("Most courts state
that no precedential effects flow from a judgment that has been vacated as moot.")

by PlanetSpace undermine, or are unrelated to, its argument.  See Dyonyx, L.P. v. United States,

83 Fed. Cl. 460, 474 (2008) (agency did not conduct responsibility determination, but merely

applied terms of the solicitation); Diversified Maintenance Sys. Inc. v. United States, 74 Fed. Cl.

122, 123 (2006) (SBA certification that bidder was a "[qualified] HUBZone small business

concern" under a different regulation, 48 C.F.R. § 52.219-3).

In this case, PlanetSpace failed to address the basic text of the operative FAR clause, and

its argument is without legal merit.

### 2.    What PlanetSpace Contends Were "Responsibility Determinations" Were, In Fact, Evaluations Expressly Mandated By The Solicitation

Apart from misinterpreting the FAR, PlanetSpace also errs by characterizing as a

"responsibility determination" evaluations that were expressly required by the terms of

Solicitation.  PlanetSpace identifies six instances that it claims demonstrate NASA's "improper

reliance upon responsibility criteria[.]"  Pl.Br.16-18.  Yet, even a passing comparison of these six

claims with the text of the RFP reveals that NASA was required to review these criteria.

Allegation 1:  The Likelihood of Successful Performance.  PlanetSpace complains of

NASA's assessment that "the considerable risk inherent in PlanetSpace's Management approach

made the likelihood of successful performance . . . remote."  Pl.Br.16.  PlanetSpace avers that

this is improper because it "goes to the heart of PlanetSpace's 'responsibility,' i.e., its 'ability and

capacity to perform' the contract requirements[.]"  Id. at 16-17.  PlanetSpace fails to disclose,

however, that the Solicitation expressly required that NASA examine PlanetSpace's

"Management Approach" and its likelihood of successful performance.

The evaluation criteria for this procurement were set forth in Section VII of the

Solicitation.  AR2089-95.  Section VII.A enumerated the "Source Selection and Evaluation

17

Factors."  AR2089.  Section VII.B identified and defined "Evaluation Subfactors."  AR2090.

Among these "Evaluation Subfactors" was "Subfactor B," which assessed the offeror's "Management Approach."  AR2091.  This subfactor directed that "<u>management</u> subfactors <u>will be evaluated</u> for . . . <u>feasibility</u>, <u>realism</u>, suitability, <u>risk</u>, and soundness."  AR2091 (emphasis supplied).  The Solicitation then elaborates upon these factors:

> **M1.  COMPANY INFORMATION**.  NASA <u>will evaluate</u> the offeror's proposed management team for key positions; the <u>teaming arrangements</u> and <u>completeness</u> in meeting the key aspects of the SOW; and the <u>overall effectiveness</u> and <u>completeness</u> of the <u>management approach</u>, <u>plan</u>, and processes.

AR2091 (emphasis supplied).

Thus, the RFP plainly <u>required</u> that NASA examine the "feasibility, realism," "risk, and soundness" of PlanetSpace's proposal    <u>i.e.</u>, the likelihood that PlanetSpace could successfully perform the contract.  These considerations, which plaintiff contend "go to the heart of PlanetSpace's responsibility[,]" Pl.Br.16, were, in fact, expressly contemplated by the RFP.

As discussed <u>infra</u>, that a Solicitation criterion arguably falls within the ambit of a SBA "responsibility determination" does not preclude the contracting agency from considering the criterion.  This interpretation of contracting functions is nonsensical, as it would deprive the contracting agency of its most basic prerogative.

<u>Allegation 2:  Management of Subcontractors</u>.  PlanetSpace avers that NASA's concerns relating to whether PlanetSpace could manage its large subcontractors amounted to a finding that it lacked "the necessary organization, experience, . . . and operational controls" identified in FAR part 9.104-1(e), and thus was an improper responsibility determination.  Pl.Br.17.

Again, PlanetSpace avoids discussion of NASA's obligations under the RFP.  In fact, the

RFP <u>instructed</u> NASA to take into account these criteria.  <u>See</u> AR2091 ("NASA <u>will evaluate</u> the

offeror's proposed management team for . . . the <u>teaming arrangements</u> and completeness in

meeting the key aspects of the SOW") (emphasis supplied); <u>see id.</u> ("<u>management</u> subfactors <u>will</u>

<u>be evaluated for</u> . . . <u>feasibility</u>, <u>realism</u>, . . . <u>risk</u>, and <u>soundness</u>").

    <u>Allegations 3 and 4:  Evaluation of Past Performance and Technical Skills</u>:  PlanetSpace

alleges that NASA "disregarded" the SEB's assessment of PlanetSpace's past performance and

technical skills,[4] and that this constituted a finding that PlanetSpace lacked a satisfactory

performance record and did not have the necessary "technical skills" or organizational or

operational controls described in FAR part 9.104-1(e).  Pl.Br.16-17.

    Once again, PlanetSpace ignores that the RFP directed NASA to address these factors.

Subfactor A of section VII.B of the Solicitation governs NASA's evaluation of an offeror's

"Technical Approach."  It instructs that "technical subfactors <u>will be evaluated for</u> . . . <u>feasibility</u>,

<u>realism</u>, suitability, <u>risk</u> and <u>soundness</u>."  AR2090 (emphasis supplied); <u>see also</u> AR2090

("NASA <u>will evaluate</u> the <u>offeror's capability to meet NASA's needs as stated in the SOW</u>.").

    Similarly, NASA's consideration of PlanetSpace's "Past Performance" was expressly

contemplated by the Solicitation.  Section VII.A identifies "Source Selection and Evaluation

---

    [4]    Plaintiff criticizes the SSA for disregarding what it views as favorable SEB
findings, notwithstanding that, by plaintiff's definition, the SEB's findings themselves would
constitute impermissible "de facto responsibility determinations."  This irony aside, the SSA was
well within his right to disagree with the SEB:  "While the SSA may use reports and analyses
prepared by others, the source selection decision shall represent the SSA's independent
judgment."  48 C.F.R. § 15.308.  This provision permits the SSA to test and disagree with
evaluators' conclusions.  <u>See</u> <u>L-3 Commus. Integrated Sys., L.P. v. United States</u>, 79 Fed. Cl.
453, 462 (2007).  It also permits the SSA to change the ratings that other evaluators assigned to a
proposal.  <u>See</u> <u>Speedy Food Service, Inc.</u>, B- 258537.5, 95-2 CPD ¶ 111, 1995 WL 317603
(Comp. Gen. May 2, 1995).

Factors   General." AR2089.  Within that section is a paragraph entitled, "Evaluation of Past Performance in Mission Suitability," which provides:  "Past Performance indicates how well an offeror performed on earlier work and can be a significant indicator of how well it can be expected to perform the work at hand." AR2090.

Allegation 5:  Assessments of "high financial risk" of PlanetSpace's plan:  PlanetSpace contends that NASA criticized the "high financial risk" associated with its proposal, and that this amounted to a "quintessential non-responsibility determination." Pl.Br.18.  Plaintiff alludes to a section of NASA's Source Selection Decision which discussed that PlanetSpace did not project a "positive cumulative cash from operations until nearly the end of the contract." AR5177.

PlanetSpace again neglects to disclose that NASA was required to perform this assessment by express terms of the RFP.  Subfactor B, "Management Approach," directed that "management subfactors will be evaluated for . . . suitability, risk and soundness." AR2091 (emphasis supplied).  Further, the RFP required that NASA examine the risks associated with PlanetSpace's cash flow:

> M2.  Performance Milestones.  NASA will evaluate the offer's proposed milestones for compliance with the limitations in Clause II.A.6, and the overall risk that the payment schedule provides to NASA.  An example of what would be viewed as a high Government risk would be a payment scenario where a high percentage of the financing payments were prior to the successful demonstration of a critical new technology, or where payments were tied to key mission development or production milestones.

AR2091 (emphasis supplied).  This clause describes precisely what NASA did in this instance: NASA was "concerned about the high financial risk to the Government prior to the successful demonstration of critical new technologies[.]" AR5177.  It concluded that "the financial risk PlanetSpace proposed to assume was a discriminator for selection." AR5177.  As with its other

20

allegations, PlanetSpace's argument here turns upon its insistence that the Court ignore

applicable Solicitation criteria, and view NASA's evaluations myopically, through the lens of the

SBA's obligations under FAR part 9.104-1.

This Court and the GAO have consistently rejected protests that seek to recast an

agency's assessment of solicitation criteria as a "responsibility determination."  In Dyonyx, L.P.

v. United States, 83 Fed. Cl. 460 (2008), the protestor argued, as PlanetSpace does in this case,

that if the contracting agency "had any doubt whether plaintiff could actually get the proposed

items on the schedule by the contract award date, as promised, the MCC should not have

eliminated plaintiff, but referred plaintiff for a nonresponsibility determination under FAR

§ 9.104-1" Id. at 472; cf. Pl.Br.17-18.  The Court rejected that argument, explaining that the

contracting agency's assessment did not require a responsibility referral per FAR part 9.104-1,

but was merely an issue of compliance with the terms of the solicitation.  83 Fed. Cl. at 474;

Capitol CREAG L.L.C., B  294958.4, 2005 CPD ¶ 31 at 6-8 (Comp. Gen. Jan. 31, 2005)

(contracting agency's assessment that CREAG "did not present an adequate resolution to

adequately managing the scope of the contract" was not a responsibility determination, and thus

no SBA referral was warranted); D&G Contract Servs., B-231453, B-231453.2, 89-1 CPD ¶ 219

at 3-4 (Comp. Gen. Mar. 2, 1989); Fabritech, Inc., 2006 WL 2098680 at *3 (no SBA referral "if

the basis for the referral is a challenge by the offeror to either the validity of the qualification

requirement or the offeror's compliance with such requirement.").

PlanetSpace cites to no authority that would prohibit a contracting agency from

examining an offeror's proposal according to criteria identified in a solicitation, on the basis that

these criteria might overlap with factors that might be considered by the SBA were it to conduct

a responsibility determination pursuant to FAR part 9.104-1.  Indeed, as discussed below, this reading is illogical and implausible.

### 3.  PlanetSpace's "Nonresponsibility" Argument Is Implausible

Apart from ignoring dispositive FAR provisions and relevant RFP criteria, plaintiff's "nonresponsibility" argument does not logically cohere and is implausible.  Plaintiff argues that, (1) a FAR part 9.104-1 responsibility determination assesses a firm's "'ability and capacity to perform'" contract requirements;" Pl. Br. at 13; (2) NASA rejected PlanetSpace's proposal for reasons "related directly to PlanetSpace's ability or capability to perform the contract[,]" id. at 16, and (3) therefore, NASA's rejection of PlanetSpace's proposal constituted a "*de facto* determination of non-responsibility" under FAR part 9.104-1.  Id. at 16.

PlanetSpace's argument depends upon the logical fallacy that, (1) A includes C; (2) B includes C; and (3) therefore A    B.  This reasoning does not pass muster.  That NASA assessed, among other things, PlanetSpace's "ability and capacity to perform a contract" does not render this assessment a FAR part 9.104-1 responsibility determination.

Logical impediments aside, plaintiff's reading of the FAR is wholly implausible.  As plaintiff demonstrates, "responsibility," under FAR part 9.104-1, relates to virtually all aspects of contract performance.  Pl.Br.13.  If, as plaintiff insists, contracting agencies were "prohibited" from examining a small business bidder's "'ability and capacity to perform' contract requirements," merely because these criteria were identified in FAR part 9.104-1, Pl.Br.13, contracting agencies would be precluded from making even the most elementary assessments of a small business bidder's proposal.  This reading cannot be reconciled with other, operative FAR provisions, which expressly grant contracting agencies this authority.  See, e.g., 48 C.F.R.

§ 15.101. (in a best value procurement, an agency may assess "the risk of unsuccessful contract performance[.]").  Plaintiff's reading of the FAR is not only counter-textual, it reveals a fundamental misunderstanding of Government contracting.

**B.      PlanetSpace's Allegations Relating To NASA's "Fail[ure] to Engage In The Required Trade-Off Analysis" Is Counterfactual And Without Legal Merit**

**1.      Trade-Off Analysis And FAR Part 15.101**

The RFP stated that, "[a] trade-off process, as described in FAR 15.101, will be used in making source selection."  AR2089.  Part 15.101 provides, in relevant part, that "[a]n agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches.  In different types of acquisitions, the relative importance of cost or price may vary." 48 C.F.R. § 15.101.  "A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR part 15.101-1(a).

As this Court has explained in the past, application of the trade-off approach identified in FAR part 15.101 affords the contracting agency broad discretion:  "During negotiated procurement, in contrast to sealed bidding, agency contracting officers are permitted to make "tradeoffs among cost or price and non-cost factors" and "accept [a proposal] other than the lowest priced proposal."  Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 336 (2009) (citing FAR part 15.101-1(c)).  Thus, "contracting officers engage in an inherently judgmental process when seeking best-value for the government during a negotiated procurement."  Id. (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).  They enjoy "substantial discretion to determine which proposal represents the best value for the government."  E.W. Bliss, 77 F.3d at 449.

23

The FAR mandates that, where a price/technical tradeoff is made, the source selection decision must be documented and the documentation must include the rationale for any tradeoffs made, including the benefits associated with the additional costs.  FAR part 15.101-1; NFS part 15.308.  "Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision."  FAR part 15.101-1; NFS part 15.308.

> **2.    PlanetSpace's Contention That NASA Conducted "No Trade-off Analysis" Is Counterfactual And Contrary To Law**

PlanetSpace contends that "[t]he SSA . . . stated in his Source Selection Statement that he was *not* performing a trade-off analysis."  Pl.Br.19.  It avers that the SSA "failed to perform a trade-off analysis of any kind, and nowhere assessed PlanetSpace's considerable price advantage over Orbital."  Id.

These statements are false and cannot be supported by reasonable reading of the SSA's Source Selection Statement.  First, the SSA did <u>not</u> state that "he was not performing a trade-off analysis."  Id.  In a section entitled, "Trade-off Analysis," AR5181, the SSA stated that he "could not perform a <u>traditional</u> trade-off analysis."  AR5181.  That statement was preceded by multiple, comparative assessments of the proposals of Orbital and PlanetSpace, including:

- the SSA's conclusion that "Orbital's proposal was superior due to the serious Management risks inherent in the PlanetSpace proposal.  AR5181.

- the SSA's qualification of the preceding statement with his recognition that "PlanetSpace had a lower overall price than [Orbital.]"  AR5181.

- after denoting PlanetSpace's price advantage, the SSA's further qualification that he had "reservations with regard to PlanetSpace's ability to successfully address the technical challenges associated with its proposal given the risks [he] identified in the Management approach."  AR5181.

24

This analysis referenced, and was buttressed by, the SSA's earlier analyses of the bidder's prices. AR5170-72 (examining price differences between bidders for CLIN 0001, 0002, and 0003). Additionally, the technical challenges that he identified in the "Trade-off Analysis" section, AR5181, were discussed in detail earlier in his decision. AR5175-78. These comparative analyses gird the SSA's assessment that "[t]he perceived benefits of the higher priced proposal [Orbital's] shall merit the additional cost." 48 C.F.R. § 15.101-1 (c); compare Wackenhut v. United States, 85 Fed. Cl. 273, 306-07 (2008) ("the SSA's Final Source Selection Decision contains absolutely no discussion about the relevant factors of that trade-off analysis").

The SSA explained why "[t]he perceived benefits of the higher priced proposal [merited] the additional cost." 48 C.F.R. § 15.101-1 (c). See AR31229 (tr.435:15-436:20, assessing the trade-offs between PlanetSpace's price and its technical approach); AR31230 (tr.438:1-13, discussing why "Orbital's [] technical superiority was worth its higher price); AR31230 (tr.438:22-440:17, explaining that his trade-off analysis was assessed throughout his decision). The SSA acted well within his "substantial discretion." E.W. Bliss, 77 F.3d at 449.

In sum, PlanetSpace's assertion that the SSA "failed to perform a trade-off analysis of any kind[,]" Pl.Br.19, has no basis in fact, and contradicts the record.[5] Plaintiff does not address any of these analyses addressing why the SSA believed the risks inherent in PlanetSpace's approach offset its price advantage. Pl.Br.19-22. Instead, it asserts that "Orbital's proposal was ███ ███ more expensive than PlanetSpace's[.]" Pl.Br.19. Although PlanetSpace does not elaborate upon this statement, its reference to the quantum of price differential suggests that it

---

[5]     Plaintiff conflates this argument with the fact that the SSA disagreed with some SEB evaluations, which was well within his discretion. See supra n.4; 48 C.F.R. § 15.308. However, this has no bearing upon the issue of whether he performed a trade-off analysis.

faults the SSA for not conducting a quantitative analysis of its trade-off decisions.  Such analyses

is unnecessary.  48 C.F.R. § 15.101-1 ("documentation need not quantify the tradeoffs that led to

the decision."); NFS part 15.308 .

### 3.    PlanetSpace's Argument Relating To NASA's Observation That PlanetSpace Had No Backup Plan Is Without Merit

PlanetSpace argues that the SSA evaluated PlanetSpace's proposal with criteria not stated

in the RFP by noting his concern that PlanetSpace's proposal did not contain a back-up plan.

Pl.Br.22-23.  Although the SSA mentioned PlanetSpace's lack of a back-up plan as an area of

concern, the SSA clarified that he did not rely upon this fact alone in his decision not to award

the ISS Contract to PlanetSpace.  Rather, the SSA's reasoning reflects that PlanetSpace's failure

to propose a back-up plan was part of a larger problem in its management approach.

Although the RFP did not require bidders to submit a plan detailing alternate procedures

in the event a subcontractor failed to perform, it stated that NASA would evaluate the risk

associated with an offeror's management plan or teaming arrangements as part of the

Management Plan subfactor within the Mission Suitability factor.  Specifically, the RFP provided

that, "[t]he management subfactors will be evaluated for . . . effectiveness, clarity,

comprehension, feasibility, realism, suitability, risk[,] and soundness."  AR2091.  The RFP also

stated that NASA would "evaluate the offeror's proposed management team for key positions;

teaming arrangements and completeness in meeting the key aspects of the SOW."  Id.

In accordance with his regulatory duties, the SSA applied Soliciation criteria when

discussing the weaknesses in PlanetSpace's management plan.  He considered:

> five weaknesses associated with the PlanetSpace [m]anagement
> approach, three of which I found to be significant for purposes of
> selection.  The first weakness involved the use of cost-plus
> subcontracts for the large subcontractors until first flight,
> subcontractors which were responsible for the majority of the work
> and would be addressing the technical difficulties identified in the
> proposal.  . . .  Moreover, I questioned whether PlanetSpace could
> successfully manage much larger subcontractors responsible for the
> majority of the performance under the contract.  Furthermore,
> although one was not required by the solicitation, I was concerned
> that the proposal did not contain a backup plan in the event that
> one of the major subcontractors was unable to perform given the
> sizable amount of responsibilities PlanetSpace proposed to place at
> the subcontractor level.

AR5176.  As this section demonstrates, the SSA's discussion of a back-up plan was made within

the broader context of his evaluation of PlanetSpace's overall management approach.

Plaintiff does not allude to this discussion.  Rather, it invokes the unremarkable

proposition that the Government may not rely upon undisclosed criteria when evaluating

proposals.  Pl.Br.22 (quoting 10 U.S.C. § 2305(b)(1)).   While true, it is equally well-settled that

an agency retains "great discretion in determining the scope of an evaluation factor."  Forest

Surveys and Data v. United States, 44 Fed. Cl. 493, 499 (1999).  For this reason, "a solicitation

need not identify each element to be considered by the agency during the course of the evaluation

where such element is intrinsic to the stated factors."  Gulf Group, Inc. v. United States, 56 Fed.

Cl. 391, 398 (2003) (citation omitted).

The RFP notified bidders that NASA would examine risk associated with all offerors'

management approach.  AR2091.  Where, as here, an offeror gave subcontractors substantial

responsibility, the SSA's concern regarding the lack of a back-up plan in case of nonperformance

was eminently reasonable.  PlanetSpace proposed subcontracting over ▇▇▇▇▇▇ of the work

under the contract, including nearly all ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ AR10581; AR10938-

11102; see also AR31775.  As the SSA observed, this heavy reliance upon larger subcontractors

presented a risk particular to PlanetSpace's proposal because of the "absence of a corresponding

strength regarding the prime contractor's abilities to perform the contract."  AR5176.  In short,

PlanetSpace's proposal introduced considerable risks and made no efforts to mollify those risks.[6]

The evidence in the record also refutes plaintiff's claim that the SSA treated the offerors'

proposals in a disparate manner.  In fact, the SSA analyzed the risk of all the offerors' proposed

subcontracting arrangements.  Of the three offerors, the SSA acknowledged that PlanetSpace as

well as Orbital proposed subcontracting some of the CRS work.  AR5167; AR5173; AR5176;

AR5180.  Because Orbital's proposal did not rely as heavily upon subcontractors as PlanetSpace,

however, the SSA determined that same level of risk did not inhere.  AR5180.  The SSA

explained that "the subcontracting team proposed by Orbital had a much smaller role since the

team amplified Orbital's extensive in-house expertise in specific areas of the CRS requirements

as opposed to being responsible for most of the technical aspects of the proposal as was the case

with PlanetSpace."  AR5180.

---

[6]      NASA also explained why the lack of a contingency plan was less problematic for
the other two proposals.  Analyzing SpaceX's proposal, the SSA observed that SpaceX proposed
to perform ███████████████████████████████████████████████████████.
AR5169; AR5178; AR5179.  Likewise in his evaluation of Orbital's management approach, the
SSA noted that "Orbital, as a prime has extensive in-house expertise in space launch,
manufacturing[,] and operation. ████████████████████████████████
███████████████████████████████████████████| AR5167; AR5173 (noting that
Orbital "████████████████████████████████").  Unlike the two other offerors,
PlanetSpace's proposal gave nearly ████████████████████████████████████████████
████████████████████████████████████████████████████████████|
AR5176; AR5180; see also AR10581.  Because the SpaceX and Orbital proposals did not use the
same management approach as PlanetSpace, the SSA had no reason to assign the same level of
weight to the risk of subcontractor non-performance for SpaceX and Orbital's proposals.

This discussion, along with the SSA's evaluation of PlanetSpace's proposal, evinces that the SSA's concern regarding PlanetSpace's lack of a back-up plan was entirely reasonable:  it was tied to its well-documented concerns about the substantial risks associated with PlanetSpace's management plan, which NASA was <u>required</u> to examine.  AR2091.

### 4. NASA Evaluated PlanetSpace's Past Performance In Accordance With The Express Terms Of The RFP

Plaintiff also alleges error in NASA's assessment of PlanetSpace's past performance, claiming that the SSA erred by not crediting PlanetSpace for the past performance of its subcontractors.  PlanetSpace's would have this Court believe that the SSA dismissed the relevance of all of PlanetSpace's subcontractors on relevant similar contracts.  Pl.Br.24.  This claim is incorrect and inconsistent with the terms of the RFP.

The RFP made clear that in evaluating proposals, NASA would not score past performance separately, but would evaluate past performance as part of each distinct Mission Suitability sub-factor.  AR2090.  Pursuant to the RFP, past performance "would be based on information provided by offerors in their proposals (Exhibit 2 and Exhibit 4), information obtained by NASA from Exhibit 3 and Exhibit 4(6.e) from listed references . . . as well as any other information obtained independently by NASA for each of the respective Mission Suitability [s]ubfactors."  <u>Id.</u>  In turn, Exhibit 2 of the RFP instructed offerors, as well as subcontractors whose subcontract would exceed $10,000,000, to submit responses to a past performance questionnaire as part of their proposals.  <u>Id.</u>, AR2101.  This questionnaire included questions regarding technical expertise, overall effectiveness of management, and small business

utilization.  AR2105-2107.  If an offeror did not have a past performance record, the RFP

provided that such an offeror "w[ould] not be evaluated favorably or unfavorably."  AR2090.

This Court accords considerable deference to an agency's evaluation of past performance.

E.g., SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 12 (2009).  The Court does not consider

whether it would reach a different conclusion, but limits its assessment to "determining whether

the evaluation was reasonable, consistent with the stated evaluation criteria and complied with

relevant statutory and regulatory requirements."  JWK, Int'l Corp. v. United States, 52 Fed. Cl.

650, 659 (2002).  Although the SSA disagreed with the significance of the SEB's assessment of

PlanetSpace's subcontractors past performance, the SSA provided a reasoned basis for his

disagreement    one that was consistent with the RFP and the applicable statutory and regulatory

requirements.[7]  The SSA acknowledged PlanetSpace's proposed subcontractors' past

performance records, but recognized that its proposal called for PlanetSpace to manage this

program.  AR5174-75.   Evaluating the "teaming arrangement" proposed by PlanetSpace for this

contract, AR2091, the SSA determined that its subcontractors' experience could not function as

an indicator of how PlanetSpace would perform work as a prime contractor.  PlanetSpace lacked

experience in this type of end-to-end contract for large, complex space systems.[8]  AR5175.

---

[7]      Plaintiff intimates that the SSA stated without qualification that he accepted all
the SEB's finding, but then dismissed the relevance of PlanetSpace's subcontractors and key
personnel's past performance.  Pl.Br.24.  To this end, plaintiff truncates the SSA's first statement
that he "agreed with all the findings the SEB made regarding any of the offerors as part of my
examination of the SEB presentation; however, I did not always agree with the significance the
SEB placed on a particular finding or with the impacts the SEB identified in regards to a
finding."  AR5172 (emphasis supplied).

[8]      The record contains ample evidence to support this assessment. ███████████
███████████████████████████████  Compare AR2313-16; AR2326-28; AR 2335-39, with

This line of reasoning fully complies with criteria of the RFP.  PlanetSpace suggests that the RFP required the SSA to give the same weight to the past performance of its subcontractors as he would if PlanetSpace had actually performed the work.  Pl.Br.23.  But nothing in the RFP supports this contention.  The portion of the RFP entitled, "Evaluation of Past Performance In Mission Suitability" refers to an <u>offeror</u>'s past performance and makes no mention of <u>subcontractors</u>.[9]  AR2090.  The RFP did not require NASA to provide a particular weight to the past performance of a subcontractor, and the SSA acted reasonably when he determined that the past performance of PlanetSpace's subcontractors was of limited value.

In addition to complying with the RFP, NASA's conclusion is consonant with this Court's interpretation of FAR 15.305(a)(2)(iii).  In <u>SP Systems, Inc. v. United States</u>, this Court explained that "[w]hile the FAR states that a past performance evaluation '<u>should</u> take into account past performance information regarding . . . subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition'

---

AR2314-15, AR2318-22, AR2330-34, AR2335-39, AR2342-46, AR2347-52, AR2353-65, AR2366-76; AR2377-80; AR2454-2460; AR2461-66; AR2467-76; AR2477-80; AR2485-93; AR2505-2510; AR2512-25. ████████████████████████████████████████ ████████████████████████████████████████████████████████████ AR2535; AR4727.  For this reason, the SSA explained that while he "concurred the SEB could not give an offeror a negative evaluation because it had little or no Past Performance. . ., [he] disagreed with the SEB assessment that this finding was a significant strength" because "the significance of this finding was offset by PlanetSpace's lack of experience in development, production and operation of large, complex space systems."  AR5175.  Cognizant that PlanetSpace had very little demonstrated past performance as a prime contractor on relevant contracts, the SSA reasonably concluded that the past performance of subcontractors could not supplant PlanetSpace's lack of experience.  AR5174.

[9]  The instructions in Exhibit 2 permit NASA to consider the past performance of subcontractors, but do not compel the agency to credit subcontractors' past performance absent a showing that the offeror could manage the subcontractors effectively.

this language does not impose a mandatory requirement to weight the evaluation by the 'criticality' of the subcontractor's work." SP Systems, 86 Fed. Cl. 23-24 (citing FAR 15.305(a)(2)(iii)) (emphasis in original).  Accordingly, the Court held that "the weight to be given [a subcontractor's] history was within the discretion of the agency." Id. at 24.

Consistent with the reasoning expressed in SP Systems, in this case, the SSA reasonably assessed that the PlanetSpace team's past performance was not a positive discriminator for selection purposes.  The SSA noted that PlanetSpace's lack of relevant experience as a prime contractor represented a risk to the program and could undermine the benefits of its subcontractors' experience.  AR5175.  Consequently, the SSA acted well within the bounds of his discretion when he concluded that the strength of the subcontractors' past performance was not relevant for purposes of selection.  AR5175.

Citing to the "Best Practices" guide published by the Office of Federal Procurement Policy ("OFPP"), plaintiff argues that the SSA erred by not assessing the past performance of PlanetSpace's key employees.[10]  Pl.Br.25.  First, PlanetSpace supplies no legal authority for the proposition that a protestor can establish that an agency's action is arbitrary, capricious or not accordance with law by a deviation from the "best practices."  Second, the OFPP document that

---

[10]     Even assuming that the FAR or RFP obligated NASA to evaluate PlanetSpace's key personnel, the record reflects that the SSA did so.  The SSA recognized that the SEB assigned PlanetSpace a significant strength for its management team's key personnel and subcontractors.  AR5176.  The SSA also noted this finding, but concluded that the strengths of the key personnel was offset by PlanetSpace's inability to perform most of the work under the Contract because almost all of the technical expertise appeared to reside at the subcontractor level.  AR5176; AR31131.  The SSA further explained the lack of technical expertise presented a problem because PlanetSpace's proposal had the added technical challenges of:  (1) the need to qualify an orbital vehicle for two different launch vehicles; (2) the need to re-qualify heritage components for use in the new launch vehicle configuration; and (3) the serious technical issues associated with its proposed fairing size.  AR5176-77.

PlanetSpace relies upon does not purport to prescribe an additional set of regulatory responsibilities apart from the FAR.  In fact, it concedes that agencies have significant discretion in evaluating past performance, concluding "[t]here are various methods that may be used to evaluate a competitive offeror with no past performance history and it is at the discretion of the agency to determine the most appropriate method on a case-by-case basis."  OFPP, <u>Best Practices For Using Current And Past Performance Information</u> (May 2000).[11]

Given the size of the scientific challenges of PlanetSpace's proposal, the SSA provided a reasonable explanation as to why his assessment of the strength of PlanetSpace's key personnel varied from that of the SEB.  PlanetSpace's reference to the qualifications of one member of its management team does not alter the SSA's sound analysis.  At best, such evidence only underscores the fact that PlanetSpace's current arguments seek to question discretionary determinations of NASA's procurement officials.

Furthermore, that the SSA did not consider PlanetSpace's past performance a significant strength does not lead to the ineluctable conclusion that "PlanetSpace's lack of past performance was in fact being evaluated unfavorably."  <u>See</u> Pl.Br.26.  In accordance with the RFP, the SSA found that PlanetSpace did not have a past performance history and did not use PlanetSpace's past performance as favorable or unfavorable.  AR5175.  Because the SSA had a neutral evaluation of PlanetSpace's past performance, <u>Meridian Management Corporation, Inc.</u>, B-285127, 2000 CPD ¶ 121, 2000 WL 1097129 (Comp. Gen. July 19, 2000), is inapposite.  In that GAO decision, the agency evaluated experience and past performance using a questionnaire

---

[11]     This document can be found at http://www.whitehouse.gov/omb/procurement/ contract_perf/<u>best_practice_re_past_perf.aspx.</u>

consisting of 31 questions.  Id. at *2.  To rank the proposals, the contract specialist calculated an

experience/past performance score for each contract by adding together the point scores for each

of the 31 questions and dividing by 31.  Id.   Responding to GAO, the agency conceded it erred

by giving the protestor a zero score for past performance on one question concerning work in

laboratories and dividing its score by 31.  Id. & n.2.  The agency corrected this error by

recalculating offerors' scores by dividing the point totals on questionnaires regarding contracts

which did not involve work in laboratories by 30 rather than 31.  Id. at *2.

Apart from the fact that the Solicitation did not require NASA to assign a separate

numerical score for past performance, Meridian Management does not avail plaintiff because the

SSA did not give PlanetSpace the equivalent of a zero score.  The Source Selection Statement

makes clear that the SSA did not penalize PlanetSpace because of its lack of past performance;

the SSA only "concluded this finding was not relevant for selection purposes."  AR5175.

Plaintiff suggests that the reference to its lack of past performance transformed this finding into a

weakness because if the SSA credited PlanetSpace for its subcontractors' past performance, it

would have received the award.  This assertion, however, stands at odds with the evidence in the

record.  As discussed above, the SSA expressed multiple concerns about the risk associated with

PlanetSpace's lack of relevant technical expertise or experience, coupled with its reliance upon

███████████████████████████████████████████████████████████████,

its projected operating deficits, its questionable sources of funding and high financial leverage,

and the unique technical challenges presented in its proposal.  All of these factors, not

PlanetSpace's past performance alone, led to the SSA's rejection of PlanetSpace's proposal.

34

**5.    PlanetSpace's Argument That NASA Violated The United States Space Transportation Policy Misinterprets That Policy, Is Counterfactual, And Is Otherwise Without Merit**

PlanetSpace next maintains that NASA violated the USSP, issued on December 21, 2004, when NASA awarded the ISS Contract to Orbital.  PlanetSpace's arguments in this regard are predicated upon two assumptions:  (1) that NASA's communications with a senior policy advisor, Damon Wells, rather than the National Security Advisor did not satisfy the requirements of the USSP, and (2) that even if the senior policy advisor had the authority to act on behalf of the Office of Science and Technology Policy ("OSTP"), his communications indicate that OTSP failed to make a decision on the Orbital's use of Taurus II and its cargo vehicle for the ISS CRS Contract.  These assumptions are not only belied by the record, but they also misapprehend the nature of NASA's obligations pursuant to the USSP.

The RFP required each offeror to certify its use of space vehicles manufactured in the United States or its compliance with the USSP during the performance period.  AR1959; AR1972.  Although the RFP requested that offerors certify compliance with the USSP, the RFP did not indicate that the policy prevented companies using foreign-made parts from bidding on the CRS Contract.  Indeed, the USSP permits contractors to seek an exemption from OSTP and only provides that:  "United States Government payloads shall be launched on space launch vehicles manufactured in the United States, unless exempted by the Director of the Office of Science and Technology Policy, in consultation with the Assistant to the President for National Security Affairs."  USSP § V.1.a.  This policy does <u>not</u> prohibit NASA from awarding a contract to a company that has yet to obtain the exemption from OSTP, but instead states that "[t]he proposed use of a non-U.S.-manufactured launch vehicle will be subject to interagency

coordination as early in the program as possible and prior to the sponsoring department's or agency's request for authority to negotiate and conclude an agreement." Id. § V.1.a.[12]

As a threshold matter, the certification required by the RFP applies to the "performance period," not the time prior to the award. Thus, this relates to contract administration and not contract award. See Precision Standard, Inc. v. United States, 69 Fed. Cl. 738, 755 (2006) (holding that an issue related to an awardee's compliance with a subcontracting limitation after award was "a matter of contract administration which the court does not review in the bid protest context"). For matters of contract administration, the applicable inquiry is whether "a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with" a solicitation's terms. Id. (internal quotations omitted). PlanetSpace does not claim that NASA should have concluded that Orbital could not and would not comply with its certification of compliance during the performance period. As such, even assuming for the sake of argument that PlanetSpace's assertion regarding Orbital's compliance with the USSP is correct, Orbital's alleged inability to comply with the certification is irrelevant.

PlanetSpace's argument also errs because it is premised upon the erroneous assumption that Orbital's proposal does not comply with the USSP. The policy does not purport to apply foreign-made payloads or even individual components of a launch vehicle. Rather the policy states that the Government shall launch payloads on domestically manufactured "space launch

---

[12]     PlanetSpace's argument appears to rest upon the assumption that the clause "prior to the sponsoring . . . agency's request for authority to negotiate and conclude an agreement" means that the agency must begin the interagency coordination process prior to contract award. This interpretation is in tension with the first clause of the same sentence, which states that interagency coordination shall take place "as early in the program as possible." Nevertheless, in an effort to address PlanetSpace's argument, the discussion in this brief will assume that the policy requires interagency coordination prior to contract award.

vehicles." Id.  In response to a question regarding the definition of a "space vehicle" as employed in the RFP's minimum requirements section, NASA clarified that "[h]istorically the domestic made manufacturing requirement has been applied to launch vehicles and not payloads."  AR30862.  To resolve any ambiguities concerning the proper interpretation the policy, however, NASA represented that it would "seek to consult with OSTP about the application of the policy to any specific proposal."  AR30862.  The record contains evidence that Lynn Cline of NASA in fact did consult with OSTP about the application of the policy to Orbital's proposal on October 24, 2008.  The record also establishes that "an interagency review led by OSTP . . . concluded the Taurus II will be eligible to launch U.S. Government payloads" and that at that meeting, Damon Wells, a senior official at OSTP, "agreed that it was a reasonable interpretation that the policy refers to the launch vehicle and not the payload, in this case the cargo vehicle."  AR6316.  As this memorandum demonstrates, NASA sought to consult with OSTP about Orbital's CRS proposal, and OSTP concluded that the Taurus II complies with the policy and that Orbital's use of foreign components in its cargo vehicle did not trigger the application of the USSP.  AR6316.

Despite this evidence, PlanetSpace challenges the results of the interagency review and determination that the Taurus II is eligible to launch Government payloads, claiming that the prior approval was based upon OSTP's belief that the vehicle would not launch "United States Government payloads.  Pl.Br.29.  In addition,  PlanetSpace alleges that OSTP never considered the "foreign nature of the cargo transfer vehicle."  Pl.Br.29.  The record, however, lends no support for these conclusions.  The December 12, 2008 memorandum reflects that an interagency team concluded that "Taurus II will be eligible to launch U.S. Government payloads."  AR6316.

Furthermore, the memorandum makes clear that the discussion between OSTP and NASA officials addressed the fact that the cargo vehicle had foreign content and that these officials "agreed that . . . that the policy refers to the launch vehicle and not the payload, in this case the cargo vehicle." AR6316. In sum, although PlanetSpace has claimed that NASA failed to consult with OSTP regarding the Orbital proposal, the record directly contradicts this assertion.

Even assuming that, as PlanetSpace contends, OSTP's prior approval of Orbital's Taurus II was somehow defective or inapplicable to the CRS procurement, this alleged lack of final OSTP approval does not constitute a violation of the USSP. By its terms, the USSP does not require that a bidder obtain the OSTP exemption prior to the submission of a bid, nor does it mandate that NASA receive explicit authorization from the National Security Advisor before awarding a contract that uses foreign-made parts. The policy expressly provides that "[t]he proposed use of a non-U.S.-manufactured launch vehicle will be subject to <u>interagency coordination</u> as early in the program as possible." USSP § V.1.a (emphasis added).

Canons of statutory construction apply equally to regulations. <u>Wronke v. Marsh</u>, 787 F.2d 1569, 1574 (Fed. Cir. 1986) ("As in the interpretation of statutes, we begin, as we must, with the plain language of the regulation." (internal citations omitted)). It remains well-settled that in construing a statute or regulation, this Court must begin by reviewing the language of the regulation to ascertain its plain meaning. <u>American Airlines, Inc. v. United States</u>, 551 F.3d 1294, 1299 (Fed. Cir. 2008). Thus, any interpretation of the USSP must begin with the language of the policy itself.

Although not defined in the policy, the term "coordination" connotes a concept distinct from final approval. <u>See, e.g.</u>, <u>The American Heritage Dictionary of the English Language</u> (4th

38

ed. 2000) (coordination means "harmonious adjustment or interaction").  Nothing in the text of

the USSP indicates that the term "agency coordination" means that an agency seeking to use a

foreign content in a space vehicle must consult directly with the National Security Advisor prior

to making a contract award.  Rather, a logical reading of the term "agency coordination" clearly

encompasses the type of meeting that occurred between Lynn Cline of NASA and Damon Wells

of OSTP.  Contrary to PlanetSpace's characterizations, the USSP does not require that a bidder

obtain the exemption from the Director of OSTP before contract award, but only prior to

launching United States Government payloads.  Therefore, NASA followed both the

requirements of the USSP and the RFP by coordinating with OSTP regarding the need for an

exemption for the Russian-made engines and the cargo vehicle prior to awarding the Contract to

Orbital, AR6316, and NASA's selection of Orbital fully complied with requirements of the

USSP and the RFP.

 Further, even if this Court were to construe the USSP or the RFP to require a bidder to

obtain an OSTP exemption prior to the award of the CRS contract, this alleged policy violation

cannot serve as the basis to set aside the award because "non-prejudicial errors in a bid process

do not automatically invalidate a procurement."  LeBatt Food Serv., Inc. v. United States, No.

2009-5017, __ F.3d __, 2009 WL2581358, at *3 (Fed. Cir. Aug. 24, 2009) (citing Data Gen.

Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  A small error will not serve as grounds

to invalidate the entire procurement.  See, e.g., Grumman Data Sys. Corp. v. United States, 15

F.3d 1044, 1048 (Fed. Cir. 1994) (agency's alleged departure from standard accounting

principles in its best value analysis was not sufficient to set aside procurement as any error was

de minimis).  The RFP required offerors to make over two dozen representations and

certifications.  AR1967-72.  PlanetSpace has not explained how it could have been prejudiced by this alleged error, given the multitude of significant shortcomings in its proposal.  Further, there is every indication that Orbital's engines and vehicle could have received an exemption from OSPT if necessary.[13]  In these circumstances, any alleged error was *de minimis,* and insufficient to merit the "extraordinary remedy" of injunctive relief.  Winter, 129 S. Ct. at 376.

**6.     NASA Reasonably Concluded That PlanetSpace's Proposed Payment Schedule And Financial Projections Posed An Undue Risk To The ISS CRS Program**

Plaintiff also takes issue with the SSA's identification of PlanetSpace's use of cost-reimbursement contracts with its subcontractors as a discriminator for selection purposes.  Pl.Br.32-33.  Plaintiff argues that the SSA's criticisms of PlanetSpace's proposed payment structure "lack[ed] any 'clear and logical trail' or 'detailed account' leading to the conclusion he reached."  Pl.Br.34.  Contrary to plaintiff's assertion, the record demonstrates that the SSA (1)  analyzed all of the "critical facts" that plaintiff now asserts were overlooked, and (2) derived the facts that supported its assessment of PlanetSpace's business plan from PlanetSpace's own representations.  As the SSA's judgment regarding the relative risk of PlanetSpace's proposal had a reasonable basis in fact, PlanetSpace's self-serving statements regarding the strength of its proposal are irrelevant and do not render the SSA's assessment irrational.  See Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1383 (2009) ("a decision is not necessarily unreasonable simply because the disappointed bidder is able to find two witnesses who disagree with it.").

---

[13]     This likelihood is supported by the fact that PlanetSpace's first launch vehicle, ███████ has a similar amount of foreign content ███████████ █ AR31148. ██████████ ██████████████████, and OSTP previously determined that the USSP's prohibition does not apply use of ████████ in space vehicles manufactured in the United States.  Id.

40

The RFP informed all offerors that NASA would evaluate the structure of its subcontractor arrangements and stated that NASA would "evaluate the offeror's proposed management team for key positions; the teaming arrangements and completeness in meeting the key aspects of the SOW; and the overall effectiveness and completeness of the management approach, plan[,] and processes."  AR2091.  In addition, as discussed above, the RFP included language that made clear that "NASA w[ould] evaluate the offeror's understanding of the risks of providing the ISS resupply services, completeness in identifying risks, and the appropriateness of their mitigation plans."  AR2091.

Applying this criteria, the SSA found that PlanetSpace's subcontracting structure represented a significant risk to the ISS CRS program.  AR5176.  He identified several weakness in PlanetSpace's management approach, the first of which "involved the use of cost-plus subcontracts for the large subcontractors until first flight, subcontractors that were responsible for the majority of the work and would be addressing the technical difficulties identified in the proposal.  (Finding 266)."  Id.  Noting that he agreed with the SEB that this structure represented a weakness in PlanetSpace's proposal, the SSA expounded that the only disagreement he had with the SEB was whether PlanetSpace could "manage this risk through incentives and cost controls."  Id.  The SEB reclassified this issue from a significant weakness in PlanetSpace's first proposal to a weakness in its final proposal revision.  In turn, the SSA "believed the subcontracting structure still represented a significant risk to the successful performance of the program."  Id.  He assessed that "it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when most of the effort in the early stages of the contract would be performed under cost type contracts."  Id.

41

The gravamen of plaintiff's argument is that this Court should look past the reasoned judgment of the SSA and substitute for it PlanetSpace's judgment.  Yet, the law of this Circuit strongly and uniformly discourages this Court from intervening in "minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials that a court will not second guess."  E.W. Bliss, 77 F.3d at 449 (citing Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993)).  Accordingly, its effort to have this Court "second guess" the judgment of NASA's procurement officials relating to, among other things, NASA's risk assessment, Pl.Br.32, PlanetSpace's lack of adequate cash flow, id. at 33, and oversight capability, id., is contrary to law.  See Central Arkansas Maintenance, Inc. v. United States, 68 F.3d 1338, 1341 (Fed. Cir. 1995) (the Court should not substitute its judgment on such matters for that of the agency, and should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable).

When read as a whole, the Source Selection Statement demonstrates that the SSA offered a detailed account of why he chose to elevate this area of PlanetSpace's management approach from a weakness to a significant weakness.  The Source Selection Statement flatly contradicts plaintiff's assertion that the SSA somehow misstated the amount of work that PlanetSpace proposed to subcontract on a cost basis.  The SSA plainly understood that PlanetSpace's proposal contemplated subcontracting a substantial portion of the development work "in the early stages of the contract" or "until the first flight."  AR5176.  Although PlanetSpace seeks to minimize the amount of work it would subcontract on a cost reimbursement basis, PlanetSpace previously has acknowledged that it intended to subcontract out ███████████████████

42

████████████████████.  AR5680; AR30931; AR10605.

The SSA also appreciated that this development work would be performed on existing heritage components.  He explained that this work could result in substantial cost overruns because the "heritage components would need to be re-qualified to meet the vibro-acoustic environment of the new launch vehicle," a fact that the SEB perceived as weakness.  AR5175; see also AR4693-94 (████████████████████████████████████████████ ████████████████████████████████████, AR5092.  Both the SSA and SEB also agreed that the fairing issue presented an additional risk of cost overruns.  In particular, these NASA officials observed that PlanetSpace's proposal increased the static envelope of the payload fairing without changing the outside diameter, resulting in a margin "lower than any fairing in current world wide industry experience."  AR5176; see also AR4698 (████████████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████), AR5093. Notwithstanding that the development work was on existing heritage components, the SSA logically recounted the technical and factual reasons for his decision to deem PlanetSpace's proposed use of cost subcontracts as a real risk.

Furthermore, in the best case, PlanetSpace would not become cash flow positive until 2013, or five years into this seven-year contract.  AR10590; see also AR2573; AR5684.  That projection assumed that NASA would order an early mission, using its proposed alternative launch vehicle, ████████.  If NASA did not order the early mission, PlanetSpace would not realize any profit until even later in the Contract performance period.  AR10590.  The SEB also

found that PlanetSpace failed to ████████████████████████ in its projection.
AR28764.  That PlanetSpace's proposal ████████████████ casts further doubt
upon the credibility of its projections.  AR10590; AR28764.  Based upon these facts, the SSA
rationally concluded that the information in PlanetSpace's proposal did not indicate that either its
████████████████████████████████ would effectively mitigate this risk.

Because the SSA considered all the relevant facts, at root, PlanetSpace's bold assertions
of error are nothing more than an attempt to have this Court re-examine the SSA's reasonable
assignment of risk.  Controlling law instructs, however, that the SSA's choice to give
PlanetSpace a lower rating than the SEB does not make his decision irrational.

## III.   **PlanetSpace Is Not Entitled To Injunctive Relief**

Even if PlanetSpace established success on the merits, it must also prove that it would be
harmed irreparably, that the balance of likely harms compels an injunction, and that an injunction
is in the public interest.  See Winter, 129 S. Ct. at 381 n.5 (the district court's award of injunctive
relief was "an abuse of discretion even if plaintiffs are correct on the underlying merits.").  The
speculative harms alleged by PlanetSpace are dwarfed by the real, material consequences that
would attend an injunction, which would imperil the ISS missions of the United States and its
partner nations.  The public interest compels that the Contract awards stand.

### A.   PlanetSpace Has Not Demonstrated That It Was Prejudiced

To demonstrate prejudice, the protestor must show that there is a substantial chance that it would have received the award but for the agency's error.  Tip Top Constr., Inc. v. United States, 563 F.3d 1338, 1345 (Fed. Cir. 2009) (no prejudice when contracting officer gave alternative ground for decision that was upheld).  PlanetSpace was not prejudiced by any alleged error.

In this case, NASA identified six reasons for rejecting PlanetSpace's bid:  three related to its Technical Plan and three to its Management Approach.  AR5175-77.  These led to NASA's conclusion that Orbital had the superior offer because of "serious Management risks" and its doubt that PlanetSpace could address technical challenges given these risks.  To demonstrate prejudice, plaintiff must prove that the alleged errors would overcome this reasoning.  Plaintiff fails to do so.  Even if the Court concluded that plaintiff's Counts II through VI had merit, NASA's judgment that PlanetSpace's proposal had "serious Management risks" would remain intact.  AR5181.  In fact, plaintiff could establish prejudice only if the Court found merit in Count I   that is, if the Court agreed with plaintiff's interpretation of the FAR, and held that NASA was prohibited from assessing that "the considerable risk inherent in PlanetSpace's Management approach made the likelihood of successful performance . . . remote."  AR5177.

### B.   The Harms PlanetSpace Alleges Are Far Outweighed By The Material, Deleterious Impact An Injunction Would Have On The United States

PlanetSpace alleges two injuries that might attend its failure to win the Contract:  (1) it will not be able to retain "its most valuable employees," and (2) it will lose out on the benefits of winning the Contract   i.e., "substantial revenue," and the winners' ability to improve their "design and development effort" by performing the Contract.  Kathuria Decl. ¶¶ 22-25.  Even if true, these events would not amount to "irreparable harm" to merit enjoining Contract award.

First, it is error to frame the "injury" that attends a Government procurement in terms of the loss of a business opportunity.  Indeed, this argument could apply to every protestor and every successful bidder in every bid protest.  "Injuries" of lost business are the *quotidia* of an open, competitive market, and do not amount to irreparable injury.  Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).  Further, as an economic matter, there is no real, net injury, because the Contract will provide jobs to one company or another.  Indeed, PlanetSpace acknowledges this fact:  it contends that its employees may leave to work for the winning bidders on this Contract. Kathuria Decl. ¶¶ 18, 21.  If true, these employees would suffer no material injury; they would merely receive their paychecks from a different company.  Any injury would fall to the residual employees of PlanetSpace, which describes itself as a small business.  Pl.Br.16.

Second, plaintiff's projection of a shapeless, hypothetical injury does not meet its burden of demonstrating irreparable harm.  See Kathuria Decl. ¶¶ 24-25 (the harm of having to "'catch up' to the 'head start' that SpaceX and OSC would have obtained" from Contract performance). The party seeking an injunction may not speculate about a possibility of harm, but must prove that this harm is likely.  Winter, 129 S. Ct. at 375-76 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an  extraordinary remedy[.]"  ).  Plaintiff's vague assertions do not satisfy this standard.

Third, even if PlanetSpace's alleged injury were built upon something more than conjecture, an injury to a few employees of a small business concern pales in comparison to the material hazards that would attend any interruption of Contract performance.  An injunction

would imperil NASA's ability to fulfill its space mission and international obligations. The supplies to be delivered by terms of the Contract include "air, water, food, clothing, medicine, spare parts, and scientific experiments for us in the US and International Partner experimental modules." Ex. A ¶ 17. The failure to deliver this critical cargo in a timely manner would require NASA " to drastically reduce the ISS crew size to a skeleton crew, and []reduce maintenance of the ISS on-orbit vehicle to minimal 'housekeeping,' and the brand new experimental facilities will remain idle." Ex. A ¶ 19.

An interruption of Contract performance would jeopardize the timely delivery of this critical cargo. Cargo is scheduled for delivery in Spring of 2011. Ex. A ¶ 7. As Mr. Gerstenmaier explains, there are currently no "mature vehicles" that could deliver supplies to the ISS. Ex. A ¶ 6. The standard production cycle for resupply spacecrafts is "approximately 24-27 months." Ex. A ¶¶ 6, 15. Indeed, NASA assesses that even the existing contractors   now ten months into contract performance   will be pressed to meet mission deadlines.

> This is a very difficult task for these commercial services contractors to perform on the current timeline.  The current CRS contract schedules show that it will be challenging for the contractors to meet their current schedules (first SpaceX mission is May 2011; first Orbital mission is October 2011).

Ex. B ¶ 8. Given these hurdles, any interruption of Contract performance would place at risk a timely delivery of critical cargo.

Further, given the 24-to-27 month time-frame for the production of new vehicles, Mr. Gerstenmaier reasoned that it was "extremely doubtful" that a new provider, starting today (i.e., September 2009), could provide these services by the scheduled completion dates. Ex. A ¶ 7. The failure to timely deliver critical supplies would impede the United States' ability

47

to meet international agreements, and could "adversely impact the future of further International

Space Exploration initiatives."  Ex. A ¶ 20.

As this Court has already found in this case, any delay "would adversely affect the

interests of the United States."  <u>PlanetSpace v. United States</u>, 56 Fed. Cl. 566, 568 (2009).[14]

These are real, material injuries that dwarf those that might someday affect PlanetSpace.  The

balance of harms strongly counsels against injunctive relief.  <u>See</u> <u>Winter</u>, 129 S. Ct. at 377

(reversing because lower courts "significantly understated the burden the preliminary injunction

would impose on the Navy's ability to conduct realistic training exercises").

### C.  It Is In The Public Interest To Proceed With Contract Award

Before this Court will grant equitable relief, a litigant also must establish that such relief

would advance the public interest.  <u>See</u> <u>Drexel Heritage Furnishings, Inc. v. United States</u>, 3 Cl.

Ct. 718, 722 (1984).   As the Supreme Court recently observed, "[i]n exercising their sound

discretion, courts of equity should pay particular regard for the public consequences in employing

the extraordinary remedy of injunction."  <u>Winter</u>, 129 S. Ct. at 376-77 (citations omitted).  The

"public consequences" that would accompany an injunction in this case would be severe.

As explained above, an injunction in this case is not in the public interest because it

would likely result in the failure to deliver critical supplies to the ISS, would imperil ISS

missions, and would interfere with the United States' international obligations.  Ex. A, ¶ 20.

The public interest is served by fulfilling the United States' international covenants.  <u>See</u> <u>World</u>

---

[14]        The principle of *res judicata* teaches that, as plaintiff had full opportunity to litigate this issue based upon the same factual theory, was denied relief, and elected not to appeal, it may not now seek to re-litigate this contention.  <u>See</u> <u>Sharp Kabushiki Kaisha v. Thinksharp, Inc.</u>, 448 F.3d 1368, 1370 (Fed. Cir. 2006).

<u>Wildlife Fund v. Hodel</u>, 1988 WL 66193 at *5 (D.D.C. 1988) ("if the treaty has been violated, then the public interest will suffer.").  By contrast, it does <u>not</u> serve the public interest to interfere with the judgment of Government procurement officials.  S. Rep. No. 275, 97th Cong. 1st Sess. 22-23 (1981) (the public interest lies in permitting the Government "to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner").[15]

Plaintiff deflects discussion of the consequences of interrupting Contract performance by proposing that it seeks only "limited relief."  Pl.Br.39.  It suggests, "one possible result will be the award of a third contract, to PlanetSpace," and cites cases where the Court discussed partial injunctions.  <u>Id.</u> at 38.  If plaintiff means to argue that the Court may order that a third contract be awarded to PlanetSpace, plaintiff errs.  <u>See</u> <u>Hydro Eng'g, Inc. v. United States</u>, 37 Fed. Cl. 448, 461 (1997) (Court "should not select a contractor or award specific performance of a contract").

## IV.    <u>Plaintiff's Protest Is Barred By Laches</u>

It has long been recognized that, "[i]n accord with the discretionary character of the injunction remedy and the venerable maxim that 'equity aids the vigilant, not those who slumber on their rights,' a plaintiff who is guilty of laches will be denied an injunction."  11A Charles A. Wright, <u>et al.</u>, FEDERAL PRACTICE AND PROCEDURE § 2946 (1995); <u>see</u>, <u>e.g.</u>, <u>New Era Publications Int'l v. Henry Holt and Co.</u>, 873 F.2d 576, 584 (2d Cir. 1989) ("The prejudice suffered by [defendant] as the result of [plaintiff's] unreasonable and inexcusable delay in bringing the action invokes the bar of laches.").  These precepts apply in bid protests as well. <u>See</u> <u>Wit Assoc., Inc. v. United States</u>, 62 Fed. Cl. 657, 662 n.5 (2004).

---

[15]    Our Motion to Strike (filed Sep. 8, 2009) describes why the declarations PlanetSpace relies upon for its "public interest" argument (1) do not relate to the public interest and (2) are barred from consideration by law.  <u>Id.</u> at 6-7, 9-10; <u>see</u> <u>Axiom</u>, 564 F.3d at 1382-83.

Laches must be considered in light of the facts of each case.  See Bott v. Four Star Corp., 807 F.2d 1567, 1576 (Fed. Cir.1986); Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 79 (3d Cir. 1986) ("Laches . . . eschews mechanical rules.").  It requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.  S.E.R. Jobs for Progress, Inc. v. United States, 759 F.2d 1, 5 (Fed. Cir. 1985).

PlanetSpace's claim is barred in this case because it "delayed filing suit for an unreasonable and inexcusable length of time from the time [it] knew or reasonably should have known of [its] claim against [NASA]; and . . . the delay operated to the prejudice or injury of [NASA]."  Poett v. Merit Sys. Prot. Bd., 360 F.3d 1377, 1384 (Fed. Cir. 2004).  NASA awarded these Contracts on December 23, 2008.  PlanetSpace challenged NASA's decision and lost its protest at GAO in April 2009.  But rather than prosecute its claim in this Court, plaintiff waited three months to file its Complaint in July 2009   seven months after Contract award.  Plaintiff attended the override proceeding and was plainly aware of the exigencies associated with the timely execution of this procurement.  PlanetSpace, 56 Fed. Cl. at 568.  As described above, if Contract performance were interrupted at this juncture, the impact would be devastating.  As there is no reasonable excuse for plaintiff's dilatory conduct, its claim is barred by laches.

## CONCLUSION

For the foregoing reasons, and pursuant to Rule 52.1 of the rules of this Court, defendant respectfully requests the Court to deny plaintiff's motion for judgment upon the administrative record, and grant our cross-motion for judgment upon the administrative record.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Alan J. Lo Re
ALAN J. LO RE
Assistant Director

OF COUNSEL

STACEY K. GRIGSBY
Trial Attorney

VINCENT A. SALGADO
Senior Attorney
Office of General Counsel
NASA Headquarters

s/ William G. Kanellis
WILLIAM G. KANELLIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone:      (202) 353-0526
Facsimiile:      (202) 514-8640

Dated: September 18, 2009

Attorneys for Defendant

<u>CERTIFICATE OF FILING</u>

I hereby certify that on September 25, 2009, a copy of a REDACTED VERSION of

"DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE

ADMINISTRATIVE RECORD, AND CROSS-MOTION FOR JUDGMENT UPON THE

ADMINISTRATIVE RECORD" (filed September 18, 2009) was filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


 s/William G. Kanellis