# United States Court of Federal Claims

**No. 09-476 C**
**Filed Under Seal: December 8, 2010**
**Reissued: December 14, 2010**[*]

---

**PlanetSpace Inc.,**

       *Plaintiff*,

**v.**

**United States of America,**

       *Defendant*,

**Space Exploration Technologies Corporation,**

       *Intervenor*, **and**

**Orbital Sciences Corporation,**

       *Intervenor*.

---

Post-Award Bid Protest;
Trade-off Analysis;
Contractor Responsibility;
Remand to Agency

 

*Steven J. Rosenbaum*, *Derron J. Blakely*, *Scott A. Freling*, *Greta S. Milligan*, *Abram J. Pafford*, Covington & Burling LLP, Washington, DC, for plaintiff.

*William G. Kanellis*, *Stacey K. Grigsby*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant; *Vincent A. Salgado*, Office of the General Counsel, National Aeronautics and Space Administration, Washington, DC, of counsel.

*Richard J. Vacura*, *Keric B. Chin*, *Marc A. Hearron*, Morrison & Foerster LLP, McLean, VA, for intervenor Space Exploration Technologies Corporation.

*David A. Churchill*, *Kevin C. Dwyer*, *Daniel E. Chudd*, *Caroline A. Keller*, *Anna M. Baldwin*, Jenner & Block LLP, Washington, DC, for intervenor Orbital Sciences Corporation.

---

[*] This opinion originally was issued under seal on December 8, 2010.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, but no such redactions were proposed.  Accordingly, the opinion is herein reissued for publication, unsealed.

# OPINION *and* ORDER

## Block, *Judge*.

On July 23, 2009, plaintiff, PlanetSpace Inc. ("PlanetSpace"), filed this post-award bid protest, alleging six counts of error in a negotiated procurement by the National Aeronautics and Space Administration ("NASA") for cargo transportation services to the International Space Station ("ISS"). The procurement concluded with NASA's decision to award contracts to the two intervenors, Space Exploration Technologies Corporation ("Space-X") and Orbital Sciences Corporation ("Orbital"), but not to plaintiff. Through a prior opinion and order, the court held in favor of defendant on counts (3)–(6) of the complaint, but withheld judgment on counts (1)–(2) pending a remand to NASA for additional explanation of the grounds for the agency's award decision. *See PlanetSpace, Inc. v. United States* ("*PlanetSpace I*"), 92 Fed. Cl. 520, 549 (2010). On May 3, 2010, pursuant to the court's remand order, defendant submitted this additional explanation in the form of a sworn declaration from NASA's Source Selection Authority ("SSA"). The case is now before the court on the parties' cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). With further explanation of NASA's award decision in hand, and for the reasons discussed below, the court resolves the remaining counts of the complaint and enters judgment in favor of defendant.

## I. BACKGROUND

Under various international agreements, the United States, acting through NASA, is responsible for providing cargo transportation services to and from the ISS.[1] In 2008, faced with the imminent retirement of its fleet of space shuttles, NASA turned to private industry for help in meeting this ongoing commitment.[2] To that end, NASA issued Request for Proposals

---

[1] *See, e.g.*, Agreement Among the Government of Canada, Governments of Member States of the European Space Agency, the Government of Japan, the Government of the Russian Federation, and the Government of the United States of America Concerning Cooperation on the Civil International Space Station (commonly referred to as the ISS "Intergovernmental Agreement" or "IGA") Art. 12(1), Jan. 29, 1998, 1998 U.S.T. LEXIS 303 (overarching international agreement establishing the framework for development and operation of the ISS, and providing that the United States, acting through NASA, "shall make available launch and return transportation services" to the ISS "using such space transportation systems as the U.S. Space Shuttle").

[2] *See* National Aeronautics and Space Administration Authorization Act of 2005, Pub. L. 109–155, § 101(a)(2), 119 Stat. 2895, 2898 (2005) (codified at 42 U.S.C. § 16611(a)(2)) (providing that "[i]n carrying out the programs of NASA, the Administrator shall-- . . . (B) work closely with the private sector, including by-- . . . (ii) contracting with the private sector for crew and cargo services, including to the International Space Station, to the extent practicable"); A Renewed Spirit of Discovery: The President's Vision for U.S. Space Exploration (Jan. 14, 2004) (national space policy announced by President George W. Bush, directing NASA to "[r]etire the Space Shuttle as soon as assembly of the International Space Station is completed, planned for the end of this decade" and to "[p]ursue commercial opportunities for providing transportation and other services supporting the International Space Station"), *available at* http://georgewbush-white

No. NNJ08ZBG001R (the "RFP") on April 23, 2008, to procure "Commercial Resupply Services" for the ISS (the "ISS-CRS procurement"). Admin. Record ("AR") 1306, 1314, 1364. Exactly eight months later, on December 23, 2008, the procurement concluded with the issuance of contract awards to the two intervenors, ultimately prompting the instant protest. *PlanetSpace I*, 92 Fed. Cl. at 529. The court's prior opinion in this matter provides a detailed account of the factual and procedural background, *see id.* at 525–30, but a selective synopsis is useful here.

### A. The Evaluation of Proposals and Award Decision

The RFP specified two factors for the evaluation of proposals: (1) price and (2) mission suitability. AR 2089. Mission suitability, in turn, included three subfactors for evaluation: (a) technical approach; (b) management approach; and (c) small business utilization. AR 2089, 2091. An offeror's relevant past performance history was not to be evaluated separately but as part of each mission suitability subfactor. AR 2090. Contract award was to be made to the offeror(s) whose proposal(s) provided the "best value" based upon a "trade-off" among price and mission suitability, with the proviso that mission suitability was more important than price.[3] AR 2089; *see PlanetSpace I*, 92 Fed. Cl. at 526–29.

Plaintiff, Orbital, and Space-X were the only contractors to submit initial proposals in response to the RFP. AR Tabs 68–80. Thereafter, the contracting officer decided to include all three offerors in the competitive range. AR 2723–24. The contracting officer also ordered a "pre-award survey" of the offerors, the results of which would help him make an eventual determination regarding the "responsibility" of the prospective contract-awardee(s).[4] AR 2691.

------

house.archives.gov/space/renewed_spirit.html; *see also* National Space Policy of the United States (June 28, 2010) at 3 (national space policy announced by President Barack Obama, articulating a commitment "to encouraging and facilitating the growth of a U.S. commercial space sector"), *available at* http://www.whitehouse.gov/sites/default/files/national_space_policy_6-28-10.pdf.

[3] Under the Federal Acquisition Regulation ("FAR"), a "tradeoff process"—which "permits tradeoffs among cost or price and non-cost factors"—"is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR 15.101-1(a),(c).

[4] As a prerequisite to the award of any government contract, the contracting officer must make a determination regarding the "responsibility" of those offerors that the SSA selects for award. *See* FAR 9.103; FAR 9.105-1(b); John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 439 (3d ed. 1998). In order to be determined "responsible," a prospective contract-awardee must possess or have the ability to obtain the technical skills, financial resources, and other means necessary for successful performance of the proposed contract. FAR 9.104-1; *see Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009). Absent "information clearly indicating that the prospective contractor is responsible," the contracting officer must make a determination of "nonresponsibility," which renders the prospective contractor ineligible for award regardless of the merits of its proposal. FAR 9.103(b). When "the information on hand or readily available . . . is not sufficient to make a determination regarding responsibility," the contracting officer may order a "pre[-]award survey," FAR 9.106-1(a), which is "an evaluation of a prospective contractor's capability to perform a proposed contract," FAR 2.101.

The final pre-award survey report concluded that Space-X and Orbital satisfied the FAR's standards for contractor responsibility, but that plaintiff did not. *See* AR 2600–01 (citing FAR 9.104-1). A member of the pre-award survey team sent to the SSA a draft copy of that report, along with an email that invited the SSA to consider the report's contents in his evaluation of proposals.[5] *See* AR 16683.

Meanwhile, a source evaluation board ("SEB") conducted an initial evaluation of the offerors' final proposals. AR Tab 53. The SEB concluded that plaintiff's proposal offered better mission suitability at a lower price than Orbital's proposal, and that Space-X's proposal, in turn, offered the best mission suitability at the lowest price. AR 4470, 5016–35; *see PlanetSpace I*, 92 Fed. Cl. at 527. The SEB presented its conclusions to the SSA on December 15, 2008. AR 4466.

Eight days later, the SSA issued his source selection decision. AR 5181. With regard to price, the SSA accepted fully the SEB's analysis, concluding that "[Space-X] proposed the lowest overall price, with the price proposed by PlanetSpace being the next lowest overall price, and with Orbital's price being the highest overall proposed price." *Id.* The SSA's source selection statement did not provide any quantitative estimate of the price differences between the three proposals. *See* AR 5180–81; *see also PlanetSpace I*, 92 Fed. Cl. at 528 n.7.

With regard to mission suitability, the SSA again concurred with the SEB's evaluation as to Space-X and Orbital's proposals. AR 5173–80. However, the SSA disagreed sharply with the SEB's assessment of plaintiff's proposal in that regard. *Id.* In particular, the SSA viewed the merits of plaintiff's technical and management approaches far less favorably than did the SEB. AR 5175–77; *see PlanetSpace I*, 92 Fed. Cl. at 528–29. The SSA was especially concerned with the risks inherent in plaintiff's proposed use of two different launch vehicles over the contract period, plaintiff's proposed reliance on subcontractors for performance of the majority of work under the contract, and the inadequacy of plaintiff's proposed measures for controlling subcontractor costs. *Id.* Accordingly, with regard to mission suitability, the SSA concluded that Orbital's proposal was superior to plaintiff's, explaining that he "had much higher confidence in Orbital's ability to provide resupply services on a fixed-price basis." AR 5180.

Ultimately, the SSA concluded that it was in NASA's best interests to award two contracts. AR 5181. Because Space-X's proposal was the best in both price and mission suitability, no trade-off analysis was necessary in selecting Space-X as one of the two contract-awardees. *Id.* However, having concluded that Orbital's proposal offered superior mission suitability but at a higher price than plaintiff's proposal, the SSA was required by the RFP to conduct a trade-off analysis in order to determine which of the two proposals provided the best value. *See* AR 2089; *supra* note 3. The SSA's only explicit documentation of his trade-off analysis was the following single paragraph in the source selection statement:

---

[5] As is often the case in complex procurements, responsibility for the evaluation of proposals and selection of the prospective contract-awardee(s) lay with the SSA rather than with the contracting officer. *See* FAR 15.303; Ralph C. Nash, Jr. et al., The Government Contracts Reference Book 536 (3d ed. 2007).

> I concluded the proposal from Orbital was superior due to the serious Management risks inherent in PlanetSpace's proposal: however, I recognized PlanetSpace had a lower overall price than the Orbital proposal. I had reservations with regard to PlanetSpace's ability to successfully address the technical challenges associated with its proposal given the risks I identified in its Management approach. Although I recognized the evaluation criteria provided that Mission Suitability was more important than price, I could not conduct [a] "typical" trade-off analysis since I believed there was a low likelihood PlanetSpace could perform the contract.

AR 5181. On that basis, the SSA selected Orbital to be the second contract-awardee. *Id*. And on the same day that the SSA issued his source selection decision, the contracting officer awarded contracts to Space-X and Orbital. AR 5252–53.

### B. The Remand to NASA

After an unsuccessful protest at the United States Government Accountability Office ("GAO"), *PlanetSpace, Inc.*, B-401016 *et al.*, 2009 CPD ¶ 103 (Comp. Gen. Apr. 22, 2009), plaintiff filed the instant complaint, alleging six counts of error in the ISS-CRS procurement, Compl. ¶¶ 46–106. As noted above, the court previously held in favor of defendant on counts (3)–(6). *See PlanetSpace I*, 92 Fed. Cl. at 533–41, 549. However, the court concluded that an irresolvable ambiguity in the SSA's source selection statement precluded judgment on the first two counts of the complaint, *see id*. at 542–49, wherein plaintiff alleges that the SSA rejected its proposal based upon (1) a *de facto* non-responsibility determination, Compl. ¶¶ 46–61, and (2) a legally deficient trade-off analysis, *id*. ¶¶ 62–70.

On the one hand, it appeared to the court that the SSA "conducted and documented a sufficient, albeit atypical, trade-off analysis," one that fully supported his decision "in light of the risks inherent in plaintiff's proposal and the high-risk, critical nature of the procurement." *PlanetSpace I*, 92 Fed. Cl. at 547. In particular, the court recognized that the contract-awardees would be "expected to deliver such necessary cargo as air, food, clothing, medicine [and] spare parts to the ISS," and that "the chance of successful contract performance [was] relatively low for all of the competing proposals." *Id*. at 545 (alteration in original) (citations and internal quotation marks omitted). Furthermore, notwithstanding the brevity of the SSA's explicit documentation of his trade-off analysis, "the SSA repeatedly articulated concerns about the nature and degree of risk posed by plaintiff's proposal" relative to Space-X and Orbital's proposals. *Id*. at 544. As such, the court concluded, "in the SSA's considered judgment, the balance of the trade-off between Orbital's and plaintiff's proposals *may* well have weighed *heavily and patently* against plaintiff, despite plaintiff's self-described 'whopping' price advantage." *Id*. at 545.

On the other hand, some portions of the SSA's source selection statement "arguably questioned plaintiff's ability to perform the proposed contract," *i.e.*, plaintiff's responsibility as a contractor, "not merely the soundness of [plaintiff's] proposal itself." *Id*. Particularly beguiling was the SSA's statement that he "could not conduct [a] 'typical' trade-off analysis since [he] believed there was a low likelihood PlanetSpace could successfully perform the contract." *Id*. at 541, 546 (quoting AR 5181). The court's "concerns about a [possible] *de facto* non-responsibility determination [were] heightened" due to the SSA's receipt of a draft copy of the pre-award survey

report, an apparent violation of NASA regulations.  *Id.* at 547 (citing NASA FAR Supplement ("NFS") 1809.106-1).

The court was thus "faced with two competing interpretations of the SSA's source selection" statement: one interpretation favored plaintiff, while the other favored defendant.  *Id.* Unable to resolve this ambiguity based upon the record before it, the court remanded the matter to NASA in order for "the SSA to provide a sworn statement, making explicit and unambiguous the trade-off analysis that he believed was implicit in his source selection" statement.  *Id.* at 549 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.")).

Pursuant to the court's remand order, defendant submitted a sworn declaration from the SSA on May 3, 2010.  *See* Decl. of William H. Gerstenmaier, May 3, 2010 ("SSA Decl."), ECF No. 95.  The content and import of that declaration are the focus of the court's present analysis. *See infra* Discussion.  Following submission of the SSA's declaration, the court afforded the parties the opportunity to file supplemental memoranda that "address the SSA's declaration, including whether, in light of the declaration, any issues remain for the court to decide." Scheduling Order, May 10, 2010, ECF No. 97.

The case is once again before the court on the parties' cross-motions for judgment on the administrative record.  *See* RCFC 52.1.  Also before the court is plaintiff's belated motion for leave to file a supplemental pleading, pursuant to RCFC 15(d).  Pl.'s Mot. to Supplement at 1. Through its proffered supplemental pleading, plaintiff seeks to "inform the [c]ourt of recent developments" that are purportedly "relevant to the 'public interest' component of [plaintiff's] request for injunctive relief."  *Id.*

## II. DISCUSSION

### A. Standard of Review

The Tucker Act, which grants the court jurisdiction to adjudicate bid protest matters, provides that the challenged procurement decisions are to be reviewed under the standard set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706).  Under the APA standard, the court must determine whether the challenged procurement decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This may be distilled to the twofold inquiry of whether the agency's decision (1) lacked a rational basis, or (2) involved a violation of statute or regulation.  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The Supreme Court has described the APA standard of review as "a narrow one" and has cautioned that the "court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Accordingly, beyond demonstrating compliance with applicable regulatory requirements, the procuring agency need only provide "a coherent and reasonable explanation of its exercise of discretion" in reaching the challenged decision.  *Impresa Construzioni Geom. Domenico Garufi v. United States* ("*Impresa*"),

- 6 -

238 F.3d 1324, 1332–33 (Fed. Cir. 2001).  And the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The plaintiff in a bid protest thus "bears a heavy burden."  *Impresa*, 238 F.3d at 1333. That burden lies heavier still when the plaintiff challenges a contract award made subsequent to negotiated procurement, where the procurement official is entrusted with "especially great discretion, extending even to his application of procurement regulations."  *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002).  Greater yet is the procurement official's discretion when selecting a contract-awardee on the basis of a best value determination rather than price alone.  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Of course, as courts have repeatedly observed, the greater the procurement official's vested discretion, the higher the threshold for finding the official's decision irrational or otherwise unlawful.  *See, e.g.*, *id.*; *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980); *Cygnus Corp., Inc. v. United States*, 72 Fed. Cl. 380, 384–85 (2006).  An agency's contract award is thus least vulnerable to challenge when based upon a best value determination.  *See Galen Med. Assocs.*, 369 F.3d at 1330.

## B. Trade-Off Analysis Generally

Ironically, it is precisely such a best value determination that is the target of plaintiff's challenge under counts (1)–(2).  *See* Compl. ¶¶ 46–70.  As noted above, the RFP provided that contract award was to be made to the offeror(s) whose proposal(s) provided the best value based upon a trade-off between mission suitability and price.  AR 2089 (citing the "trade-off process" described at FAR 15.101-1); *see PlanetSpace I*, 92 Fed. Cl. at 526–29.  The FAR provides for the use of such "tradeoffs among cost or price and non-cost factors" whenever it "may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR 15.101-1(a),(c).

To be sure, when conducting a trade-off analysis of competing proposals, price must remain a meaningful factor in the SSA's decision-making even if the RFP provides that a non-price evaluation factor is more important than price (as was the case here, AR 2089).  *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993); *see* 41 U.S.C. § 253a(c)(1)(B); FAR 15.304; FAR 15.405.  Thus, the SSA may select for award the higher-priced proposal only if the "perceived benefits of the higher priced proposal . . . merit the additional cost." FAR 15.101-1(c).  And "the rationale for [the SSA's] tradeoffs must be documented," *id.*, "including the benefits associated with additional costs," FAR 15.308.  Beyond these two basic requirements—documentation and meaningful consideration of price—the FAR entrusts the trade-off analysis of competing proposals, along with the ultimate best value determination, to the SSA's broad discretion.  *See, e.g.*, *Galen Med. Assocs.*, 369 F.3d at 1330; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

In its initial review of the SSA's source selection decision in this case, the court found it instructive to recognize that trade-off analysis in the procurement context is "a form of cost-benefit analysis . . . a decision-making paradigm that dates back more than 160 years." *PlanetSpace I*, 92 Fed. Cl. at 542.  That recognition led to several insights that, prior to remand,

helped reveal the ambiguity in the SSA's source selection statement, and which now prove instrumental in guiding the court's review of the SSA's post-remand declaration.[6]

First and most broadly, as a form of cost-benefit analysis, trade-off analysis in the procurement context is simply a framework in which the benefits and costs associated with competing proposals are identified for purposes of information and assessment. *PlanetSpace I*, 92 Fed. Cl. at 542. Thus, as is well established in procurement law, the SSA is not required to quantify the costs and benefits associated with a given offeror's proposal. *Id.* at 542–44; *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008) (citing *Widnall v. B3H Corp.*, 75 F.3d 1577, 1580 (Fed. Cir. 1996)); FAR 15.308. Indeed, where qualitative considerations are sufficiently compelling, a proposal may provide the best value—and the SSA may lawfully select that proposal for award—even if the proposal's quantified benefits fall short of its additional cost or price. *PlanetSpace I*, 92 Fed. Cl. at 543.

Two such qualitative considerations—the importance of the service procured and the risk of unsuccessful contract performance—are especially pertinent. *Id.* at 542–43. Where the service procured is highly specialized or technically challenging, the risk of unsuccessful contract performance (performance risk, for short) may be high for all offerors. *See id.* at 543. In such a high-risk scenario, a proposal that offers even marginal improvement in the chance of successful performance may merit a substantial price premium relative to riskier proposals. *Id.* And, for any given disparity in performance risk between two competing proposals, the more important the procured service, the higher the price premium that the less risky proposal will merit. *Id.* at 543–44. When these qualitative considerations converge, the service procured may be so critical and the performance risk so high that almost no price advantage would justify selecting the riskier of two proposals. *Id.* at 545.

Correctly conceived, the FAR's trade-off analysis is thus not intended to be a legal or analytical straightjacket for the SSA's decision-making or the court's review thereof. Rather, trade-off analysis is a tool to guide the SSA's decision-making in a way that rationalizes and clarifies the SSA's selection of the proposal that offers the best value to the agency. *See id.* at 543.

### C. The SSA's Post-Remand Declaration

With this framework in mind, the court turns to the SSA's sworn declaration, which was filed pursuant to the court's remand order. *See id.* at 549. As set out below, the court concludes that the SSA's declaration amply documents a legally sufficient trade-off analysis, one that fully supports the SSA's decision to select Orbital, rather than plaintiff, for a second contract award.

The SSA begins his declaration by explaining that he performed "essentially a cost-benefit analysis." SSA Decl. ¶ 1. The SSA then sets out two background considerations that framed his analysis. First, the SSA notes the highly critical nature of the procured services in this case. *Id.* ¶ 2. The SSA explains that the ISS-CRS contracts "establish new domestic sources for timely

---

[6] In order to avoid undue repetition while providing sufficient context for the present discussion, the court briefly summarizes these insights here, but refers the reader to its prior opinion for a more thorough review of the underlying concepts. *See id.* at 542–45.

delivery of critical cargo to the ISS," and that such timely "[d]elivery of the required services . . . will be critical to the health of the ISS." *Id.*

Second, the SSA notes the high-risk nature of the work required to deliver the procured services. The SSA describes in detail the "highly technical work" required by the ISS-CRS contracts, work that offerors needed to demonstrate that they could perform in "a timely manner for a fixed cost." *Id.* ¶ 4. In light of the technical challenges involved, the SSA states that he "considered this overall procurement to be difficult and risky for all offers" and the "chance of successful contract performance for all proposals [to be] low." *Id.* In particular, given "the present state of the relevant U.S. aerospace sector, technically, economically, and otherwise," the SSA considered "the development of a new U.S. commercial supply system" for the ISS to be "a high-risk scenario." *Id.* Indeed, the SSA cites the industry-wide "high failure rate" as the primary reason for his decision to make two contract awards, so as to "enhance the probability of success by spreading the risk of failure among two contractors." *Id.* ¶ 6.

The SSA then devotes more than half of his declaration to explaining the trade-off analysis that he conducted in light of the above considerations. In analyzing all proposals, the SSA "focused on the technical and management risks associated with the proposals and their potential to deliver critical cargo to the [ISS] in a timely manner." *Id.* ¶ 3. "Price was a consideration," the SSA explains, "but the potential ability to provide the necessary service was the more important consideration." *Id.*

Consistently with his source selection statement, AR 5181, the SSA states that he "recognized [that] the proposal from Orbital was superior due to the serious management risks associated with the PlanetSpace proposal," but that "PlanetSpace had a lower overall price than Orbital," SSA Decl. ¶ 7. The SSA explains that he "understood the significance of the fact that Orbital's [proposed] price . . . was significantly higher than PlanetSpace's proposed price." *Id.* ¶ 8. Critically, however, the SSA notes that he "did not believe [that] the large disparity in prices was meaningful because there was also a large disparity in risk among the two proposals." *Id.* ¶ 9.

In his declaration, the SSA expounds at length on the nature and magnitude of this risk disparity. *Id.* ¶¶ 11–14. The SSA details many of the same concerns that he documented in his source selection statement regarding the significant risks associated with plaintiff's proposed technical and management approaches. *Compare id. with* AR 5175–77, 5179–80. Again echoing his source selection statement, the SSA emphasizes that plaintiff's subcontracting structure and management "approach, in light of the overall complexity of technical activity" under the ISS-CRS contracts, created "a very high risk of not receiving a timely service from [plaintiff's] proposal." SSA Decl. ¶ 13. In contrast, the SSA explains that the technical and management approaches in Orbital's proposal "contained significantly less risk" than plaintiff's proposed approaches. *Id.* ¶ 14.

"Because the disparity in risk between [plaintiff's and Orbital's] proposals was great and the nature of the services so critical," the SSA explains that, in his judgment, "almost no price advantage could justify selecting PlanetSpace's riskier proposal." *Id.* ¶ 9. Relatedly, the SSA clarifies his reference in the source selection statement to a non-"typical" trade-off analysis. *See* AR 5181; *PlanetSpace I*, 92 Fed. Cl. at 541, 546. "In this sense, my trade-off analysis between

PlanetSpace and Orbital was not typical," the SSA explains: the "higher price of Orbital's proposal was not justified entirely by its perceived technical benefits, but also the avoidance of the significantly higher risks reflected in PlanetSpace's proposal." *Id.* ¶ 10. It is on the basis of this trade-off analysis that the SSA "selected Orbital's higher priced, but technically superior, far less risky proposal." *Id.* ¶ 9.

The SSA's declaration thus provides a comprehensive account of the SSA's trade-offs between the relative costs and benefits of plaintiff's and Orbital's respective proposals. In so doing, the declaration does precisely what the court's remand order required: to make "explicit and unambiguous the trade-off analysis that . . . was implicit in [the SSA's] source selection" statement. *PlanetSpace I*, 92 Fed. Cl. at 549. More to the point, the declaration documents a trade-off analysis that fits squarely within the legal and analytical framework described above, and is consistent with the SSA's contemporaneous documentation of his source selection decision. *See Ryder Move Mgmt., Inc. v. United States*, 48 Fed. Cl. 380, 392 (2001) (relying, in part, upon the contracting officer's post-protest affidavit to "confirm" that a proper trade-off analysis was conducted); *Sayed Hamid Behbehani & Sons, WLL*, B-288818.6, 2002 CPD ¶ 163, at *4 n.2 (Comp. Gen. Sept. 9, 2002) (denying protest based upon the contracting officer's "post-protest explanation," which provided "additional rationales" not explicitly documented in the source selection statement, where the additional rationales were "credible and consistent with the contemporaneous record").

Specifically, the SSA's declaration confirms, as the source selection statement suggested, that the SSA fully appreciated the significant price difference between plaintiff's and Orbital's proposals. *Compare* SSA Decl. ¶¶ 3,8,9 *with* AR 5180–81. Furthermore, the declaration identifies the same areas of significant risk in plaintiff's proposal that the source selection statement identified. *Compare* SSA Decl. ¶¶ 11–14 *with* AR 5175–77, 5179–80. The declaration simply makes explicit the logical connections that the SSA's source selection statement left implicit between (1) the critical nature of the procured services, (2) the high-risk character of the work required to deliver those services, and (3) the magnitude of the risk disparity between plaintiff's and Orbital's proposals. *Compare* SSA Decl. ¶¶ 9–14 *with* AR 5175–77, 5179–81. Thereby, the declaration makes explicit those qualitative considerations that justifiably shaped the SSA's non-"typical" trade-off analysis. SSA Decl. ¶¶ 2–4, 9–14; *see PlanetSpace I*, 92 Fed. Cl. at 544–45.

Finally, in confirming that the SSA conducted a legally sufficient trade-off analysis—one that provides a firm foundation for his selection decision—the SSA's declaration allays the court's concerns over those portions of the source selection statement that appeared to question plaintiff's responsibility as a contractor. *See PlanetSpace I*, 92 Fed. Cl. at 545–47. As a general matter, the SSA "may, in the context of a comparative evaluation of proposals, use traditional responsibility criteria, such as considering an offeror's financial resources and past performance." *Id.* at 546; *see YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 394–95 (1993) (citing *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984)); *Zolon Tech, Inc.*, B-299904.2, 2007 CPD ¶ 183, at *6 (Comp. Gen. Sept. 18, 2007). It is only when "responsibility-type concerns *preclude* a comparative or trade-off analysis" that an unlawful "*de facto* non-responsibility determination has been made." *PlanetSpace I*, 92 Fed. Cl. at 546 (emphasis added); *see Capitol CREAG LLC*, B-294958.4, 2005 CPD ¶ 31, at *5 n.6 (Comp. Gen. Jan. 31, 2005).

Therefore, in deciding whether the SSA made a *de facto* non-responsibility determination, "the key inquiry for the court in this case" has been "whether responsibility concerns so permeated the SSA's decision that it cannot be said that the SSA performed a proper trade-off analysis at all." *PlanetSpace I*, 92 Fed. Cl. at 546.  The SSA's declaration clarifies that the SSA rejected plaintiff's proposal, in favor of Orbital's, based upon a properly conducted trade-off analysis.  Accordingly, the court concludes that the SSA did not make a *de facto* non-responsibility determination, but lawfully relied upon arguable responsibility criteria only as part of his comparative evaluation of proposals.  *See id.*; *YRT Servs. Corp.*, 28 Fed. Cl. at 394–95 (citing *Webster*, 744 F.2d at 203); *Zolon Tech, Inc.*, 2007 CPD ¶ 183, at *6.

### D. Plaintiff's Challenges to the SSA's Declaration

All the same, and somewhat incredibly, plaintiff asserts that the SSA's "declaration *confirms* that the agency did *not* conduct the required trade-off analysis and instead made an impermissible [non-]responsibility determination."  Pl.'s Supplemental Mem. at 2 (emphasis added).  Specifically, plaintiff argues that the declaration fails to "demonstrate that the [SSA's] evaluation and assessment of PlanetSpace was not influenced by the information" in the pre-award survey report.  *Id.* at 8.  Plaintiff also posits that the SSA's declaration merely "re-cast[s] what were clearly statements regarding PlanetSpace's ability to carry out the contract (*i.e.*, responsibility evaluations) into statements regarding alleged deficiencies in PlanetSpace's proposal."  *Id.* at 4.  According to plaintiff, the SSA attempts this "transmutation through the simple expedient of substituting the term 'proposal' where . . . the [s]ource [s]election [s]tatement employed [the term] 'PlanetSpace.'"  *Id.*  Plaintiff concludes that the SSA's declaration is a "post hoc rationalization" that "cannot reasonably be seen as 'consistent'" with the source selection statement and "should not be given any weight."  *Id.* at 5.  Yet plaintiff's attempt to discredit and even dismiss entirely the SSA's declaration is based upon a misapprehension of law, an elevation of form over substance, and unfounded insinuations of bad faith.

To address the last defect in plaintiff's position first, the SSA explicitly states that his declaration "reflect[s] [his] considerations of the evaluation record *prior* to making [his] selection decision," SSA Decl. at 1 (emphasis added), and "declare[s] under penalty of perjury that the information stated [t]herein is true and correct to the best of [his] knowledge," *id.* at 5.  These categorical statements by the SSA, made under oath, only augment the strong presumption of regularity and good faith to which procurement officials are ordinarily entitled.  *See Am-Pro Protective Army, Inc. v. United States*, 281 F.3d 1234, 1239–41 (Fed. Cir. 2002); *Aero Corp. v. United States*, 38 Fed. Cl. 408, 413 (1997).  Thus, to the extent that plaintiff insinuates that the SSA has deliberately mischaracterized his trade-off analysis and evaluation of proposals, *see* Pl.'s Supplemental Mem. at 4–5, the court can give such insinuation no weight absent "clear and convincing evidence," *Am-Pro Protective Army*, 281 F.3d at 1239–40.  Yet plaintiff offers nothing in support of that insinuation save its own conviction.  *See, e.g.*, Pl.'s Supplemental Mem. at 4–5.

Equally misguided is plaintiff's attempt to discredit the SSA's declaration based upon the SSA's access to the pre-award survey report.  *See id.* at 7–10; Pl.'s Consol. Resp. to Def.'s, Orbital's, and Space-X's Supplemental Mems. ("Pl.'s Supplemental Resp.") at 5–6.  To be sure, this fact heightened the court's prior concern that the SSA might have made a *de facto* non-responsibility determination.  *PlanetSpace I*, 92 Fed. Cl. at 547.  However, any prior "inference" that the SSA considered the contents of the pre-award survey report, *see* Pl.'s Supplemental Mem.

at 9, must yield to the SSA's express statement in his declaration, made under penalty of perjury, that he "did not consider or rely on any of [the] contents" of the pre-award survey report "in making [his] selection decisions," SSA Decl. ¶ 15.

More to the point, the court's concerns, prior to remand, stemmed first and foremost from the ambiguity in the SSA's source selection statement. *See PlanetSpace I*, 92 Fed. Cl. at 544–47. The SSA's access to the pre-award survey report was merely circumstantial evidence[7] tending to favor one of "two competing interpretations" of that document, specifically, that the SSA may have rejected plaintiff's proposal based upon a *de facto* non-responsibility determination. *Id.* at 547. As explained above, the SSA's post-remand declaration fully resolves that ambiguity in favor of the opposing interpretation, specifically, that the SSA rejected plaintiff's proposal based upon a legally sufficient and carefully conducted trade-off analysis. Therefore, to the extent that the SSA's access to the pre-award survey report was a violation of NASA regulations, *see* NFS 1809.106-1, NFS 1809.106-70, the court concludes that the violation was harmless.

Finally, plaintiff argues that the SSA's declaration merely "recasts" prior responsibility evaluations into evaluations of plaintiff's proposal, and that the declaration otherwise fails "to address the [purportedly] myriad additional responsibility assessments" in the SSA's source selection statement. Pl.'s Supplemental Mem. at 4–6. Plaintiff describes this as "quintessential post hoc rationalization" and a source of decided inconsistency between the SSA's declaration and the source selection statement. *Id.* at 5. Yet, in making these arguments, plaintiff misapprehends two critical points of law.

First, plaintiff continues to overlook the "fine, but important distinction" in procurement law, *PlanetSpace I*, 92 Fed. Cl. at 545, between evaluating the soundness of an offeror's proposal and evaluating the offeror's ability to perform the proposed contract. Only the latter evaluation goes to the contractor's responsibility. *See* FAR 9.104-1. Thus, some of the purported responsibility evaluations that plaintiff quotes from the SSA's source selection statement are nothing of the sort. A salient example is the SSA's conclusion that "the considerable risk inherent in PlanetSpace's [m]anagement approach made the likelihood of successful performance of this proposal remote." AR 5177. Plaintiff contends that this was "clearly" a responsibility evaluation rather than an assessment of a deficiency in plaintiff's proposal. Pl.'s Supplemental Mem. at 4. Yet the converse is manifestly true: the RFP specified "[m]anagement [a]pproach" as one of three mission suitability subfactors to be used in the comparative evaluation of proposals. AR 2089,

---

[7] Notably, this circumstantial evidence did not include what plaintiff now characterizes as "striking similarities" between the source selection statement and the pre-award survey report. *See* Pl.'s Supplemental Resp. at 6. In the source selection statement, the SSA expressed his concerns that plaintiff did not project "positive cumulative cash from operations until nearly the end of the contract" and that plaintiff's proposal "would cause NASA payments . . . to occur later" in the contract period. AR 5177. Plaintiff complains that this information was "reflected in the [p]re-[a]ward [s]urvey report." Pl.'s Supplemental Mem. at 9–10 (citing AR 2609). However, plaintiff overlooks the fact that the RFP *required* the SSA to consider this information as part of his evaluation of plaintiff's management approach, *i.e.*, as part of the evaluation of plaintiff's proposal. *See* AR 2091 (providing that "NASA will evaluate" an offeror's "proposed milestones" for receipt of contract payments as well as "the overall risk that the [resulting] payment schedule provides to NASA").

2091. Thus, any statements concerning plaintiff's management approach—whether those statements appear in the source selection statement or in the SSA's declaration—are evaluations of plaintiff's proposal, not plaintiff's responsibility as a contractor, whatever the precise phraseology. *See* Pl.'s Supplemental Mem. at 5 (reproving the "minor shift in phraseology" between the source selection statement and the SSA's declaration).

Second, and more importantly, plaintiff misapprehends the law to contend that the SSA's arguable reliance on responsibility criteria in evaluating and rejecting plaintiff's proposal automatically amounted to a *de facto* non-responsibility determination. *See* Pl.'s Supplemental Mem. at 5–6. As explained above, it is well established that the use of traditional responsibility criteria as part of a comparative evaluation of proposals is permissible. *See, e.g.*, *YRT Servs. Corp.*, 28 Fed. Cl. at 394–95; *Zolon Tech, Inc.*, 2007 CPD ¶ 183, at *6. Indeed, the RFP in this case expressly provided that an offeror's past performance record—a responsibility criterion under FAR 9.104-1(c)—was to be considered as part of the comparative evaluation of proposals, AR 2090. Therefore, to reiterate, a *de facto* non-responsibility determination is made only if and when the consideration of responsibility criteria *precludes* a trade-off or other comparative analysis. *See PlanetSpace I*, 92 Fed. Cl. at 546; *Capitol CREAG LLC*, 2005 CPD ¶ 31, at *5 n.6.

For that reason, the SSA's unfavorable assessment of plaintiff's proposal based upon arguable responsibility criteria was not, in and of itself, troubling to the court prior to remand. *See PlanetSpace I*, 92 Fed. Cl. at 545–47. Rather, the "key inquiry" was, and remains, whether the SSA "performed a proper trade-off analysis at all." *Id.* at 546. It is that narrow inquiry to which the ambiguous and somewhat cryptic source selection statement yielded no answer. *See id.* at 547.

The SSA's post-remand declaration supplies the answer by confirming that the SSA's decision to reject plaintiff's proposal was grounded upon a properly conducted trade-off analysis. The SSA's critiques of plaintiff's proposal based upon arguable responsibility criteria, *see id.* at 545–47, were thus made in service, rather than to the preclusion, of a comparative evaluation of the offerors' proposals. As a matter of law, those critiques—now viewed in proper context—did not amount to a *de facto* non-responsibility determination. *See id.* at 546; *Zolon Tech, Inc.*, 2007 CPD ¶ 183, at *6; *Capitol CREAG LLC*, 2005 CPD ¶ 31, at *5. Therefore, contrary to plaintiff's contention, the SSA's post-remand declaration is perfectly consistent with the source selection statement (the contemporaneous record of the SSA's decision).

### E. Plaintiff's Motion To Supplement the Pleadings

Plaintiff has thus failed on the merits of all allegations in its complaint. This obviates the court's need to address plaintiff's pending motion for leave to file a supplemental pleading. For, as the court previously explained, "success on the merits is a condition precedent to granting a permanent injunction" or even reaching the equitable factors bearing upon a request for permanent injunctive relief. *Linc Gov't Servs., LLC v. United States*, __ Fed. Cl. __, 2010 WL 4484021, at *23 (Fed. Cl. Oct. 22, 2010). Quite simply, "[a]bsent success on the merits, the other [injunction] factors are irrelevant." *Info. Tech. & Appls. Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004); *Assessment and Training Solutions Consulting Corp. v. United States*, 92 Fed. Cl. 722, 737 (2010). Plaintiff's instant motion characterizes the proffered supplemental pleading as relating exclusively to the public interest in the grant or denial of plaintiff's request for a permanent injunction. *See* Pl.'s Mot. to Supplement at 1. Given plaintiff's failure on the merits, the motion is moot.

### III. CONCLUSION

For the foregoing reasons, the court holds in favor of defendant on counts (1)–(2).  Having previously held in favor of defendant on the remaining counts of the complaint, *PlanetSpace I*, 92 Fed. Cl. at 549, it is therefore ORDERED that:

(1) defendant's motion for judgment on the administrative record is **GRANTED**;

(2) Orbital's motion for judgment on the administrative record is **GRANTED**;

(3) Space-X's motion for judgment on the administrative record is **GRANTED**;

(4) plaintiff's motion for judgment on the administrative record and for a permanent injunction is **DENIED**; and

(5) plaintiff's motion for leave to file a supplemental pleading is **DENIED as MOOT**.

The Clerk is directed to enter judgment in favor of defendant.

s/ *Lawrence J. Block*

Lawrence J. Block
Judge